Martin E. Seneca, Jr. (*pro hac vice* application forthcoming)
Seneca Nation of Indians
12837 Route 438
Irving, NY 14081
(716) 532-4900
meseneca@sni.org

Brian T. Carney
Akin Gump Strauss Hauer & Feld LLP
One Bryant Park
New York, NY 10036-6745
(212) 872-8156
bcarney@akingump.com

[additional counsel listed on signature page]

*Attorneys for Seneca Nation*

### IN THE UNITED STATES DISTRICT COURT
### FOR THE WESTERN DISTRICT OF NEW YORK

| | |
|---|---|
| SENECA NATION, a federally recognized Indian tribe, <br><br> Plaintiff, <br><br> v. <br><br> Andrew CUOMO, in his official capacity as Governor of New York; <br><br> Eric T. SCHNEIDERMAN, in his official capacity as New York State Attorney General; <br><br> Paul A. KARAS, in his official capacity as Acting Commissioner of the New York State Department of Transportation; <br><br> Thomas P. DiNAPOLI, in his official capacity as Comptroller of the State of New York; and <br><br> The New York State Thruway Authority, <br><br> Defendants. | Case No. 1:18-cv-429 <br><br> **COMPLAINT** |

For its complaint against the defendants, plaintiff Seneca Nation (the "Nation") alleges:

## NATURE OF THE ACTION

1. This is an action to enjoin New York State officers and the New York State Thruway Authority from continuing violations of federal law protecting the Nation's Cattaraugus Reservation in western New York, and to bring into compliance with federal law the ongoing public use of and toll collection for an illegal easement on which a portion of the New York State Thruway, a toll road, is built.

2. The official-capacity defendants are named pursuant to *Ex parte Young,* 209 U.S. 123 (1908) and its progeny, which allow declaratory and injunctive relief against state officers in their official capacities to stop ongoing violations of federal law, notwithstanding the state's immunity under the Eleventh Amendment to the United States Constitution. A state does not have, and therefore cannot confer on its individual officers, any authority to violate federal law. *See id.* at 124.

3. The Defendants' continuing operation of the Thruway without a valid easement violates the federal treaties and laws establishing the Reservation and protecting it against alienation. *See, e.g.,* Canandaigua Treaty of 1794, Art. 3 ("The land of the Seneca Nation is . . . to be the property of the Seneca Nation," which shall not be disturbed "in the free use and enjoyment thereof."). Federal law (*e.g.*, 25 U.S.C. § 323, 25 C.F.R. Part 169) comprehensively regulates rights-of-way across Indian lands such as the Reservation, and Defendants' operation of the Thruway is an ongoing violation of federal law.

4. The Nation brings this action seeking declaratory relief and injunctive relief to require (1) that the Defendants (except for the Comptroller) obtain a valid easement for the portion of the Nation's Reservation on which the Thruway is situated, so as to bring continued

public use of and public benefit from those Indian lands into compliance with federal law, on terms that will in the future equitably compensate the Nation pro rata for future use of its lands; or, in the alternative, that the Defendants (except for the Comptroller) be enjoined from collecting tolls for the portion of the Nation's Reservation on which the Thruway is situated without first obtaining a valid easement; and (2) that the Comptroller of the State of New York segregate and hold in escrow any future toll monies collected on the Thruway that are fairly attributable to the portion of the Thruway operated in violation of the Nation's federally protected property rights until the other Defendants obtain a valid easement.

5. Such relief will bring continued public use of, and public benefit from, the Nation's Reservation into compliance with federal law, on terms that will equitably compensate the Nation pro rata for future use of its lands.

**PARTIES**

6. Plaintiff is a federally recognized Indian tribe.

7. Defendant Andrew Cuomo is the Governor of the State of New York. He is sued here only in his official capacity.

8. Defendant Eric T. Schneiderman is the New York State Attorney General. He is sued here only in his official capacity.

9. Paul A. Karas is Acting Commissioner of the New York State Department of Transportation. He is sued here only in his official capacity.

10. Defendant Thomas P. DiNapoli is the Comptroller of the State of New York. He is sued here only in his official capacity.

