UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

---

SENECA NATION, a federally recognized Indian tribe,

                        Plaintiff,

        vs.

KATHLEEN C. HOCHUL, in her official capacity as Governor of New York; LETITIA JAMES, in her official capacity as New York State Attorney General; MARIE T. DOMINGUEZ, in her official capacity as Commissioner of the New York State Department of Transportation; THOMAS P. DINAPOLI, in his official capacity as Comptroller of the State of New York; and THE NEW YORK STATE THRUWAY AUTHORITY.

                        Defendants.

Case No. 18-cv-00429-LJV

---

**DEFENDANTS' JOINT STATEMENT OF UNDISPUTED MATERIAL FACTS PURSUANT TO LOCAL RULE 56(1)(a) IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Defendant New York State Thruway Authority ("the Thruway Authority") and

Defendants Governor of the State of New York, Attorney General of the State of New York, the

Commissioner of the New York State Department of Transportation, and the Comptroller of the

State of New York (collectively, the "State") submit the following Joint Statement of Undisputed

Material Facts in Support of its Joint Motion for Summary Judgment pursuant to Western

District of New York Local Rule 56(a)(1):

**INTRODUCTION**

1.      In this lawsuit, plaintiff Seneca Nation of Indians ("the Nation") seeks to compel

the State to renegotiate an agreement the Nation made with the State of New York in 1954.

1

Under that agreement, the Nation granted the People of the State of New York a permanent easement to build and maintain the New York State Thruway over a portion of the Nation's Cattaraugus Reservation (the "1954 Easement"). In exchange, the State paid $75,500 to the Nation in addition to compensating individual landowners affected by its acquisition of the easement.

2.      The Nation contends that its conveyance of the 1954 Easement violated the Nonintercourse Act of 1834, which requires that any conveyance of land by an Indian tribe be approved by the federal government. On that basis, the Nation claims that the easement was void *ab initio*, thereby setting the stage for the Nation's demand for compensation for a new easement.

## FACTUAL BACKGROUND

### A.      The New York State Thruway

3.      In 1944, Governor Thomas E. Dewey authorized the New York Department of Public Works ("DPW") to proceed with construction of the Thruway. *See* Declaration of David Malone in Support of Defendants' Motion for Summary Judgment ("Malone Declaration") ¶ 16.

4.      In 1950, New York State created the Thruway Authority, a public corporation, to finance, construct, reconstruct, improve, develop, maintain, and operate the Thruway. Malone Declaration ¶ 17; *see also* N.Y. Pub. Auth. Law § 353.

5.      The first section of the Thruway, between Utica and Rochester, opened on June 24, 1954, while the remainder of the "mainline" opened in 1955. Malone Declaration ¶ 18.

6.      The "Erie Section" of the Thruway opened in 1957. *Id*. ¶ 18.

7.      The Erie Section is 70 miles in length and runs between Buffalo, New York (Exit 55) and the Pennsylvania State Line (Exit 61 in Ripley, New York). *Id*. ¶ 12.

8.      A 2.7-mile stretch of the Erie Section crosses the Seneca Nation's Cattaraugus Reservation (the "Seneca Section").  *Id.* ¶¶ 10-12; ECF No. 1 (Complaint ¶ 36).

9.      By December 23, 1960, all 559 miles of the original Thruway were open.  Malone Declaration ¶ 18.

10.      The Thruway's 426-mile "mainline" and 70-mile Erie Section make up a toll road that runs from the New York City line at Yonkers, New York to the Pennsylvania State Line at Ripley, New York.  *Id.* ¶ 19.

11.      The portion that runs north-south between Albany, New York and the New York City line at Yonkers is part of Interstate 87.  *Id.*

12.      The portion that runs east-west between Albany, New York and the Pennsylvania State Line at Ripley, New York is part of Interstate 90.  *Id.*

13.      Today, the Thruway is 570 miles in length and is one of the largest tolled highway systems in the United States.  *Id.* ¶ 20.

14.      The Thruway is a critical component of the National Interstate Highway System and plays a significant role in New York's transportation system connecting New York City, Albany, Utica, Syracuse, Rochester and Buffalo.  *Id.* ¶ 21.

**B.      United States Secretary of the Interior Approves New York State Obtaining an Easement for the Cattaraugus Section**

15.      By January 15, 1946, the DPW had contacted the Nation to discuss surveying its lands for the purposes of constructing the Thruway.  On that date, Chas. R. Waters, a DPW District Engineer, sent a letter to Cornelius Seneca, the President of the Nation, requesting permission to enter the Cattaraugus Reservation to survey the land for the Thruway.  The letter referred to prior discussions between the parties and described in general terms where the

Thruway would cross the Cattaraugus Reservation.  Declaration of Daniel Maguire in Support of Defendants' Motion for Summary Judgment ("Maguire Declaration"), Ex. E.

