UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

---

SENECA NATION, a federally recognized Indian tribe,

Plaintiff,

vs.

KATHLEEN C. HOCHUL, in her official capacity as Governor of New York; LETITIA JAMES, in her official capacity as New York State Attorney General; MARIE T. DOMINGUEZ, in her official capacity as Commissioner of the New York State Department of Transportation; THOMAS P. DINAPOLI, in his official capacity as Comptroller of the State of New York; and THE NEW YORK STATE THRUWAY AUTHORITY.

Defendants.

Case No. 18-cv-00429-LJV

---

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' JOINT MOTION FOR SUMMARY JUDGMENT**

**NIXON PEABODY LLP**
Erik A. Goergen
40 Fountain Plaza, Suite 500
Buffalo, New York 14202
Telephone: (716) 853-8118

*Attorneys for Defendant New York State Thruway Authority*

**LETITIA JAMES**
**Attorney General of the State of New York**
Daniel R. Maguire
Stephanie Joy Calhoun
Main Place Tower, Suite 300A
350 Main Street
Buffalo, New York 14202
Tel: (716) 853-8419

*Attorneys for Defendants Governor of the State of New York, Attorney General of the State of New York, the Commissioner of the New York State Department of Transportation, and the Comptroller of the State of New York*

## TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................................... 1

STATEMENT OF FACTS AND PROCEDURAL HISTORY.................................... 4

LEGAL FRAMEWORK ........................................................................................... 4

    A.    The Nonintercourse Act........................................................................ 5

    B.    1836 New York Railroad Right-of-Way Act........................................ 5

    C.    1875 Seneca Leasing Act...................................................................... 5

    D.    The 1901 Highway Act and the Right-of-Way Act............................... 7

    E.    Indian Right-of-Way Act of 1948......................................................... 7

    F.    1950 Seneca Leasing Act...................................................................... 8

    G.    1961 Seneca Leasing Act Amendment ................................................. 8

ARGUMENT ........................................................................................................... 9

POINT I    THE STATE IS ENTITLED TO SUMMARY JUDGMENT ON ITS
AFFIRMATIVE DEFENSE OF LACHES ............................................ 10

    A.    Sherrill Laches Bars the Nation's Claims............................................ 10

        1.    The Significant Length Of Time Between The Allegedly Invalid
Easement And Today...................................................................... 16

        2.    The Inherently Disruptive Nature Of The Nation's Long Delayed
Claims To Invalidate The 1954 Easement ...................................... 19

        3.    The Nation's Claims Significantly Upset The Justifiable Expectations
Of New York State, The Millions Of Thruway Users, And All Individuals
And Entities Who Rely On The Thruway For Transportation ................... 24

    B.    Traditional Laches Also Bars the Nation's Claims............................... 26

        1.    The Nation's Lack Of Diligence................................................... 27

        2.    Prejudice To The State Resulting From The Nation's Long Delay............. 30

POINT II    UNDER THE 1875 SENECA LEASING ACT AND SENECA LEASING ACT
OF 1950, THE 1954 EASEMENT DID NOT NEED TO BE APPROVED BY
THE SECRETARY OF THE INTERIOR............................................... 31

    A.    1875 Seneca Leasing Act..................................................................... 31

    B.    Seneca Leasing Act of 1950 ................................................................. 33

POINT III    THE NATION RATIFIED THE 1954 EASEMENT AT A TIME WHEN
FEDERAL APPROVAL WAS NOT NECESSARY .......................................... 39

POINT IV    THE UNITED STATES SECRETARY OF THE INTERIOR APPROVED
THE THRUWAY PROJECT ACROSS THE CATTARAUGUS
RESERVATION............................................................................... 42

CONCLUSION............................................................................................... 45

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*BAC Home Loans Servicing, LP v. Uvino*,
  155 A.D.3d 1155 (3d Dep't 2017)..................................................................................41

*Banque Nationale de Paris v. 1567 Broadway Ownership Assocs.*,
  214 A.D.2d 359 (1st Dep't 1995) ..................................................................................41

*Becker v. Manufacturers Trust Co.*,
  262 A.D.525 (1st Dep't 1941) ......................................................................................34

*Brown v. Gardner*,
  513 U.S. 115 (1994).....................................................................................................34

*Cammeby's Mgmt. Co., LLC v. Allian Ins. Servs., Inc.*,
  720 Fed. App'x 18 (2d Cir. 2017)................................................................................40

*Canadian St. Regis Band of Mohawk Indians v. New York*,
  No. 5:82-CV-0783, 2013 U.S. Dist. LEXIS 94381 (N.D.N.Y. June 8, 2013).........................22

*Cayuga Indian Nation of New York v. Pataki*,
  413 F.3d 266 (2d Cir. 2005)................................................................................ *passim*

*Cayuga Indian Nation v. Cuomo*,
  1999 U.S. Dist. LEXIS 10579 (N.D.N.Y. June 30, 1999)......................................................23

*Celotex Corp. v. Catrett*,
  477 U.S. 317 (1986)........................................................................................................9

*Citizens Against Casino Gambling v. Hogen*,
  No. 07-CV-0451S, 2008 U.S. Dist. LEXIS 52395 (W.D.N.Y. July 8, 2008) ...................28, 29

*City of Sherrill v. Oneida Indian Nation of N.Y.*,
  544 U.S. 197 (2005)............................................................................................. *passim*

*Commissioner of the N.Y. State DOT v. Polite*,
  No. 2020-05137, 2024 N.Y. App. Div. LEXIS 6445 (2d Dep't Dec. 4, 2024)...........18, 19, 22

*Conn. Ironworkers Employers Assn., Inc. v. New England Regional Council of
  Carpenters*, 869 F.3d 92 (2d Cir. 2017).........................................................................9

*County of Oneida v. Oneida Indian Nation of New York State*,
  470 U.S. 226 (1985)......................................................................................................40

*Felix v. Patrick*,
  145 U.S. 317 (1892)....................................................................................................17, 18

*Fitzgerald v. Erie R. Co.*,
  158 A.D. 801 (4th Dep't 1913)................................................................................35

*Galliher v. Cadwell*,
  145 U.S. 368 (1892)....................................................................................................17

*Gila River Indian Cmty. v. Henningson, Durham & Richardson*,
  626 F.2d 708 (9th Cir. 1980) ...................................................................................40

*Goenaga v. March of Dimes Birth Defects Found.*,
  51 F.3d 14 (2d Cir. 1995)............................................................................................9

*Hempstead Realty, LLC v. Sturrup*,
  55 Misc. 3d 1219(A), (Sup. Ct. Nassau Cnty. 2017), *aff'd*, 192 A.D.3d 795
  (2d Dep't 2021)...........................................................................................................41

*John Hancock Life Insurance Co. of N.Y. v. Solomon Baum Irrevocable Family
  Life Ins. Trust*, 357 F. Supp. 3d 209 (E.D.N.Y. 2018).......................................39, 40

*Johnson v. Johnson*,
  191 A.D.2d 257 (1st Dep't 1993)..............................................................................41

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
  475 U.S. 574 (1986)......................................................................................................9

*New Jersey v. New York*,
  523 U.S. 767 (1998)....................................................................................................27

*Niagara Mohawk Power Corp. v. Tonawanda Band of Seneca Indians*,
  94 F.3d 747 (2d Cir. 1996).........................................................................................40

*Oneida Indian Nation v. County of Oneida*,
  617 F.3d 114 (2d Cir. 2010)................................................................................ *passim*

*Oneida Indian Nation v. County of Oneida*,
  802 F. Supp. 2d 395 (N.D.N.Y. 2011)......................................................................40

*Onondaga Nation v. New York*,
  500 Fed. App'x. 87 (2d Cir. 2012)......................................................................14, 16

*PDK Labs, Inc. v. Friedlander*,
  103 F.3d 1105 (2d Cir. 1997)........................................................................................9

*Pension Ben. Guar. Corp. v. LTV Corp.*,
  496 U.S. 633 (1990)....................................................................................................38

iii

*Prudential Ins. Co. of Am. v. BMC Indus., Inc.*,
630 F. Supp. 1298 (S.D.N.Y. 1986)......................................................................................41

*Rainwater v. United States*,
356 U.S. 590 (1958)............................................................................................................39

*Seneca Nation of Indians v. New York*,
383 F.3d 45 (2d Cir. 2004)...........................................................................................1, 4, 38

*Seneca Nation of Indians v. United States*,
173 Ct. Cl. 917 (1965) ...................................................................................................5, 29

*Seneca Nation v. Cuomo*,
484 F. Supp. 3d 65 (W.D.N.Y. 2020) ..............................................................................4, 27

*Seneca Nation v. Hochul*,
58 F.4th 664 (2d Cir. 2023) ............................................................................................4, 33

*Sharp v. Erie R. Co.*,
90 A.D. 502 (3d Dep't 1904) ...............................................................................................35

*Shinnecock Indian Nation v. New York*,
628 Fed. App'x. 54 (2d Cir. 2015)..................................................................................14, 22

*Shinnecock Indian Nation v. New York*,
No. 05-CV-2887, 2006 U.S. Dist. LEXIS 87516 (E.D.N.Y. Nov. 28, 2006).........................23

*Stockbridge-Munsee Community v. New York*,
756 F.3d 163 (2d Cir. 2014)................................................................................................14

*Sullivan v. Finkelstein*,
496 U.S. 617 (1990) (Scalia, J., concurring) .......................................................................39

*Taggart v. Lorenzen*,
587 U.S. 554 (2019).............................................................................................................36

*United States v. Cattaraugus County*,
71 F. Supp. 413 (W.D.N.Y. 1947) .......................................................................................32

*U.S. v. Devonian Gas and Oil Co.*,
424 F.2d 464 (2d Cir. 1970) .........................................................................................6, 36, 37

*United States v. Southwestern Cable Co.*,
392 U.S. 157 (1968).............................................................................................................38

*VKK Corp. v. National Football League*,
244 F.3d 114 (2d Cir. 2001)...........................................................................................39, 42

*Ex Parte Young*,
   209 U.S. 123 (1908) ................................................................................. *passim*

**Statutes**

23 U.S.C. § 101(b)(1) ........................................................................................25

25 U.S.C. §§ 232-33 .........................................................................................37

25 U.S.C. § 323 ............................................................................................7, 43

42 U.S.C. § 1983 ...............................................................................................16

1875 Seneca Leasing Act ........................................................................ *passim*

25 U.S.C. § 311 ..........................................................................................7, 8, 43

N.Y. Highway Law § 347 ..................................................................................32

N.Y. Indian Law § 78 ........................................................................................36

N.Y. Pub. Auth. Law §§ 354(4), 358, 358-a.....................................................32

New York Railroad Right-of-Way Act................................................................5

Seneca Leasing Act of 1950 .................................................................... *passim*

State Public Authorities Law § 354(4)...............................................................32

Defendant New York State Thruway Authority (the "Thruway Authority") and Defendants Governor of the State of New York, Attorney General of the State of New York, the Commissioner of the New York State Department of Transportation, and the Comptroller of the State of New York (collectively, with the Thruway Authority, the "State") submit the following Memorandum of Law in Support of their Joint Motion for Summary Judgment.

## PRELIMINARY STATEMENT

In this lawsuit, Plaintiff Seneca Nation ("the Nation") challenges the validity of a permanent easement it conveyed to New York State in 1954 to construct and maintain a portion of the New York State Thruway (the "1954 Easement").  ECF No. 1 (Complaint ¶¶ 15, 18, 29, 33 and 38).  In exchange, New York State paid $75,500 to the Nation in addition to compensating individual Indian landowners affected by its acquisition of the permanent easement.

