**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NEW YORK**

SENECA NATION, a federally recognized
Indian tribe,

          Plaintiff,

          v.

KATHLEEN C. HOCHUL, in her official
capacity as Governor of New York, *et al.*,

          Defendants.

Case No. 1:18-cv-429-LJV-MJR

<u>**PLAINTIFF SENECA NATION'S MEMORANDUM OF LAW IN SUPPORT OF ITS
MOTION FOR SUMMARY JUDGMENT**</u>

**TABLE OF CONTENTS**

BACKGROUND ...............................................................................................................2

LEGAL STANDARD ......................................................................................................6

ARGUMENT ....................................................................................................................6

    I.      THE 1954 AGREEMENT IS VOID *AB INITIO* UNDER THE NON-
           INTERCOURSE ACT BECAUSE THE LEGAL REQUIREMENTS FOR
           APPROVAL BY THE UNITED STATES WERE NEVER MET. .........................6

    II.     THE NATION IS ENTITLED TO AN INJUNCTION REQUIRING
           DEFENDANTS TO OBTAIN A VALID EASEMENT ON TERMS THAT
           EQUITABLY COMPENSATE THE NATION FOR USE OF ITS LANDS. ........11

    III.    ALTERNATIVELY, THE NATION IS ENTITLED TO SUMMARY
           JUDGMENT ON ITS REQUEST FOR A DECLARATION THAT
           DEFENDANTS CONTINUE TO VIOLATE FEDERAL LAW BY NOT
           OBTAINING A VALID EASEMENT. ................................................................15

    IV.    THE NATION IS ENTITLED TO SUMMARY JUDGMENT ON
           DEFENDANTS' REMAINING DEFENSES ........................................................16

         A.      The traditional state law defense of laches is unavailable to
                 Defendants, and the federal *City of Sherrill* equitable defense does
                 not apply. ..............................................................................................16

         B.      New York is not a required party; the State's interests are
                 adequately represented by Defendants here. ..........................................18

         C.      All other defenses are foreclosed. ..........................................................21

CONCLUSION ................................................................................................................23

ii

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Am. Trucking Ass'n, Inc. v. N.Y. State Thruway Auth.*,
  795 F.3d 351 (2d Cir. 2015)...........................................................................................19

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242 (1986).........................................................................................................6

*Banner v. United States*,
  238 F.3d 1348 (Fed. Cir. 2001)................................................................................2, 9, 10

*Canadian St. Regis Band of Mohawk Indians v. New York*,
  278 F. Supp. 2d 313 (N.D.N.Y. 2003).........................................................................21

*Canadian St. Regis Band of Mohawk Indians v. New York*,
  Nos. 5:82-CV-0783, 5:82-CV-1114, 5:89-CV-0829, 2013 WL 3992830
  (N.D.N.Y. July 23, 2013)..........................................................................................17, 18

*Cavanaugh v. Looney*,
  248 U.S. 453 (1919).......................................................................................................12

*Cayuga Indian Nation of New York v. Cuomo*,
  730 F. Supp. 485 (N.D.N.Y. 1990)...............................................................................23

*Cayuga Indian Nation of New York v. Cuomo*,
  565 F. Supp. 1297 (N.D.N.Y. 1983)...............................................................................6

*Celotex Corp. v. Catrett*,
  477 U.S. 317 (1986).........................................................................................................6

*City of New York v. Mickalis Pawn Shop, LLC*,
  645 F.3d 114 (2d Cir. 2011)..........................................................................................13

*City of Sherrill v. Oneida Indian Nation*,
  544 U.S. 197 (2005)..........................................................................................16, 17, 18

*CSX Transp., Inc. v. New York State Off. of Real Prop. Servs.*,
  306 F.3d 87 (2d Cir. 2002).............................................................................................19

*Dow Jones & Co. v. Harrods Ltd.*,
  346 F.3d 357 (2d Cir. (2003))........................................................................................16

*Doyle v. UBS Fin. Servs., Inc.*,
  No. 22-CV-276, 2024 WL 1146620 (W.D.N.Y. Feb. 23, 2024) ..........................................23

iii

*eBay Inc. v. MercExchange, L.L.C.*,
  547 U.S. 388 (2006) ..................................................................................................12

*Ewert v. Bluejacket*,
  259 U.S. 129 (1922) ..................................................................................................17

*Fed. Power Comm'n v. Tuscarora Indian Nation*,
  362 U.S. 99 (1960) ......................................................................................................1

*Fluent v. Salamanca Indian Lease Auth.*,
  928 F.2d 542 (2d Cir. 1991) ........................................................................................9

*Forschner Grp., Inc. v. Arrow Trading Co.*,
  124 F.3d 402 (2d Cir. 1997) ......................................................................................13

*Landgraf v. USI Film Prods.*,
  511 U.S. 244 (1994) ..................................................................................................11

*Marvel Characters, Inc. v. Kirby*,
  726 F.3d 119 (2d Cir. 2013) ................................................................................19, 20

*McGirt v. Oklahoma*,
  591 U.S. 894 (2020) ....................................................................................................7

*New York v. Solvent Chem. Co.*,
  664 F.3d 22 (2d Cir. 2011) ........................................................................................16

*Oneida Cnty. v. Oneida Indian Nation (Oneida II)*,
  470 U.S. 226 (1985) ............................................................................................ *passim*

*Oneida Indian Nation v. Cnty. of Oneida*,
  414 U.S. 661 (1974) ............................................................................................ *passim*

*Oneida Indian Nation v. Cnty. of Oneida*,
  617 F.3d 114 (2d Cir. 2010) ................................................................................17, 18

*Oneida Indian Nation v. New York*,
  194 F. Supp. 2d 104 (N.D.N.Y. 2002) ..........................................................11, 21, 22

*Oneida Indian Nation v. New York*,
  691 F.2d 1070 (2d Cir. 1982) ....................................................................................22

*Oneida Indian Nation v. Oneida Cnty.*,
  434 F. Supp. 527 (N.D.N.Y. 1977) ............................................................................22

*Oneida Indian Nation v. Oneida Cnty.*,
  719 F.2d 525 (2d Cir. 1983) ........................................................................................7

iv

*Oneida Indian Nation v. Phillips*,
  981 F.3d 157 (2d Cir. 2020)...............................................................................17, 18

*Panday v. Allen*,
  133 N.Y.S.3d 303 (N.Y. App. Div. 2020) ...............................................................22

*Pelfresne v. Vill. of Williams Bay*,
  865 F.2d 877 (7th Cir. 1989) .................................................................................12

*Perkins v. Comm'r*,
  970 F.3d 148 (2d Cir. 2020)....................................................................................2

*Reed v. Goertz*,
  598 U.S. 230 (2023)..............................................................................................15

*Salt River Project Agric. Improvement & Power Dist. v. Lee*,
  672 F.3d 1176 (9th Cir. 2012) ...............................................................................21

*Schwengber v. Hultenius*,
  74 N.Y.S.3d 120 (N.Y. App. Div. 2018) ................................................................22

*Seneca Nation of Indians v. New York*,
  206 F. Supp. 2d 448 (W.D.N.Y. 2002) .....................................................................1

*Seneca Nation of Indians v. New York*,
  382 F.3d 245 (2d Cir. 2004)..........................................................................4, 7, 13

*Seneca Nation of Indians v. New York* (*Seneca I*),
  383 F.3d 45 (2d Cir. 2004)........................................................................1, 4, 5, 13

*Seneca Nation of Indians v. State of N.Y.*,
  26 F. Supp. 2d 555 (W.D.N.Y. 1998) .......................................................................7

*Seneca Nation v. Hochul* (*Seneca II*),
  58 F.4th 664 (2d Cir. 2023) ........................................................................ *passim*

*Shomo v. City of New York*,
  579 F.3d 176 (2d Cir. 2009)...................................................................................21

*Springs Mills, Inc. v. Ultracashmere House, Ltd.*,
  724 F.2d 352 (2d Cir. 1983)...................................................................................13

