**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SENECA NATION, a federally recognized Indian tribe, | |
| Plaintiff, | Case No. 1:18-cv-429-LJV-MJR |
| v. | |
| KATHLEEN C. HOCHUL, in her official capacity as Governor of New York, *et al.*, | |
| Defendants. | |

**PLAINTIFF SENECA NATION'S STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**

Pursuant to Local Rule of Civil Procedure 56(a)(1), the Seneca Nation (Nation) submits this statement of undisputed material facts in support of its motion for summary judgment.

1.      The Seneca Nation is a federally recognized Indian tribe.  Records Custodian Declaration of Randall Trickey ("U.S. Decl.") ¶ 2 (attached as Exhibit A); *see also* 89 Fed. Reg. 944, 946 (Jan. 8, 2024).

2.      The Seneca Nation exercises jurisdiction over and owns in restricted fee its Allegany, Cattaraugus, and Oil Spring Territories, and individual Seneca members occupy lands on the Territories pursuant to Nation law.  Defs.' Resp. to Pl.'s First Set of Requests for Admis. ("RFA Resp.") ¶¶ 1, 2 (attached as Exhibit B).

3.      The Cattaraugus Territory was set aside for the Seneca Nation by treaties between the Seneca Nation and the United States in 1794, 1797, 1802, and 1842.  RFA Resp. ¶ 3 (Ex. B).

4.      The New York State Thruway (Thruway) was constructed between 1949 and 1960. Expert Report of Rick Gobeille, P.E. ("Gobeille Report") at 4 (attached as Exhibit C).

5.      At 570 miles in length, the Thruway is one of the largest tolled highway systems in the United States and is a critical component in the National Interstate Highway System.  There are few alternatives to the Thruway as it connects the principal cities of the State from New York

City to Albany, and on to Utica, Syracuse, and Rochester through to Buffalo and the Pennsylvania state line.  Gobeille Report at 3–4 (Ex. C); *see also* Deposition Transcript of David Malone ("Malone Depo.") at 144:19–146:2 (attached as Exhibit D).

6.    "The most important benefit of the Thruway is it provides an efficient way for individuals to travel [and] for companies to move goods across the country [or] within the state[.]" Malone Depo. at 74:9–74:14 (Ex. D).  It "crosses New York State and travels near to . . . almost all the major metropolitan areas within the State of New York."  *Id.* at 72:25–73:4.

7.    The Erie Section of the Thruway is 70 miles in length and runs from Buffalo through the Seneca Nation's Cattaraugus Territory to the Pennsylvania State Line. Gobeille Report at 1, 6 (Ex. C).   The Erie Section was constructed and completed by December 1957.  *Id.* at 8.

8.    The Erie Section of the Thruway runs through 2.7 miles of the Nation's Cattaraugus Territory, dividing the Territory in two.  Gobeille Report at 1 (Ex. C); Expert Report of Steven E. Turner ("Turner Report") ¶¶ 26, 40 (attached as Exhibit E).

9.    "Crossing the Nation's lands allowed [the Thruway] to have a direct route down to the Pennsylvania border where [the Thruway] connected to the rest of the interstate . . . system." Malone Depo. at 97:15–97:19 (Ex. D).

10.    On average, 30,000 vehicles cross Seneca Nation lands using the Thruway each day.  Deposition Transcript of Richard Gobeille ("Gobeille Depo.") at 78:17–78:20 (attached as Exhibit F).

11.    Both experts in this case developed a potential alternative routing of the Thruway around Seneca Nation lands.  Gobeille Report at 8 (Ex. C); Turner Report ¶ 46 (Ex. E); Expert Rebuttal Report of Steven E. Turner ("Turner Rebuttal Report") ¶ 4 (attached as Exhibit G).

12.    Defendants' expert Rick Gobeille and the Nation's expert Steven Turner "chose fairly similar alternative routings that assumed the majority of the Thruway's 70-mile Erie Section in Western New York would remain on its current path."  Rebuttal to Expert Report of Steven E. Turner ("Gobeille Rebuttal Report") at 1 (attached as Exhibit H).

