# EXHIBIT E

**BEFORE THE UNITED STATES DISTRICT COURT**

**WESTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SENECA NATION, a federally recognized Indian tribe<br><br>      Plaintiff,<br><br>VS.<br><br>KATHLEEN C. HOCHUL, in her official capacity as Governor of New York, et al.,<br><br>      Defendants | CASE NO. 18-CV-429-LJV-MJR |

**EXPERT REPORT OF STEVEN E. TURNER**

**MAY 31, 2024**

**TABLE OF CONTENTS**

I.  **Qualifications**...........................................................................................................................1

   A.  Toll Road Experience ..............................................................................................................1

      1.  North Texas Tollway Authority .......................................................................................1

      2.  Harris County Toll Road Authority ................................................................................3

      3.  Transurban USA ...............................................................................................................3

      4.  Puerto Rico Highway Transportation Authority ............................................................3

      5.  New Jersey Turnpike Authority .......................................................................................4

   B.  Valuation Qualifications ..........................................................................................................5

      1.  Secured Creditors for Santa Rosa Bay Bridge ...............................................................6

      2.  SH 130 Concession Company...........................................................................................6

      3.  Salik Toll Road Valuation on behalf of the Government of Dubai ................................7

II.  **Overview of Dispute and Instructions from Counsel**................................................................7

   A.  Overview of Dispute ................................................................................................................7

   B.  Instructions from Counsel and Scope of Services....................................................................8

III.  **Summary of Opinions**.........................................................................................................10

IV.  **Ongoing Benefit Methodology** .............................................................................................11

   A.  Net Income as a Foundation of Ongoing Benefit Analysis....................................................11

   B.  The Seneca Section and a *But-For* Alternative......................................................................13

      1.  The Seneca Section .........................................................................................................13

      2.  *But-For* Alternative Route .............................................................................................14

      3.  Section Enabled by the Seneca Section .........................................................................18

V.  **Ongoing Benefit Inputs and Assumptions** .............................................................................20

   A.  Key Drivers of Net Income ....................................................................................................20

   B.  Seneca Section Revenues and Expenses.................................................................................20

      1.  Revenue Considerations..................................................................................................20

         a)  Tolling Fee Revenues...............................................................................................20

         b)  Related Fee Revenues ..............................................................................................22

      2.  Direct Expense Considerations ......................................................................................23

         a)  Incremental Costs.....................................................................................................24

         b)  Rural Cost Factor .....................................................................................................24

      3.  Depreciation and Interest Expense Considerations.......................................................25

         a)  Capital Improvement Projects and Depreciation .....................................................26

         b)  Interest Expense .......................................................................................................27

      4.  Summary of Net Income for the Enabled Seneca Section .............................................27

   C.  But-For Alternative Route .....................................................................................................28

      1.  Loss of Traffic Means Lower Operating Revenues .......................................................29

      2.  Less Traffic Lowers Cost Rate, Longer Route Raises Upkeep Mileage.......................33

      3.  Depreciation and Interest Expenses Increase with Mileage.........................................34

      4.  Summary of Net Loss for the But-For Route..................................................................35

**VI.    Presentation of Ongoing Benefit** ................................................................................................**36**
**VII.    Signature** ................................................................................................................................**37**

# I.  Qualifications

1.     My name is Steven E. Turner.  I am a Senior Managing Director at FTI Consulting, Inc. I co-lead the TMT Dispute Advisory practice. I hold a Bachelor of Science degree in Electrical Engineering from Auburn University in Auburn, Alabama and a Master of Business Administration in Finance from Georgia State University in Atlanta, Georgia.

2.     My hourly rate is $1,184 per hour, and the rates for FTI personnel working on this assignment under my direction range from $369 to $1,062 per hour. A copy of my curriculum vitae is attached as Exhibit SET-A, and includes a list of matters in which I have given testimony.

## A.     Toll Road Experience

### 1.     North Texas Tollway Authority

1.     For approximately 15 years, I have served as an operational advisor and expert witness on a variety of matters within the toll road industry across the United States and internationally.  My toll road experience includes cost recovery, revenue modeling, traffic forecasting, operations and maintenance, toll collection, and billing practices.  I have developed several comprehensive studies to allocate costs across functional areas of toll road operations.  For example, for North Texas Tollway Authority ("NTTA"), I developed a model that utilized the full financial reporting for NTTA and then developed cost-based allocation methods to determine the quantity of cost attributable to providing tolling services across all of its toll roads.  This information was used for negotiating Tolling Services Agreements with various parties as well as in a litigation related to administrative fees for collecting unpaid tolls.  I have developed a similar analysis for both Harris County Toll Authority and Transurban..  Further, in my work with tolling agencies, I have also performed sensitivity analyses against traffic and revenue studies to develop

dynamic pricing models.  I have detailed knowledge of the construction costs, revenue, operating expense, and maintenance capex across multiple projects and multiple tolling operators.

2.      I have worked on multiple engagements on behalf of the NTTA, which is a government agency established to develop and operate toll roads in the Dallas/Fort Worth metropolitan area.  I was retained to evaluate a series of Tolling Services Agreements ("TSAs") between NTTA and the Texas Department of Transportation ("TxDOT"), which was acting on behalf of Ferrovial/Cintra, the concessionaire that was operating the various tollways. Specifically, the engagement included developing a comprehensive model for NTTA to determine the cost associated with providing TSA services to an entity such as Ferrovial/Cintra based on the probabilities of payment collected from users of the toll roads.  In another engagement, I advised NTTA on the development of a TSA with Ferrovial/Cintra for the North Tarrant Express ("NTE"). As part of this assignment, I performed detailed reviews of Ferrovial/Cintra's traffic studies and performed sensitivity analyses against these studies to develop the pricing model used for this contract.  I have continued to perform a number of projects on behalf of NTTA including serving as an expert in a litigation,[1] analyzing pricing for post-pay transactions and the impact on the probability of payment, benchmarking transaction fees, and analyzing other operational issues within NTTA.

---

[1]  In the United States District Court for the Northern District of Texas – Dallas Division, Civil Action No. 3:10-CV-0868-G, *Mirna Reyes, et al., Plaintiffs, vs. North Texas Tollway Authority (NTTA), Defendant*, Oral and Videotaped Deposition of Steven Turner as the 30(b)(6) Representative of the North Texas Tollway Authority (July 24, 2015), Expert Report of Steven E. Turner on behalf of North Texas Tollway Authority (October 29, 2015), Expert Rebuttal Report of Steven E. Turner on behalf of North Texas Tollway Authority (December 4, 2015).

**2.     Harris County Toll Road Authority**

3.     My experience with toll roads also includes projects for the Harris County Toll Road Authority ("HCTRA"), which is a government agency established to develop and operate toll roads in the Houston metropolitan area.  I initially was retained to evaluate an existing set of cost models developed by HCTRA to determine its cost associated with pursuing unpaid tolls on the HCTRA system.  This work led to an engagement to develop a comprehensive model for HCTRA to determine the cost associated with providing tolling operations services separate from processes associated with road operations.

**3.     Transurban USA**

4.     On behalf of Transurban USA I was retained to testify as an expert with respect to its tolling operations, cost, the fees charged for pursuing unpaid tolls, and the revenues generated related to those fees.

5.     Initially, I was retained to evaluate a preliminary cost model developed by Transurban USA to allocate its operating costs between those associated with managing the payment of electronic tolls, pursuit of unpaid tolls and those associated with the operation of its toll roads.  Based on this initial evaluation, my team then undertook to develop its own preliminary model for the purpose of advising counsel as to the cost and revenue for tolling operations at each stage of invoicing for unpaid tolls.

6.     Information was utilized by counsel and Transurban USA to arrive at a settlement with counsel for Plaintiffs.  No expert report was required.