11. The New York State Thruway Authority is public-benefit corporation created by New York state law.

3

## JURISDICTION

12. This Court has jurisdiction under 28 U.S.C. § 1331 (federal question jurisdiction), 28 U.S.C. § 1362 (civil actions arising under federal law brought by federally recognized Indian tribes), and 28 U.S.C. §§ 2201-2202 (the Declaratory Judgment Act).

13. The Court has federal question jurisdiction because the Complaint alleges ongoing violations of the Tribe's treaty and Reservation rights pursuant to federal law, including the Canandaigua Treaty of 1794, Art. 3; 25 U.S.C. § 177; 25 U.S.C. § 323; and the Seneca Leasing Act of 1950 as amended in 1961 (64 Stat. 442, 75 Stat. 499).

14. The Court has jurisdiction to grant prospective injunctive and declaratory relief against the non-Thruway defendants under *Ex parte Young,* 209 U.S. 123 (1908), and the Court's inherent equitable powers. The Court also has jurisdiction to grant relief against the Thruway Authority, which is a corporation that is not an arm of the state and therefore is not entitled to the State's Eleventh Amendment immunity.

## GENERAL ALLEGATIONS

15. On October 5, 1954, the Nation purported to convey a permanent easement for a portion of the New York State Thruway to be constructed and used over approximately 300 acres of the Nation's Cattaraugus Reservation.

16. The Nation continues to own and occupy the Cattaraugus Reservation as a federal Indian reservation.

17. The purported easement was never legally valid or effective because the Nation's Cattaraugus Reservation currently consists of, and has always consisted of, Indian lands held by the Nation in restricted fee, subject to federal restraints on alienation. The State officials who

negotiated and obtained the easement did not comply with the federal law governing those restraints on alienation, which required approval of the Secretary of the Interior.

18. In 1954, under federal law, a valid easement over the Nation's Cattaraugus Reservation could not be obtained without approval of the Secretary of the Interior pursuant to 25 U.S.C. § 177, 25 U.S.C. § 323, and applicable regulations. The Nation is an "Indian nation" within the meaning of these statutes and its trust relationship with the United States has never been terminated or abandoned. The State officials who negotiated and obtained the easement did not comply with these statutes or applicable regulations.

19. The years 1946 to 1954 leading up to the purported easement coincided with the "termination era" of federal Indian policy, which was characterized by policies aimed at ending the trust relationship between the United States and Indian nations, permitting greater state influence over Indians, ending the political existence of Indian nations, removing restrictions on the alienation of Indian lands, and breaking up reservations and relocating Indians to off-reservation lands.

20. The termination era involved "the most concerted drive against Indian property and Indian survival since the removals following the act of 1830 and the liquidation of tribes and reservations following 1887." *Cohen's Handbook of Federal Indian Law*, § 1.06 (2005 ed.) (quotations omitted). In these years, "the value of even the most isolated and resource-deprived Indian lands increased substantially" and "[v]ast acreages of Indian land were allowed to pass out of Indian hands[.]" *Id*.

21. In 1947, the Nation was specifically identified by the United States for termination. The Nation had no full-time employees, its council met infrequently on very limited

5

issues, and the Nation was almost entirely dependent on the United States for even the most basic needs of its government.

22.     In this period, the United States Bureau of Indian Affairs closed its New York office and federal officials attempted to persuade the Nation to accept a lump-sum payment ending the United States' solemn and historic treaty obligations to the Nation.

23.     In 1950, President Truman appointed Dillon S. Myer to be Commissioner of Indian Affairs.  Myer had headed the United States War Relocation Authority during World War II, overseeing the forcible relocation of Japanese Americans from their homes and communities to internment camps.  The Secretary of the Interior, in recommending the appointment of Myer, told the President: "He did an outstanding job in the maintenance and relocation of the Japanese evacuated from the Pacific Coast region. . . . I feel that this total experience well fits him for the position of Commissioner of Indian Affairs."

24.     The years 1946 to 1954 likewise coincided with a postwar development boom in New York, which included unprecedented, large-scale highway construction, expansion of state parks, public power development and other public works projects across the State.  As with the lands of other Indian nations located in the territory of New York, State officials viewed Seneca lands as potential "sacrifice areas" when situated in the path of these development goals.

25.     In January 1946, a representative of the New York State Department of Public Works, predecessor to the present-day New York State Department of Transportation, contacted the Nation to discuss surveying the Nation's lands for the purpose of constructing the Thruway through the Nation's Cattaraugus Reservation.