16.     On May 7, 1946, J. Frank O'Marah, the Director of DPW, sent a letter to William Zimmerman, Jr., an Assistant Commissioner in the Office of Indian Affairs within the Department of Interior.  The letter notes that Mr. O'Marah held a conference with President Seneca about the Thruway project on April 28, 1946, during which they discussed the process by which New York State could obtain an easement.  In outlining that process, Mr. O'Marah wrote:

> Mr. Seneca recommended that I communicate with the residents of the land within the Reservation whose property is affected and endeavor to reach an agreement with each person as to the sum to be paid for their interest, and if such agreements can be made, he would call a Council meeting of the Seneca Nation to ratify such action and agree on an amount to be paid the Seneca Nation.  This is the same procedure I followed in dealing with the Seneca Nation when negotiations were undertaken with reference to P.S.C. Case No. 5389 for elimination of grade crossings near Irving, N.Y.

> This Department understands it cannot appropriate or acquire fee title to Indian Lands on this Reservation and must agree with the individual Indians whose allotment of land is involved in the project and obtain the consent of the Council of the Seneca Nation before any part of their property is used for this project and the Department proposes to proceed along that line.

Mr. O'Marah then asked that the Department of Interior approve New York State's acquisition of the easement:

> Based on the Department's experience in the past in such matters, I would ask the consent and approval of the Department of the Interior as to this procedure.

Enclosed with the letter were two maps depicting the location of the Thruway across the Cattaraugus Reservation.  *Id*. Ex. F.

17.     On May 20, 1946, Elmer Thompson, the Clerk of the Nation, sent a letter to the Superintendent of the New York Indian Agency (a federal entity) enclosing a summation of a meeting of the Lease Committee of the Tribal Council held on May 18, 1946 at which the

proposed Thruway was discussed.  The meeting was attended by both Nation and DPW officials. During the meeting, "[a] general discussion was conducted by the chairman on many of the contemplated issues concerning Indian lands and areas to be effected inasmuch as jurisdiction, usage of the Thru-Way by Indians, fee-title to Indian lands, costs and damages as estimated by the State Officials…"  *Id*. Ex. G.

18.   On May 21, 1946, the Acting Superintendent for the New York Indian Agency wrote back to Mr. Thompson expressing regret he did not attend the May 18, 1946 Lease Committee meeting because "I did not know that the State men were going to be present to discuss the Thru-Way."  The Acting Superintendent did not express any objection to DPW obtaining an easement for the Thruway in this letter.  *Id*. Ex. H.

19.   On June 10, 1946, Oscar Chapman, the Acting Secretary of the Interior, responded to Mr. O'Marah's May 7, 1946 letter.  In his letter, Mr. Chapman approved construction work on the Thruway after DPW obtained consent from the Nation's tribal council and the individual Indians with interests in the acquired property:

> You advise that Mr. Seneca, President of the Seneca Nation of Indians has recommended that an agreement be reached between your Department and the individual Indians, whose property will be affected by the construction of the Erie Thruway.  Upon reaching an agreement with individual Indians as to the amount of damages to be paid to them, Mr. Seneca is agreeable to call a council meeting for the purpose of determining the amount of damages due the tribe.
>
> It appears this procedure is similar to that used in the acquisition of a right of way for elimination of a grade crossing, P.S.C. Case No. 5389, near Irving, New York. This Department is agreeable to your proposal that the same method used in acquiring a right of way for the grade crossing be used for the acquisition of a right of way for the Erie Thruway.  Maps of definite location together with your application should be filed with the Superintendent.  Signed copies of the agreements executed by the individual Indians should also be furnished.  The consideration cited in the agreements may be paid to the Indians entitled thereto.
>
> It should be understood that before any construction work is commenced consent of the Indian owners must be obtained.  ***It is agreeable to this Department for the***

5

*New York State Department of Public Works to begin construction work on the Erie Thruway after consent of the individual Indians and tribal council has been obtained and payment of the damages has been made*.

*Id*. Ex. I (emphasis added).

**C.**    **New York Obtains the 1954 Easement for the Erie Section of the Thruway**

20.    On September 18, 1954, the Nation's council, by an 11-1 vote, adopted a resolution approving construction of the Thruway across the Cattaraugus Reservation.  *Id*. Ex. J.