This is not the first lawsuit that the Nation has brought to challenge the validity of the 1954 Easement.  Almost forty years after the Nation executed that easement – long after the Thruway was constructed and the Erie Section[1] (which includes the land encompassing the 1954 Easement) established itself as the fastest and most efficient mode of vehicular travel from Buffalo, New York to Erie, Pennsylvania – the Nation commenced its first lawsuit in 1993 challenging the 1954 Easement's validity.  After a decade of litigation, that action was dismissed by this Court in 1999 and affirmed by the Second Circuit in 2004.  *See Seneca Nation of Indians v. New York*, 383 F.3d 45 (2d Cir. 2004) (affirming this Court's order that the State of New York was an absent and indispensable party under Rule 19 of the Federal Rules of Civil Procedure and that the action was thus barred by sovereign immunity).

---

[1] The Erie Section, completed in 1957, is 70 miles in length and runs between Buffalo, New York (Exit 55) and the Pennsylvania State Line (Exit 61 in Ripley, New York).  *See* State's Joint Statement of Undisputed Material Facts ("SUMF") ¶¶ 6-7; Declaration of David Malone in Support of Defendants' Motion for Summary Judgment ("Malone Decl.") ¶¶ 12, 18, 19.

1

Another fourteen years passed between the dismissal of the Nation's first action (2004) and its commencement of this action (2018) challenging the 1954 Easement's validity. Importantly, nothing material changed from 2004 to 2018 that could possibly excuse the Nation's further delay in pursuing its claim that the 1954 Easement violated federal law. The only change that occurred was the Nation hiring new legal counsel, who pursued a different legal theory from the first action. Despite the availability of that legal theory both before and during the first action and in the fourteen years that followed the first case's dismissal, the Nation failed to raise it until 2018 when the Nation commenced this second action challenging the 1954 Easement.

While nothing meaningful changed between 2004 and 2018 to justify the Nation's additional delay in commencing this second suit, those fourteen years further exacerbated the substantial prejudice that already existed to the State if this Court were to grant the Nation's highly disruptive requested relief – an injunction compelling the State to renegotiate the 1954 Easement. During those intervening years, as it has every year since the Erie Section of the Thruway was constructed, the Thruway Authority continued to expend significant funds to maintain the Thruway in continued reliance upon the 1954 Easement's validity.

As discussed in greater detail below (*see* Argument Point I), the Nation's claims are barred by the equitable defense of laches[2] – whether analyzed under the laches doctrine governing Indian land claims enunciated by the United States Supreme Court in *City of Sherrill v. Oneida Indian Nation of N.Y.*, 544 U.S. 197 (2005) and its progeny, or under the traditional laches approach. Summary judgment should be granted to the State pursuant to "*Sherrill* laches" because: (1) a significant amount of time has passed between the Nation's grant of the 1954 Easement and the present day; (2) the Nation's long delayed claims are highly disruptive; and (3)

---

[2] The State's laches affirmative defense was set forth in its answer. *See* ECF No. 74 (Answer – Sixth Affirmative Defense).

2

the Nation's claims upset the justifiable expectations of New York State and the many millions of Thruway travelers – all of whom are individuals or entities far removed from the negotiation, execution, and approval of the 1954 Easement.

Likewise, under the traditional laches framework, the Nation has, through its own lack of diligence, closed the door to the far-reaching relief it seeks – *i.e.*, a declaration that the 1954 Easement is invalid and an injunction compelling the State to renegotiate the permanent easement that has been in place for over seventy years. Any form of relief on the Nation's long-delayed claims would result in immense prejudice to New York State, whose actions (expenditures on Thruway construction, maintenance, improvements, interest payments etc.) over the past seven decades have been based upon a complete and justified reliance on the 1954 Easement's validity.

Even if this Court disagrees with the State's laches arguments, summary judgment to the State is still warranted because the Nation's injunction and declaratory judgment claims lack merit as a matter of law. Contrary to the Nation's contention, New York State acted in conformance with the Indian Trade and Intercourse Act (the "Nonintercourse Act") when it sought – and obtained – Department of Interior approval of the Erie Section construction project traversing the Nation's land back in 1946 (*see* Argument Point IV).

In any event, applicable federal law (both the 1875 Seneca Leasing Act and the Seneca Leasing Act of 1950) vested the Nation with the requisite authority to enter into the 1954 Easement *without* federal approval (*see* Argument Point II). And finally, the 1961 amendment to the Seneca Leasing Act of 1950 unquestionably granted the Nation the express authority to enter into the 1954 Easement, which was followed by the Nation engaging in conduct ratifying the 1954 Easement (*see* Argument Point III).

3

## STATEMENT OF FACTS AND PROCEDURAL HISTORY

The Court is respectfully referred to the State's SUMF and accompanying declarations, for a complete recitation of the facts relevant to this motion.[3]  In its Complaint, the Nation asserts three causes of action: (1) an injunction compelling the State (except for the Comptroller) to renegotiate the 1954 Easement (first cause of action);[4] (2) an injunction against the Comptroller to require him to "segregate and hold in escrow any future toll monies collected on the Thruway that are fairly attributable to the portion of the Thruway operated in violation of the Nation's federally protected property rights until the other Defendants obtain a valid easement" (second cause of action);[5] and (3) a declaratory judgment that the 1954 Easement is invalid (third cause of action).[6]  The State moves for summary judgment on all three claims and on its laches affirmative defense.

## LEGAL FRAMEWORK

Resolution of the State's motion for summary judgment requires familiarity with the Nonintercourse Act, 25 U.S.C. § 177, and other relevant statutes such as the 1875 Seneca Leasing Act and 1950 Seneca Leasing Act.

---

[3] The factual background and procedural history of this case is also discussed in prior opinions of this Court and the Second Circuit.  *See Seneca Nation v. Hochul*, 58 F.4th 664 (2d Cir. 2023); *Seneca Nation*, 383 F.3d 45*; Seneca Nation v. Cuomo*, 484 F. Supp. 3d 65 (W.D.N.Y. 2020).

[4] The Nation phrases this claim as one seeking to "obtain a valid easement for the portion of the Nation's Reservation on which the Thruway is situated, so as to bring continued public use of and public benefit from those Indian lands into compliance with federal law, on terms that will in the future equitably compensate the Nation pro rata for future use of its lands."  ECF No. 1 (Complaint ¶ 51, Wherefore Clause ¶ 1).  In plain language, the Nation seeks to force the State to renegotiate the 1954 Easement.  The Nation also seeks the alternative relief of "enjoining the Defendants (except for the Comptroller) from collecting tolls for the portion of the Nation's Reservation on which the Thruway is situated without first obtaining a valid easement."  *Id*. ¶ 52.

[5] This memorandum of law does not set forth an independent basis for dismissing the claim against the Comptroller because all the arguments herein apply with equal force to this claim.

[6] This claim seeks a declaratory judgment that the State (other than the Comptroller) "will continue to violate federal law by not obtaining a valid easement" and "that some of the funds being collected by the Thruway and being deposited with the Comptroller on a continuing basis are derived from this violation of federal law."  *Id*. ¶ 62, Wherefore Clause ¶ 3.  In essence, the Nation seeks a declaration that the 1954 Easement is invalid.

A. **The Nonintercourse Act**

Congress passed the first Nonintercourse Act on July 22, 1790. Act of July 22, 1790, ch. 33, 1 Stat. 137. The Nonintercourse Act was renewed periodically and remains substantially in force today. Last modified in 1834, the Act is currently codified in 25 U.S.C. § 177. *Seneca Nation of Indians v. United States*, 173 Ct. Cl. 917, 924 n.6 (1965) (tracing amendments). The current version provides, in pertinent part, that:

> No purchase, grant, lease, or other conveyance of lands, or of any title or claim thereto, from any Indian nation or tribe of Indians, shall be of any validity in law or equity, unless the same be made by treaty or convention entered into pursuant to the Constitution.

25 U.S.C. § 177. The Nonintercourse Act essentially requires congressional consent of all land purchases from Indian nations and tribes.

B. **1836 New York Railroad Right-of-Way Act**

In 1836, New York enacted a statute authorizing New York Indians to grant rights-of-way to rail-road companies on their reservations:

> It shall be lawful for any rail-road company that has been, or may hereafter be chartered by the legislature of this state, to contract with the chiefs of any nation of Indians, over whose lands it may be necessary to construct such rail-road, for the right to make such road upon such lands; but no such contract shall vest in such rail-road company the fee to such lands, nor the right to occupy the same for any purposes other than what may be necessary for the construction, occupancy and maintenance of such rail-road.

N.Y. Ch. Law 1836, c316, § 1. Pursuant to this statute, the Nation entered into various rights-of-way agreements with railroads on its reservation land. *See e.g.* Maguire Decl. Ex. V (1851 Railroad Agreement).

C. **1875 Seneca Leasing Act**

Around 1875, a New York State court held that New York did not have the authority to empower the Nation to lease their reservation land to non-Indian settlers or enter into rights-of-

5

way agreements with railroads. *See U.S. v. Devonian Gas and Oil Co.*, 424 F.2d 464, 465-66 (2d Cir. 1970) (discussing 1875 New York State court decision and historical background of 1875 Seneca Leasing Act); *see also* Maguire Decl. Ex. X (legislative history for 1875 Seneca Leasing Act). This created an issue for New York: there were now settlers residing and railroads on the Nation's reservation lands pursuant to agreements with the Nation that were not valid. *See id.* To remedy this problem, New York persuaded Congress to enact the 1875 Seneca Leasing Act, which removed the granting of certain leases and rights-of-way by the Nation from the coverage of the Nonintercourse Act.

The 1875 Seneca Leasing Act ratified the existing leases with the settlers and authorized new ones within the "villages" for up to 12 years, 18 Stat. 330, § 4 (1875) ("1875 Seneca Leasing Act"), later extended to 99 years, 26 Stat. 558 (1890). *See* Maguire Decl. Ex. W; LL. The 1875 Seneca Leasing Act also authorized the Nation to lease lands within its reservations for railway purposes and the construction of highways. Section 1 of the 1875 Seneca Leasing Act granted the Nation the authority to lease lands for railroad purposes:

> That all leases of land within the Cattaraugus and Alleghany reservation in the State of New York, heretofore made by or with the authority of the Seneca Nation of New York Indians, to railroad corporations, are hereby ratified and confirmed; and said Seneca Nation may in accordance with their laws and form of government, lease lands within said reservation for railroad purposes.

18 Stat. 330, § 1. And, Section 8 authorized the Nation to lease land within its reservations to "lay out" (*i.e.* construct) highways:

> That all laws of the State of New York now in force concerning the laying out, altering, discontinuing, and repairing highways and bridges shall be in force within said villages, and may, with the consent of said Seneca Nation in council, extend to, and be in force beyond, said villages in said reservations[.]

18 Stat. 331, § 8.

6

To summarize, following passage of the 1875 Seneca Leasing Act, the Nation had authority, without needing federal approval: (1) to lease land within certain villages located on the Allegany and Cattaraugus reservations; (2) to lease any land within its reservations to railroad corporations for railroad purposes; and (3) to convey land within its reservations for the "laying out" of highways.

### D.  The 1901 Highway Act and the Right-of-Way Act

In 1901, Congress passed the 1901 Highway Act and the Right-of-Way Act of Mar. 3, 1901, 25 U.S.C. § 311 (the "1901 Act").  The 1901 Act empowered the Secretary of Interior to grant permission to open and establish public highways through any Indian reservation.  Specifically, it provides:

> [t]he Secretary of the Interior is authorized to grant permission, upon compliance with such requirements as he may deem necessary, to the proper State or local authorities for the opening and establishment of public highways, in accordance with the laws of the State or Territory in which the lands are situated, through any Indian reservation or through any lands which have been allotted in severalty to any individual Indian under any laws or treaties but which have not been conveyed to the allottee with full power of alienation.

25 U.S.C. § 311.  The 1901 Act modifies the Nonintercourse Act for public highways.  No longer was a "treaty or convention" necessary to convey land owned by an Indian nation to a State or local authority for purposes of establishing a public highway.  Instead, the Secretary of Interior could approve such conveyances.