*U.S. Forest Serv. v. Cowpasture River Preservation Ass'n*,
  590 U.S. 604 (2020)...............................................................................................12

*United States v. Cook*,
  922 F.2d 1026 (2d Cir. 1991)..................................................................................18

*United States v. Devonian Gas & Oil Co.*,
   424 F.2d 464 (2d Cir. 1970)..................................................................................2, 10

*United States v. Santa Fe Pac. R.R. Co.*,
   314 U.S. 339 (1942)..............................................................................................7

*Ute Indian Tribe. v. Utah*,
   790 F.3d 1000 (10th Cir. 2015) ......................................................................12, 13

*Vann v. U.S. Dep't of the Interior*,
   701 F.3d 927 (D.C. Cir. 2012) ...................................................................18, 20, 21

*Weinberger v. Romero-Barcelo*,
   456 U.S. 305 (1982)............................................................................................12

**Statutes and Treaties**

25 U.S.C.
   § 177.............................................................................................................1, 6, 21
   § 232.....................................................................................................................18
   § 233.....................................................................................................................18
   § 311.......................................................................................................................7
   § 323..................................................................................................................7, 17

Act of 1875, 18 Stat. 330 .............................................................................................9, 10

Seneca Leasing Act of 1950, 64 Stat. 442 ....................................................................9, 10

Seneca Leasing Act of 1950, 1961 amendment, Pub. L. No. 87-230, 75 Stat. 499.............9, 10, 23

Treaty of Canandaigua, 7 Stat. 44 (Nov. 11, 1794) ....................................................2, 16

**Other Authorities**

25 C.F.R. Part 256 (1949).........................................................................................7, 8, 9

89 Fed. Reg. 944 (Jan. 8, 2024) .....................................................................................11

H.R. Rep. No. 87-1003 .....................................................................................................10

N.Y. Exec. L. § 63(1)........................................................................................................19

N.Y. Pub. Auth. L. § 354(4) .............................................................................................19

S. Rep. No. 87-599............................................................................................................10

vi

The Seneca Nation (Nation) seeks summary judgment on its claim for injunctive relief (claim one), its claim for declaratory relief (claim three), and all defenses to the complaint, to redress the continued unauthorized operation and use of the New York State Thruway (Thruway) across Nation lands without a valid easement, in violation of federal law and treaties. Defendants rely on an invalid "1954 agreement between the Seneca Nation . . . and New York State, acting through the New York State Thruway Authority." *Seneca Nation v. Hochul* (*Seneca II*), 58 F.4th 664, 667 (2d Cir. 2023). The agreement describes a purported permanent easement "for Thruway purposes" over approximately 300 acres of the Nation's Cattaraugus Territory in exchange for a one-time payment of $75,500. *Seneca Nation of Indians v. New York* (*Seneca I*), 383 F.3d 45, 47 (2d Cir. 2004). But "[a]t the time of the agreement, 25 U.S.C. § 177 (commonly called the 'Non-Intercourse Act') provided that any easement over Indian land required the consent of the United States." *Seneca II*, 58 F.4th at 667. The Non-Intercourse Act's consent requirement serves "to prevent unfair, improvident or improper disposition by Indians of lands owned or possessed by them to other parties." *Seneca Nation of Indians v. New York*, 206 F. Supp. 2d 448, 482 (W.D.N.Y. 2002) (quoting *Fed. Power Comm'n v. Tuscarora Indian Nation*, 362 U.S. 99, 119 (1960)). A magistrate judge reviewing undisputed evidence determined in 1999 that federal consent was never obtained for the 1954 agreement, and Defendants have not come forward with any evidence to the contrary. *See Seneca Nation of Indians et al. v. State of New York et al.*, No. 93-CV-688A(H), Report and Recommendation, Doc. 228 (W.D.N.Y. July 12, 1999) ("1999 R&R"). The United States has recently confirmed there is no record of any federal approval of the 1954 agreement. *See* SOF ¶¶ 34, 35 (citing Records Custodian Declaration of Randall Trickey (U.S. Decl.) (Ex. A)). Therefore, the Nation is entitled to summary judgment granting injunctive and declaratory relief against Defendants.[1]

---

[1] References to the "Defendants" do not include the Comptroller; the Nation seeks summary judgment only as to claims one and three in the complaint and related defenses, as to which the Comptroller is not a named defendant.

## BACKGROUND

The Nation is a federally recognized, sovereign Indian tribe.  SOF ¶ 1.  The Nation was the largest and westernmost of the Six Nations or Iroquois Confederacy.  "Prior to European colonization, the Iroquois Confederacy exercised active dominion over nearly thirty-five million acres, most of what is now the states of New York and Pennsylvania, and was considered the most powerful peacekeeping force of Native Americans east of the Mississippi River."  *Banner v. United States*, 238 F.3d 1348, 1350 (Fed. Cir. 2001).  The Nation, like the rest of the Iroquois Confederacy, had immense tracts of lands confiscated by colonizers, beginning with the French and Indian War.  *Id.*  Although the Nation's ancestral homelands include territory throughout what is now central and western New York, by the mid-1800s the Nation was left with control of only more limited landholdings, including the Cattaraugus Territory.  *See United States v. Devonian Gas & Oil Co.*, 424 F.2d 464, 465 (2d Cir. 1970).

The lands at issue here are among the precious, few remaining lands guaranteed to the Nation by treaty.  In 1794, the United States and the Iroquois Confederacy entered the Treaty of Canandaigua, recognizing the lands within the Cattaraugus Territory crossed by the Thruway as belonging to the Nation.  SOF ¶ 3; *see also Banner*, 238 F.3d at 1350.  The Treaty provides "[t]he land of the Sene[c]a nation is . . . to be the property of the Sene[c]a nation," which shall not be disturbed "in the [Nation's] free use and enjoyment thereof."  7 Stat. 44, 45 (Nov. 11, 1794).  The United States Court of Appeals for the Second Circuit has "held that the term 'free use and enjoyment' in the Canandaigua Treaty is to be 'interpreted as preventing American encroachment onto Seneca lands, or interference with the Seneca Nation's use of its lands.'"  *Seneca II*, 58 F.4th at 670 (quoting *Perkins v. Comm'r*, 970 F.3d 148, 158 (2d Cir. 2020)).  In violation of the Nation's treaty guarantees, the Nation's free use and enjoyment of its Cattaraugus Territory is disrupted by the Thruway that cleaves the Territory in two.

The Nation's lands are critical to the operations of the Erie Section of the Thruway, which runs from Buffalo, through the Nation's Cattaraugus Territory, and to the Pennsylvania state line.  SOF ¶¶ 7–9.  The Thruway is one of the largest tolled highway systems in the United States and is

2

a critical component in the national interstate highway system.  SOF ¶ 5.  "The most important benefit of the Thruway is it provides an efficient way for individuals to travel [and] for companies to move goods across the country [or] within the state."  SOF ¶ 6.  It "crosses New York State and travels near to . . . almost all the major metropolitan areas within the State of New York."  *Id.* Because the Nation's Cattaraugus Territory abuts Lake Erie, New York officials knew as early as 1946 that crossing the Nation's lands was necessary to directly connect Buffalo to the Pennsylvania state line.  *See* SOF ¶ 22.  "Crossing the Nation's lands allowed [the Thruway] to have a direct route down to the Pennsylvania border where [the Thruway] connected to the rest of the interstate . . . system."  SOF ¶ 9.  But, unlike other lands used for the Thruway system, the Nation's lands were not subject to eminent domain. *See Oneida Indian Nation v. Cnty. of Oneida*, 414 U.S. 661, 670 (1974); *see also* SOF ¶ 23.  To build the planned route over those lands, Thruway officials required a negotiated easement.