13. Mr. Gobeille developed an alternative route around the Seneca Nation's lands that is approximately 30 miles in length. Gobeille Report at 9 (Ex. C).

14. Mr. Turner developed an alternate route that is 37.8 miles in length. Turner Report ¶ 46 (Ex. E).

15. Rerouting a portion of the Thruway around Seneca Nation lands as a less direct route would make it less attractive to drivers, prompting some to divert to other roadways, causing a reduction in toll revenue. Gobeille Report at 3 (Ex. C); Gobeille Depo. at 80:8–80:16 (Ex. F); Turner Report ¶¶ 85–87 (Ex. E); Turner Rebuttal Report ¶ 4 (Ex. G).

16. Operating a less direct alternative route around the Nation's lands would also increase direct operating costs and depreciation and interest expenses due to a longer roadway. Turner Report ¶¶ 75–76 (Ex. E); Gobeille Depo. at 88:6–89:9 (Ex. F); Gobeille Rebuttal Report at 12 (Ex. H) ("I agree with Mr. Turner that a longer route will have greater overall expenses (operating, depreciation, and interest) than a shorter route[.]").

17. Mr. Gobeille determined that if the Thruway were diverted to an alternate route around the Seneca Nation's lands, the Thruway would be expected to lose $11.3 million in toll revenue annually and would incur an additional $9.89 million in operating expenses annually. Gobeille Report at 1 (Ex. C); Gobeille Depo. at 45:8–45:14, 88:13–89:9 (Ex. F).; *see also* Turner Rebuttal Report ¶ 5 (Ex. G).

18. The prospective financial benefits that result from the ongoing use of Nation lands for Thruway purposes is equal to: (a) the net income (or net loss) generated for the Thruway by the disputed Seneca Section easement; minus (b) the net income (or net loss) that *would be* generated for the Thruway by the most likely alternative route around the Seneca Section. Turner Report ¶¶ 30, 43, 95 (Ex. E).

19. Use of an ongoing benefit analysis is an appropriate way to value the use of Seneca Nation lands for Thruway purposes on an annual basis. Turner Report ¶¶ 42–45 (Ex. E); Turner Rebuttal Report ¶ 7 (Ex. G).

20.     In his rebuttal report, Mr. Gobeille took no issue with Mr. Turner's ongoing benefit approach to valuate a new, valid easement over Nation lands.  *See* Gobeille Rebuttal Report at 2, 13 (Ex. H).

21.     Mr. Gobeille offered no alternative approach to valuing the ongoing use of the Seneca Nation's lands for Thruway purposes.  *See* Gobeille Depo. at 128:20–129:1 (Ex. F).

22.     By at least 1946, New York officials had prepared plans and specifications for the Erie Section of the Thruway, part of which they proposed to extend through the Seneca Nation's Cattaraugus Territory.  *See* Letter from J. Frank O'Marah, New York Department of Public Works, to Hon. Wm. Zimmerman, Jr., Office of Indian Affairs, dated May 7, 1946 ("May 7, 1946 Letter") (attached as Exhibit I); RFA Resp. ¶ 24(B) (Ex. B); *see also* Gobeille Rebuttal Report at 8 (Ex. H).

23.     The New York State Thruway Authority has a continuous right-of-way that travels the entire route of the Thruway system.  Most of the right-of-way was acquired through eminent domain.  Malone Depo. at 75:5–76:3 (Ex. D).

24.     In a letter dated May 7, 1946 to William Zimmerman, Jr. (Assistant Commissioner, U.S. Department of the Interior, Office of Indian Affairs), J. Frank O'Marah (Director, New York Department of Public Works) wrote with respect to extending the Thruway "through the Cattaraugus Indian Reservation":

> This Department understands it cannot appropriate or acquire fee title to Indian Lands on this Reservation and must agree with the individual Indians whose allotment of land is involved in the project and obtain the consent of the Council of the Seneca Nation before any part of their property is used for this project and the Department proposes to proceed along that line.
>
> Based on this Department's experience in the past in such matters, I would ask the consent and approval of the Department of the Interior as to this procedure.