**4.     Puerto Rico Highway Transportation Authority**

7.     The Puerto Rico Highway Transportation Authority (PRHTA) had during several Request for Proposal (RFP) cycles unsuccessfully completed a bid for its Tolling Services

operations without the RFP ending in litigation that cancelled the results of the RFP. I was retained to run the RFP process on behalf of PRHTA to make every effort to successfully select a new bidder for Tolling Services both for PRHTA and for a partner with PRHTA (Metropistas).

8. I performed a comprehensive assessment of all of the tolling infrastructure in Puerto Rico including the maintenance of the infrastructure by the current vendor operating the network.

9. I further performed a comprehensive review of the existing contract between PRHTA and its vendor including all terms and conditions, pricing, and the like over the prior five years of the contract. In addition, I performed an analysis on behalf of PRHTA related to existing traffic studies and identified opportunities for PRHTA to further stimulate demand for traffic across the island. This analysis was performed in light of restructuring work that FTI was also involved with PRHTA to determine opportunities for additional revenue on the island.

10. I developed all RFP documents on behalf of PRHTA to document the contract requirements for Toll Services across Puerto Rico. I then led the RFP process and worked with PRHTA senior management to follow all regulatory requirements for performing an RFP.

11. Our team successfully completed the RFP process on behalf of PRHTA identifying the new vendor saving Puerto Rico substantial cost over the contract life. The losing party filed suit but it was dismissed in summary judgment.

**5. New Jersey Turnpike Authority**

12. The New Jersey Turnpike Authority (NJTA) was sued by James Long and Homer Walker regarding the administrative fees charged by NJTA for the recovery of cost associated with the late payment of tolls. Specifically, the suit was filed with the Appellate Division in New Jersey which then heard testimony on the reasonableness of the administrative fees. My colleague, Brian Pitkin, and I were retained to testify as experts on the administrative fees and costs for the NJTA.

13.     Specifically, we undertook a comprehensive review of NJTA cost studies related to pursuing and collecting violations.  We also evaluated whether NJTA reasonably calculated these costs.  Further, identified any adjustments we believed would be appropriate to more precisely estimate the NJTA's costs and to quantify the impact of those adjustments in evaluating the administrative fee.

### B.     Valuation Qualifications

14.     My work in this matter involves an assessment of the ongoing financial benefit, to the New York Thruway Authority, of an easement on the Cattaraugus Territory of the Seneca Nation.  For reasons I describe in my report, the assessment of an ongoing financial benefit is not the same thing as the valuation of a business or asset (*e.g.*, for an acquisition or sale).  Nonetheless, the work I do to value businesses and assets informs my judgment in this matter.

15.     I regularly provide expert support on multiple matters related to the valuation of complex infrastructure assets, such as fiber and copper cabling, satellites, towers, and wireline and wireless telecommunications networks.  Much of this work is at the request of lenders or private equity organizations, and often includes valuation work related to asset securitizations.

16.     I regularly perform operational and financial due diligence for prospective mergers and acquisitions.  This work involves in-depth analyses of the financial operations, infrastructure, competition, and broader market outlook for one or more companies involved in such transactions.

17.     I also advise clients in disputes stemming from disagreements regarding the valuation of operations or assets, including ROWs.

18.     My diverse experience as an engineer, executive, and consultant helps me to develop asset evaluations that are detailed and realistic.  My experience also allows me to explain key assumptions and conceptual frameworks to multiple parties in a given engagement, including

lenders, investors, operators, and courts. I have also specifically provided valuation-specific work related to the toll road industry as discussed following.

### 1.    Secured Creditors for Santa Rosa Bay Bridge

19.    I performed a traffic study on the Santa Rosa Bridge identifying all available economic and traffic variables in the market (North Florida Panhandle near Pensacola) to determine the effects on demand for the toll road based on potential pricing changes to electronic and cash tolling across the bridge.

20.    I further performed a comprehensive traffic study on the Santa Rosa Bridge to forecast traffic over a 30-year period using all available economic and traffic related data in the market.  The analysis was to include the effects of price increases as well as reflect a traffic forecast based on economic developments in the market that affect both electronic and cash tolling.

### 2.    SH 130 Concession Company

21.    I was retained in this litigation to provide expert testimony related to the solvency of SH 130 based on projected traffic revenues, projected construction cost, and projections operations and maintenance costs for a rural toll road operating from Austin, Texas to north of San Antonio, Texas.  This case involved the development of valuations of the toll road under various traffic assumptions over time that considered parallel routes that were available to the toll road and the traffic conditions that were likely to be experienced at different times of day between the non-tolled interstate and SH 130.  Further, I was asked to determine specific valuations of the toll road relative to its debt at those times to determine the project's solvency.  My analysis and testimony demonstrated that the toll road was insolvent at each of the relevant time periods.

### 3.    Salik Toll Road Valuation on behalf of the Government of Dubai

22.    The Government of Dubai sought to carve out its toll road operations – Salik – into a public entity through an initial public offering. To accomplish this offering, the government needed a third-party to develop a reliable traffic and revenue forecast for the project. I was retained by the government to develop this forecast. Ultimately, my team developed a detailed model that identified various economic, seasonal, employment, and related factors that contribute to the level of traffic passing across the Salik toll road. We included in this analysis an assessment of non-tolled routes (and the corresponding time differences between these routes and the toll road), public transportation options (train rapid transit as well as taxis), and the introduction of new ingress/egress points along the route to develop a long-range traffic forecast for the project.

23.    I was further retained to assist in writing the contractual documents that would be used to establish the ongoing relationship between the carved out entity – Salik – and various government agencies that would continue to be involved either in the performance of the toll road or the electronic infrastructure for the collection of tolls. In this role, my responsibility was to focus on the operational viability of the new entity.

## II.    Overview of Dispute and Instructions from Counsel

### A.    Overview of Dispute

24.    The present matter between the Seneca Nation and officers of the State of New York arises from a dispute regarding the validity of an easement used by the New York Thruway ("Thruway") to cross the Cattaraugus Territory for purposes of building the Thruway in Western New York State.[2]

---

[2]    *Seneca Nation* v. *Hochul, et al.,* No. 20-4247-cv, Second Circuit Court of Appeals, January 26, 2023, p. 2.

25.    I understand that in 1954, the Seneca Nation was paid a sum of $75,500 by the State of New York for the easement in dispute.  I also understand that the Second Circuit has held that federal law (25 U.S.C. §177) provided at the time of the 1954 agreement that "any easement over Indian land required the consent of the United States."[3] I understand, further, that the purpose of that law was to protect Indian tribes and nations from the further erosion of their historical land holdings.[4] Finally, I understand that the federal approval of the easement required by 25 U.S.C. §177 was never obtained by the State of New York.[5]

26.    In the 1950s, the construction of the Interstate Highway System disproportionately displaced or disrupted poor and minority communities.[6] The Thruway almost precisely bisects the Cattaraugus Territory, creating significant disruptions to land use, noise and environmental patterns, and free movement within the Territory itself.

## B.    Instructions from Counsel and Scope of Services

27.    I have been asked by counsel for the Seneca Nation, first, to demonstrate that there are methods for determining the prospective financial benefits that result from the Thruway's

---

[3]    *Id*. p. 4.  The text of the law in question, 25 U.S.C. § 177, reads, "No purchase, grant, lease, or other conveyance of lands… from any Indian nation or tribe of Indians, shall be of any validity in law or equity unless the same be made by treaty or convention entered into pursuant to the Constitution. Every person who, not being employed under the authority of the United States, attempts to negotiate such treaty or convention, directly or indirectly, or to treat with any such nation or tribe of Indians for the title or purchase of any lands by them held or claimed, is liable to a penalty of $1,000."  See "25 U.S. Code § 177 – Purchases or grants of lands from Indians," Cornell Law School Legal Information Institute, www.law.cornell.edu/uscode/text/25/177, last accessed May 21, 2024.

[4]    To be clear, my understanding is from counsel for Seneca Nation, as I am not an attorney and offer no conclusions regarding the law.

[5]    *Complaint*, In the United States District Court for the Western District of New York, *Seneca Nation*, *Plaintiff*, *v. New York State Thruway Authority, et al.*, *Defendants*, No. 1:18-cv-429, ¶ 18.