26.     On May 7, 1946, Frank O'Marah, Director of the Bureau of Rights-of-Way and Claims for the State Department of Public Works, wrote to the United States Department of the

Interior seeking Interior's consent and approval of the State's proposed procedure for acquiring an easement for Thruway purposes across the Nation's Cattaraugus Reservation.

27. On June 10, 1946, Interior responded to O'Marah's May 7, 1946 letter by outlining several steps necessary under federal law for a valid conveyance of an easement across Indian land. These steps included providing Interior with a map of the definite location of the easement, an application, and information regarding agreements for compensation to individual landowners, for Interior to review.

28. Neither the Department of Public Works, nor any other state agency, officer, or authority ever complied with any of the requirements set forth in Interior's June 10, 1946 letter to O'Marah.

29. During this period, state officials took, or threatened to take, a variety of actions that would imperil the Nation's lands, exerting coercive pressure on the Nation. For example, during the months of discussion and negotiations preceding the October 5, 1954 easement, State officials prepared to follow through on plans, originally devised in 1946, to impound the Allegheny River in cooperation with officials in Pennsylvania. The plans involved one of two scenarios for the Nation's Allegany Territory. One scenario would have left the Nation in possession of its present land, but would have flooded members' homes whenever operation of the proposed dam required the reservation to be inundated. The other scenario called for the elimination of the Nation's Allegany reservation altogether and the forced removal and relocation of the Seneca Indians living there. The Nation had actively opposed these plans since their inception. Numerous similar projects had been undertaken in the state in recent years and had resulted in the substantial loss of Indian lands.

30. In the years preceding the purported conveyance of the October 5, 1954 easement, State officials had been subjected to intense lobbying pressure by financial interests, transportation companies, and local chambers of commerce, to extend the Thruway from Buffalo, New York, to Erie, Pennsylvania—a route requiring passage across the Nation's Cattaraugus Territory. In April 1954, the Governor of New York publicly announced that the link between Buffalo and Erie would be built.

31. Negotiations for the purported October 5, 1954 easement occurred over two sessions, on August 28, 1954 and September 17, 1954. The Nation was represented during these negotiations only by an attorney approved and paid for by the State, Edward E. O'Neill, who was hired on the same day the first negotiating session was held, on August 28, 1954. He did not have any significant experience in or knowledge of federal law protecting the rights of Indians or Indian nations or restricting the alienation of Indian lands absent federal approval.

32. There was no professional independent appraisal of the value of the purported easement. At the outset of the negotiations, the Nation insisted as consideration for the easement that, among other terms, it receive a one-third share of the Thruway revenues generated from traffic over that portion of the Thruway passing over the Nation's Territory. However, according to the lead negotiator, Paul G. Baldwin, the Director of the Bureau of Rights of Way and Claims in the Department of Public Works, after "several hours of very frank talk" ("frank talk" that took place against the backdrop of the perilous overall situation in which the Nation found itself), he was able to get the Nation's opening negotiating position "hammered down to a [one-time payment] of $75,000. This is much lower than any of us expected to acquire these lands for[.]" *See* P.G. Baldwin to Bertram D. Tallamy, Memorandum: "Settlement with the Seneca Nation of Indians," September 20, 1954, New York State Department of Public Works, Deputy

8

Superintendent's Records, #BO 251-84, Box 9 (1954), folder: "Indian Affairs," New York State Archives, Albany.

33. On October 5, 1954, the Nation signed a purported easement agreement to grant a permanent easement for Thruway purposes across approximately 300 acres of the Nation's Cattaraugus Territory in exchange for a one-time payment of $75,500 to the Nation and other smaller amounts of compensation for displaced members of the Nation occupying such lands.

34. The easement agreement was not signed by a representative of the United States, and contained no reference to the United States or to the requirement for federal approval of the conveyance. No federal official was present when the agreement was signed.

35. Closing of title took place later the same day, October 5, 1954, in the presence of Ali David Good, New York State Attorney General's Office; Paul G. Baldwin, Director of the Bureau of Rights of Way and Claims in the Department of Public Works; and representatives of the Thruway Authority. Again, no federal official was present.