21.    On October 5, 1954, the Nation and State of New York entered into the 1954 Easement.  The Nation granted the State of New York a "Permanent Easement for Thruway Purposes" over the lands of the Cattaraugus Reservation, for which the Nation was paid $75,500.00, exclusive of the rights of individual Seneca Indian landowners, who were separately compensated.  Included in the 1954 Easement was a general release:

> That this instrument shall operate as a General Release by the [Nation] of all claims in any manner arising out of the appropriation, construction and use of the New York State Thruway across the lands of the Cattaraugus Indian Reservation occupied by [the Nation]; subject to the conditions above mentioned so far as the same may be applicable.

*Id*. Exs. K at ¶ (e), L.

22.    The Nation was represented by an attorney, Edward E. O'Neil, throughout the negotiations and closing of the 1954 Easement.  *See id.* Exs. L, O.

23.    There is no evidence that the Nation has ever returned the $75,500 paid to it in exchange for granting the 1954 Easement to the State of New York.

**D.**    **New York Constructs the Erie Section of the Thruway**

24.    The Thruway's Erie Section—of which the Nation's land is a small but essential part—was built in the 1950s at cost of approximately $64 million.  Malone Declaration ¶ 22.

25.    The Thruway Authority did not separately identify construction costs for the 2.7 mile Seneca Section as that term is only relevant to this litigation and not a designated section or zone of the Thruway relevant to Thruway operations or finances.  *Id*. ¶¶ 11, 14, 23.

26.    Construction costs attributable to the Seneca Section (in 1950s dollars) were approximately $2.5 million.  *Id*. ¶ 25.

**E.    The New York State Thruway Authority Maintains and Operates the Thruway**

27.    The Thruway Authority has expended vast sums of money to operate and maintain the Erie Section as a whole and the Seneca Section therein.  *Id*. ¶ 29.

28.    From 1957 (when the Erie Section was completed) to 2023, the total cost incurred by the Thruway Authority attributable to operating and maintaining the Seneca Section was approximately $55 million (unadjusted for present-day value).  *Id*.

29.    Annual expenses attributable to operating and maintaining the Seneca Section included, but were not limited to, expenses related to salaries, employee benefits, maintenance and repairs, and utilities.  *Id*. ¶ 30.

30.    This does not include interest expenses associated with the issuance of Thruway Authority bonds for financing improvements for the Erie Section and Seneca Section.  *Id*. ¶ 37(c).

**F.    New York State Negotiates Compensation with Individual Nation Members**

31.    While the Thruway Authority was negotiating with the Nation, it was also negotiating compensation with the individual allotees, *i.e.*, the individual members of the Nation who held allotment rights about obtaining an easement for the Thruway across the Cattaraugus Reservation.  On June 22, 1957, the Council of the Seneca Nation, acting pursuant to the 1954

7

Agreement, passed a series of resolutions certifying a number of the allottees as the persons entitled to payment, and such payment was subsequently made.  Maguire Declaration Exs. M, N.

32.    The Council, however, was unable to resolve claims to four of the titles.  *Id*. Ex. O.

33.    As to at least two of these unresolved claims, disputes continued as to which members of the Nation were entitled to payment.

34.    In one case, a Nation member, Harriet Halftown, complained by letter of February 18, 1967 that she had not been paid for her property rights.  *Id*. Ex. P.

35.    By letter of April 14, 1967, the Thruway Authority responded by advising Ms. Halftown:

> The record reveals that a meeting of the Council of the Seneca Nation of Indians on June 2 [sic], 1957 the Council refused to certify the title to either Harriet or Hattie Halftown.  The record also shows that other members of the Halftown family would have an interest in the compensation that would be payable herein.  This is the reason this matter was not processed for payment.
>
> It is suggested that you take this matter up with the Council of the Seneca Nation of Indians.

*Id*. Ex. Q.

36.    After considerable correspondence on the issue, on November 20, 1968, the Surrogate for the Cattaraugus Reservation, on behalf of Hattie Halftown, presented the Council a quit claim deed and verification of land ownership.  *Id*. Ex. R.

37.    As recorded in the Council's minutes on November 20, 1968, "Mr. Kennedy stated that Hattie Halftown is seeking compensation from the Thruway Authority for easement rights which was [sic] never processed.  The Thruway Authority is requesting proof of ownership before payment can be made.  There is no dispute on this property."  Because there

was a question about the property's description in the deed, however, the matter was tabled until the December Council meeting for the correction of the deed.  *Id.*

38.      At the Council's December 14, 1968 meeting, as reflected by the minutes, the corrected deed was submitted and the motion "that Council accept the Deed dated July 17, 1968, and Land Ownership Verification pertaining to Nancy Halftown Estate" was carried.  *Id*. Ex. S at p. 3.