### E.  Indian Right-of-Way Act of 1948

In 1948, Congress passed the Indian Right-of-Way Act of 1948, 25 U.S.C. §§ 323-328 ("Right-of-Way Act").  Relevant here, the Right-of-Way Act empowered the Secretary of Interior to "grant rights-of-way for all purposes, subject to such conditions as he may prescribe, over and across any lands now or hereafter held in trust by the United States for individual Indians or Indian tribes…"  25 U.S.C. § 323.

7

The purpose of the Right-of-Way Act was to harmonize the amalgam of special purpose access statutes promulgated in the early 1900s. *See* 25 U.S.C. §§ 311 (opening of highways), 312 (rights-of-way for railway, telegraph, and telephone lines), 321 (rights-of-way for pipelines), 961 (rights-of-way for power and communications facilities). The old statutory scheme limited the nature of rights-of-ways to be obtained, and in certain cases, created an unnecessarily complicated method for obtaining rights-of-way. *See* Maguire Decl. Ex. Y (legislative history for Right-of-Way Act)

### F.  1950 Seneca Leasing Act

In 1950, Congress passed the Seneca Leasing Act of 1950. First, the Act dictated how money realized from existing leases or leases thereafter entered on the Nation's reservations should be collected and distributed. 64 Stat. 442, §§ 1-4; *see* Maguire Decl. Ex. AA (copy of Act). Second, and relevant to this action, the Act expanded the Nation's ability to lease lands on its reservations without federal approval. *Id.* at § 5. Specifically, Section 5 provides:

> In addition to the authority now conferred by law on the Seneca Nation of Indians to lease lands within the Cattaraugus, Alleghany, and Oil Springs Reservations to railroads and to lease lands within the limits of the villages established under authority of the [1875 Seneca Leasing Act], the Seneca Nation of Indians, through its council, is authorized to lease lands within the Cattaraugus, Allegany, and Oil Springs Reservations, outside the limits of such villages, for such purposes and such periods as may be permitted by the laws of the State of New York.

### G.  1961 Seneca Leasing Act Amendment

In 1961, Congress amended the Seneca Leasing Act of 1950. *See* Maguire Decl. Ex. BB. The primary purpose of the amendment, as demonstrated by the legislative history, was to remove the $5,000 cap and empower the Council of the Seneca Nation to distribute lease income as it determined. Maguire Decl. Ex. FF, p. 4 ("In view of the lack of Federal supervision over the fiscal affairs of the Senecas, and in view of the general increase in the cost of business and government since 1950, we believe that the arbitrary $5,000 limitation on the council's use of

8

lease income is unjustified and that it should be repealed"). As an add-on, Congress also amended Section 5 of the Seneca Leasing Act of 1950 "by inserting after 'to lease' the last time the verb appears the words 'or grant easements or rights-of-way on.'" 75 Stat. 499, § 2.

## ARGUMENT

In considering a motion for summary judgment in an action for declaratory relief, courts apply the same standard under Rule 56 applicable to any other summary judgment motion. *See PDK Labs, Inc. v. Friedlander*, 103 F.3d 1105, 1111 (2d Cir. 1997). The same standard similarly applies "whether summary judgment is granted on the merits or on an affirmative defense." *Conn. Ironworkers Employers Assn., Inc. v. New England Regional Council of Carpenters*, 869 F.3d 92, 99 (2d Cir. 2017).

A court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant—that is, the party seeking summary judgment—has the burden of demonstrating that there is no disputed material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). The movant may satisfy this burden by relying on evidence in the record, "including depositions, documents, ... [and] affidavits," Fed. R. Civ. P. 56(c)(1)(A), or by "point[ing] to an absence of evidence to support an essential element of the nonmoving party's claim," *Goenaga v. March of Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir. 1995) (citing *Celotex*, 477 U.S. at 322-23); *see* Fed. R. Civ. P. 56(c)(1)(B). Once the movant has satisfied its initial burden, "the nonmoving party must come forward with specific facts" showing that there is a genuine dispute of material fact. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). If the nonmovant fails to do so, the court may grant summary judgment. *See Celotex*, 477 U.S. at 322-23.

9

## POINT I

## THE STATE IS ENTITLED TO SUMMARY JUDGMENT ON ITS AFFIRMATIVE DEFENSE OF LACHES

### A.  Sherrill Laches Bars the Nation's Claims

Beginning in 2005, the Supreme Court and Second Circuit issued a series of decisions instructing when equitable doctrines such as laches, abandonment, acquiescence, and impossibility applied to claims asserted by Indian Nations.  In *Sherrill*, the Supreme Court held that "standards of federal Indian law and federal equity practice" barred the Oneida Indian Nation's assertion of sovereignty over lands that were allegedly part of its ancient reservation and that the tribe had recently purchased on the open market.  544 U.S. at 202-03, 214.  The Oneidas claimed that the historical transactions that purported to extinguish its aboriginal title violated the Nonintercourse Act, one of the federal statutes at issue here.  The Supreme Court rejected the Oneidas' argument, holding that an adjudication of "present and future" sovereignty would be a "disruptive remedy" precluded by equitable principles underlying the doctrines of laches, acquiescence, and impossibility.  *Id.* at 216-17, 221.

Shortly after *Sherrill*, the Second Circuit applied these equitable principles in *Cayuga Indian Nation of New York v. Pataki*, 413 F.3d 266 (2d Cir. 2005).  There, the Cayuga Nation asserted claims to its alleged historic lands and sought ejectment of the current occupants of those lands.  *Id.* at 274-75.  The Northern District ruled that the Cayuga Nation's desired remedy of ejectment was inappropriate given the impact it would have on innocent landowners far removed from the acts of dispossession, but nonetheless awarded the tribe money damages.  *Id.* at 275.  The Second Circuit reversed, holding that the equitable principles recognized in *Sherrill* barred all remedies, including damages, flowing from ancestral land claims because such claims, when raised long after the events which gave rise to them, are inherently disruptive.  *Id.* at 275, 277.

10

The Second Circuit concluded that the Supreme Court's concern with the Oneidas' claim in *Sherrill* was "the disruptive nature of the claim itself," and thus, the *Sherrill* equitable defenses applied not just to claims seeking a revival of sovereignty, but to "disruptive" Indian land claims more generally. *Id.* at 274. Commenting on the effects of *Sherrill*, the Second Circuit further explained that "'disruptive,' forward-looking claims, a category exemplified by possessory land claims, are subject to equitable defenses, including laches." *Id.* at 277.

The Nation's claims here do not seek the relief of "ejectment," but they are nonetheless "disruptive, forward-looking claims" subject to laches pursuant to *Sherrill*. Indeed, the highly disruptive nature of the future consequences stemming from the Nation's claims cannot reasonably be disputed. In an effort to escape Eleventh Amendment immunity arguments, the Nation has emphasized that the relief it seeks would prospectively compel the State to renegotiate the purportedly invalid 1954 Easement in an effort to obtain a "valid easement" regarding "future" uses and compensation. *See* ECF No. 1 (Complaint, Relief Requested, p. 14, ¶ 1 (seeking a mandatory injunction requiring the State (except for the Comptroller) to "obtain a valid easement for the portion of the Nation's Reservation on which the Thruway is situated, so as to bring continued public use of and public benefit from those Indian lands into compliance with federal law, on terms that will *in the future* equitably compensate the Nation pro rata for *future use* of its lands") (emphasis added)); *see also id.* ¶¶ 4, 5, 51, 57.

In 2010, the Second Circuit again applied *Sherrill* principles to dismiss a tribal land claim in *Oneida Indian Nation v. County of Oneida*, 617 F.3d 114 (2d Cir. 2010). The Court reiterated its prior holding in *Cayuga* that "any claims premised on the assertion of a current, continuing right to possession as a result of a flaw in the original termination of Indian title—are by their nature disruptive." 617 F.3d at 125. The Court explained that *Cayuga* "expressly held . . . that the

11

dispositive question in ascertaining the applicability of *Sherrill's* equitable defense is not whether a current possessory right is asserted, but whether a plaintiff's claim is inherently disruptive." *Id.* at 136. "[T]he equitable defense originally recognized in *Sherrill* is potentially applicable to *all* ancient land claims that are disruptive of justified societal interests that have developed over a long period of time, of which possessory claims are merely one type, and regardless of the particular remedy sought." *Id.* (emphasis added). The Court dismissed both the Oneidas' possessory and non-possessory claims for damages. Because the Oneidas' claims depended on a declaration that the original land transfers were void *ab initio*, they were inherently disruptive and barred by *Sherrill* equitable principles. *Id*. at 129-31.

Similarly, here, although "Indian title" was never terminated as the land encompassed by the 1954 Easement is still owned by the Nation in "restricted fee" and remains part of its Cattaraugus Reservation (*see* ECF No. 1 (Complaint ¶¶ 16-17)), it is undisputed that *permanent* easement rights to this land were conveyed by the Nation to the State to construct the Thruway (*see id.* ¶¶ 15, 33). As in the *Cayuga* and *Oneida* cases, the Nation's claims here also allege violations of the Nonintercourse Act and are "premised on the assertion of a current, continuing right to possession" of the 1954 Easement land because the Nation seeks a ruling from this Court that the easement failed to comply with federal law and is thus void *ab initio*. *See id.* ¶¶ 1, 4, 40, 47-63. *Cayuga* and *Oneida* both held that *Sherrill* equitable defenses applied to the respective Indian Nations' claims. *See Cayuga*, 413 F.3d at 268; *Oneida*, 617 F.3d at 118. As the Second Circuit explained, the Oneidas' claims, whether sounding in "ejectment, trespass, or a related theory of injury derived from the Oneidas' claimed right to possession of the lands" were "premised on the Oneidas' continuing right of possession" and thus "fall within *Cayuga's*

12

holding that equitable defenses apply to possessory land claims of this type." *Oneida*, 617 F.3d at 125 (internal quotation marks omitted).

In essence, the Nation's "right" to complete control over the land in question – unburdened by the allegedly illegal easement – is wholly dependent on this Court's resolution of the Nation's legal claim that the 1954 Easement was not approved by the federal government and, as such, that the Nation retains full ownership and possessory rights without the burdens imposed by the 1954 Easement. Put another way, if the Nation's claims were not construed in this manner, this Court would necessarily lack any legal basis to compel the State to renegotiate the 1954 Easement as demanded in the Nation's Complaint.

Moreover, while the Complaint does not use the term "trespass," the declaratory judgment sought by the Nation essentially requires a determination that the State is trespassing, which is consistent with prior allegations made by the Nation in *Seneca I*. *See* Maguire Decl. Ex. A (*Seneca I* Complaint) ¶ 29 ("The defendants State of New York and New York Thruway Authority are *trespassers* upon the land in violation of the law.") (emphasis added). Any attempt to re-frame or re-characterize the nature of the Nation's claims as "nonpossessory" cannot evade *Sherrill* because nonpossessory claims can be equally disruptive. The Second Circuit has expressly held that courts should not permit plaintiffs to "convert[] an otherwise unsuccessful claim . . . into a successful claim simply by re-framing it as 'nonpossessory.'" *Oneida*, 617 F.3d at 139. In language equally applicable to this case, the Second Circuit further explained that "the essence of a cause of action is found in the facts alleged and proven by the plaintiff, not the particular legal theories articulated" and that "even liberally construing the complaints here to contain some references to the claims now contended to be nonpossessory, the Oneidas and the United States, in the years prior to *Cayuga*, habitually referred to their claims as vindicating

13

possessory rights." *Id*. (internal citations and quotation marks omitted).  The Nation's claims here are therefore subject to, and barred by, *Sherrill* laches.