Years after the final Thruway route was chosen and construction had begun, New York state officials met with the Nation to seek an easement.  On October 5, 1954, New York officials procured a purported permanent easement of approximately 300 acres of the Cattaraugus Territory. SOF ¶ 26.  The State's lead negotiator reported that after "several hours of very frank talk," the price was "hammered down" to a one-time payment of $75,000, which was "much lower than any of us expected to acquire these lands for[.]" SOF ¶ 27 (quoting New York State Thruway Authority Inter-Office Memorandum dated Sept. 20, 1954 (Ex. L)).  No federal official participated in the negotiations.  SOF ¶ 29.  No New York state official submitted the agreement or made any application to the federal government for approval of the agreement.  SOF ¶ 31.  And no federal official ever reviewed or approved the agreement or the location of the purported easement.  SOF ¶ 32.  New York nonetheless proceeded to construct the Erie Section of the Thruway across the Cattaraugus Territory.  *See* SOF ¶ 8.  On average, 30,000 vehicles cross Nation lands using the Thruway each day.  SOF ¶ 10.

Since at least 1993, the Nation has openly denied any validity for the purported easement. That year, the Nation filed a lawsuit in the United States District Court for the Western District of

3

New York raising two claims.  The first claim addressed ownership of certain land within New York State's geographic boundaries, including Grand Island.  *See Seneca Nation of Indians v. New York*, 382 F.3d 245 (2d Cir. 2004).  The second claim challenged the State's continuing operation of the Thruway across the Nation's Cattaraugus Territory in violation of federal law.  The Nation asserted the Thruway claim against three defendants: the Thruway Authority, its Executive Director, and the State of New York.  *Seneca II*, 58 F.4th at 667.  The Nation sought to invalidate the easement based on the State's failure to comply with the Non-Intercourse Act, as well as seeking ejectment and compensatory damages. *Id.*

The case was referred to a magistrate judge, who determined the easement was invalid in a report and recommendation on the parties' cross-motions for summary judgment.  The report found it "undisputed" that the federal regulatory requirements for New York to obtain a valid right-of-way across the Nation's land "were never met."  1999 R&R at 11.  The magistrate judge emphasized that "[t]hese requirements are not merely ministerial formalities, but are necessary for the Secretary [of the Interior] to carry out his trust responsibilities to the Indian tribes" and "to protect fully Indian interests." *Id.* at 11–12.  Nevertheless, the magistrate judge recommended the Nation's Thruway claim be dismissed under Federal Rule of Civil Procedure 19.  The magistrate judge determined that New York State, who declined to waive its sovereign immunity in the suit, was a necessary party under Rule 19(a). *Id.* at 21.  Then, applying the "Rule 19(b) factors" to the Thruway claim, the magistrate judge concluded that the State was an indispensable party and "equity and good conscience require dismissal." *Id.* at 22–23.  This Court adopted the magistrate judge's conclusion that the State was an indispensable party, and therefore declined to address whether New York's purported easement was obtained in compliance with federal law.  *Seneca Nation of Indians et al. v. State of New York et al.*, No. 93-CV-688A(H), Order, Doc. 244 (W.D.N.Y. Nov. 18, 1999).  Neither the district court nor the magistrate judge considered whether *Ex parte Young* would permit the Nation to bring a claim against New York state officials for prospective injunctive relief.  On appeal, the Second Circuit affirmed this Court's order of dismissal under Rule 19.  *Seneca I*, 383 F.3d at 49.

4

Since dismissal of the first lawsuit, the Nation has continued to protest operation of the Thruway without a valid easement, but New York state officials have refused to address the problem.  For example, in 2007 the Nation's Council passed resolutions to (1) officially rescind the Council's 1954 authorization of the 1954 easement agreement, declare New York State's continued use of the purported easement an ongoing act of trespass, and authorize the Nation's President to request "initiation of negotiations to attempt to resolve this transgression against the Nation and its people"; (2) impose a $1 per vehicle toll on motorists traveling through Nation lands on the Thruway to be collected by the Thruway Authority and remitted to the Nation; and (3) authorize the Nation's President and Treasurer to invoice the Thruway Authority for the toll with interest and penalties for nonpayment.  SOF ¶ 37.  On June 11, 2007, the Nation's Treasurer invoiced the Thruway Authority for April, May, and June 2007.  SOF ¶ 38.  The Nation's President also sued the State of New York, the Thruway Authority and the Federal Highway Administration in the Nation's Peacemakers' Court, but none of them appeared.  SOF ¶ 39.  After briefing, the Peacemakers Court issued an Advisory Opinion and Order on April 29, 2009 determining the easement was void at its inception and remains void as a matter of Nation and federal law.  *Id.*  In 2011, the Nation's President petitioned President Obama "to bring about a reasonable resolution to the nearly sixty-year illegally imposed use of Nation lands by the State of New York" for Thruway purposes.  SOF ¶ 40.

In 2018, the Nation filed this lawsuit invoking the *Ex parte Young* doctrine.  The Nation named as defendants to claims one and three New York state officers who, in their official capacities, have authority to obtain a valid easement to remedy the unauthorized use of the Nation's lands for Thruway purposes.  Consistent with *Ex parte Young*, the Nation seeks different, far more limited relief than the damages and ejectment it pursued in the earlier litigation.  Accordingly, the Second Circuit upheld this Court's denial of Defendants' motion to dismiss (Doc. 16), holding that this "lawsuit falls under the *Ex parte Young* exception to the Eleventh Amendment.  Thus, neither collateral estoppel nor the Eleventh Amendment bars the Nation from proceeding in this case." *Seneca II*, 58 F.4th at 674.

## LEGAL STANDARD

Upon a party's motion brought under Rule 56, a court "shall grant summary judgment" as to any claim or defense or any parts thereof "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986).  A genuine dispute does not exist unless "the evidence is such that a reasonable [trier of fact] could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  Material facts are those "that might affect the outcome of the suit under the governing law."  *Id.*  A party asserting that a fact cannot be genuinely disputed can support that assertion by showing "that an adverse party cannot produce admissible evidence to support the fact."  Fed. R. Civ. P. 56(c)(1)(B).

## ARGUMENT

I.     **THE 1954 AGREEMENT IS VOID *AB INITIO* UNDER THE NON-INTERCOURSE ACT BECAUSE THE LEGAL REQUIREMENTS FOR APPROVAL BY THE UNITED STATES WERE NEVER MET.**

The magistrate judge's determination in 1999 that the 1954 agreement violated the Non-Intercourse Act due to lack of federal approval is obviously correct and should be reiterated here.  The United States has confirmed there is no record of any federal approval of the 1954 agreement.  *See* SOF ¶¶ 34, 35 (citing U.S. Decl. ¶¶ 1, 3 (Ex. A)).  Defendants have admitted they lack evidence to the contrary.  SOF ¶¶ 29, 32–34.

"At the time of the [1954] agreement, 25 U.S.C. § 177 (commonly called the 'Non-Intercourse Act') provided that any easement over Indian land required the consent of the United States."  *Seneca II*, 58 F.4th at 667.  Any conveyance of Indian lands without federal consent in violation of the Non-Intercourse Act is void *ab initio*.  "No purchase, grant, lease, or other conveyance of lands . . . from any Indian nation . . . shall be of any validity in law or equity" unless approved under federal law.  25 U.S.C. § 177.  "The very first Nonintercourse Act provided that conveyances of land, absent federal consent, were invalid.  That provision has been continually re-enacted in substance, and 'has remained the policy of the United States to this day.'"  *Cayuga Indian Nation of New York v. Cuomo*, 565 F. Supp. 1297, 1329 (N.D.N.Y. 1983) (quoting *Oneida*

*Indian Nation*, 414 U.S. at 668).  "Unquestionably it has been the policy of the federal government from the beginning to respect the Indian right of occupancy, which could only be interfered with or determined by the United States."  *Oneida Indian Nation*, 414 U.S. at 668.