May 7, 1946 Letter (Ex. I); *see also* RFA Resp. ¶ 24(B) (Ex. B).

25.     In a letter dated June 10, 1946, Oscar Chapman (Acting Secretary of the Interior) responded to Mr. O'Marah's May 7, 1946 letter as follows:

> It appears this procedure is similar to that used in the acquisition of a right of way for elimination of a grade crossing . . . near Irving, New York.  This Department is agreeable to your proposal that the same method used in acquiring a right of way for the grade crossing be used for the acquisition of a right of way for the Erie

4

> Thruway.  Maps of definite location together with your application should be filed with the Superintendent.  Signed copies of the agreements executed by the individual Indians should also be furnished.  The consideration cited in the agreements may be paid to the Indians entitled thereto.
>
> It should be understood that before any construction work is commenced consent of the Indian owners must be obtained.  It is agreeable to this Department for the New York State Department of Public Works to begin construction work on the Erie Thruway after consent of the individual Indians and tribal council has been obtained and payment of the damages has been made.

Letter from Oscar L. Chapman, Acting Secretary of the Interior, to J. Frank O'Marah, New York Department of Public Works, dated June 10, 1946 (attached as Exhibit J). *see also* RFA Resp. ¶ 24(E) (Ex. B).

26.     On October 5, 1954, "the People of the State of New York, acting by and through the New York State Thruway Authority," purported to enter into an indenture with "the Seneca Nation of Indians" by which the Seneca Nation purported to grant a "Permanent Easement for Thruway purposes" over approximately 300 acres of the Cattaraugus Territory in exchange for a one-time payment of $75,500.  New York State Thruway, Erie Section, Indenture ("Disputed Thruway Easement") (attached as Exhibit K); RFA Resp. ¶ 24(I) (Ex. B).

27.     In a Thruway Authority Inter Office Memorandum dated September 20, 1954, P.G. Baldwin (Director, Bureau of Rights-of-Way and Claims, New York Department of Public Works) reported that after "several hours of very frank talk," the price for the Disputed Thruway Easement was "hammered down" to a one-time payment of $75,000, which was "much lower than any of us expected to acquire these lands for[.]"  New York State Thruway Authority Inter-Office Memorandum from P.G. Baldwin, Director, to B.D. Tallamy, Chairman, dated Sept. 20, 1954 (attached as Exhibit L); *see also* Malone Depo. at 130:10–131:13 (Ex. D).

28.     There is no record that after June 10, 1946, the Thruway Authority or any New York state official submitted or provided any documentation or other information related to the Disputed Thruway Easement to the Secretary of the Interior or any other federal official.  RFA Resp. ¶ 4 (Ex. B); *see also* U.S. Decl. ¶¶ 3, 4 (Ex. A).

5

29.     The Disputed Thruway Easement was not signed by a representative of the United States, no federal official was present when the agreement was signed, and no federal official was present at the closing.  RFA Resp. ¶ 8 (Ex. B).

30.     There was no professional independent appraisal of the value of the Disputed Thruway Easement prior to October 5, 1954.  RFA Resp. ¶ 9 (Ex. B).

31.     There is no record that any map of the definite location of the easement, an application for approval of the easement, signed agreements, or a schedule of damages for the Disputed Thruway Easement were filed with the Department of the Interior.  RFA Resp. ¶¶ 10–12 (Ex. B); *see also* U.S. Decl. ¶¶ 3, 4 (Ex. A).

32.     There is no record showing the Secretary of the Interior approved any agreement, application, map, or schedule of damages for the Disputed Thruway Easement.  RFA Resp. ¶ 13 (Ex. B); *see also* U.S. Decl. ¶¶ 3, 4 (Ex. A).

33.     There is no record of any endorsement by the Secretary of the Interior or any of his or her delegates on any map of definite location of the lands relating to the Disputed Thruway Easement.  RFA Resp. ¶ 14 (Ex. B); *see also* U.S. Decl. ¶¶ 3, 4 (Ex. A).