[6]    David Karas, "Highway to Inequity: The Disparate Impact of the Interstate Highway System on Poor and Minority Communities in American Cities," *New Visions for Public Affairs*, Vol. 7, April 2015.

ongoing use of the Seneca Nation property occupied by the Thruway, and second, to provide an estimate of those benefits for purposes of valuing a new, valid easement for those lands.

28.    Counsel advises me, further, that due to the nature of this dispute as an *Ex parte Young* matter, the Seneca Nation seeks *prospective* relief, rather than past damages.  I proceed accordingly in what follows.

29.    "Valuation" analyses are typically done on behalf of the parties to a *transaction* (*e.g.,* lenders, buyers, sellers), and involve detailed forecasts of the revenues and expenses that are expected to ultimately produce financial benefits to the owners of an asset.  This matter, however, does not involve any proposed transaction or sale.  In addition, the full range of data necessary to produce detailed forecasts of asset-*specific* revenues and costs has not been produced for this matter.  The methodology that I develop below does allow, however, for a close approximation of the benefits that the New York Thruway Authority continues to enjoy as a result of its access to the Cattaraugus Territory.  I therefore use the term "Ongoing Benefit," rather than the transaction-oriented term "valuation," to describe the focus of my analysis in this report.

30.    Following the above instructions from counsel for Seneca Nation, my report details the methodology I have developed to assess the Ongoing Benefit enjoyed by the New York State Thruway ("Thruway"[7]) as a result of its access to the portion of the Thruway passing through the Cattaraugus Territory.  I refer to this 2.7-mile portion of the Thruway as the "Seneca Section."

31.    In addressing these matters, I rely on my education, professional training and experience, toll road and telecommunications industry-specific experience, and a review of materials from the record in this case (which are identified in Exhibit SET-B). The information I

---

[7]    For the purposes of my analysis, the "Thruway" encompasses both a physical asset, "the 570-mile superhighway crossing New York State, [one] of the longest toll superhighway systems in the United States," ("Frequently Asked Questions," www.thruway.ny.gov/about/faqs.html, last accessed May 21, 2024), as well as the New York State Thruway Authority, to whom the benefits of that asset accrue.

rely upon in forming my opinions is consistent with materials I review in my normal course of business. I form the opinions set forth in this report, which are my present opinions based on information available to me as of the filing of this report, from my review of this information as well as my education, training, knowledge, and experience.

## III.    Summary of Opinions

32.    After considering the material I have been provided in this matter and performing the analysis described in this report, I have reached the following conclusions:

- **The Seneca Section is an operating asset that produces an Ongoing Benefit for the Thruway.** The Seneca Section carries an average of more than 28,000 passenger and commercial vehicles per day,[8] providing significant revenues to the Thruway. Importantly, the Seneca Section produces these revenues to the Thruway at relatively low cost.

- **Net income methods are appropriate to the evaluation of the Ongoing Benefits provided by operating assets.** As an operating asset, the Ongoing Benefit provided to the Thruway by the Seneca Section is evaluated in this report according to the net income (*i.e.*, revenue less costs) that the asset itself provides to the Thruway. A net income method is more appropriate to the evaluation of the Seneca Section than a pure valuation methodology that might focus instead on projections of future "cash flows" for purposes of an acquisition.

- **Corridor directness is highly beneficial to the Thruway.** This matter is about the Ongoing Benefit provided by a *uniquely direct* corridor that helps to link the economic centers of Buffalo, New York, and Cleveland, Ohio, and which connects the Thruway to the broader United States Interstate Highway System. Route directness incentivizes traffic volume, thereby increasing Thruway toll revenue, while also allowing the Thruway to *avoid* the additional construction, maintenance, and other costs that a more circuitous route would require. As an operating asset, the Seneca Section's Ongoing Benefit to the Thruway is enhanced by the directness of the Thruway route that it enables.

- **The Ongoing Benefit offered by the Seneca Section easement is driven by the value gained from the use of the Seneca Section *and also* the avoidance**

---

[8]    The New York State Department of Transportation estimates that an average of 28,594 vehicles traveled along Interstate 90 from Exit 58 to the Erie County line (*i.e.*, along the Seneca Section of the Thruway) per day in 2022. https://www.dot.ny.gov/tdv, Station ID 520103. See Section V of this report for more detail.

**of loss from lesser alternatives.** Based on my assessment of operating revenues and expenses for the Seneca Section, as well as anticipated operating revenues and expenses of the most likely but-for alternative route, I estimate that the Seneca Section provides the Thruway Authority with an Ongoing Benefit of $16.98 - $18.44 million annually.

## IV.   Ongoing Benefit Methodology

### A.   Net Income as a Foundation of Ongoing Benefit Analysis

33.   In this report I analyze the Seneca Section as an operating asset. Aswath Damodaran, a widely cited expert on valuation methods, writes, "In an asset-based valuation, we focus primarily on the assets in place and estimate the value of each asset separately."[9] An "asset in place" is an existing investment that "generates cash flows today."[10]

34.   The full valuation of an asset for the purposes of a sale transaction would require the analysis of "the *expected* [ital. added] cash flows on that asset,"[11] as well as an estimate of the present *value* of those anticipated future cash flows. Transactions depend upon asset buyers and sellers coming to some agreement regarding that present value.

35.   This matter, however, does not involve a transaction where a seller is attempting to attract a buyer. In addition, the data produced in discovery does not provide insight into asset-specific forecasts of future cash flows. I therefore do not provide a formal "valuation" in this report.[12] However, I do judge that it is possible to estimate the revenues, the expenses, and the

---

[9]   Aswath Damodaran, *Damodaran on Valuation: Security Analysis for Investment and Corporate Finance, Second Edition*, John Wiley & Sons, Inc., 2006, p. 11.

[10]   *Id.*, p. 11.  Cf. pp. 459-60.

[11]   *Id.*, p. 10.

[12]   Damodaran presents cash flows as the basis for acquisition-oriented valuation. However, cash flows are not precisely synonymous with net income. For instance, a widely used metric in mergers and acquisitions, "unlevered free cash flow," attempts to understand the cash flow produced by an asset *regardless* of how it was financed by the current owner (*e.g.,* through debt or "leverage"). The goal of valuation is often to understand the amount of

resulting net income that currently accrue, and can be expected to prospectively accrue, to the Thruway as a result of its access to the disputed easement.

36.    The net income methodology developed here also focuses on the *incremental* income attributable to the Seneca Section itself as one asset within a system of assets.  An incremental approach focuses on the revenues and costs that a specific asset adds "incrementally" to an overall business.[13]  An incremental methodology supports precision in asset evaluation.

37.    Full allocation methods, which allocate *all* expenses to a given asset based on some principle of proportionality (*e.g.,* mileage), are very blunt instruments, treating the Mario Cuomo Bridge and the Seneca Section, which have nearly identical lengths, as *the same kind of asset*.

38.    A full allocation model can also obscure the ways in which some assets, if generating revenue at low cost, actually subsidize other assets within a business ecosystem.[14]  In the full-year financial totals listed in the Thruway's December 2023 Financial Report, the Thruway notes that its total "Change in Net Position" for 2023 involved a year-over-year *decrease* of $40,325,922.[15] The Thruway is comprised of approximately 3,200 "lane-miles" (*i.e.,* a single

---

cash an asset will produce under *new* financing – which means that interest payments on current debt are not always viewed as relevant inputs for evaluation.  However, Thruway operating assets are often created or improved using debt financing, and I believe that including interest payments as key expenses in my net income analysis is reasonable and conservative.

[13]    An incremental income evaluation does not attempt to ignore system-wide costs altogether.  The incremental approach instead allows the analyst to include only the most relevant and applicable system-wide costs.