36. Thereafter, approximately three miles of interstate highway was constructed over the Nation's Cattaraugus Territory.

37. At the time of the Nation's purported consent to the easement, federal law provided that any conveyance of an interest in Indian land required the consent of the United States and that any such conveyance made absent federal consent was void. *See* 25 C.F.R. Part 256 (1949) and 25 U.S.C. § 177 (1949).

38. Since October 5, 1954, motorists have continuously entered the Nation's Territory on the Thruway. The Thruway Authority or its agents have collected and remitted to the Comptroller tolls, some of which are derived from the purported grant by the Thruway of a right to traverse the Nation's lands, in violation of federal law protecting the Nation's lands.

39. In 1961, Congress gave the Nation the power to approve rights of way over all of its Reservation lands without federal approval. *See* Seneca Leasing Act of 1950, as amended in 1961 (64 Stat. 442, 75 Stat. 499).

40. Since at least 1993, the Nation has openly denied any validity for the purported easement, which was void *ab initio* under federal law. For example, the Nation has asked the Thruway Authority to collect tolls for the Nation and to remit them to the Nation for the use of its lands by motorists on the Thruway. The Thruway Authority has refused to do so and continues to assert the validity of the easement notwithstanding the failure to comply with federal law.

41. Defendants Cuomo, Schneiderman, and Karas have authority separately and collectively to obtain valid easements for the State and have failed to obtain any valid easement for the portion of the Nation's Reservation where the Thruway is located.

42. The executive power of New York State is vested in Governor Cuomo, who, by virtue of this executive power, has the constitutional authority to seek a valid easement for the State of New York for that portion of the Thruway that traverses the Nation's lands.

43. Attorney General Schneiderman likewise has the authority to seek a valid easement; he is authorized to participate as a party in any "action or proceeding affecting the property or interests of the state." N.Y. Exec. Law § 63. The New York State Attorney General's Real Property Bureau is responsible for ensuring acquisition of clear title to the lands purportedly held in the name of the State of New York. It investigates titles, clears liens, prepares deeds and various closing documents, and facilitates the closing of title for land interests held by the State of New York. The Attorney General's office participated in the closing of title for the invalid easement in 1954.

44. Similarly, Acting Commissioner Karas has "power to acquire by grant or purchase" interests in land necessary for lawful operation of the Thruway. N.Y. Highway Law § 347. The Department of Transportation's predecessor agency participated in the closing of title for the invalid easement in 1954.

45. The Thruway Authority also has the power to obtain a valid easement for the lands in question. It participated in the closing of title for the invalid easement in 1954.

46. The portion of tolls collected for the Thruway that are attributable to the right to enter and cross the Nation's lands are obtained in violation of the Nation's federally protected property rights. These tolls, as with all tolls collected by the Thruway Authority, are "paid to the comptroller as agent of the authority." N.Y. Pub. Auth. Law § 364.

## FIRST CAUSE OF ACTION

### INJUNCTION
### (Against all Defendants except DiNapoli)

47. The Nation realleges and incorporates paragraphs 1–46.

48. The Nation is entitled to an injunction to enforce federal law protecting its Cattaraugus Reservation from continuing unauthorized use for the purpose of operating a toll road without a valid easement.

49. The Nation does not seek to eject anyone from the purported easement, but seeks only to prevent further violation of its rights to a valid easement for such usage.

50. The continued operation of the Thruway without a valid easement by the Defendants (except for the Comptroller) violates the federal treaties and laws establishing the Reservation and protecting it against alienation. *See, e.g.,* Canandaigua Treaty of 1794, Art. 3 ("The land of the Seneca Nation is . . . to be the property of the Seneca Nation," which shall not be disturbed "in the free use and enjoyment thereof."). Federal law (*e.g.,* 25 U.S.C. § 323, 25

11

C.F.R. Part 169) comprehensively regulates rights-of-way across Indian lands such as the Reservation, and these Defendants' operation of the Thruway is an ongoing violation of this federal law.

51. The Nation is entitled to an injunction requiring that the Defendants (except for the Comptroller) obtain a valid easement for the portion of the Nation's Reservation on which the Thruway is situated, so as to bring continued public use of and public benefit from those Indian lands into compliance with federal law, on terms that will in the future equitably compensate the Nation pro rata for future use of its lands.