39.      A similar dispute existed concerning the property of Merwin Pierce.  Maguire Declaration Ex. O.  It was not until a meeting of the Council on October 16, 1971 that this claim was resolved.  On that date, the Council passed a motion "to certify that Newton Pierce was owner of property on Cattaraugus Reservation shown on Claim Map 868 of October 3, 1956, and Map 911 dated October 16, 1956.  *Id*. Ex. T.

### G.      Rerouting the Erie Section of the Thruway

40.      Richard Gobeille is a licensed professional engineer with Stantec Consulting Services Inc., a longtime consultant to the Thruway Authority.  *See* Declaration of Richard Gobeille in Support of Defendants' Motion for Summary Judgment ¶¶ 1-4.

41.      Mr. Gobeille estimated the economic impacts and capital costs to reroute a portion of the Thruway's Erie Section to avoid the Nation's land.  *Id*. ¶ 5.

42.      Mr. Gobeille conducted a limited analysis that included the development of potential alternative routing which did not alter the current character of the Thruway by maintaining it as a high-speed, tolled highway with two lanes per direction and grade-separated interchanges.  *Id*. ¶ 6.

43.     Mr. Gobeille estimated a range of capital costs related to building this alternative route, revenue impacts to the Thruway Authority, additional costs to drivers, and other economic and traffic diversion impacts.  *Id*. ¶ 8.

44.     Mr. Gobeille opined, to a reasonable degree of engineering and financial certainty, that the capital cost of constructing an alternative Thruway route – if access to the existing 1954 Easement was eliminated – was likely to range from $2.1 to $3.0 billion (in 2024 dollars).  *Id*. ¶ 9.

**H.     Southern Tier Expressway Easement Between New York State and the Nation**

45.     In 1976, the State of New York and the Nation entered into an agreement whereby the Nation granted the People of the State of New York a permanent easement through the Alleghany Reservation for the construction of the Southern Tier Expressway.  Maguire Declaration Ex. GG.

46.     In exchange, the State of New York paid the Nation $494,386 and conveyed approximately 795 acres of State land adjacent to the Nation's territory to the Nation.  *Id.* at p. 4.

47.     Before entering into the agreement, the parties contacted the United States Department of Interior to request its approval of the agreement.  *Id*. Ex. HH.  The Department of Interior reviewed the agreement and declined to approve or disapprove the agreement, explaining:

> Our attorneys have reviewed the agreement, and it is their view that Secretarial approval of it is not statutorily required.  Section 5 of the Act of August 14, 1950 (64 Stat. 442), as amended by Section 2 of the Act of September 14, 1960 (75 Stat. 499), authorizes the Seneca Nation to grant easements across the Alleghany Reservation.  And it is clear from a reading of the legislative history of those statutes that Congress intended that the Nation would be able to grant such easement without first looking to the Secretary of the Interior for approval.

*Id.*

48. As a result, the phrase in the Southern Tier Expressway Agreement requiring approval by the Secretary of the Interior was stricken and the Secretary of the Interior was removed as a signatory. Maguire Decl. Ex. GG, at ¶ 13.

For the reasons outlined in Defendants' Memorandum of Law in Support of Their Motion for Summary Judgment, this Court should grant summary judgment to Defendants and dismiss the case.

Dated: February 11, 2025
Buffalo, New York

**NIXON PEABODY LLP**

BY: /s/ *Erik A. Goergen*
Erik A. Goergen
40 Fountain Plaza, Suite 500
Buffalo, New York 14202
Telephone: (716) 853-8118
egoergen@nixonpeabody.com

*Attorneys for Defendant New York State Thruway Authority*

**LETITIA JAMES**
**Attorney General of the State of New York**

BY: /s/ *Daniel Maguire*
Daniel Maguire
Stephanie Joy Calhoun
Assistant Attorney General, of Counsel
Main Place Tower, Suite 300A
350 Main Street
Buffalo, NY 14202
(716) 853-8400
Daniel.Maguire@ag.ny.gov
Stephanie.Calhoun@ag.ny.gov

*Attorneys for Defendants Governor of the State of New York, Attorney General of the State of New York, the Commissioner of the New York State Department of*

*Transportation, and the Comptroller of the State of New York*