Additional case law from the Second Circuit supports application of *Sherrill* to the Nation's claims.  In *Stockbridge-Munsee Community v. New York*, 756 F.3d 163 (2d Cir. 2014), the Second Circuit held that the tribe's land claim was, on its face, barred by *Sherrill* equitable principles applied to dismiss the similar claims in *Cayuga* and *Oneida*.  In affirming the dismissal of the tribe's claims, the Second Circuit stated, "it is now well-established that Indian land claims asserted generations after an alleged dispossession are inherently disruptive of state and local governance and the settled expectations of current landowners, and are subject to dismissal on the basis of laches, acquiescence and impossibility."  *Id.* at 165; *see also Onondaga Nation v. New York*, 500 Fed. App'x. 87 (2d Cir. 2012) (holding that ancient Indian land claim was barred by *Sherrill*); *Shinnecock Indian Nation v. New York*, 628 Fed. App'x. 54 (2d Cir. 2015) (same).

In sum, *Sherrill* laches is a defense "properly applied to bar any ancient land claims that are disruptive of significant and justified societal expectations that have arisen as a result of a lapse of time during which the plaintiffs did not seek relief."  *Oneida*, 617 F.3d at 135.  The defense applies not only to claims wherein a tribe seeks possession of land and ejectment of current owners, but *any claim* "premised on the assertion of a current, continuing right to possession as a result of a flaw in the original termination of Indian title." *Id.* at 125.  The Nation's claims here fall within this category.

As discussed above, "Indian title" was not terminated by virtue of the Nation's execution of the 1954 Easement, but the Nation nevertheless claims that there was a "flaw" in the express grant of permanent easement rights to the State of New York due to the purported failure to obtain Department of Interior approval.  Unlike many easements where the fee title owner carves

14

out a portion of the "bundle of rights" associated with land ownership and only transfers a limited use of the land to the easement holder while still retaining virtually all other rights – including the right to possess, control, exclude others from, enjoy, and dispose of property – the easement here is vastly different.  The Nation's ability to use the land burdened by the easement is entirely restricted given that a four-lane interstate highway traverses it.  The land is undoubtedly owned by the Nation and is part of its reservation, but it effectively lacks possession and control over it due to the presence of the New York State Thruway.

Nor can the Nation dispose of the property given that New York State maintains a permanent easement, and the Nation cannot exclude others from, or otherwise enjoy the land because vehicles are constantly traveling across it.  Indeed, the Thruway is part of the federal Interstate Highway System and, as such, is regulated by the Federal Highway Administration. Among relevant federal regulations are those restricting what activities may occur within the right-of-way and where access may occur.  Thus, for all practical purposes, these facts render the 1954 Easement more akin to fee title termination for purposes of bringing the Nation's claims within the auspices of *Sherrill*.

In *Cayuga*, the Second Circuit explained that "the Supreme Court did not identify a formal standard for assessing when these equitable defenses apply" and that "the broadness" of the Supreme Court's statements indicate that *Sherrill* was "not narrowly limited to claims identical to that brought by the Oneidas, seeking a revival of sovereignty, but rather, that these equitable defenses apply to 'disruptive' Indian land claims more generally."  413 F.3d at 274. "Three specific factors determine when ancestral land claims are foreclosed on equitable grounds: (1) 'the length of time at issue between an historical injustice and the present day' (2) 'the disruptive nature of claims long delayed;' and (3) 'the degree to which these claims upset the

15

justifiable expectations of individuals and entities far removed from the events giving rise to the plaintiffs' injury." *Onondaga Nation*, 500 F. App'x at 89 (quoting *Oneida*, 617 F.3d at 127).

As discussed below, all three factors support application of the *Sherrill* laches defense, and thus, summary judgment should be granted to the State on this affirmative defense.

1. *The Significant Length of Time Between the Allegedly Invalid Easement and Today*

The Nation first challenged the validity of the 1954 Easement in 1993, nearly four decades after the Nation granted the permanent easement to the State of New York. *See* Maguire Decl. Ex. A (*Seneca I* Complaint). The instant case, however, was not filed until 2018, 64 years after this allegedly illegal real estate transaction occurred and 61 years after the Erie Section of the Thruway was constructed (1957).

In *Seneca I*, the Nation brought claims against New York State, the Thruway Authority, and the Thruway Authority's Executive Director in 1993 and, like here, claimed that the 1954 Easement violated the Nonintercourse Act and sought a declaration it was invalid.[7] Four years later, in 1997, the Nation filed a second amended complaint in *Seneca I* in which the Governor and the Commissioner of the Department of Transportation, among others, were named in their official and individual capacities for alleged violations of 42 U.S.C. § 1983. *See* Maguire Decl. Ex. B (*Seneca I* SAC) ¶¶ 7, 11, 14, 37-38. The Nation alleged that the actions of the State and State officials "with respect to the land at issue were taken under color of state law" thereby depriving the Nation of its rights under federal law. *Id*. ¶ 38.

---

[7] While both *Seneca I* and *Seneca II* challenge the legality of the 1954 Easement, the relief sought was different: here, the Nation seeks a permanent injunction compelling the State (except for the Comptroller) to renegotiate the 1954 Easement. *See* ECF No. 1 (Complaint p. 14 – Relief Requested ¶ 1). In addition to seeking a declaration that the 1954 Easement was invalid in *Seneca I*, the Nation also sought a "permanent injunction ejecting the defendants from the land" and monetary damages for the "fair rental value of the lands." Maguire Decl. Ex. A (*Seneca I* Complaint), ¶¶ 2(B), 2(D), 3, 4(B). These differences, however, are ultimately superficial – both cases were predicated on the invalidity of the 1954 Easement.

Notably, the Nation did not assert that the State officials engaged in "ongoing violations" of federal law pursuant to the *Ex Parte Young*, 209 U.S. 123 (1908) doctrine – as it does here – despite having full awareness in *Seneca I* that its claims concerning the 1954 Easement could have been dismissed pursuant to well-established Eleventh Amendment and Rule 19 indispensable party case law. The Nation's litigation choice and/or failure to assert claims under *Ex Parte Young* against these State officials in *Seneca I* strongly supports application of laches in *Seneca II* given the significant passage of time.

Moreover, after the Second Circuit affirmed the dismissal of *Seneca I* in 2004, the Nation could have promptly refiled suit against the State officials sued herein under *Ex Parte Young*, but instead, it waited *another fourteen years* to file this second action (from 2004 to 2018) asserting differently pled claims that involved the *same subject matter* as in *Seneca I* (*i.e.*, the validity of the 1954 Easement). Yet again, the Nation's litigation choice and/or failure to sue these State officials for *Ex Parte Young* claims back when *Seneca I* was first filed, during the pendency of that litigation, or shortly after its dismissal, demonstrates that the Nation's claims should be barred by laches.

Although the length of the Nation's delay is not as long as the Oneidas' delay in *Sherrill*, the delay of 64 years (from the 1954 Easement to the 2018 commencement of this action) remains significant because of the "disruptive nature" of the requested relief. *See Sherrill*, 544 U.S. at 202; *Cayuga*, 413 F.3d at 277; *see generally Galliher v. Cadwell*, 145 U.S. 368, 373 (1892) ("laches is not like limitation, a mere matter of time; but principally a question of the inequity of permitting the claim to be enforced – an inequity founded upon some change in the condition or relations of the property or the parties"). Indeed, in *Sherrill*, the Supreme Court also approvingly cited *Felix v. Patrick*, 145 U.S. 317 (1892), where the Court barred "the heirs

17

of an Indian from establishing a constructive trust over land their Indian ancestor had conveyed in violation of a statutory restriction" because "[i]n the nearly three decades between the conveyance and the lawsuit '[a] large part of the tract ha[d] been platted and recorded as an addition to the city of Omaha, and . . . sold to purchasers.'" *Sherrill*, 544 U.S. at 217 (quoting *Felix*, 145 U.S. at 326). The three decades of delay in that case is far less than the delay here regardless of how its measured: 71 years (from the 1954 Easement to today); 64 years (from the 1954 Easement to the 2018 commencement of this action); or 39 years (from the 1954 Easement to the 1993 commencement of the Nation's first action). And, as discussed below, the Nation's claims are highly disruptive and therefore barred by *Sherrill*.

In a remarkably similar case, the Appellate Division, Second Department recently analyzed *Sherrill* laches in addressing whether the Shinnecock Nation may assert regulatory authority over land it owned within a right-of-way on a highway built and operated by the State. *See Commissioner of the N.Y. State DOT v. Polite*, No. 2020-05137, 2024 N.Y. App. Div. LEXIS 6445, at *1-3 (2d Dep't Dec. 4, 2024). There, the State acquired a permanent easement over 3.62 acres in 1959 from the Shinnecocks for highway purposes. *Id.* at *3. The State thereafter built Sunrise Highway over the Shinnecocks' land (known as "the Westwoods"). *Id.*

The DOT Commissioner sued Shinnecock officials to enjoin billboard construction and operation on easement land under a state law theory analogous to *Ex Parte Young* for "ongoing violations of New York State law." *Id.* at *2. As particularly important here, the Appellate Division addressed the DOT's argument that – even if it did not establish that the Shinnecocks' aboriginal title to the Westwoods had been extinguished – their "regulatory authority over the subject property would unduly disrupt settled expectations" under *Sherrill*. *Id.* at 49; *see also id.* at 55-56. The Appellate Division agreed with the DOT, holding that it was "likely to prevail on

18

the argument that recognition of the [Shinnecocks'] ability to assert regulatory authority over the subject property for purposes of constructing, maintaining, and/or operating the structures in the highway right-of-way would be unduly disruptive to settled expectations" within the meaning of *Sherrill*. *Id.* at 49-50.

The Shinnecocks' claim "presents the type of disruptive land claim that would be barred under [*Sherrill*]" as "[t]he record demonstrates that in 1959, the State acquired a permanent easement for highway purposes over the subject property from the [Shinnecocks], and, since then, the State constructed, maintained, and operated the highway, which runs through the subject property." *Id.* at 58. The same is true here and therefore bars the Nation's claims as a matter of law. *See infra* Argument Point I(A)(2).

On the issue of timing and the length of delay, the Appellate Division concluded that, "[a]lthough this approximately 60-year period may not be as long as the lengths of time at issue in other cases, the critical issue is the disruptiveness of the claim, not necessarily the length of time involved." *Id.* at 58-59 (citing *Sherrill*, 544 U.S. at 202; *Cayuga*, 413 F.3d at 277). In other words, "the length of time is a factor that should be considered in determining how disruptive a claim is, but it is not necessarily dispositive of the issue." *Id.* at 59. As with the Shinnecocks, the long passage of time between the wrong alleged here and the Nation's filing of this suit significantly contributes to the highly disruptive nature of the Nation's claims.

2. *The Inherently Disruptive Nature of the Nation's Long Delayed Claims to Invalidate the 1954 Easement*

"[A]ny claims premised on the assertion of a current, continuing right to possession as a result of a flaw in the original termination of Indian title—are by their nature disruptive." *Oneida*, 617 F.3d at 125. As discussed above, like in *Oneida*, the Nation's claims are "premised on the assertion of a current, continuing right to possession" of the 1954 Easement land because

19

the Nation seeks a declaration that the easement failed to comply with federal law and is therefore void *ab initio*. *See* ECF No. 1 (Complaint ¶¶ 1, 4, 40, 47-63). A consequence of such a ruling is that the legal status of the land would necessarily revert to full sovereign control by the Nation upon a declaration of the 1954 Easement's invalidity, thereby extinguishing the State of New York's right to operate the Thruway. Accordingly, to the extent the Nation's claims are construed (as they should be) as one premised on a "current, continuing right to possession," it is highly disruptive of settled expectations as a matter of law within the meaning of *Sherrill*.