"[T]o establish a violation of the Non-Intercourse Act, the Senecas are required to establish that: (1) they are an Indian tribe; (2) the land at issue was tribal land at the time of the conveyance; (3) the United States never approved the conveyance[;] and (4) the trust relationship between the United States and the tribe has not been terminated."  *Seneca Nation*, 382 F.3d at 258.  Consent must be "plain and unambiguous," and will not be "lightly implied."  *Oneida Cnty. v. Oneida Indian Nation (Oneida II)*, 470 U.S. 226, 247–48 (1985); *accord United States v. Santa Fe Pac. R.R. Co.*, 314 U.S. 339, 346, 354 (1942).  "Implicit congressional ratification" will not satisfy the requirements of the Non-Intercourse Act.  *Seneca Nation of Indians v. State of N.Y.*, 26 F. Supp. 2d 555, 571 (W.D.N.Y. 1998); *see also McGirt v. Oklahoma*, 591 U.S. 894, 903–04 (2020).  Showing consent is a high bar because, with the Non-Intercourse Act, "Congress intended to provide maximum protection of Indian land."  *Oneida Indian Nation v. Oneida Cnty.*, 719 F.2d 525, 534 (2d Cir. 1983), *aff'd in part, rev'd in part on other grounds by Oneida II,* 470 U.S. 226.

Federal law gives the Secretary of the Interior the authority to provide the necessary federal approval of rights-of-way across Indian lands.  "The Secretary of the Interior is authorized to grant permission, upon compliance with such requirements as he may deem necessary, to the proper State or local authorities for the opening and establishment of public highways . . . through any Indian reservation[.]" 25 U.S.C. § 311; *see also id.* § 323 ("The Secretary of the Interior . . . is empowered to grant rights-of-way for all purposes, subject to such conditions as he may prescribe, over and across" Indian lands.).  The Secretary has set out in regulations the "requirements" (25 U.S.C. § 311) and "conditions" (*id.* § 323) to obtain federal consent for easements across Indian lands.  In 1954, those regulations required that an application and map of definite location be filed, that damages be assessed, and that the application, map, and schedule of damages be approved by the Secretary.  *See* 25 C.F.R. Part 256 (1949).  "These requirements are not merely ministerial formalities, but are necessary for the Secretary to carry out his trust responsibilities to the Indian

7

tribes.  Without knowing the specific land involved, the amount of the compensation to be paid, or the other terms and conditions of the transaction, the Secretary could not knowingly and intelligently approve the permanent alienation of reservation land."  1999 R&R at 11–12.

Here, as in 1999, "[i]t is undisputed that these requirements were never met."  1999 R&R at 11.  Defendants admit they lack any filing with the Department of the Interior of a map of the definite location of the disputed easement, an application for approval of the easement, or a schedule of damages.  SOF ¶ 31.  They admit they have no record of the Secretary of the Interior approving any application, map, or schedule of damages for the 1954 agreement and that there is no record of an endorsement from the Secretary of the Interior or any of his or her delegates on any map of definite location of the easement in question.  SOF ¶¶ 32, 33.  Defendants have no record of the 1954 agreement being approved by the Secretary of the Interior or his or her delegates after it was executed.  SOF ¶ 34.  And the United States has confirmed that there is no such approval: "[i]f the Department of Interior had approved an easement between the Seneca Nation and the State of New York, the Bureau of Indian Affairs would have a signed easement document in its files."  SOF ¶ 35 (quoting U.S. Decl. ¶ 5 (Ex. A)).

As in the prior litigation, Defendants' attempt to construe a June 10, 1946 letter written by Acting Secretary of the Interior Oscar Chapman as federal authorization of the subsequent 1954 agreement fails.  Chapman was responding to a letter from the Director of the New York Department of Public Works Bureau of Rights-of-Way and Claims J. Frank O'Marah.  Director O'Marah had asked Interior for advance "consent and approval of the Department of the Interior" for its plan to seek agreement "with the individual Indians whose allotment of land is involved in the [Thruway] project and obtain the consent of the Council of the Seneca Nation before any part of their property is used for this project."  SOF ¶ 24 (quoting Letter from Director O'Marah to Hon. Wm. Zimmerman, Jr., Office of Indian Affairs, dated May 7, 1946 (Ex. I)).  O'Marah stated, "[t]his Department understands it cannot appropriate or acquire fee title to Indian Lands on this Reservation."  *Id*.  Acting Secretary Chapman responded that seeking an easement from the individual Senecas occupying the lands and from the Nation itself was an acceptable procedure for

8

initially obtaining a right of way, but that an "application" would then need to be submitted to Interior accompanied by the agreements and maps with the definite location of the easement: "***Maps of definite location*** together with ***your application*** should be ***filed with the Superintendent***. ***Signed copies of the agreements*** executed by the individual Indians should also be furnished. The consideration cited in the agreements may be paid to the Indians entitled thereto." SOF ¶ 25 (quoting Letter from Acting Secretary Chapman to Director O'Marah dated June 10, 1946 (Ex. J)) (emphases added). Although Mr. Chapman agreed that construction could proceed "after consent of the individual Indians and tribal council has been obtained and payment of the damages has been made," he did not purport to exempt the Thruway from submission of an application with maps of definite location of the easement and a copy of any agreement for review. *Id.*; *see also* 25 C.F.R. Part 256 (1949). As noted above, Defendants admit they have no record of these requirements ever being met. SOF ¶ 31. Federal consent must be strictly construed. *Oneida II*, 470 U.S. at 248. "Without knowing the specifics of the right-of-way, it would have been impossible for the Secretary to approve it." 1999 R&R at 11.

Defendants' arguments that the United States nonetheless authorized the agreement through legislation pre-dating or post-dating the agreement also fail. Neither the provisions of 18 Stat. 330 (1875), nor the Seneca Leasing Act of 1950 (64 Stat. 442), nor the 1961 amendment to the Seneca Leasing Act of 1950 (75 Stat. 499) lifted the requirements of the Non-Intercourse Act with respect to the 1954 agreement. "[T]he overriding purpose of the 1875 Act was to validate the existing leases voluntarily entered into between the Nation and the settlers" in the City of Salamanca. *Fluent v. Salamanca Indian Lease Auth.*, 928 F.2d 542, 546 (2d Cir. 1991). "Throughout the mid 1800s, white settlers began to settle in a certain area of the Allegany Reservation, located at the junction of three major inter-continental railroads. This junction and settlement became what is now known as the city of Salamanca[.]" *Banner*, 238 F.3d at 1351.

> Early settlers entered into property leases with the [Nation] to remain on the land. Prior to 1875, however, a New York state court invalidated the leases because the [Nation], a Native American tribe, did not have congressional authority to lease land. Congress remedied that legal deficiency by adopting the Act of February 19, 1875, 18 Stat. 330 ("Act of 1875"). The Act of 1875, among other things, ratified

9

then-existing leases and established that they would be valid until February 19, 1880.

*Id.* The 1875 Act also authorized the Nation to prospectively lease lands for railroad purposes and to generally lease land only within five villages on the Allegany Territory. *See* 18 Stat. 330–31. Nothing in the Act granted the Nation prospective authority to grant rights-of-way without federal approval, or to generally grant easements across its separate Cattaraugus Territory.

Nor did the Seneca Leasing Act of 1950 eliminate the requirement of federal consent for permanent easements over Nation lands. It addressed only authority to "lease lands":

> In addition to the authority now conferred by law on the Seneca Nation of Indians to lease lands within the Cattaraugus, Allegany, and Oil Springs Reservations to railroads and to lease lands within the limits of the villages established under authority of [the 1875 Act] (18 Stat. 330), the Seneca Nation of Indians, through its council, is authorized to lease lands within the Cattaraugus, Allegany, and Oil Springs Reservations, outside the limits of such villages, for such purposes and such periods as may be permitted by the laws of the State of New York.