34.     There is no record showing the Disputed Thruway Easement was approved by the Secretary of the Interior or his or her delegates on or after October 5, 1954.  RFA Resp. ¶ 15 (Ex. B); *see also* U.S. Decl. ¶¶ 3, 4 (Ex. A).

35.     If the Department of the Interior had approved an easement between the Seneca Nation and the State of New York, the Bureau of Indian Affairs would have a signed easement document in its files.  U.S. Decl. ¶ 5 (Ex. A).

36.     Defendants do not and cannot point to any post-1961 action explicitly authorizing the Disputed Thruway Easement.  Defs.' Resp. to Pl.'s First Set of Interrogatories ¶ 7 (attached as Exhibit M) (citing only to a 1957 Seneca Nation Council Resolution "certifying individual landowners as legally entitled to compensation by reason of the appropriation of their land as a result of the easement" in support of ratification defense).

37.     In 2007, the Seneca Nation's Council passed resolutions to (1) officially rescind the Nation Council's 1954 authorization of the 1954 easement agreement, declare New York State's continued use of the illegal easement an ongoing act of trespass, and authorize the Nation's President to request "initiation of negotiations to attempt to resolve this transgression against the Nation and its people"; (2) impose a $1 per vehicle toll on motorists traveling through Nation lands on the Thruway to be collected by the Thruway Authority and remitted to the Nation; and (3) authorize the Nation's President and Treasurer to invoice the Thruway Authority for the toll with interest and penalties for nonpayment.  Seneca Nation of Indians Council Resolution No. S-04-14-07-27 "Rescinding Approval of Thruway Right-of-Way/Approval" dated April 14, 2007 (attached as Exhibit N); Seneca Nation of Indians Council Resolution No. R-05-12-07-17 "To Access Fee on Passage Through Nation Lands/Approval" dated May 12, 2007 (attached as Exhibit O); Seneca Nation of Indians Council Resolution No. R-06-09-07-26 "Amending Resolution Regarding Thruway Tolls/Approval" dated June 9, 2007 (attached as Exhibit P).

38.     On June 11, 2007, the Nation's Treasurer invoiced the Thruway Authority for estimated tolls due for the months of April (partial), May, and June 2007.  Letter from Treasurer Kevin Seneca to John Buono, Chairman of the New York State Thruway Authority, dated June 11, 2007 (attached as Exhibit Q).

39.     The Nation's President sued the State of New York, the Thruway Authority and the Federal Highway Administration in the Nation's Peacemakers' Court but none of the defendants—New York State, the Thruway Authority, or the Federal Highway Administration—appeared personally or by counsel.  After briefing, the Peacemakers' Court issued an Advisory Opinion and Order determining the easement was void at its inception and remains void as a matter of Nation and federal law.  *Seneca Nation of Indians v. State of New York, et al.*, No. 0113-09-1, Advisory Op. & Order (Seneca Nation of Indians Peacemakers' Court Apr. 29, 2009) (attached as Exhibit R).

40.     In 2011, the Nation's President petitioned President Barack Obama "to bring about a reasonable resolution to the nearly sixty-year illegally imposed use of Nation lands by the State

of New York" for Thruway purposes.  Letter from Seneca Nation President Robert Odawi Porter

to President Obama, dated July 29, 2011 (attached as Exhibit S).

DATED this 11th day of February 2025.

Donald Pongrace (pro hac vice)
James E. Tysse
*/s/ Merrill C. Godfrey*
Merrill C. Godfrey
Jenny Patten Magallanes (pro hac vice)
Brette A. Peña (pro hac vice)
Akin Gump Strauss Hauer & Feld, LLP
2001 K Street N.W.
Washington, D.C. 20006
(202) 887-4000
dpongrace@akingump.com
jtysse@akingump.com
mgodfrey@akingump.com
jpatten@akingump.com
bpena@akingump.com

Christopher Karns
Seneca Nation of Indians
12837 Route 438
Irving, NY 14081
(716) 532-4900
Chris.Karns@sni.org

*Attorneys for Plaintiff*