[14]    Toll roads often depend upon lenders to finance large capital expenditures (I have worked on behalf of lenders, for instance, when evaluating the Santa Rosa Bay Bridge toll road).  If lenders are only willing to provide debt financing based on the Thruway's ability to pay future principle and interest on that debt, then lenders will be highly focused on financial ratios such as revenue-to-interest-payments (a "coverage" ratio).  Assets that create revenue at low expense allow for other, higher cost assets to receive debt financing where necessary.

[15]    New York Thruway Authority, "Monthly Financial Report: December 2023," Feb. 29, 2024, p. 4. https://www.thruway.ny.gov/about/financial/monthly/2023/monthly-financials/dec2023finrpt.pdf, last accessed May 28, 2024 ("*NYSTA Financial Report*").

paved lane)[16]; the Thruway's change in net position for 2023 was therefore a decrease of $12,601 per lane-mile.  The section of Thruway crossing the Cattaraugus Territory produces, instead, a *positive* change in net position per lane-mile, which generates a significant benefit to the Thruway.

39.     The net income methodology developed here estimates the incremental *revenues* attributable to the Seneca Section as an operating asset, and then subtracts all incremental *expenses* attributable to the Seneca Section.  This methodology is intended to carefully estimate the Ongoing Benefit enjoyed by the New York Thruway as a result of its access to the Seneca Section.

### B.     The Seneca Section and a *But-For* Alternative

#### 1.     The Seneca Section

40.     As stated above, the Seneca Section of the Thruway is a 2.7-mile stretch of roadway passing through the Seneca Nation's Cattaraugus Territory.  The map below shows the Seneca Section of the Thruway in context, including the Cattaraugus Territory (shaded).

---

[16]  Stantec, "New York State Thruway Traffic and Revenue Report: Including a Review of the Physical Condition of the Thruway System," November 30, 2023, https://www.thruway.ny.gov/about/financial/bond/traffic-revenue-report.pdf, last accessed May 29, 2024.  See pp. 11-14.  Lane-miles are provided for each of the four maintenance divisions, except for the Syracuse Division.  I estimate that the Syracuse Division maintains approximately 770 total lane-miles.

**Figure 1**
**Seneca Section of the New York Thruway**



41. This map also shows that the Cattaraugus Indian Territory *does not allow for any simple detour around it*.

### 2. *But-For* Alternative Route

42. In order to assess the Ongoing Benefit provided to the Thruway by the Seneca Section, it is essential to evaluate other options available to the Thruway other than the Seneca Section. If some other route – measurably more beneficial in terms of directness, expense features, revenue features, *etc.* – were available to the Thruway, the Ongoing Benefit offered to the Thruway by the Seneca Section would be nonexistent.

43. The Ongoing Benefit provided to the Thruway by the Seneca Section is therefore equal to: (a) the net income (or net loss) generated for the Thruway by the disputed Seneca Section

easement; minus (b) the net income (or net loss) that *would be* generated for the Thruway by the most likely alternative route around the Seneca Section.[17]

44.     This alternative route is what the Thruway would have reasonably built, *but for* its present access to the Seneca Section easement.  *But-for* frameworks can be used to "consider the value the plaintiff would have received in the absence of the economically detrimental relationship" under examination in a given dispute.[18]

45.     Alternative-route analysis is already generally familiar to the Thruway.  For instance, Stantec Consulting has assessed how traffic may change, both on the Thruway and on alternative adjacent surface roads, as a result of proposed toll rate increases.[19]

46.     I have considered potential alternative routes that the Thruway might have taken if it had not had access to the Seneca Section easement.  In my opinion, the most likely alternative route would have travelled east from Thruway Exit 59 along New York State Route 39, and then north toward Eden along US Route 62, before rejoining the current Thruway at Exit 57A (see map below). This alternative "But-For Route" is 37.8 miles in length, and is materially less direct than the current Thruway routed through the Seneca Section.[20]

---

[17]  This methodology is similar to the one I employed when assessing the projected value of Texas State Highway 130 in a previous engagement.

[18]  Allen, Mark A., Hall, Robert E., and Victoria A. Lazear. "Reference Guide on Estimation of Economic Damages," in *Reference Manual on Scientific Evidence: Third Edition*, National Academies Press, 2011, p. 436.  The authors note that "In the standard format, the but-for analysis differs from the actual world only by hypothesizing the absence of the harmful act committed by the defendant" (Allen, et al., p. 477).

[19]  D0002127 and D0002224.

[20]  It is also possible that the Thruway would have followed US Route 219 due south from Buffalo before turning back toward the present Thruway well below the Cattaraugus Territory by following the present Interstate 86.  I have selected the alternative that, I believe, would have provided the *most* incremental benefit to the Thruway.

**Figure 2**
**But-For Route Around Cattaraugus Territory**



47.     Certain other Thruway assets are built *entirely around* the Cattaraugus Territory. A fiber optic ROW agreement produced for this matter illustrates the fiber optic cable closely following the New York Thruway for hundreds of miles – except when the map arrives at the Cattaraugus Territory (see map below):

**Figure 3**
**"Seneca Re-Route" Detail of Fiber Optic ROW Agreement Map[21]**



48.       This "Seneca Re-Route" of fiber assets is 30.11 miles in length,[22] or approximately 25 miles longer than the route would have been, had the fiber directly crossed the 4.76 miles between Thruway mile posts 451.77 and 456.53 (*i.e.,* the mile posts listed on the map).  Indirect fiber routes are more expensive to build and more costly to maintain – I estimate that the additional 25 miles of fiber installation required by the "Seneca Re-Route" would cost at least $2.0 million to install today.  The re-route depicted in the map above is not likely to be a preferred route for any infrastructure provider, and finding a way to avoid using indirect routes can be very valuable.

---

[21]   D000531.

[22]   D000529.

49.     In his deposition testimony for this matter, Thruway Chief Financial Officer David Malone noted that one important function of the Thruway is to connect drivers to the broader United States Interstate Highway System.[23] The easement in dispute is just 65 miles from Interstate 90 interchanges with Interstates 79 and 86 in Pennsylvania.  Prior to a 2020 re-paving of the Seneca Section, New York State Assemblyman Joseph Giglio noted that the poor condition of the Seneca Section roadway "interfere[d] with economic relationships" between the Seneca Nation and Pennsylvania neighbors.[24]

50.     The Thruway's 2023-2033 Strategic Plan notes that the Thruway's "*efficient connectivity* [ital. added]" helps to "make it an economic lifeline, driving the overall prosperity of New York State."[25] Mr. Malone likewise testifies that "The most important benefit of the Thruway is it provides an efficient way for individuals to travel, for commercial trucking companies to move goods across the country… That's the primary benefit."[26]  I believe that Mr. Malone is right to emphasize the importance of this efficiency, and the value that such efficiency creates.

### 3.     Section Enabled by the Seneca Section

51.     Because there are few potential alternative routes around the Cattaraugus Territory, and because the most likely alternative But-For Route would leave the Thruway at Exit 57A (mile post 444.87) and rejoin the Thruway at Exit 59 (mile post 467.74),[27] the 2.7-mile Seneca Section

---

[23]   Examination before Trial of David Malone (*Malone 30(b)(6) Deposition*), May 20, 2024, pp. 73-74.

[24]   WBFO-NPR, "Rough Road Ahead to Repair NYS Thruway Through Seneca Territory," https://www.wbfo.org/politics/2019-08-02/rough-road-ahead-to-repair-nys-thruway-through-seneca-territory, last accessed May 21, 2024.

[25]   New York State Thruway Authority, "Strategic Plan 2023-2033: A roadmap for maintaining operational excellence over the next decade," https://www.thruway.ny.gov/about/strategic-plan-2023-2033.pdf, last accessed May 29, 2024, p. 9.

[26]   *Malone 30(b)(6) Deposition*, p. 74:9-16.