52. In the alternative, the Nation is entitled to an order enjoining the Defendants (except for the Comptroller) from collecting tolls for the portion of the Nation's Reservation on which the Thruway is situated without first obtaining a valid easement.

53. The Nation is suffering and will continue to suffer irreparable harm without injunctive relief because its property will continue to be invaded without authorization. The Nation lacks an adequate remedy at law, and therefore an injunction is necessary to remedy the Nation's injuries.

54. The balance of equities favors the Nation. These Defendants will not suffer any legally cognizable harm from an injunction enforcing federal law.

55. An injunction is in the public interest because compliance with federal law governing conveyance of easements over Indian lands is in the public interest.

## SECOND CAUSE OF ACTION

### INJUNCTION
### (Against Defendant DiNapoli)

56. The Nation realleges and incorporates paragraphs 1–55.

57. The Nation is also entitled to an injunction requiring that the Comptroller of New York segregate and hold in escrow any future toll monies collected on the Thruway that are fairly attributable to the portion of the Thruway operated in violation of the Nation's federally protected property rights until the other Defendants obtain a valid easement.

58. The Nation is suffering and will continue to suffer irreparable harm without injunctive relief because its property will continue to be invaded without authorization. The Nation lacks an adequate remedy at law, and therefore an injunction is necessary to remedy the Nation's injuries.

59. The balance of equities favors the Nation. The Defendants will not suffer any legally cognizable harm from an injunction enforcing federal law.

60. An injunction is in the public interest because compliance with federal law governing conveyance of easements over Indian lands is in the public interest.

## THIRD CAUSE OF ACTION

### DECLARATORY JUDGMENT
**(Against all Defendants except DiNapoli)**

61. The Nation realleges and incorporates paragraphs 1–60.

62. The Nation seeks and is entitled to a declaration that Defendants (other than the Comptroller) will continue to violate federal law by not obtaining a valid easement for the portion of the Thruway over the Nation's Reservation lands and that some of the funds being collected by the Thruway and being deposited with the Comptroller on a continuing basis are derived from this violation of federal law.

63. The Nation seeks and is entitled to further necessary or proper relief pursuant to such a declaration, as the Court may see fit.

## **RELIEF REQUESTED**

WHEREFORE, in accordance with the Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202, and general principles of equity, the Nation seeks:

1. An injunction requiring that the Defendants (except for the Comptroller) obtain a valid easement for the portion of the Nation's Reservation on which the Thruway is situated, so as to bring continued public use of and public benefit from those Indian lands into compliance with federal law, on terms that will in the future equitably compensate the Nation pro rata for future use of its lands; or, in the alternative, an order enjoining the Defendants (except for the Comptroller) from collecting tolls for the portion of the Nation's Reservation on which the Thruway is situated without first obtaining a valid easement;

2. An injunction requiring that the Comptroller of the State of New York segregate and hold in escrow all future toll monies collected on the Thruway that are fairly attributable to the portion of the Thruway operated in violation of the Nation's federally protected property rights until the other Defendants obtain a valid easement;

3. A declaration that Defendants (other than the Comptroller) are violating federal law by not obtaining a valid easement for the portion of the Thruway over the Nation's Reservation lands, and that some of the funds being collected by the Thruway and being deposited with the Comptroller on a continuing basis are derived from this violation of federal law;

4. Such further necessary or proper relief as the Court may see fit to grant in conjunction with a declaratory judgment;

5. All costs and fees as allowed by law; and

6. Such other and additional relief as the Court deems just and equitable.

DATED this 11th day of April 2018.

                Martin E. Seneca, Jr.
                Seneca Nation of Indians
                12837 Route 438
                Irving, NY 14081
                (716) 532-4900
                meseneca@sni.org

                Brian T. Carney
                Akin Gump Strauss Hauer & Feld LLP
                One Bryant Park
                New York, NY 10036-6745
                (212) 872-8156
                bcarney@akingump.com

                Donald Pongrace
                */s/ Merrill C. Godfrey*
                Merrill C. Godfrey
                Akin Gump Strauss Hauer & Feld, LLP
                1333 New Hampshire Avenue, N.W.
                Washington, D.C. 20036-1564
                (202) 887-4000
                dpongrace@akingump.com
                mgodfrey@akingump.com

                *Attorneys for Seneca Nation*