But even if this Court construes the Nation's claims as non-possessory in nature, the equitable relief sought by the Nation – a mandatory injunction compelling the State to renegotiate an easement that has been in place for over 70 years – is "inherently disruptive." *Oneida*, 617 F.3d at 136. As the Second Circuit explained in *Oneida*, the "dispositive question in ascertaining the applicability of *Sherrill's* equitable defense is not whether a current possessory right is asserted, but whether a plaintiff's claim is inherently disruptive." *Id*. Indeed, "the equitable defense originally recognized in *Sherrill* is potentially applicable to all ancient land claims that are disruptive of justified societal interests that have developed over a long period of time, of which possessory claims are merely one type, and regardless of the particular remedy sought." *Id.*

The relief the Nation seeks here, by its very nature, is highly disruptive and thus barred by *Sherrill* given the State of New York and the Thruway Authority's extensive reliance on the original permanent easement when constructing the Thruway's Erie Section and the massive prejudice resulting from a compelled renegotiation.

Moreover, the *consequences* flowing from this mandatory injunctive relief are extremely disruptive. The Nation could demand certain "conditions" upon a "new easement" that are both impractical and unduly burdensome including subjecting this land to the Nation's governance,

20

laws, rules, and regulations – creating an unworkable "checkerboard of alternating state and tribal jurisdiction" on the Thruway which would "seriously burden the administration of state . . . government[]." *Sherrill*, 544 U.S. at 219-20.  In addition to burdens on the State government, the Nation could seek to impose its own laws, rules and regulations regarding the operation of vehicles on this portion of the Thruway – including those that may conflict with the remainder of the Thruway outside of the 1954 Easement area.  This could create confusion and safety issues for the large number of vehicles that travel through the Erie Section of the Thruway.

If the State were forced to renegotiate a "new easement" with the Nation, nothing would bar the Nation from seeking an exorbitant sum of money for such, which would potentially have a materially detrimental impact on the Thruway Authority's budget, possibly leading to large toll increases to be paid by operators of passenger vehicles and commercial trucks.  The Nation's negotiation tactics could also force the State of New York and the Thruway Authority to at least consider alternative options such as rerouting the Erie Section, which is yet another factor demonstrating the highly disruptive nature of the Nation's requested relief.

While rerouting admittedly is not sought by the Nation as *direct* relief in this instant matter, it is nevertheless a potential *consequence* stemming from the extremely broad and disruptive relief of a compelled easement renegotiation.  This is because the land in question would necessarily revert to the Nation's full sovereign control – unburdened by the "original easement" – upon a declaration of the original easement's invalidity and the Nation as owner of the land could seek to eject New York State.  Otherwise, any agreement forming the basis of a "new easement" would lack consideration since the Nation would not possess complete ownership rights if it agreed to grant a "new easement" to New York State and the Thruway

21

Authority.  Simply stated, the Court granting the Nation its requested relief would open the door to future ejectment of New York State and future rerouting of the Thruway.

Similar consequences were considered by the Appellate Division in *Shinnecock*.  If the Shinnecocks were "permitted to assert sovereign authority over the subject property for purposes of [billboard construction and operation], little would prevent the Nation from asserting full sovereign authority over the subject property or even requiring that the portion of the highway that goes through the subject property be rerouted."  *Polite*, 2024 N.Y. App. Div. LEXIS 6445, at *62.  Like here, rerouting was not directly at issue in the *Shinnecock* case, only the construction of billboards, but it was undoubtedly considered by the court when analyzing the ramifications of allowing the Shinnecocks to assert full sovereign authority over the disputed land.  Considering the application of this analysis to one highway in Long Island, the same analysis can be attributed to the Thruway which is a part of the federal Interstate Highway System and a significant instrumentality of New York State.

The Northern District's decision in *Canadian St. Regis Band of Mohawk Indians v. New York*, No. 5:82-CV-0783 (Lead), 2013 U.S. Dist. LEXIS 94381 (N.D.N.Y. June 8, 2013) is also instructive.  There, the court dismissed on *Sherrill* laches grounds the Canadian St. Regis Band of Mohawk Indians' possessory claim regarding a public highway (New York State Route 37) that ran through the Mohawks' reservation.  The Northern District concluded that "[e]jecting the state or otherwise requiring that the highway be rerouted at this late date would be highly disruptive in precisely the way *Sherrill* laches operates to prevent."  *Id.* at *23.

The Northern District addressed these considerations in the *Cayuga* land claim case as well.  As the court explained, "ejectment would mean that transportation systems, such as the New York State Thruway, would have to be rerouted at great expense" and "[p]utting aside costs,

22

rerouting the Thruway would have almost unthinkable consequences in terms of intrastate and interstate commerce." *Cayuga Indian Nation v. Cuomo*, 80-CV-930, 80-CV-960, 1999 U.S. Dist. LEXIS 10579, at *97-98 (N.D.N.Y. June 30, 1999).  On the disruptive consequences of ejecting the Long Island Railroad from land claimed by the Shinnecocks in Suffolk County, the Eastern District similarly concluded that it "would have devastating consequences to the region's economy and a drastic impact on thousands of commuters." *Shinnecock Indian Nation v. New York*, No. 05-CV-2887, 2006 U.S. Dist. LEXIS 87516, at *18 n.9 (E.D.N.Y. Nov. 28, 2006).

This Court can take judicial notice of the plain fact that rerouting the Thruway for approximately 30 miles would be prohibitively expensive, and thus, highly disruptive by its very nature, but it can also rely on the State's expert.  Rick Gobeille, a licensed professional engineer with Stantec Consulting Services Inc., a longtime consultant for the Thruway Authority, estimated the economic impacts and capital costs to reroute a portion of the Thruway's Erie Section to avoid the Nation's land.  *See* SUMF ¶¶ 40-41; Declaration of Richard Gobeille in Support of Defendants' Motion for Summary Judgment ("Gobeille Decl."), ¶¶ 1-5; *Id.* at Ex. A (Gobeille Expert Report).  Given the monumental nature of this project, Mr. Gobeille conducted a limited analysis that included development of potential alternative routing which did not alter the current character of the Thruway by maintaining it as a high-speed, tolled highway with two lanes per direction and grade-separated interchanges.  SUMF ¶ 42; Gobeille Decl. ¶ 6.  Mr. Gobeille estimated a range of capital costs related to building this alternative route, revenue impacts to the Thruway Authority, additional costs to drivers, and other economic and traffic diversion impacts. SUMF ¶ 43; Gobeille Decl. ¶ 8.  He opined that the capital cost of constructing the alternative Thruway route – if access to the existing 1954 Easement was eliminated – was likely to range from $2.1 to $3.0 billion (in 2024 dollars).  SUMF ¶ 44; Gobeille Decl. ¶ 9.

23

Assuming *arguendo* that this Court has the authority to issue an order directing the State to renegotiate the 1954 Easement, it cannot compel the parties to agree to specific contract terms. Consequently, rerouting a portion of the Thruway cannot be foreclosed and it is hard to conceive of an outcome more disruptive.  Finally, a compelled renegotiation of the 1954 Easement would force the highest ranking officials in the State of New York and the Thruway Authority to divert attention away from normal State business and Thruway operations to address a matter that had been settled for *seven decades*.

3.  *The Nation's Claims Significantly Upset the Justifiable Expectations of New York State, the Millions of Thruway Users, and All Individuals and Entities Who Rely on the Thruway for Transportation*

As demonstrated above, the Nation's claims would "upset the justifiable expectations of individuals and entities far removed from the events giving rise to the plaintiffs' injury."  *Oneida*, 617 F.3d at 127.  There has been significant reliance by New York State and the Thruway Authority between 1954 and today on the validity of the 1954 Easement – including the initial construction of the Thruway's Erie Section and development around the existing route and improvements made throughout those many years.

Yet again, the Court can take judicial notice of the incontrovertible facts that the land over which the 1954 Easement runs was improved by the construction of a four lane interstate highway, along with the various appurtenances which accompany this highway (paved shoulders, signage, guiderails, drainage, bridges, etc.).  All of this was constructed with the understanding that the permanent easement the Nation executed in 1954 was valid.  New York State and the Thruway Authority have spent a massive amount of money in reliance on the legitimacy of this easement.  In other words, the Nation's claims which seek to invalidate the easement significantly upset the justifiable expectations of New York State and the Thruway Authority – and the millions of Thruway travelers who rely on it for expedient and efficient transportation,

24

including for purposes of interstate commerce, national defense, commuting to and from their

place of employment, access to health care, and tourism.  *See* 23 U.S.C. § 101(b)(1) ("Congress

declares that it is in the national interest to accelerate the construction of Federal-aid highway

systems, including the Dwight D. Eisenhower National System of Interstate and Defense

Highways, because many of the highways (or portions of the highways) are inadequate to meet

the needs of local and interstate commerce for the national and civil defense.").

The Thruway's Erie Section – of which the Nation's land is a small but essential part –

was built in the 1950s at a cost of $64 million.  *See* SUMF ¶¶ 24-26; Malone Decl. ¶¶ 10-12, 22-

25.  The Thruway Authority did not separately identify construction costs for the 2.7 mile

"Seneca Section" as that term is only relevant to this litigation.  SUMF ¶ 25; Malone Decl. ¶ 23.

However, construction costs attributable to the Seneca Section (in 1950s dollars) were $2.5

million.  SUMF ¶ 26; Malone Decl. ¶ 25.  And had New York State known *prior to* construction

of the Erie Section that the Nation's lands could not be used, it would have most certainly

developed an alternative route that bypassed the Nation's land.  *See* Gobeille Decl. ¶ 23.  But that

did not occur and the Erie Section was built over the Nation's land *after* the Nation granted New

York State a permanent easement.

Additionally, the Thruway Authority has expended vast sums of money to operate and

maintain the Erie Section as a whole and the Seneca Section therein.  From 1957 (when the Erie

Section was completed) to 2023, the total cost incurred by the Thruway Authority attributable to

operating and maintaining the Seneca Section alone was approximately $55 million (unadjusted

for present-day value).  *See* SUMF ¶ 27; Malone Decl. ¶ 29.  Annual expenses attributable to

operating and maintaining the Seneca Section included expenses related to salaries, employee

benefits, maintenance and repairs, and utilities.  SUMF ¶ 29; Malone Decl. ¶ 30.  This does not

include interest expenses associated with the issuance of Thruway Authority bonds for financing improvements for the Erie Section and Seneca Section.  SUMF ¶ 30; Malone Decl. ¶ 37(c).

The Nation's claims therefore significantly upset the justifiable expectations of New York State and the Thruway Authority and are barred by *Sherrill* laches.

### B.  Traditional Laches Also Bars the Nation's Claims

*Sherrill* laches and traditional laches, while sharing many common attributes, are different in several respects.  Regardless, under either doctrine, the Nation's claims are barred.

In *Oneida*, the Second Circuit stated that "the equitable defense recognized in *Sherrill* and applied in *Cayuga* does not focus on the elements of traditional laches but rather more generally on the length of time at issue between an historical injustice and the present day, on the disruptive nature of claims long delayed, and on the degree to which these claims upset the justifiable expectations of individuals and entities far removed from the events giving rise to the plaintiffs' injury."  617 F.3d at 127.  As the Second Circuit explained, the Supreme Court in *Sherrill* "discussed laches not in its traditional application but as one of several preexisting equitable defenses, along with acquiescence and impossibility, illustrating fundamental principles of equity that precluded the plaintiffs 'from rekindling embers of sovereignty that long ago grew cold.'"  *Id.* at 128 (quoting *Sherrill*, 544 U.S. at 214).  "Moreover, the Supreme Court made no mention of unreasonable delay by the New York Oneidas [in *Sherrill*], as distinguished from delay alone, or prejudice to the particular defendants, as opposed to the disruption of broader societal expectations."  *Id.* (quoting *Sherrill*, 544 U.S. at 213).  *Sherrill* therefore "did not involve the application of a traditional laches defense so much as an equitable defense that drew upon laches and other equitable doctrines but that derived from general principles of 'federal Indian law and federal equity practice.'"  *Id.* (quoting *Sherrill*, 544 U.S. at 213).

26

For all the reasons discussed above, *Sherrill* laches applies to the facts and circumstances here and bars the Nation's claims as a matter of law.  The same result applies if this Court determines that traditional laches governs as many of the same arguments set forth above regarding *Sherrill* laches apply with equal force to traditional laches.