64 Stat. 442–43. Through the 1950 Act, Congress withdrew "federal control of *leasing*." *Devonian*, 424 F.2d at 467 (emphasis added). It did not include authority for the Nation "to grant rights of way in addition to leases." *Id.* at 469. "The Seneca Leasing Act did not authorize this and New York, of course, could not grant this additional authority without congressional approval." *Id.* at 469 n.7; *see also* S. Rep. No. 87-599, at 2 ("The 1950 act permitted the Seneca Council to lease lands in accordance with the laws of New York, but it did not cover the granting of easements or rights-of-way."); *accord* H.R. Rep. No. 87-1003, at 4. As the magistrate judge correctly determined in 1999, "the requirements of the Non-Intercourse Act were not lifted by either the 1875 Act or the 1950 Act." 1999 R&R at 14.

Likewise, the 1961 amendment to the Seneca Leasing Act does not constitute retroactive federal approval of the 1954 agreement. It provided the Nation prospective authority to grant easements and rights-of-way in addition to leasing its lands, "by inserting after 'to lease' the last time the verb appears the words 'or grant easements or rights-of-way on.'" Pub. L. No. 87-230, 75 Stat. 499 (1961). With the amendment, the Seneca Leasing Act reads: the Seneca Nation of Indians, through its council, is authorized to lease *or grant easements or rights-of-way on* lands within the Cattaraugus, Allegany, and Oil Spring Reservations. Nothing in the 1961 amendment

10

purported to retroactively approve prior easements. This does not even hint at the kind of "plain and unambiguous" approval of an easement required by the Non-Intercourse Act. *See Oneida II*, 470 U.S. at 248. And the presumption against retroactivity of federal statutes applies in full force here. "The largest category of cases in which we have applied the presumption against statutory retroactivity has involved new provisions affecting contractual or property rights, matters in which predictability and stability are of prime importance." *Landgraf v. USI Film Prods.*, 511 U.S. 244, 271 (1994). Congress, in the 1875 Act, overcame this presumption against retroactivity by explicitly validating the Salamanca leases. There is no indication in the 1961 amendment that Congress intended such retroactive effects.

The other elements of the Nation's Non-Intercourse Act claim are easily satisfied. The Nation is an Indian tribe, and the trust relationship between the United States and the Nation has not been terminated. SOF ¶ 1; *see also* 89 Fed. Reg. 944, 946 (Jan. 8, 2024). The Nation clearly is "an Indian tribe within the meaning of the [Non-Intercourse] Act." *See Oneida Indian Nation v. New York*, 194 F. Supp. 2d 104, 119–20 (N.D.N.Y. 2002) ("Courts have consistently found that recognition of a tribe by the United States government is to be given substantial weight in determining an Indian plaintiff's tribal status for Nonintercourse Act claims."). Further, the land at issue lies exclusively within the Nation's Cattaraugus Territory, which the Nation holds title to by treaty right. SOF ¶ 2. Undisputed facts show the 1954 agreement violates the Non-Intercourse Act. It is void *ab initio* as a matter of law. *Oneida II*, 470 U.S. at 245.

## II. THE NATION IS ENTITLED TO AN INJUNCTION REQUIRING DEFENDANTS TO OBTAIN A VALID EASEMENT ON TERMS THAT EQUITABLY COMPENSATE THE NATION FOR USE OF ITS LANDS.

Undisputed facts show an injunction requiring Defendants to obtain a new, valid easement is necessary to cure Defendants' unlawful use of the Cattaraugus Territory for Thruway purposes without a valid easement. Indeed, it is the least intrusive means possible to cure the ongoing violation of federal law. Moreover, there is no dispute that the value of the ongoing use of the Nation's lands can be estimated on an annual basis by calculating the increased revenues and avoided costs from using the current route on the Nation's lands as compared to using a longer

11

alternative route that circumvents the Territory. Defendants' own expert has calculated those values using Thruway data. The Nation asks the Court to issue an injunction that specifically directs the Defendants to negotiate an easement on those undisputed terms.

Granting injunctive relief "is an act of equitable discretion." *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006). Injunctive relief is proper in cases such as this one, "where the intervention of a court of equity 'is essential in order effectually to protect property rights against injuries otherwise irremediable.'" *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982) (quoting *Cavanaugh v. Looney*, 248 U.S. 453, 456 (1919)). The Supreme Court explains:

> [A] plaintiff seeking a permanent injunction must satisfy a four-factor test before a court may grant such relief. A plaintiff must demonstrate: (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction.

*eBay*, 547 U.S. at 391. These factors are satisfied here.

First, the Nation has suffered an irreparable injury. The operation of the Thruway across the Territory without a valid easement, and in direct violation of federal law and the Nation's treaties, deprives the Nation of its free use and enjoyment of its lands, not only those burdened by the Thruway but also the Cattaraugus Territory more generally because the Thruway cuts through the middle of it. "The Supreme Court has noted that easements 'burden land that continues to be owned by another,' and if unlawfully obtained by the state amount to a taking under the Fifth Amendment." *Seneca II*, 58 F.4th at 671 (quoting *U.S. Forest Serv. v. Cowpasture River Preservation Ass'n*, 590 U.S. 604, 614 (2020)). Thus, as the Second Circuit said in this case, "[t]he complaint's allegation that the Nation's free use and enjoyment of its protected land is continuously impaired by the presence of an unlawful easement therefore reflects an ongoing harm to the Nation." *Id.* And that harm is irreparable. "As a general rule, interference with the enjoyment or possession of land is considered 'irreparable' since land is viewed as a unique commodity for which monetary compensation is an inadequate substitute." *Pelfresne v. Vill. of Williams Bay*, 865 F.2d 877, 883 (7th Cir. 1989); *see also Ute Indian Tribe. v. Utah*, 790 F.3d 1000, 1005 (10th Cir.

12

2015) (Gorsuch, J.) (holding that even a partial infringement on a Tribe's sovereignty over its land constitutes an irreparable harm).

The other factors also weigh in favor of granting the injunction the Nation seeks. The Nation has no available remedies at law given the State's sovereign immunity. *Seneca I*, 382 F.3d 245. If the Court grants the Nation an injunction, Defendants will simply be prohibited from violating federal law, "something they have no legal entitlement to do in the first place." *Ute Indian Tribe v. Utah*, 790 F.3d at 1007. "In this light, the defendants' claims to injury should an injunction issue shrink to all but the vanishing point." *Id.* (citation omitted). Thruway operations will not be disturbed. The public will not lose access to the direct route between Buffalo and Pennsylvania afforded by access to the Nation's lands. Balancing the immense burden the Nation faces in the absence of injunctive relief, that is, the continued unlawful use of its lands for Thruway purposes, with the minimal burden Defendants will face to negotiate a new easement, an injunction is appropriate. And the public interest will be served by a permanent injunction. The public, and in particular those persons in the 30,000 vehicles that use the Thruway to cross Nation lands every day (SOF ¶ 10), will benefit from a valid easement that legalizes operation of the Thruway across Nation lands.

Further, undisputed facts support an injunctive order requiring the Defendants to negotiate a new easement that specifically compensates the Nation on an ongoing, annual basis for the benefit derived from the use of Nation lands compared to the next best alternative route. "A district court has a wide range of discretion in framing an injunction in terms it deems reasonable to prevent wrongful conduct." *Forschner Grp., Inc. v. Arrow Trading Co.*, 124 F.3d 402, 406 (2d Cir. 1997) (quoting *Springs Mills, Inc. v. Ultracashmere House, Ltd.*, 724 F.2d 352, 355 (2d Cir. 1983)). The Second Circuit has interpreted Rule 65(d)'s specificity requirement to mandate that "an injunction . . . be specific and definite enough to apprise those within its scope of the conduct that is being proscribed." *City of New York v. Mickalis Pawn Shop, LLC*, 645 F.3d 114, 143 (2d Cir. 2011) (citation omitted). In light of the undisputed facts, this Court should exercise its discretion to order Defendants to obtain a new, valid easement on terms that equitably compensate the Nation

13

for use of its lands. In particular, the Court should order, based on undisputed expert testimony, that equitably compensating the Nation for the use of its lands means accounting for the revenues gained and the costs avoided by using the current route compared with an alternative route that avoids the Nation's lands.