[27]   Mile posts for each Thruway exit can be found at "Interchange/Exit Listings," https://www.thruway.ny.gov/travelers/interchanges/index.html, last accessed May 21, 2024.

functionally enables the existing 22.87-mile Thruway section traveling directly between those two exits. This 22.87-mile section, which I will refer to as the "Enabled Seneca Section," *could not function without access to the 2.7-mile Seneca Section.*

**Figure 4**
**Exit 57A to Exit 59 Enabled Seneca Section[28]**

52.     As I note in my discussion of the But-For Route above, all of the likely alternative routes around the Cattaraugus Territory would need to circumvent this entire 22.87-mile section of the Thruway. Thus, I treat the entire 22.87-mile Enabled Seneca Section as the basis for the operating revenues and expenses used in my financial assessment of the true Ongoing Benefits attributable to the Seneca Section itself.

---

[28]   Though this example illustration depicts a 23.8 mile stretch, the exact Enabled Section – running from Exits 57A to 59 – is 22.87 miles.

## V.    Ongoing Benefit Inputs and Assumptions

### A.    Key Drivers of Net Income

53.    As described above, the net income of a revenue-generating operating asset is based on the revenues that the asset produces, less the costs of operations and maintenance.  To inform my evaluation of annual net income attributable to the Enabled Seneca Section as an operating asset, I relied on a diverse array of sources, including but not limited to the materials produced in this matter and publicly available information, such as the New York State Thruway Authority's December 2023 Financial Report ("NYSTA Financial Report").

### B.    Seneca Section Revenues and Expenses

#### 1.    Revenue Considerations

54.    To determine the annual revenues currently attributable to the Enabled Seneca Section, I rely on two primary revenue streams: (1) revenues from tolling fees; and (2) revenues from "related fees" as identified in the NYSTA Financial Report (namely: EZ-Pass Fees, Tolls by Mail Fees, and Special Hauling revenues).[29]

#### a)    Tolling Fee Revenues

55.    Approximately 90% of Thruway operating revenues are derived from fees charged to drivers who elect to use the toll road for its speed and directness advantages over surface road alternatives.[30] While the NYSTA Financial Report provides tolling revenues for the broader Erie Section of the Thruway (the ~67-mile section between exits 55-61), it does not disaggregate these

---

[29]    The *NYSTA Financial Report* includes < 2% Leasing and Other Revenues in Operating Revenues. Because these are non-tolling related revenues (and represent only a small percentage of total revenue), I conservatively exclude them from my assessment.

[30]    Tolling revenues and related fees accounted for over 90% of total operating revenues for the Thruway in 2023. See *NYSTA Financial Report*, p. 2.

totals such that specific revenues for the Enabled Seneca Section can be readily identified. To more precisely estimate tolling fee revenues for the Enabled Seneca Section, I use historical traffic data to estimate expected annual traffic (*i.e.*, the number of vehicles traveling along the Enabled Seneca Section). I then multiply that annual traffic by the effective toll rates provided by the Thruway – less pricing discounts – with special consideration given to the composition of this traffic (*i.e.*, passenger vehicles vs. commercial vehicles). Additionally, I include an allocated portion of total, annualized revenues earned via the issuance of commuter permit plans.

- To estimate expected traffic, I reviewed Annual Average Daily Traffic ("AADT") statistics provided by the New York State Department of Transportation ("NYDOT"). In 2022, an estimated average of 28,594 vehicles traveled each day along Interstate 90 from Exit 58 to the Erie County line – a critical segment of the Enabled Seneca Section.[31] I assume that this volume is an accurate reflection of the current levels of daily traffic along the Enabled Seneca Section.[32]

- Traffic composition is especially important for any calculation of net income because per-vehicle fees levied on commercial trucks are significantly higher than for cars. According to the NYSTA Financial Report, commercial vehicles make up 16.0% of daily traffic along the Erie Section of the Thruway, which encompasses the Enabled Seneca Section.[33]

- According to the Thruway's website, the current effective toll for a standard 2-axle passenger vehicle traveling between Exit 57A and Exit 59 (*i.e.*, the Enabled Seneca Section) is $1.07 per trip.[34] The current toll for a 5-axle commercial

---

[31] https://www.dot.ny.gov/tdv. The AADT at Station 520103, just south of the Cattaraugus Territory, is consistent with the AADT of the surrounding segments of Interstate 90, suggesting that this level of daily traffic was representative of the broader Enabled Seneca Section in 2022. The NYDOT Traffic Data Viewer also suggests that AADT at Station ID 520103 has increased every year since 2020. Therefore, using 2022 daily traffic levels is likely a genuinely conservative estimate of current daily traffic levels, and therefore a conservative estimate of revenues attributable to the Enabled Seneca Section.

[32] The NYSTA Financial Report's section on "Vehicle Trips and Miles" notes that for 2023, 18.6 million passenger vehicles and 3.7 million commercial vehicles traveled within the Erie Section. This would suggest a traffic volume of more than 60,000 vehicles per day. However, this total volume is for the Erie Section as a whole, not for any particular segment of the Erie Section (*i.e.,* some vehicles travel just a few miles before exiting again).

[33] NYSTA Financial Report, p. 21. Section 7.2 of the Thruway's 2023 Traffic and Revenue Report confirms this 16.0% calculation of commercial traffic.

[34] New York State Thruway Authority, "Toll and Distance Calculator" tollcalculator.thruway.ny.gov/index.aspx?Class=1&Entry=m57a&Exit=m59x, last accessed May 21, 2024.

vehicle traveling the same route is $5.45.[35] When applying these rates to forecasted traffic levels and composition, I estimate base revenue (*i.e.*, traffic volume times per-vehicle toll rates) for the Enabled Seneca Section to be $18.48 million annually.

- The Thruway provides discounts to "commercial vehicle operators who incur over $1,000 in Thruway tolls per month."[36] For 2023, the Thruway reported $31.55 million in commercial volume discounts.[37] These commercial volume discounts are reported only for the Thruway in total (*i.e.*, not by segment or section). I have therefore calculated the ratio of commercial volume discounts, on the one hand, to total commercial revenue for the Thruway as a whole, on the other hand, and have then applied that ratio to my estimate of *commercial* toll revenues for the Enabled Seneca Section. These commercial volume discounts reduce my final estimate of Enabled Seneca Section revenue by $0.72 million annually.

- For frequent commuter traffic, the Thruway offers an annual permit plan that covers tolls for the first 30 miles per trip on the Thruway.[38] For 2023, the Thruway reported $3.78 million in revenues from the sale of such permit plans for the Erie and the Woodbury-to-Buffalo Sections of the Thruway (exits 15-61).[39] I have therefore calculated the ratio of those passenger permit plan revenues, on the one hand, to total Erie and Woodbury-to-Buffalo Section passenger revenues, on the other, and then applied that ratio to my estimate of passenger toll revenues for the Enabled Seneca Section. The resulting permit revenues increase my estimate of Enabled Seneca Section revenue by $0.15 million annually.

### b)     *Related Fee Revenues*

56.     According to the NYSTA Financial Report, the Thruway generated $64.29 million in "related" fee revenues in 2023.[40] As specified in the NYSTA Financial Report, related fees include revenues from EZ-Pass Fees, Tolls by Mail Fees, and Special Hauling. Here again, these revenues are not split into specific attributions by Thruway section. I have therefore calculated the

---

[35]  *Id.*

[36]  "New York E-ZPass Discount Plans," www.thruway.ny.gov/ezpass/discount.html, last accessed May 21, 2024.

[37]  NYSTA Financial Report, p. 2.

[38]  "New York E-ZPass Discount Plans."

[39]  NYSTA Financial Report, p. 2.

[40]  NYSTA Financial Report, p. 2.

ratio of total related fees, on the one hand, to total Thruway toll revenues, on the other hand, and then applied that ratio to my estimate of total toll revenues for the Enabled Seneca Section. The incremental related fee revenues calculated in this way increase my final estimate of Enabled Seneca Section revenues by $1.29 million.

57.    When combining tolling and related fee revenues, I calculate 2023 Operating Revenues of $19.20 million for the Enabled Seneca Section.