As this Court previously stated, laches "requires proof of (1) lack of diligence by the party against whom the defense is asserted, and (2) prejudice to the party asserting the defense." *Seneca Nation*, 484 F. Supp. 3d at 78 (quoting *New Jersey v. New York*, 523 U.S. 767, 806 (1998)).  This Court denied the State's motion to dismiss on laches grounds because it was "premature" and "not plain from the complaint that laches applies," but nevertheless observed that "[t]he defendants may well have a valid laches defense in this case."  *Id.*  It was unclear to the Court at that early stage "what the prejudice is to the defendants or whether there was actual lack of diligence during all those years on the part of the Nation."  *Id.*  The lack of clarity on prejudice that existed at the pleadings stage is now gone.  The prejudice stemming from the Nation's long delay is monumental and its lack of diligence cannot reasonably be disputed.

       1.   *The Nation's Lack of Diligence*

Although not required for *Sherrill* laches, unreasonable delay/lack of diligence is an element for traditional laches.  The State has nevertheless established this element as a matter of law.  Against the procedural history backdrop of this extensively litigated case, the Nation's lack of diligence is demonstrated by the indisputable fact that (1) the Nation waited nearly four decades after it executed the 1954 Easement with the State of New York to commence *Seneca 1* (1993) and (2) nearly six and a half decades after executing that very same easement to commence *Seneca II* (2018).  The Nation's *Ex Parte Young* legal theory was not raised in *Seneca I* – or during the 14-year interval between *Seneca I's* dismissal and *Seneca II's* commencement – even though the Supreme Court decided *Ex Parte Young* 85 years before *Seneca I* and 110 years

before *Seneca II*. Indeed, even if this Court concludes that the Nation was not obligated to raise its claims under *Ex Parte Young* in *Seneca I* (in light of this Court and the Second Circuit's rulings on the State's motion to dismiss), the Nation certainly could have raised its claim in 2004 or shortly after the Second Circuit's dismissal, but instead, the Nation waited another fourteen years to file this suit. Laches serves to protect defendants against such lack of diligence and unreasonable delay.

Nor does the Nation have any reasonable excuse or justification for its lengthy delay in bringing this action. Indeed, the Nation was fully aware of its rights under the Nonintercourse Act, enacted in 1790, well *before* it executed the 1954 Easement. In a case involving a challenge to the Nation's operation of a casino in the City of Buffalo, this Court (Judge Skretny) recounted the Nation's history, its historical relationship to the land in Western New York, and the interplay among various federal statutes, including the Nonintercourse Act. *See Citizens Against Casino Gambling v. Hogen*, No. 07-CV-0451S, 2008 U.S. Dist. LEXIS 52395, at *8-52 (W.D.N.Y. July 8, 2008). This Court noted that the Nation's claims for damages with the Indian Claims Commission ("the ICC") established by Congress in 1946 "to hear and resolve certain claims by Indian tribes against the federal government." *Id.* at *34-35. Recounting the procedural history of the ICC litigation, this Court noted that "[o]n August 11, 1951, the [Nation] filed a petition with the [ICC] seeking an award for damages for the United States' alleged failure to ensure that the [Nation] received conscionable consideration in the sale and leasing of its land under various treaties, agreements and statutes." *Id.* at 36-37 (citing *Seneca Nation of Indians v. United States*, 39 Ind. Cl. Comm. 355, 355 (1977)). The Nation sought redress in the ICC for various land purchases and leases from the late 1700s and throughout the 1800s. *Id.* at 37.

28

As this Court explained, the federal Court of Claims (which heard ICC appeals) concluded that, because of the Nonintercourse Act, "the United States assumed a special fiduciary responsibility to protect and guard Indians against unfair treatment in transactions with respect to the disposition of their lands."  *Id.* at 38 (citing *Seneca Nation of Indians*, 173 Ct. Cl. at 925).  The Court of Claims "held that wherever the Nonintercourse Act applies, it necessarily follows that 'the United States is liable, under the Indian Claims Commission Act, for the receipt by the Indians of an unconscionably low consideration.'" *Id.* (citing 173 Ct. Cl. at 925-26).

While the defendants and claims involved in the ICC litigation are different from the instant case, this history demonstrates that, as of at least 1951, the Nation was fully aware of its rights under the Nonintercourse Act.  *Hogen*, 2008 U.S. Dist. LEXIS 52395, at *34-*38; *see also Seneca Nation of Indians v. United States*, 12 Ind. Cl. Comm. 552, 557 (1963) (noting that the Nation "assert[ed] that the provisions of [the Nonintercourse Act] . . .  require the consent of the United States to make any alienation of the subject lands effective" and that the Nation cited "a number of cases to support the view that [the Nonintercourse Act] obligated the United States to vacate any disposition of [the Nation's] lands made without the consent of the United States").  But the Nation nevertheless waited until 1993 to file its first suit and until 2018 to file this suit.  The Nation's knowledge of purported Nonintercourse Act violations *prior* to its execution of the 1954 Easement further supports application of laches here.

Additionally, the Nation's 1976 agreement with the State of New York relating to the State's acquisition of a different easement across the Nation's Allegany Reservation for construction of another highway, the Southern Tier Expressway, demonstrates the Nation's awareness of Department of Interior approval requirements (or lack thereof).  *See* SUMF ¶¶ 45-48; Maguire Decl., Ex. GG.  In light of the Seneca Leasing Act of 1961, the Nation

unquestionably no longer needed federal approval to grant easements across its lands.

Accordingly, language requiring such approval was stricken from the Southern Tier Expressway

Agreement and the Secretary of the Interior was removed as a signatory to that contract. *See*

SUMF ¶ 48; Maguire Decl. Ex. GG, ¶ 13. As such, the Nation was fully aware that Department

of Interior approval was no longer required as of 1976 but it now claims that such approval was

required for the 1954 Easement, yet it waited until 2018 to file this suit. This is another reason

why the Nation should have challenged the 1954 Easement much sooner than it did, rather than

wait until 1993 and 2018.

      In light of this history, the State has established that the Nation exhibited a lack of

diligence by waiting over six decades after executing the 1954 Easement to bring this case. No

excuse exists for such a lengthy and highly prejudicial delay.

      2.  *Prejudice to the State Resulting from the Nation's Long Delay.*

      Not only is the Nation's delay inexcusable, but its delay would result in massive

prejudice to New York State and the Thruway Authority (if the Nation's claims were allowed to

proceed) because of the highly disruptive remedy sought here. *See supra* Argument Point

I(A)(2). As noted above, New York State incurred costs of $64 million in the 1950s

(approximately $750 million today) to build the Erie Section of the Thruway that traversed the

Nation's land. *See* SUMF ¶ 24; Malone Decl. ¶ 22. Additionally, the Thruway Authority has

spent nearly $55 million to operate and maintain the 2.7 mile Seneca Section from 1957 to 2023.

      Not only is the prejudice immense, but permitting the Nation to proceed with its claims

would allow it to *benefit* from its lengthy delay in filing suit. Instead of a timely, pre-

construction challenge to the easement – which almost certainly would have resulted in the

Thruway going around the Nation's lands (*see* Gobeille Decl. ¶ 23) – the Nation instead waited

another four decades to make its first legal challenge to the easement and over six decades for its

second challenge.  Indeed, even a challenge shortly after the Erie Section's initial construction would have been less prejudicial since the costs to acquire alternative rights-of-way around the Nation's land today would be far greater than the costs in the 1950s or 1960s.

The Nation's own expert – opining on the purported value of the easement using 2023 dollars (which he calls an "Ongoing Benefit Analysis") – further establishes the prejudice to New York State and the Thruway Authority from the Nation's lengthy delay.  According to the Nation's expert, Steven Turner, the alleged "Ongoing Benefit" to the Thruway Authority for the "Enabled Seneca Section" of the Thruway is $16.98 to $18.44 million per year.  *See id.* ¶ 13. Most of this supposed "Ongoing Benefit" to the Thruway Authority from using the current Thruway route is predicated on the avoidance of losses associated with not having to use a much longer and less direct alternative "But-For Route" developed by Mr. Turner.  *Id.* ¶ 15.  Mr. Turner calculated a hypothetical 2023 "net loss" of $14.29-$15.74 million using the But-For Route.  *Id.* ¶ 20.   Notably, this net loss calculation does not even account for design and construction costs for a new Thruway route that bypasses the Nation's lands.  *Id.* ¶ 21.  Allowing the Nation to proceed with its claims would potentially subject the State to exorbitant payment demands for a "new easement" – which only grew because of the Nation's unreasonable delay.

In sum, the State is entitled to judgment as a matter of law on the affirmative defense of laches – whether analyzed under the *Sherrill* framework or the traditional laches approach.

## POINT II

### UNDER THE 1875 SENECA LEASING ACT AND SENECA LEASING ACT OF 1950, THE 1954 EASEMENT DID NOT NEED TO BE APPROVED BY THE SECRETARY OF THE INTERIOR

#### A.  1875 Seneca Leasing Act

The 1875 Seneca Leasing Act provided the Nation with authority to give New York State the property rights required for the State to establish highways within the Nation's reservations:

31

> That all laws of the State of New York now in force concerning the laying out, altering, discontinuing, and repairing highways and bridges shall be in force within said villages, and may, with the consent of said Seneca Nation in council, extend to, and be in force beyond, said villages in said villages, or in either of them…

18 Stat. 331, § 8.  This section did two things: (1) it provided that New York State and its municipal entities could acquire the property rights necessary for the "laying out" of highways within the villages pursuant to the laws of New York; and (2) it provided that New York State, with consent of the Nation, could acquire the property rights necessary for the "laying out" of highways outside the villages pursuant to the laws of New York.  In 1947, this Court interpreted this section as allowing Cattaraugus County, without running afoul of the Nonintercourse Act, to take via eminent domain property rights necessary for a highway within the Village of Red House provided the taking properly complied with the laws of New York.  *United States v. Cattaraugus County*, 71 F. Supp. 413, 419 (W.D.N.Y. 1947).

Under the plain language of the 1875 Seneca Leasing Act, with the Nation's consent, New York's laws concerning the "laying out" of highways apply across the Nation's territory.  And, New York's laws allow certain agencies and authorities, including the Thruway Authority, to obtain property rights, title, and easements for construction of highways.  *See* N.Y. Pub. Auth. Law §§ 354(4), 358, 358-a; N.Y. Highway Law § 347.  Here, through the September 18, 1954 resolution, the Nation exercised its authority under Section 8 of the 1875 Seneca Leasing Act to extend the laws of the State of New York to the section of the Cattaraugus Reservation required for the Thruway.  Then, the Thruway Authority acting under New York State Public Authorities Law § 354(4), acquired the 1954 Easement from the Nation on behalf of the People of the State

32

of New York.[8]  Maguire Decl. Ex. K (1954 Easement).  Under the 1875 Seneca Leasing Act, the

Nation did not need federal approval to enter into the 1954 Easement.

### B.  Seneca Leasing Act of 1950

The Seneca Leasing Act of 1950 also gave the Nation the legal authority to enter into the

1954 Easement without federal approval.  As discussed above, the Act authorized the Nation to

"lease" lands within its reservations, without federal approval, "for such purposes and such

periods as may be permitted by the laws of New York."  64 Stat. 442, § 5.  This "leasing"

authority included the Nation's authority to enter into the 1954 Easement without federal

approval.  Ultimately, both the plain language of the Seneca Leasing Act of 1950 and other

relevant evidence supports an interpretation of the term "lease" as sufficiently broad to

encompass empowering the Nation to "lease" the 1954 Easement to New York State.