It is undisputed that the prospective financial benefits that result from the ongoing use of Nation lands for Thruway purposes include the revenue gains and the costs avoided compared to less direct alternative routes. Both parties' experts concluded that operating an alternative route around the Nation's lands would result in less revenue and higher costs. First, the Nation's expert, Steven Turner, opined that the ongoing value of a new, valid easement "is equal to (a) the net income (or net loss) generated for the Thruway by the disputed Seneca Section easement; minus (b) the net income (or net loss) that *would be* generated for the Thruway by the most likely alternative route around the Seneca Section." *See* SOF ¶ 18. Mr. Turner determined what is, in his view, the most likely alternative route, which is 37.8 miles in length and materially less direct than the current Thruway route through Nation lands. SOF ¶ 14. He concluded this alternative route would represent a net loss for the Thruway Authority due to the increased mileage (i.e. increased operating costs) and decreased directness (i.e. less traffic) the option presents. *See* SOF ¶¶ 15, 16. Taking together this net loss with the net income derived from continuing Thruway operations along Nation lands, Mr. Turner calculated the total ongoing benefit of the use of Nation lands using the data available to him. *See* SOF ¶¶ 18, 19.

Responding to Mr. Turner, Defendants' expert Rick Gobeille did not dispute the appropriateness of Mr. Turner's approach, and indeed, he likewise calculated the revenue gained and the costs saved compared with the use of an alternative route. SOF ¶¶ 17, 20. He offered no alternative method of valuing the ongoing use of the Nation's lands on which the Thruway is located. SOF ¶ 21. There is therefore no dispute that Mr. Turner's ongoing benefit analysis is the appropriate approach to valuate a new, valid easement that properly compensates the Nation for the use of its lands for Thruway purposes. SOF ¶ 19.

Indeed, Mr. Gobeille proposed an alternative routing similar to Mr. Turner's and then

14

estimated the increased costs and lower revenue that would result from that routing.  Mr. Gobeille proposed an alternative route 30 miles long.  SOF ¶ 13.  As Mr. Gobeille put it, "Mr. Turner and I chose fairly similar alternative routings."  SOF ¶ 12.  He, like Mr. Turner, concluded that the Thruway Authority would stand to lose substantial revenue if it needed to adopt an alternative, less direct route.  "Rerouting a portion of the Thruway as a less direct route will make it less attractive to drivers, prompting some to divert to other roadways, causing a reduction in toll revenue."  SOF ¶ 15.  He, like Mr. Turner, calculated the increased costs associated with a longer route.  SOF ¶ 16.  Ultimately, Mr. Gobeille calculated that his alternative route "would result in $11 million less of income and $9.8 million more in operating expenses," SOF ¶ 17, resulting in a total comparative benefit of $21.19 million annually to the Thruway Authority for the use of the current route.  Defendants' $21.19 million figure should serve as the annual equitable compensation due to the Nation to be memorialized in a new, valid right-of-way agreement.[2]  The Court should order that a new easement be negotiated accordingly.

### III.    ALTERNATIVELY, THE NATION IS ENTITLED TO SUMMARY JUDGMENT ON ITS REQUEST FOR A DECLARATION THAT DEFENDANTS CONTINUE TO VIOLATE FEDERAL LAW BY NOT OBTAINING A VALID EASEMENT.

If for any reason the Court does not enter an injunction that makes clear the invalidity of the current easement, the Court should enter a declaratory judgment stating that the 1954 agreement is void *ab initio*.  "[T]he *Ex parte Young* doctrine allows suits . . . for declaratory or injunctive relief against state officers in their official capacities."  *Reed v. Goertz*, 598 U.S. 230, 235 (2023).  When faced with a request for a declaratory judgment, a district court must inquire:

> [1] whether the judgment will serve a useful purpose in clarifying or settling the legal issues involved; ... [2] whether a judgment would finalize the controversy and offer relief from uncertainty[;] ... [3] whether the proposed remedy is being used merely for procedural fencing or a race to res judicata; [4] whether the use of a declaratory judgment would increase friction between sovereign legal systems or improperly encroach on the domain of a state or foreign court; and [5] whether there is a better or more effective remedy.

---

[2] Mr. Turner did not have access to the same data as Mr. Gobeille.  The Nation does not dispute that Mr. Gobeille's calculation of the revenue gained plus the costs avoided from his proposed alternative route, which is higher than Mr. Turner's estimate, is based on more complete data.

15

*New York v. Solvent Chem. Co.*, 664 F.3d 22, 26 (2d Cir. 2011) (quoting *Dow Jones & Co. v. Harrods Ltd.*, 346 F.3d 357, 359–60 (2d Cir. (2003)).  If the Court does not grant the injunction the Nation seeks, the Court must enter the declaratory judgment the Nation requests.

A declaration that Defendants will continue to violate federal law by not obtaining a valid easement will serve a useful purpose in settling the key issue in this long-standing dispute and finalize the controversy.  For decades, Defendants have operated the Thruway across Nation lands without a valid easement.  SOF ¶¶ 8, 34; 1999 R&R at 11.  Their continued operation of the Thruway interferes with the federal treaties and laws establishing the Cattaraugus Territory and protecting it against alienation for the reasons explained above.  *See, e.g.*, Canandaigua Treaty of 1794, art. 3 ("The land of the Seneca Nation is . . . to be the property of the Seneca Nation," which shall not be disturbed "in the free use and enjoyment thereof.").  A declaration confirming that Defendants' continued operation of the Thruway across Nation lands violates federal treaties and laws will finally settle the key legal issue here and offer relief from any lingering uncertainty about the easement's validity.

The other factors also favor declaratory relief here.  There is no other pending litigation involving this dispute.  The remedy is not merely for procedural fencing or a race to res judicata, and would not cause friction between legal systems.  There is no better or more effective remedy if the Court denies the Nation's request for injunctive relief.  The Nation has sought relief in every conceivable forum. Therefore, absent injunctive relief, the Court must enter the declaration the Nation seeks. *See Solvent*, 664 F.3d at 26 ("These factors require a district court to issue a declaratory judgment in this case.").

## IV.    THE NATION IS ENTITLED TO SUMMARY JUDGMENT ON DEFENDANTS' REMAINING DEFENSES.

### A.  The traditional state law defense of laches is unavailable to Defendants, and the federal *City of Sherrill* equitable defense does not apply.

Under federal law, "the equitable doctrine of laches . . . cannot properly have application to give vitality to a void deed and to bar the rights of Indian wards in lands subject to statutory restrictions." *Ewert v. Bluejacket*, 259 U.S. 129, 138 (1922).  "Under the Supremacy Clause, state-

16

law time bars, *e.g.*, adverse possession and laches, do not apply of their own force to Indian land title claims." *Oneida II*, 470 U.S. at 240 n.13.  State law defenses to Indian land claims such as laches are preempted by federal law.  *Oneida Indian Nation*, 414 U.S. at 670.

Defendants' reliance on *City of Sherrill v. Oneida Indian Nation*, 544 U.S. 197 (2005), is inapposite here.  Whether a claim can proceed in light of *Sherrill* focuses on the disruption that the requested relief would cause.  It requires balancing (1) "the length of time . . . between [a] historical injustice and the present day"; (2) "the disruptive nature of claims long delayed"; and (3) "the degree to which these claims upset the justifiable expectations of individuals and entities far removed from the events giving rise to the plaintiffs' injury." *Oneida Indian Nation v. Cnty. of Oneida*, 617 F.3d 114, 127 (2d Cir. 2010). "In *Sherrill*, the Supreme Court applied a federal common law equitable defense to a claim of tribal ownership for lands that the [Oneida] Nation had reacquired 200 years after an allegedly unauthorized sale to New York State, and over which long chains of private landowners had held putative title." *Oneida Indian Nation v. Phillips*, 981 F.3d 157, 167 (2d Cir. 2020).  The Supreme Court concluded the 200-year delay, "during which the Oneidas did not seek to revive their sovereign control through equitable relief in court, and the attendant dramatic changes in the character of the properties, preclude[d] [the Tribe] from gaining the disruptive remedy it now seeks." *Sherrill*, 544 U.S. at 216–17.