### 2.    Direct Expense Considerations

58.    When attributing expenses to the Enabled Seneca Section, I do so by lane-mile. As noted above, the Thruway has approximately 3,200 total lane-miles (*i.e.* miles of paved lanes). I calculate that the 22.87-mile Enabled Seneca Section, because it is a 4-lane road (two lanes in each direction), contains 22.87 miles x 4 lanes, or a total of 91.48 lane-miles. Lane-miles offer a more precise foundation for the allocation of expenses than does mileage alone given that parts of the Thruway will have varying numbers of lanes in each direction of the system.

59.    To determine annual expenses directly attributable to the Enabled Seneca Section, I begin by examining 2023 operating expenses and state police expenditures. However, these expenses are reported as system-wide totals in the NYSTA Financial Report, and therefore require specific attribution to the Seneca Enabled Section. To this end, I make two key assumptions: 1) costs that are directly attributable to the Enabled Seneca Section are *incremental* costs – *i.e.*, the 91.48 lane-miles constituting the Enabled Seneca Section do not produce any new "increments" to general overhead costs, such as Administrative and Financial Planning Support, for the Thruway as a whole; and 2) because the Enabled Seneca Section is mostly rural, some of its expenses (*e.g.*, for maintenance labor, or policing-per-lane-mile) are likely to be lower than they are for more urban, densely populated areas.

### a)    *Incremental Costs*

60.    The operating expense line items in the NYSTA Financial Report that relate directly to the regular operations and maintenance of the Enabled Seneca Section include: (1) Maintenance & Operations (*i.e.*, Thruway Maintenance, Equipment Maintenance, and Traffic and Services); (2) Engineering Services; and (3) State Police. Because these expenses are directly related to the operation of the Enabled Seneca Section, I treat them as incrementally attributable expenses.  These expenses totaled $233.43 million across the Thruway as a whole in 2023.[41] To estimate the portion of these incremental expenses that are attributable to the Enabled Seneca Section, I calculated an annualized cost per lane-mile across the entire Thruway, and then applied that cost per lane-mile to the Enabled Seneca Section.

### b)    *Rural Cost Factor*

61.    The Enabled Seneca Section is largely rural. In many cases, costs to operate and maintain roadways in rural areas are materially lower than those for urban areas, particularly the New York City Metropolitan Area.[42]

62.    The Thruway notes that hourly wages for new Thruway Maintenance Workers start at $19.64, but go up to "$24.02 *in certain geographic locations* [ital. added]."[43]  The Thruway's 2023 Traffic and Revenue Report divides maintenance into four divisions: New York, Albany, Syracuse, and Buffalo.  The Buffalo Division has the highest number of maintenance employees (320), but it also has the highest number of total lane-miles to maintain (1,080).[44]  Total lane-miles

---

[41]  NYSTA Financial Report, p. 4.

[42]  For example, rural law enforcement officers are typically responsible for much larger geographies, reducing the concentration of policing for rural areas. From a cost perspective, police funding in these areas represents a lower cost per lane-mile for individual roadways in their jurisdiction.

[43]  "Employment Opportunities: Thruway Maintenance Worker (TMW) and Thruway Maintenance Worker (TMW) Trainee," https://www.thruway.ny.gov/about/jobs/tmw.html, last accessed May 29, 2024.

[44]  Traffic and Revenue Report, p. 13.

and maintenance personnel counts are also provided for the New York Division (679 lane-miles and 230 personnel) and the Albany Division (680 lane-miles and 250 personnel).[45]  Per lane-mile, the New York Division has 0.34 personnel; the Albany Division has 0.37 personnel; and the Buffalo Division has 0.30 personnel. The Buffalo Division has fewer employees maintaining each lane-mile, and likely also pays lower wages for those employees.

63.     Similarly, the Buffalo Division is projected to spend significantly less per mile on capital improvement projects than the New York division in coming years.  The Thruway's Traffic and Revenue Report provides projected 2024-2028 capital improvement expenditures for each division: projected expenditures total $382.9 million for the New York Division, and projected expenditures total $426.7 million for the Buffalo Division.[46]  Per lane-mile, the New York Division plans to spend $564 thousand on capital improvements in coming years. Per lane-mile, the Buffalo Division plans to spend $395 thousand on capital improvements in coming years.

64.     I apply a 30% rural cost suppression factor to the per-lane-mile costs attributed to the Enabled Seneca Section.  When calculating per-lane-mile incremental costs for the 91.48-lane-mile Enabled Seneca Section, less the 30% rural cost suppression factor, I estimate that $4.67 million in direct costs are attributable to the Enabled Seneca Section.

### 3.     Depreciation and Interest Expense Considerations

65.     Roadway assets require significant capital to build and maintain, and the net income methodology developed here therefore includes debt financing and depreciation as foundational components of analysis.  These expense components are included in the Thruway's own financial

---

[45]  *Id.*, pp. 11-14.

[46]  *Id.*

operations and reporting, not least because that reporting helps to educate the Thruway's lenders about the financial health of Thruway operations.

66.     In addition to costs directly associated with the regular operations of an asset, net income also contemplates costs associated with depreciation, as well as interest payments on debt used to finance capital projects.

### a)      *Capital Improvement Projects and Depreciation*

67.     In data produced for this matter, the Thruway lists more than 17,000 assets subject to depreciation across the Thruway as a whole.[47] In addition, the Thruway identifies just three of these 17,000 depreciable assets within the Seneca Section.[48] However, my own analysis of the 17,000 assets – primarily based on mile post indicators within the coded asset titles – suggests that there are actually dozens of depreciable assets within the Seneca and Enabled Seneca Sections.[49] The total depreciation for these 78 assets within the 91.48-lane-mile Enabled Seneca Section was $7.29 million for 2023.

68.     The Thruway has also invested in streamlining its operations through the implementation of cashless tolling.  Because the Enabled Seneca Section participates in this system-wide capital project, I allocate a portion of depreciation expenses associated with that project to the Enabled Seneca Section, increasing the depreciation expense for that section by $1.06 million.  I calculate the total depreciation expense for the Enabled Seneca Section as $8.35 million.

---

[47]   D0000004, "All Assets" tab.

[48]   D0000004, "Assets Within Lands" tab.

[49]   Ongoing Benefit Analysis.xlsx

### b)    Interest Expense

69.    According to the NYSTA Financial Report, the Thruway's total interest expense for 2023 was $202.57 million.[50]   However, because debt financing is used to support capital projects, I calculate interest expense for the Enabled Seneca Section in relationship to depreciation. This is reasonable, because depreciation is a reflection of the capital costs that were required to improve the Enabled Seneca Section as an asset in the first place, and those costs were likely financed in large part by debt.  In an incremental net income analysis, interest payments should be tied to the assets they have helped finance.

70.    I therefore take a ratio of my previously estimated depreciation for the Enabled Seneca Section ($8.35 million), on the one hand, and the total 2023 depreciation of the Thruway, on the other hand ($362.41 million), and then apply that ratio to the total 2023 interest expense of the Thruway. I thereby estimate an annual interest expense of $4.67 million for the Enabled Seneca Section.

71.    The net income methodology developed here does *not* include taxation as an input. The New York Thruway Authority notes in its Financial Statement for 2023 that "The Authority is a public benefit corporation of the State of New York.  As such, income earned in the exercise of its essential government functions is exempt from state and federal income taxes."[51]

### 4.    Summary of Net Income for the Enabled Seneca Section

72.    In summary, I estimate the following annual operating revenues and expenses for the Enabled Seneca Section:

---

[50]   NYSTA Financial Report, p. 4.

[51]   New York Thruway Authority, *Financial Statements: December 31, 2023 and 2022*, p. 22.