First, the legislative acts predating the Seneca Leasing Act of 1950, upon which the Act

builds upon, supports a broad interpretation of the Nation's authority to dispose certain property

rights without federal approval.  The 1875 Seneca Leasing Act authorized the Nation to "lease"

land anywhere on the reservations to railroad corporations for railroad purposes.  18 Stat. 330 §§

---

[8] The Complaint should be dismissed because the State of New York is an absent but indispensable party under Rule 19.  On appeal, the Second Circuit explained:

> Whether the lawsuit can proceed against these individual state defendants without the State as a party is a separate question from that of collateral estoppel. Defendants here did not move to dismiss the lawsuit on the basis that the State was an absent but indispensable party under Rule 19. As the district court noted, should discovery make it clear that the state-official defendants cannot adequately represent the State's interest such that the action should be dismissed under Rule 19 because the State is a necessary and indispensable party, defendants may so move at summary judgment.

*Seneca II*, 58 F.4th at 669 n. 19.  The State of New York does not dispute that the state-official defendants can adequately represent its interests in this litigation *if they are properly parties to this litigation*.  While the Second Circuit held that the state-official defendants are proper parties under *Ex Parte Young*, *id.* at 674, the State of New York may seek further review of that holding.  If that holding is reversed, the State of New York reserves and preserves its defense that it is an indispensable party under Rule 19.

1, 4.  The term "lease" usually denotes "a grant of devise of real property, usually for a term of years with reversion to the grantor."  *Becker v. Manufacturers Trust Co.*, 262 A.D.525, 527 (1st Dep't 1941); *see also* Maguire Decl. Ex. MM (Black's Law Dictionary (1st Ed.) (1891)) ("a conveyance of any lands or tenements…made for life, for years, or at will, but always less time than the lessor has in the premises).  Such a temporal limitation, however, should not be read into the term "lease" as used in Section 1 of the 1875 Seneca Leasing Act.  In Section 1, there is no explicit time restriction on the Nation's ability to "lease" its land to railroads—the Nation could permanently "lease" its lands.  However, in Section 3, when Congress authorized the renewal of leases within the villages, Congress did include an explicit time limitation—allowing renewal for only 12 years.  In 1890, Congress amended the 1875 Seneca Leasing Act to allow the villages' leases to be renewable for 99 years.  26 Stat. 558.  In that amendment, Congress explicitly carved out leasing to railroads, further demonstrating that there was no time limitation on the Nation's ability to "lease" lands to railroads.  Because Congress included an explicit time limitation when referring to leases in Section 3, but no time limitation when referring to leases in Section 1, the Court should not read an implicit time limitation into the Nation's authority to "lease" its lands to railroads under the 1875 Seneca Leasing Act.  *See Brown v. Gardner*, 513 U.S. 115, 118 (1994) ("presumption that a given term is used to mean the same thing throughout a statute.").

Pursuant to its leasing authority under the 1875 Act, the Nation entered into multiple agreements with different railroads.  Those agreements are nearly identical to the 1954 Easement.  *See* Maguire Decl. Ex. CC (1906 Railroad Agreement); Ex. II (1906 Right-of-Way Agreements); Ex. JJ (1903 Right-of-Way Agreement); and Ex. KK (1907 Railroad Agreement).  And they demonstrate that it was possible under the 1875 Seneca Leasing Act for a railroad to

34

"lease" a right-of-way from the Nation for purposes of constructing and operating a railroad. *See* Maguire Decl. Ex. KK ("a lease of a right of way for a railroad switch").

For example, in 1906, the Nation entered into an agreement with the Lake Shore and Michigan Southern Railway Company ("Lake Shore Railroad"). Just as the 1954 Easement granted New York State a property interest on the Cattaraugus Reservation "for purposes of constructing, reconstructing, and maintaining a Thruway," this railroad agreement granted the Lake Shore Railroad a property interest on the Cattaraugus Reservation to "construct and maintain" a railroad line. *Id.* The Nation was clearly authorized to convey this type of property right under the 1875 Seneca Leasing Act because it is the type of property interest a railroad company would need to construct a rail line. In characterizing the property right owned by the railroads on the Nation's reservations, early 20th century courts repeatedly characterized the property right as a "right-of-way." *See Sharp v. Erie R. Co.*, 90 A.D. 502, 503 (3d Dep't 1904) ("he jumped from the car and ran from the [railroad's] right of way into an adjoining piece of property"); *Fitzgerald v. Erie R. Co.*, 158 A.D. 801, 803 (4th Dep't 1913) ("It was the time of day when it was to be anticipated that employees engaged in the maintenance of the right of way would be engaged along the right of way").

The Seneca Leasing Act of 1950 *expanded* the Nation's leasing authority under the 1875 Seneca Leasing Act. 64 Stat. 442, § 5. ("In addition to the authority now conferred by law on the Seneca Nation of Indians to lease lands within the Cattaraugus, Alleghany, and Oil Springs Reservations to railroads and to lease lands within the limits of the villages established under authority of the [1875 Seneca Leasing Act]…). And, when interpreting the term "lease" in the Seneca Leasing Act of 1950, the Court should give it the same meaning as it had under the 1875 Seneca Leasing Act (with the 1890 amendment) pursuant to the "old soil" principle of statutory

35

interpretation. *See Taggart v. Lorenzen*, 587 U.S. 554, 561 (2019) ("When a statutory term is 'obviously transplanted from another legal source,' it "brings the old soil with it.'") (quoting Frankfurter, Some Reflections on the Reading of Statutes, 47 Colum. L. Rev. 527, 537 (1947)). Specifically, it authorized the Nation to "lease lands" outside the limits of the villages "for such purposes and such periods as may be permitted by the laws of the State of New York." *Id.*  The expansion of leasing authority can be conceptualized in two ways: (1) it broadened the Nation's authority to lease land outside the villages; and (2) removed the limitation restricting the Nation's authority to lease land outside the villages only for railroad purposes.  By removing that limitation, Congress authorized the Nation to give the same property rights it had been giving to railroad companies for railroad purposes to other entities for non-railway purposes.  This includes the authority to give New York State the 1954 Easement property rights.

Second, the Nation itself endorsed a broad interpretation of its authority under the Seneca Leasing Act of 1950 that encompassed the right to enter into easement/right-of-way agreements. In March 1960, the Nation passed a resolution, favoring passage of what is now N.Y. Indian Law § 78, stating the Seneca Leasing Act of 1950 authorized it to regulate "leases and rights of ways to Tribal Lands:"

> AND WHEREAS: The Seneca Nation of Indians has had the right under (the Seneca Leasing Act) passed by the Congress of the United States and approved on August 14, 1950, to regulate leases and rights of ways to Tribal Lands;

*Devonian Gas & Oil Co*., 424 F.2d at 469 (quoting Seneca resolution).  In *Devonian Gas & Oil Co*., the Second Circuit recognized that the Nation's interpretation of its own authority under the Seneca Leasing Act of 1950 has some relevance to interpreting the statute.  *Id*.

Third, the purpose of the Seneca Leasing Act of 1950 supports a broad interpretation of the Nation's authority to convey certain property rights without federal approval.  The Act was

36

enacted at a time when the overall federal policy towards Indian tribes in New York was aimed at withdrawing federal supervision over their affairs. *See id.* at 468. Indeed, in passing the Act, a Senator from New York explained that its purpose was part of an "announced congressional policy withdrawing Federal supervision, *wherever possible*." Maguire Decl. Ex. Z (96 Cong. Rec. 11076) (emphasis added); *see also* Maguire Decl. Ex. DD, pp. 6-7 ("Enactment of the bill will further the policy of placing the management of tribal affairs in the hands of the tribe and of withdrawing Federal supervision of Indian affairs where possible"). Given that express purpose and understanding, it makes little sense to construe the Act to have required federal supervision of a leasing or easement decision.

Other legislation passed around the same time as the Seneca Leasing Act of 1950 further supports a broad interpretation of the Nation's leasing authority under the Act. In 1948 and 1950, Congress passed the Acts of July 2, 1948, 62 Stat. 1224, and September 13, 1950, 64 Stat. 845, now 25 U.S.C. §§ 232-33. These acts relinquished the criminal and civil jurisdiction of the United States over New York Indians. The Commissioner of Indian Affairs explained the purpose of these Acts:

> The criminal and civil jurisdiction acts were part of an overall plan to withdraw Federal services to the Indians in New York and place the Indians in the same status as other citizens there.

*Devonian Gas & Oil Co.*, 424 F.2d at 468. This collective legislative history all points to the same conclusion: that Congress intended to give the Nation broad authority to grant property rights on its reservations without federal approval. Given this background, it is illogical to interpret the Seneca Leasing Act of 1950 as allowing the Nation to engage in a broad swath of property transfers except for the granting of property rights necessary for Thruway construction.

37

While Magistrate Judge Heckman rejected the State's argument in *Seneca I* that the Seneca Leasing Act of 1950 authorized the Nation to enter into the 1954 Easement without federal approval (*see* Maguire Decl. Ex. C, pp. 12-14), that determination was erroneous as a matter of law and should be rejected.[9]  In reaching that conclusion, Judge Heckman relied entirely on the 1961 amendment to the Act which added the phrase "or grant easements or rights-of-way on" to the Seneca Leasing Act of 1950 and the accompanying legislative history.  *Id.* Admittedly, both the Senate and House Reports accompanying the 1961 amendment state that the Seneca Leasing Act of 1950 did not cover the granting of easements or rights-of-way, but those statements should not be used to ascertain Congressional intent underlying the Seneca Leasing Act of 1950.  *See* Maguire Decl. Ex. EE, p. 2 ("the 1950 Act permitted the Seneca Council to lease lands in accordance with the laws of New York, but it did not cover the granting of easements or rights-of-way."); Maguire Decl. Ex. FF, p. 4 ("[T]he 1950 act permits the Seneca Council to lease lands that are within the three reservations and outside certain villages, in accordance with the laws of New York, but it does not cover the grant of easements and rights-of-way").

The Supreme Court has repeatedly warned against using the views of a later Congress to construe a statute enacted years before.  *See Pension Ben. Guar. Corp. v. LTV Corp.*, 496 U.S. 633, 650 (1990) (later history is a "hazardous basis for inferring the intent of an earlier' Congress"); *United States v. Southwestern Cable Co.*, 392 U.S. 157, 171 (1968) ("the views of one Congress as to the construction of a statute adopted many years before by another Congress

---

[9] In any event, neither Judge Arcara nor the Second Circuit adopted the Magistrate's conclusion that the 1954 Easement was invalid.  *See Seneca Nation*, 383 F.3d at 47 n.2 ("Judge Arcara declined to adopt Magistrate Judge Heckman's findings that the transaction [violated] the Non-Intercourse Act and that the Non-Intercourse Act's requirements were not lifted by subsequent legislation, and declined to address Defendants' argument that the [Nation] ratified the agreement by their subsequent acts. Accordingly, the parties did not brief—and we do not reach—these issues.").

have 'very little, if any, significance.'") (quoting *Rainwater v. United States*, 356 U.S. 590, 593 (1958)); *see also Sullivan v. Finkelstein*, 496 U.S. 617, 632 (1990) (Scalia, J., concurring) ("Arguments based on subsequent legislative history…should not be taken seriously, not even in a footnote").  Judge Heckman therefore erred in relying on the 1961 amendment and its accompanying legislative history to conclude that the Seneca Leasing Act of 1950 did not empower the Nation to enter into the 1954 Easement.  Ultimately, there is significant evidence to support an interpretation of "lease" in the Seneca Leasing Act of 1950 as broad enough to authorize the Nation to enter into the 1954 Easement.  That the legislative history for a later amendment to that Act suggested that it did not allow the Nation to enter into "easements or rights-of-way" does not controvert this evidence.