*Sherrill* is inapplicable to the limited relief sought here.  First, the events at issue occurred within the lifetimes of some living members of the Nation; certainly not after some "extraordinary passage of time."  Moreover, the Nation has asserted the invalidity of the Thruway easement since at least 1993.  In a strikingly analogous case, *Canadian St. Regis Band of Mohawk Indians v. New York*, Nos. 5:82-CV-0783, 5:82-CV-1114, 5:89-CV-0829, 2013 WL 3992830, at *8 (N.D.N.Y. July 23, 2013), *Sherrill* did not bar a tribe's claim regarding invalidity of power line easements originating in a 1949 agreement:

> *Sherrill* laches cannot bar this claim.  The claim's basis is that a 1949 agreement creating the right-of-way was not consummated properly under 25 U.S.C. § 323 . . . . and related regulations. . . .  While the 40-year gap between the formation of the agreement and the filing of the 1989 Complaint is not the blink of an eye, neither is it the "extraordinary passage of time" that is a prerequisite to application of the

17

extraordinary defense of *Sherrill* laches.

*Id.* (internal citations omitted).  This case is similar.

Second, the claims here are not "disruptive."  As in *Oneida Indian Nation v. Phillips* where the Second Circuit rejected the application of *City of Sherrill*, "there is no 'longstanding, distinctly non-Indian character of the disputed land and its inhabitants.'"  981 F.3d at 168 (cleaned up).  The Nation continues to own the entire Cattaraugus Territory, including the portion of the land underlying the disputed easement, in restricted fee.  SOF ¶ 2.  And the outcome of this litigation will not affect the scope of the State's limited civil and criminal jurisdiction within the Nation's lands under federal law.  *See* 25 U.S.C. §§ 232–233; *see also United States v. Cook*, 922 F.2d 1026, 1033 (2d Cir. 1991).  Requiring Defendants to comply with federal law to obtain a valid right of way will not disrupt jurisdiction or authority to regulate the Nation's lands.

Finally, this case will not "upset the justifiable expectations of individuals and entities far removed from the events giving rise to the plaintiffs' injury."  *Oneida Indian Nation*, 617 F.3d at 127.  The Nation seeks a non-disruptive remedy that will allow the uninterrupted continued use of the Thruway.  Here, the Nation already has undisputed title to its land, there is only one purported easement owner, and the Nation seeks only to conclude a valid easement on equitable terms.  To avoid any disruption that might implicate *Sherrill*, the Nation explicitly disclaims ejectment as a remedy in this case.  Compl. ¶ 49.  *Sherrill* does not apply.

### B. New York is not a required party; the State's interests are adequately represented by Defendants here.

In an *Ex parte Young* suit such as this one, the state by definition is not a necessary party because named state official defendants protect the state's interests.  *See Vann v. U.S. Dep't of the Interior*, 701 F.3d 927, 929 (D.C. Cir. 2012).  This lawsuit cures the previous suit's Rule 19 defect by seeking limited prospective relief against individual state officials in accordance with *Ex parte Young*.  The prior litigation "did not determine whether an action seeking relief from the invalid easement could proceed against other state officials in the absence of the State."  *Seneca II*, 58 F.4th at 669.  Here, the answer to that question is clearly yes, because the entire purpose of the *Ex parte Young* doctrine is to allow suit against state officials in the absence of the state, so long as

18

the relief sought is a prospective remedy for an ongoing violation of federal law. "[T]he Supreme Court has instructed that the purpose of *Ex Parte Young* is to ensure that the doctrine of sovereign immunity remains meaningful, while also giving recognition to the need to prevent violations of federal law." *CSX Transp., Inc. v. New York State Off. of Real Prop. Servs.*, 306 F.3d 87, 98 (2d Cir. 2002) (citation omitted).

The first step in a Rule 19 analysis is to determine whether an absent party "should be joined as a 'necessary party' under Rule 19(a)." *Am. Trucking Ass'n, Inc. v. N.Y. State Thruway Auth.*, 795 F.3d 351, 356 (2d Cir. 2015). Rule 19(a) asks whether the absent party "claims an interest relating to the subject of the action" such that "disposing of the action" without them may "as a practical matter impair or impede the person's ability to protect the interest." Fed. R. Civ. P. 19(a)(1)(B)(i). Joinder will not be compelled under the "impair or impede" provision of Rule 19(a) if the absentee's interest is adequately represented by an existing party.[3] *See, e.g.*, *Am. Trucking*, 795 F.3d at 360. "As the text of the rule suggests, pragmatic considerations are controlling in conducting this inquiry." *Id.* at 360 (cleaned up). Here, New York is not a required party under Rule 19(a) because its interests are adequately represented by the present Defendants, who have the authority to enter into and review easement agreements on behalf of the State. N.Y. Pub. Auth. L. § 354(4) ("[T]he [Thruway] authority shall have power . . . [t]o acquire and hold in the name of the state by purchase or appropriation real property or rights or easements therein[.]"). In exercising that authority, there is no doubt Defendants represent the State's interests. *See Am. Trucking*, 795 F.3d at 360. Indeed, if the State were a named defendant, it would be represented by the Attorney General, both a named defendant and lead counsel for most Defendants here. N.Y. Exec. L. § 63(1) ("The attorney-general shall . . . defend all actions and proceedings in which the state is interested[.]").

Even if the State were a required party under Rule 19(a), the Rule 19(b) factors would

---

[3] Sometimes courts evaluate adequate representation under Rule 19(b). *See, e.g., Marvel Characters, Inc. v. Kirby*, 726 F.3d 119, 134 (2d Cir. 2013). Under either provision, the State's interest as the owner of the purported easement is sufficiently protected by Defendants.

preclude dismissal.  The Second Circuit has restated these factors as "(1) whether a judgment rendered in a person's absence might prejudice that person or parties to the action, (2) the extent to which any prejudice could be alleviated, (3) whether a judgment in the person's absence would be adequate, and (4) whether the plaintiff would have an adequate remedy if the court dismissed the suit."  *Marvel*, 726 F.3d at 133 (internal quotation marks and citation omitted).  "[P]rejudice to absent parties approaches the vanishing point when the remaining parties are represented by the same counsel, and when the absent and remaining parties' interests are aligned in all respects."  *Id.* at 134.  The State's interests are aligned with Defendants here in all respects.  The State stands to suffer no prejudice in its absence.  And any prejudice is alleviated by the narrow relief the Nation seeks.  The Nation does not seek ejectment or past monetary damages.  The relief is limited to declaratory and injunctive relief to bring the ongoing use of the Thruway across Nation lands into compliance with federal law through a new easement.  The State will not lose its access to Nation lands for Thruway purposes.  As to the third factor, a judgment in the State's absence will be adequate because "[a]s a practical matter," the State and its officials "are one and the same in an *Ex parte Young* suit for declaratory and injunctive relief."  *Vann*, 701 F.3d at 929.  The Defendants have authority to enter into easement agreements for Thruway purposes on behalf of the State and can rectify the violations here.  Indeed, the 1954 agreement was granted to "the people of the State of New York, **acting by and through the New York State Thruway Authority**."  SOF ¶ 26. Finally, the Nation has no adequate remedy if the Court were to dismiss the suit for the incursion on its sovereign lands.  Balanced against the absence of prejudice to the State if this suit proceeds without it, the Court must reject any Rule 19 defense in this lawsuit.