**Figure 5**
**Net Income of the Enabled Seneca Section**

| Annualized Financials in $M | Seneca Section |
|---|---|
| Operating Revenues *(tolling and related fees)* | $19.20 |
| Operating Expenses *(maintenance, services, & policing)* | ($4.67) |
| Depreciation Expense *(Capital Improvement Projects)* | ($8.35) |
| Interest Expense *(on debt financing)* | ($4.67) |
| Net Income | $1.51 |

73.    Taken together, these inputs yield a net income of $1.51 million for the Enabled Seneca Section for 2023.

## C.    But-For Alternative Route

74.    In the previous section, I introduced and calculated the first component of my Ongoing Benefit analysis – the annual net income of the Enabled Seneca Section. The second component of my analysis involves the evaluation of the net income that *would have* accrued to the Thruway, *but for* its access to the Cattaraugus Territory. As described in Section IV, the most likely and most beneficial But-For Route alternative is a 37.8-mile or 151.2-lane-mile route that entirely circumvents the Cattaraugus Territory.

75.    My analysis indicates that the But-For Route would represent a net *loss* for the Thruway, due to the increased mileage (with associated increases in gas costs for potential drivers) and decreased directness (with associated increases in time costs for potential drivers) that this option presents.

76.     From a financial perspective, the But-For Route would: 1) significantly decrease operating revenues due to a significant loss of traffic; 2) increase direct operating costs due to

higher maintenance, servicing, and policing costs over more lane-miles; and 3) increase depreciation and interest expenses due to a substantively longer roadway requiring at least occasional capital improvement.

### 1.    Loss of Traffic Means Lower Operating Revenues

77.    The But-For Route is 151.20 lane-miles in length, or 59.72 lane-miles longer than the 91.48-lane-mile Enabled Seneca Section. For drivers, taking the But-For Route would translate to both higher fuel costs and more time spent in transit.[52]

78.    Stantec Consulting has estimated that higher tolls are likely to have only "minor" effects on Thruway traffic patterns[53] – *i.e.*, Thruway users are relatively price inelastic ("toll inelastic," in Stantec's own terminology).[54]  Drivers who already use the Thruway generally have few options to access *more* or even *equally* direct alternative routes.[55]  However, in the area of the Thruway under consideration in this matter, there is a genuine no-toll alternative to the Thruway. This no-toll alternative is US Route 20.

79.    US Route 20 passes through Cattaraugus Territory, and offers a direct route between Thruway Exits 57A and 59.  At the moment, most Thruway drivers do not get off of the

---

[52]  Based on 2024 gasoline ($3.50 per gallon) and diesel ($4.50 per gallon) prices, as well as the average miles per gallon ("mpg") for cars (25 mpg) and commercial trucks (6.5 mpg), I estimate that this new route would increase costs *per trip* by $1.88 and $9.28, respectively.  This is important because the relative increase in costs per trip is so much higher for commercial trucks, and these provide much higher revenues per trip in toll revenues to the Thruway.  If commercial trucks are disincentivized to use the Thruway, this has substantial negative revenue impacts on the Thruway.

[53]  D0002261 and D0002266.  Stantec notes that historically, "the Thruway has generally seen relatively small reactions to toll modifications" (D0002260).

[54]  D0002260.

[55]  Stantec Consulting notes that there where no-cost alternatives already exist, "the decision to use those routes over the Thruway will likely have already occurred" (D0002265), which helps to explain why more Thruway traffic is not lost when toll modifications are introduced.

Thruway to use US Route 20 when traveling between Exits 57A and 59 because the Thruway offers greater directness and "efficient connectivity" to those drivers.

80.    However, even though US Route 20 is not an effective alternative to the Thruway as it stands – because the Thruway has ongoing access to the Seneca Route easement – US Route 20 *would* provide a genuinely attractive alternative to the 151.2-lane-mile But-For Route.  As a result, a material percentage of the traffic that currently flows along the Enabled Seneca Section would likely opt to take US Route 20 instead of following the toll road along the But-For Route.

81.    To estimate this traffic loss, I first used the NYDOT AADT data to determine current traffic volumes along US Route 20 (*i.e.,* with the existing Enabled Seneca Section still in place). According to NYDOT data, approximately 7,000 vehicles (95% cars, 5% trucks) travel along US Route 20 every day.[56]

82.    I then reviewed hour-by-hour arrival time estimates in Google Maps for this alternate route. I found that hourly traffic peaks between the hours of 7 AM and 7 PM daily (*i.e.*, estimated arrival times increase by roughly 20% during this period). This pattern in arrival times is similar to the hourly traffic percentage distributions cited by the Federal Highway Administration in the below Figure.

---

[56]    https://www.dot.ny.gov/tdv. My estimate is based on an averaging of the segments of US Route 20 that parallel the current Enabled Seneca Section (ranging from 6,000 – 8,000 AADT).

**Figure 6**
**Time of Day Traffic Patterns by Vehicle Type[57]**



83.     Using the percentages from the above Figure, I estimated hourly traffic – split into Rural Cars (95% of traffic) and Through-Trucks (5% of traffic) – for the 7,000 daily vehicles that travel along US Route 20. I also assumed that these vehicle-specific hourly traffic patterns are consistent for traffic along the Enabled Seneca Section (noting that *overall* traffic patterns are different, given the higher contribution of Through Trucks to total traffic along the toll road).

84.     Next, I compared the difference in estimated arrival times for peak versus off-peak periods, as well as the expected hourly traffic during those periods, to determine each incremental vehicle's contribution to the increased travel time during peak hours. Using the average time value per hour for cars ($18.00) and trucks ($75.00), I calculated the incremental cost per vehicle added

---

[57]   Federal Highway Administration, Office of Highway Policy Information, "Traffic Monitoring Guide," www.fhwa.dot.gov/policyinformation/tmguide/tmg_2013/traffic-monitoring-theory.cfm, last accessed May 30, 2024.

to total traffic along US Route 20.[58] Finally, I derived an estimated number of vehicles that would need to move to US Route 20 before the cost of the added travel time met or exceeded the costs of tolls plus additional fuel necessary to use the But-For Route.

85.    Based on the analysis outlined above, I estimate that the But-For Route would lose roughly one-third of current Enabled Seneca Section traffic (20-30% of passenger vehicles, 60-70% of commercial vehicles, respectively).[59,60] Note that the percentage of trucks lost is materially higher than for cars, due to two primary factors: 1) the hourly traffic for Through Trucks (as illustrated in Figure 6 above) is relatively flat throughout the day; thus, a greater proportion of trucks are more likely to move to US Route 20 during off-peak hours when there are fewer competing cars on the road; and 2) the higher costs to trucks to travel the But-For Route (based on added toll and fuel expenses) translates to a greater time-savings threshold before the US Route 20 alternative is no longer the more attractive option.

86.    I also estimate that the But-For Route would incentivize a small percentage (roughly 5%) of the population living along the But-For Route to begin using the Thruway for local travel.[61]    However, I would not expect small increases in Thruway usage by very low-

---

[58]    These time value estimates are commonly used throughout the industry to calculate tolling fees, are consistent with materials provided in this matter, and are consistent with the ratio of toll paid to the time saved for the different classes of traffic. *See* D0002263.

[59]    Given that traffic patterns can fluctuate due to weather, seasonality, maintenance, etc., I provide these estimate as ranges instead of singular values.

[60]    I note that my new total traffic estimates for US Route 20 (*i.e.*, current traffic plus incremental traffic from the But-For Route) fall within the standard capacity calculations used elsewhere. See, for example, "Appendix B: Traffic Level of Service Calculation Methods," in City/County Association of Governments of San Mateo County, *Final Congestion Management Program for 2005*, https://ccag.ca.gov/wp-content/uploads/2014/07/cmp-2005-final.pdf, last accessed May 30, 2024.

[61]    To estimate the percentage increase from local traffic, I created a similar model to the one described in the preceding paragraphs that I used to estimate But-For traffic lost to US Route 20. This 'traffic gain' model relied on hourly traffic patterns along the current roads that follow the But-For Route (*i.e.*, US Routes 39 and 62), and compared the dollar value of time saved versus the incremental tolling costs if a parallel toll road were constructed along this same route.

population communities to offset the overall exodus of drivers from the Thruway. Further, if pricing discounts were used to improve traffic flow along the But-For Route, these discounts would erode incremental revenues.