## POINT III

### THE NATION RATIFIED THE 1954 EASEMENT AT A TIME WHEN FEDERAL APPROVAL WAS NOT NECESSARY

Ratification results when a party to a contract accepts benefits flowing from the contract, or remains silent, or acquiesces in contract for any considerable length of time after he has opportunity to annul or void the contract.  *VKK Corp. v. National Football League*, 244 F.3d 114, 124 (2d Cir. 2001).  "When a party with full knowledge, or with sufficient notice of his rights and of all the material facts, freely does what amounts to a recognition of adoption of a contract or transaction as existing, or acts in a manner inconsistent with its repudiation, and so as to affect or interfere with the relations and situation of the parties, he acquiesces in and assents to it and is equitably estopped from impeaching it, although it was originally void or voidable." *John Hancock Life Insurance Co. of N.Y. v. Solomon Baum Irrevocable Family Life Ins. Trust*,

39

357 F. Supp. 3d 209, 218 (E.D.N.Y. 2018) (quoting *Rothschild v. Title Guarantee $ Tr. Co.*, 204

N.Y. 458, 464 (N.Y. 1912).[10]

Assent must be clearly established and may not be inferred from doubtful or equivocal

acts, but acquiescence or silence can give rise to an inference of ratification.  *Cammeby's Mgmt.*

*Co., LLC v. Allian Ins. Servs., Inc.*, 720 Fed. App'x 18, 22 (2d Cir. 2017).  "Thus, ratification

may be implied when a party fails to repudiate, or retains the benefit of, an unauthorized

transaction when he knows of the material facts concerning the agreement."  *John Hancock Life*

*Ins. Co.*, 357 F. Supp. 3d at 218.  "Both void and voidable contracts and instruments may be

ratified."  *Id.*

Even if the Court holds that the 1875 Seneca Leasing Act and Seneca Leasing Act of

1950 did not provide the Nation with authority to enter into the 1954 Easement without federal

approval, the 1961 amendment to the Seneca Leasing Act of 1950 removes all doubt.  This

amendment clarified the Seneca Leasing Act of 1950 by adding to the Nation's authority to enter

into leases the term "or grant easements or rights-of-way on" the Nation's lands.  The Act then

reads, in relevant part, "the Seneca Nation of Indians, through its council, is authorized to lease

or grant easements or rights-of-way on lands within the Cattaraugus, Alleghany, and Oil Spring

Reservations,…for such purposes and such periods as may be permitted by laws of the State of

New York."  Following the amendment and during a time that the Nation would have had

---

[10] While Indian relations fall within the exclusive province of federal law," *County of Oneida v. Oneida Indian Nation of New York State*, 470 U.S. 226, 234 (1985), nothing within the federal law governing Indian relations purport to create an entirely separate body of federal common law governing contracts with Indians.  Indeed, the Second Circuit has rejected the proposition "that [the] statutory requirements governing federal approval of certain contracts between Indians and non-Indians give right to a federal common law governing such contracts." *Niagara Mohawk Power Corp. v. Tonawanda Band of Seneca Indians*, 94 F.3d 747, 753 (2d Cir. 1996) (citing *Gila River Indian Cmty. v. Henningson, Durham & Richardson*, 626 F.2d 708, 714-15 (9th Cir. 1980)).  Accordingly, in this case, New York state contract law governs to the extent it is not preempted by federal law.  *See Oneida Indian Nation v. County of Oneida*, 802 F. Supp. 2d 395, 412 (N.D.N.Y. 2011) (applying New York law when interpreting retainer agreement).

incontrovertible express authority to enter into the 1954 Easement, the Nation engaged in conduct ratifying the 1954 Easement.

First, the Nation accepted and has retained the compensation it received for entering into the 1954 Easement. Pursuant to the 1954 Easement, New York paid the Nation $75,500. The Nation has not returned these funds. SUMF ¶ 23. By retaining the benefits of the 1954 Easement, the Nation ratified it. *See BAC Home Loans Servicing, LP v. Uvino*, 155 A.D.3d 1155, 1157 (3d Dep't 2017) (defendant would be deemed to have adopted mortgage note, even if forged, based on retention of its benefits); *Johnson v. Johnson*, 191 A.D.2d 257, 257 (1st Dep't 1993) (defendant's acceptance of the benefit of plaintiff's performance under the parties' agreement ratified the agreement and prevented defendant from challenging its validity).

Second, for 32 years, between 1961 and 1993 (when the Nation commenced *Seneca I*), the Nation took no action to repudiate the 1954 Easement. By failing to repudiate the 1954 Easement for 32 years, the Nation ratified it. *See Prudential Ins. Co. of Am. v. BMC Indus., Inc.*, 630 F. Supp. 1298, 1302 (S.D.N.Y. 1986) ("In adjudicating the issues of ratification, the key factors are whether a party silently acquiesced in the contract or rather promptly interposed his objections upon discovering the basis for the claim of rescission."); *Hempstead Realty, LLC v. Sturrup*, 55 Misc. 3d 1219(A), at *8 (Sup. Ct. Nassau Cnty. 2017), *aff'd*, 192 A.D.3d 795 (2d Dep't 2021) (trust beneficiaries ratified unauthorized sale of trust asset where they failed to set aside sale and recover asset for five years); *Banque Nationale de Paris v. 1567 Broadway Ownership Assocs.*, 214 A.D.2d 359, 361 (1st Dep't 1995) (ratification barred defendant-appellants from withdrawing assent to forged mortgage-modification where defendant-appellants waited "two years before seeking to repudiate their contractual commitments ... after enjoy[ing] the financial benefits of the modification").

41

Third, after 1961, the Nation engaged in affirmative acts consistent with the 1954 Easement.  Pursuant to the 1954 Easement, the Nation's Council was responsible for designating the individual Seneca Indian landowners who had rights affected by the Thruway construction and, therefore, were entitled to receive compensation from New York.  Prior to entering into the 1954 Easement, the Council passed a resolution that included the provision "[t]hat the Council of the Nation will approve the right of each individual Seneca Indian landowner as the proper person or persons having the right of occupation and legally entitled to receive compensation by reason of such acquisitions for Thruway purposes."  SUMF ¶ 20; Maguire Decl. Ex. J.

Most of the individual Senecas whose property was affected were compensated relatively soon after granting the 1954 Easement.  *See* SUMF ¶ 31; Maguire Decl. Exs. M and N.  Two of the claims, however, were not certified until after 1961.  In 1968, the Tribal Council passed a motion certifying the land ownership to the Nancy Halftown Estate which entitled the estate to payment from New York for Thruway construction.  SUMF ¶ 38; Maguire Decl. Ex. S.  And, in 1971, the Tribal Council, consistent with its duties under the 1954 Easement, certified that Newton Pierce was the owner of property that had been affected by the Thruway construction. SUMF ¶ 39; Maguire Decl. Ex. T.  By affirmatively certifying individual Seneca ownership consistent with its responsibilities under the 1954 Easement, the Tribal Council ratified such at a time it indisputably had authority to do so.  *See VKK Corp.*, 244 F.3d at 124.

## POINT IV

### THE UNITED STATES SECRETARY OF THE INTERIOR APPROVED THE THRUWAY PROJECT ACROSS THE CATTARAUGUS RESERVATION

Through the 1901 Highway Act and Right-of-Way Act, Congress eliminated the Nonintercourse Act's requirement that any conveyance of an Indian nation's reservation property be done through a "treaty or convention."  Instead, the 1901 Highway Act and Right-of-Way Act

42

authorized the Secretary of Interior to grant permission for "the opening and establishment of public highways," 25 U.S.C. § 311, and "rights-of-way for all purposes," 25 U.S.C. § 323. Here, the Secretary of Interior granted New York permission to obtain the right-of-way and construct the Thruway across the Cattaraugus Reservation.

On May 7, 1946, J. Frank O'Marah, Director of the Bureau of Rights-of-Way and Claims of the New York State Department of Public Works, wrote to the Department of the Interior and outlined New York's plans for construction of the Thruway over the Cattaraugus Reservation. Maguire Decl. Ex. F. After describing the project, he requested that the Department of Interior approve the Thruway project:

> This Department understands it cannot appropriate or acquire fee title to Indian Lands on this Reservation and must agree with the individual Indians whose allotment of land is involved in the project and obtain the consent of the Council of the Seneca Nation before any part of their property is used for this project and the Department proposes to proceed along that line.
>
> Based on this Department's experience in the past in such matters, I would ask the consent and approval of the Department of the Interior as to this procedure.

SUMF ¶ 16; Maguire Decl. Ex. F. Attached to the letter was a map of the proposed easement. *Id.*

On May 18, 1946, the Seneca Tribal Council's Lease Committee held a meeting with Mr. O'Marah and other State officials from the Department of Public Work's Buffalo office, at which several aspects of the Thruway projected were discussed. SUMF ¶ 17; Maguire Decl. Ex. G. On May 20, 1946, the Clerk of the Nation, Elmer Thompson, sent the minutes of this meeting to Nora M. Anderson, Acting Superintendent of the New York Agency for the Department of the Interior's Office of Indian Affairs. *Id.*

By letter of June 10, 1946, Oscar L. Chapman, the Acting Secretary of the Interior, responded to O'Marah. SUMF ¶ 19; Maguire Decl. Ex. I. As authorized by the 1901 Highway

43

Act and Right-of-Way Act, the Acting Secretary prescribed certain requirements, and subject to those requirements, granted permission for the project.  The letter states: "It is agreeable to this Department for the New York State Department of Public Works to begin construction work on the Erie Thruway after consent of the individual Indians and tribal council has been obtained and payment of the damages has been made."  *Id.*  Through this letter, the Acting Secretary granted the State express permission to construct the Thruway across the Cattaraugus Reservation.  While the State anticipates that the Nation will reference language in the letter stating that "[m]aps of definite location together with your application should be filed with the Superintendent" and that "[s]igned copies of the agreements executed by the individual Indians should also be furnished," this did not require the State to obtain another round of Department of Interior approval to construct the Thruway across the Nation's land.  Such approval was granted by the 1946 letter and the State acted accordingly in reliance on the Department of Interior's express approval of the construction project.

In *Seneca I*, Magistrate Judge Heckman held that the letter was not sufficient to constitute approval of the right-of-way because New York did not comply with the regulatory requirements for obtaining approval from the Secretary of the Interior.  Maguire Decl. Ex. C, pp. 10-11.  This erroneous holding (unadopted by the District Court) relies on a misunderstanding of what was at issue in *Seneca I* and at issue here.  The issue is not whether the Secretary of Interior ***should have or should not have*** approved the Thruway project (it is easy to imagine a contemporaneous lawsuit seeking to enjoin the Secretary of Interior from granting a right-of-way due to lack of compliance with relevant regulations), the issue is whether the Secretary of Interior ***did*** approve the Thruway project.  And, the Acting Secretary approved the Thruway project when he told

44

New York that it could "begin construction work on the Erie Thruway after consent of the

individual Indians and tribal council has been obtained and payment of damages has been made."

## CONCLUSION

For the foregoing reasons, the Court should grant the State's Motion for Summary

Judgment.

Dated:   February 11, 2025
          Buffalo, New York

                                        **NIXON PEABODY LLP**

                                        BY: /s/ *Erik A. Goergen*
                                        Erik A. Goergen
                                        40 Fountain Plaza, Suite 500
                                        Buffalo, New York 14202
                                        Telephone: (716) 853-8118
                                        egoergen@nixonpeabody.com

                                        *Attorneys for Defendant New York State
                                        Thruway Authority*

                                        **LETITIA JAMES**
                                        **Attorney General of the State of New
                                        York**

                                        BY: /s/ *Daniel Maguire*
                                        Daniel Maguire
                                        Stephanie Joy Calhoun
                                        Assistant Attorney General, of Counsel
                                        Main Place Tower, Suite 300A
                                        350 Main Street
                                        Buffalo, NY 14202
                                        (716) 853-8400
                                        Daniel.Maguire@ag.ny.gov
                                        Stephanie.Calhoun@ag.ny.gov

                                        *Attorneys for Defendants Governor of the
                                        State of New York, Attorney General of the
                                        State of New York, the Commissioner of the
                                        New York State Department of
                                        Transportation, and the Comptroller of the
                                        State of New York*