Under Rule 19, it is dispositive that the Nation has limited the relief it seeks to the confines of *Ex parte Young*.  This lawsuit seeks only prospective relief.  The Nation "seeks to compel defendants to 'obtain a valid easement for the portion of the Nation's Reservation on which the Thruway is situated on terms that will *in the future* equitably compensate the Nation.'"  *Seneca II*, 58 F.4th at 672.  In doing so, the Nation avoided the State's sovereign immunity defense.  "[T]he lawsuit falls under the *Ex parte Young* exception to the Eleventh Amendment."  *Id.* at 674.  If the

20

suit were nonetheless dismissed for failure to join the State under Rule 19, "official-action suits against government officials would have to be routinely dismissed, at least absent some statutory exception to Rule 19, because the government entity in question would be a required party yet would be immune from suit and so could not be joined." *Vann*, 701 F.3d at 930.  "But that is not how the *Ex parte Young* doctrine and Rule 19 case law has developed." *Id.*  "Indeed, a contrary holding would effectively gut the *Ex parte Young* doctrine." *Salt River Project Agric. Improvement & Power Dist. v. Lee*, 672 F.3d 1176, 1181 (9th Cir. 2012).  Rule 19 is no bar here.

### C.  All other defenses are foreclosed.

*Statute of limitations.* It is well established that "[t]here is no federal statute of limitations governing federal common-law actions by Indians to enforce property rights." *Oneida II*, 470 U.S. at 240.  There is simply no basis for Defendants' frivolous assertion of a statute of limitations defense here. *See Canadian St. Regis Band of Mohawk Indians v. New York*, 278 F. Supp. 2d 313, 336–37 (N.D.N.Y. 2003); *accord Oneida Indian Nation*, 194 F. Supp. 2d at 128 ("The ruling of the Supreme Court regarding congressional policy governing statute of limitations defenses in Indian land claims is clear and directly applicable here.").  And, even if there were a statute of limitations to apply, the Nation has alleged a continuing violation of federal law, making this action timely under the continuing violation doctrine. *See Shomo v. City of New York*, 579 F.3d 176, 182 (2d Cir. 2009).

*Consideration.* As in *Oneida Indian Nation*, Defendants' defense of consideration improperly "rel[ies] on the principle that conduct by Plaintiffs or Defendants can validate Indian land transactions even if those transactions were not approved by the United States as required by the Nonintercourse Act."  194 F. Supp. 2d at 122.  But transactions that fail to comply with the Non-Intercourse Act are void. *See* 25 U.S.C. § 177 (Indian land transactions lacking federal consent "shall be of any validity in law or equity.").  As a result, "the Nonintercourse Act precludes inquiry into the fairness of the transactions." *Oneida Indian Nation*, 194 F. Supp. 2d at 122.  "The statute makes no reference to overreaching or fraud or inadequate consideration.  By prohibiting all unauthorized dealings with Indians, it cuts off any inquiry into the fairness of such dealings

21

insofar as the validity of the resulting transfer is concerned." *Oneida Indian Nation v. Oneida Cnty.*, 434 F. Supp. 527, 541 (N.D.N.Y. 1977), *aff'd*, 719 F.2d 525 (2d Cir. 1983), *aff'd in part, rev'd in part by Oneida II*, 470 U.S. 226. Defendants' defense of adequate consideration is frivolous and fails as a matter of law. And in any event, Defendants have failed to produce any evidence that a one-time payment of $75,500 for a permanent easement over the Nation's land was adequate at the time of the transaction, especially given the great value of the lands necessary for a direct route between Buffalo and Pennsylvania in light of the State's inability to obtain use of the Nation's land without negotiation. *See* SOF ¶¶ 9, 30.

*Prescriptive easement.* A prescriptive easement—a state-law time bar akin to a claim for adverse possession—is unavailable here as a matter of law because it would run counter to the protective purposes of the Non-Intercourse Act. *See Oneida II*, 470 U.S. at 240 n.13 (collecting cases); *see also Oneida Indian Nation*, 194 F. Supp. 2d at 123–24 (striking adverse possession defense as legally insufficient). "Defenses in Indian land claim cases based upon state adverse possession laws and state statutes of limitations have been consistently rejected." *Oneida Indian Nation*, 194 F. Supp. 2d at 124 (quoting *Oneida Indian Nation v. New York*, 691 F.2d 1070, 1083 (2d Cir. 1982)) (cleaned up). And, in any event, Defendants did not gain access to Nation lands through "hostile" use, which is a prerequisite to a prescriptive easement. Under New York law, "[t]o acquire an easement by prescription, it must be shown that the use was hostile, open and notorious, and continuous and uninterrupted for the prescriptive period of 10 years," and "[t]he elements of a prescriptive easement must be established by clear and convincing evidence." *Panday v. Allen*, 133 N.Y.S.3d 303, 306 (N.Y. App. Div. 2020) (internal quotations and citations omitted). "[W]here permission can be implied from the beginning, no adverse use may arise until the owner of the servient tenement is made aware of the assertion of a hostile right." *Schwengber v. Hultenius*, 74 N.Y.S.3d 120, 122 (N.Y. App. Div. 2018). Because there is no dispute that the Nation agreed to the easement in 1954, there was no "hostile" use until the Nation became aware of the easement's invalidity. Defendants have no evidence, let alone "clear and convincing evidence," of any 10-year period after the Nation was made aware of the assertion of a hostile right

22

and failed to protest it. *See* SOF ¶¶ 37–40.

*Ratification by the Nation.* Similarly, Defendants' defense of ratification by the Nation fails because it relies on the notion that the Nation could validate the 1954 agreement without federal approval. But the State's failure to comply with the federal consent requirements of the Non-Intercourse Act and the Secretary's regulations renders the 1954 agreement void *ab initio*. *See Oneida II*, 470 U.S. at 246. "[I]t is generally recognized that a voidable contract may be ratified, but a void contract may not." *Doyle v. UBS Fin. Servs., Inc.*, No. 22-CV-276, 2024 WL 1146620, at *8 (W.D.N.Y. Feb. 23, 2024) (citation omitted). The Nation could not revive the void 1954 agreement through ratification.

And, even if the Nation could ratify a void agreement, Defendants point to no evidence that the Nation ratified the 1954 agreement. Congress did not recognize authority for the Nation to approve easements across its lands without federal approval until 1961. *See* Pub. L. No. 87-230, 75 Stat. 499 (1961). Defendants do not and cannot point to any post-1961 action explicitly authorizing the 1954 agreement under the authority of the 1961 amendment. SOF ¶ 36. The only action they cite is a 1957 resolution certifying certain landowners as entitled to compensation under the 1954 agreement. *Id.* The notion that ratification can be implied has been rejected time and again by courts in the context of Indian land claims. *See Oneida II*, 470 U.S. at 248; *Cayuga Indian Nation of New York v. Cuomo*, 730 F. Supp. 485, 492 (N.D.N.Y. 1990).

## CONCLUSION

The Court should grant summary judgment to the Seneca Nation on claim one of the complaint and all defenses thereto, by ordering that a valid easement be negotiated based on an annual payment of $21.19 million to equitably compensate the Nation for the revenue gained and the costs saved by the Thruway Authority in using the Nation's lands (or such other terms as the Court finds to be equitable based on the undisputed facts). In the alternative, the Court should grant summary judgment on claim three and all defenses thereto and declare the 1954 agreement *void ab initio*.

DATED this 11th day of February 2025.

Donald Pongrace (pro hac vice)
James E. Tysse
*/s/ Merrill C. Godfrey*
Merrill C. Godfrey
Jenny Patten Magallanes (pro hac vice)
Brette A. Peña (pro hac vice)
Akin Gump Strauss Hauer & Feld, LLP
2001 K Street N.W.
Washington, D.C. 20006
(202) 887-4000
dpongrace@akingump.com
jtysse@akingump.com
mgodfrey@akingump.com
jpatten@akingump.com
bpena@akingump.com

Christopher Karns
Seneca Nation of Indians
12837 Route 438
Irving, NY 14081
(716) 532-4900
Chris.Karns@sni.org

*Attorneys for Plaintiff*

24