87.    Overall, I assume that the But-For Route would see an approximate 20-30% decline in traffic (*i.e.*, losses to Route 20, with gains from local travel), compared to the traffic volume currently using the Seneca Section of the Thruway. Under revenue assumptions per vehicle similar to those used to estimate Enabled Seneca Section revenues (*i.e.*, using the same per-vehicle passenger and commercial toll rates, as well as related fee revenues proportional to this lower traffic projection), I estimate annual operating revenues for the But-For Route to be $10.81 - $12.73 million.

## 2.    Less Traffic Lowers Cost Rate, Longer Route Raises Upkeep Mileage

88.    As stated above, the But-For Route is roughly 59.72 lane-miles longer than the current 91.48-lane-mile Enabled Seneca Section of the Thruway.  Using the same per-lane-mile expense assumptions previously used to calculate operating costs for the Enabled Seneca Section, and then applying those same per-lane-mile assumptions to a longer route, results in higher operating costs for the But-For Route.  However, the But-For Route would also see significantly lower traffic volumes.  I have therefore divided my expense calculation for the But-For Route into (a) variable costs that vary with traffic volumes, including incremental maintenance and policing; as well as (b) fixed costs, which do not vary in response to traffic volumes, and which include only routine maintenance.

89.    I have assumed that fixed costs would total 40% of the per-lane-mile costs already calculated for the Enabled Seneca Section.[62] I have made variable costs a function of both commercial and passenger vehicle traffic.  These assumptions result in an annual estimate of But-For Route operating costs of $6.27 - $6.73 million.

### 3.    Depreciation and Interest Expenses Increase with Mileage

90.    To calculate a depreciation expense for the But-For Route, I take the asset-based depreciation already calculated for the Enabled Seneca Section ($7.29 million), and adjust that amount to reflect the But-For Route's longer lane-mileage, resulting in $12.06 million in asset-based depreciation for the But-For Route.  In addition, given that the But-For Route would represent an increased percentage of the total lane-mileage of the Thruway, the But-For Route's allocation of depreciation for the Thruway's cashless tolling renovations would increase to 4.64%. I therefore estimate annual depreciation expenses for the But-For Route to be $13.77 million.

91.    Similarly, I assume an increase in annual interest expense for the But-For Route. Because my allocation of interest expense for a specific Thruway section is based on the proportion of that section's depreciation to total Thruway depreciation, a slightly higher depreciation expense translates to a slightly higher interest expense. I estimate that the interest expense for the But-For Route would increase to $7.70 million annually.

---

[62] The Reason Foundation, a research organization seeking to promote "choice, competition, and a dynamic market economy," estimates that the State of New York spends approximately $50,000 per lane mile per year on maintenance ("27th Annual Highway Report," April, 2023, https://reason.org/wp-content/uploads/27th-annual-highway-report.pdfhttps://reason.org/wp-content/uploads/27th-annual-highway-report.pdf, last accessed May 21, 2024).  The Reason Foundation notes that the national average of maintenance per lane mile per year for 2020 was just $14,546 (p.17).  It is highly unlikely that New York spends the same amount per lane mile in rural Western New York as it does in highly urban contexts.  I also estimate that a radical decrease in truck traffic along the But-For Route would result in a significant reduction in maintenance costs.  My application of a fixed cost rate of 40% for the But-For Route results in a $14,582 per lane-mile in *fixed* operating costs (excluding policing costs) across the But-For Route.  I believe this is a fair estimate for the fixed cost to operate these lane-miles *before* accounting for the effects of traffic volume and related impacts.

### 4.    Summary of Net Loss for the But-For Route

92.    In summary, I estimate the following annual operating revenues and expenses for the But-For Route (assuming a 25% decrease in traffic relative to the current Enabled Seneca Section):

**Figure 7**
**Example Net Income on the But-For Route (25% Total Traffic Loss)[63]**

| Annualized Financials, in $M | But-For Route |
|---|---|
| Operating Revenues *(tolling and related fees)* | $12.14 |
| Operating Expenses *(fixed & variable; maintenance, services, & policing)* | ($6.56) |
| Depreciation Expense *(Capital Improvement Projects)* | ($13.77) |
| Interest Expense *(on debt financing)* | ($7.70) |
| Net Income | ($15.89) |

93.    In the above table, depreciation and interest expenses are based on the lane-mileage of the But-For Route. However, the main driver of operating revenues (and to a lesser degree, operating expenses) is toll-paying traffic. Thus, my estimate of the potential range of traffic lost to Route 20 yields the following net incomes at various traffic loss intervals:

---

[63]    Example 25% Total Traffic Loss = 100% Initial Enabled Seneca Section Traffic - (62% Trucks Lost + 24% Cars Lost) + 5% Local Traffic Gained

**Figure 8**
**Net Income on the But-For Route By Traffic Lost**

| *in $M* | % of Cars Lost to Route 20 | | | | | |
|---|---|---|---|---|---|---|
| **% of Trucks Lost to Route 20** | 20% | 22% | 24% | 26% | 28% | 30% |
| 60% | ($14.29) | ($14.41) | ($14.54) | ($14.67) | ($14.79) | ($14.92) |
| 62% | ($14.45) | ($14.58) | ($14.70) | ($14.83) | ($14.96) | ($15.08) |
| 64% | ($14.62) | ($14.74) | ($14.87) | ($14.99) | ($15.12) | ($15.25) |
| 66% | ($14.78) | ($14.91) | ($15.03) | ($15.16) | ($15.29) | ($15.41) |
| 68% | ($14.94) | ($15.07) | ($15.20) | ($15.32) | ($15.45) | ($15.58) |
| 70% | ($15.11) | ($15.24) | ($15.36) | ($15.49) | ($15.62) | ($15.74) |

*\*\*Net Income totals reflect net traffic change after the increases due to local traffic referenced above.*

94.     Taken together, these inputs yield a 2023 net loss of $14.29 - $15.74 million for the But-For Route.

## VI.    Presentation of Ongoing Benefit

95.     The Seneca Section is valuable for its directness and "efficient connectivity," and it presents significant advantages over more circuitous alternative routes. When combining (1) the net income that the Thruway stands to gain from continuing operations along the Seneca Section with (2) the avoidance of a net loss for the most likely But-For Route alternative, I estimate the total Ongoing Benefit of the Seneca Section easement to be between $16.98 - $18.44 million.

**Figure 9**
**Example Total Ongoing Benefit of the Seneca Section (25% Total Traffic Loss on But-For)**

| Annualized Financials, in $M | Seneca Section | But-For Route | |
|---|---|---|---|
| Operating Revenues *(tolling and related fees)* | $19.20 | $12.14 | |
| Operating Expenses *(fixed & variable; maintenance, services, & policing)* | ($4.67) | ($6.56) | |
| Depreciation Expense *(Capital Improvement Projects)* | ($8.35) | ($13.77) | |
| Interest Expense *(on debt financing)* | ($4.67) | ($7.70) | Ongoing Benefit |
| | [A] | [B] | [C] = [A] – [B] |
| Net Benefit / Loss | $1.51 | ($15.89) | $17.40 |

96.     At this level of traffic loss, net income for the But-For Route is negative. However, even if the But-For Route were to retain *all* current Seneca Section traffic (*i.e.*, 0% traffic loss), the Seneca Section would still provide over $10 million in Ongoing Benefits over and above the But-For Route alternative, given the incremental costs required to maintain a longer toll road.

97.     Finally, I note that this analysis is an approximation of Ongoing Benefits to the Thruway that relies on the data I have been provided to date. Calculating a formal valuation of the Seneca Section, such as a Discounted Cash Flow analysis, would require access to more detailed operating data and section-specific forecasts from the Thruway, such as information on trends, future-looking forecasts, and transaction-based billings and collections data.

## VII.   Signature

The statements and opinions contained herein are, to the best of my knowledge, accurate as of the date set forth below.


 */s/ Steven E. Turner*
Steven E. Turner
May 31, 2024