# EXHIBIT G

i | P a g e

**BEFORE THE UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SENECA NATION, a federally recognized Indian tribe,<br><br>    Plaintiff,<br><br>VS.<br><br>KATHLEEN C. HOCHUL, in her official capacity as Governor of New York, et al.,<br><br>    Defendants | CASE NO. 18-CV-429-LJV-MJR |

**EXPERT REBUTTAL REPORT OF STEVEN E. TURNER**

**July 26, 2024**

## I.     Introduction and Assignment

1.     My name is Steven E. Turner.  I filed an expert report in this proceeding on May 31, 2024 (*Turner Report*[1]).

2.     I have been asked by counsel for the Seneca Nation to review the expert report prepared by Mr. Rick Gobeille for this proceeding (*Gobeille Report*[2]), and to provide an assessment of that report's methods and findings.

3.     The opinions set forth below, which are my present opinions based on information available to me as of the filing of this report, are formed from my review of the *Gobeille Report*, as well as my knowledge, experience, education, and training.

## II.     Summary of Rebuttal Findings

4.     Often in litigation, the experts for the respective sides in a dispute have considerably divergent opinions on the issues.  That is not the case in this dispute.  The conclusions that I reached in the *Turner Report* and those that Mr. Gobeille has reached in the *Gobeille Report* are remarkably similar.  These similarities include:

- **The identification of an alternative New York Thruway re-route** that would circumvent the Cattaraugus Territory;[3]

- **An emphasis on the value of route directness to Thruway users.**  The *Gobeille Report*'s discussion of the broadly negative commercial impacts of

---

[1]    Expert Report of Steven E. Turner, Seneca Nation v. Hochul, et al., Before the United States District Court, Western District of New York, Case No. 18-CV-429-LJV-MJR, May 31, 2024 (*Turner Report*).

[2]    Rick Gobeille, "New York State Thruway Economic Impacts of Rerouting MP 452.3-455," Stantec Consulting, Prepared for the New York State Thruway Authority, June 28, 2024 (*Gobeille Report*).

[3]    *Gobeille Report*, §3.1; *Turner Report* IV.B.2.  The alternative route proposed by the *Gobeille Report* "is approximately 30 miles in length, versus approximately 13 miles of existing roadway resulting in a route 17 miles longer than the current Thruway route" (*Gobeille Report* p. 9).  The alternative route proposed by the *Turner Report* is 37.8 miles in length, and replaces 22.87 miles of existing roadway, resulting in a re-route approximately 15 miles longer than the current Thruway route (*Turner Report* ¶46 and ¶51).

Thruway re-routing is consonant with the *Turner Report*'s discussions of the value of route directness;[4]

- **A "level-of-service" analysis of traffic flow** for proposed Thruway re-routes, as well as for other local routes (*e.g.*, US Route 20) where traffic patterns would change as a result of alterations to the Thruway corridor;[5]

- **A comparison of toll revenues** received as a result of the Thruway's access to the easement in dispute, on the one hand, with much lower toll revenues generated by proposed Thruway re-routes, on the other hand;[6] and

- **A projection of additional costs** necessary to operate a longer, re-routed section of the Thruway.[7]

5.      Ultimately, in the *Turner Report*, I conclude that there is an ongoing financial benefit to the New York Thruway Authority of $16.98—$18.44 million per year due to the access to the Seneca Nation route.[8]  Mr. Gobeille has likewise provided information that indicates an annual direct benefit to the New York Thruway Authority of $21.19 million per year: $9.89 million in *costs avoided* plus $11.3 million in revenue *losses avoided*.[9]  As I will demonstrate later in this report, there are small differences in our assumptions that account for the lower range that I have calculated: *e.g.*, the mix of commercial traffic using the Thruway through the Seneca Nation, and the proportion of passenger and commercial traffic diverted from the Thruway as a result of re-routing.

---

[4]    The *Gobeille Report* notes: "Businesses that ship goods between the Buffalo area and points southwest of the Pennsylvania/New York State border would be particularly impacted [by re-routing] because… there is no other direct, high-speed alternative [to the current Thruway route]" (*Gobeille Report*, §3.2.1.4).  Cf. *Turner Report*, ¶49.

[5]    *Gobeille Report*, §§3.2.1-2; *Turner Report* V.C.1.

[6]    *Gobeille Report*, §3.2.1.2; *Turner Report* V.C.4.

[7]    *Gobeille Report*, §3.1; *Turner Report* V.B.2-3.

[8]    *Turner Report*, ¶95.

[9]    $9.89 million in costs avoided are presented as "Add'l OPEX based on 2.4% Addl Lane Miles" in Appendix E of the *Gobeille Report*; $11.3 million in revenue losses are forecast in the *Gobeille Report*, §3.2.1.2 "Revenue Impacts to Thruway Authority."

6.      One of the primary differences between Mr. Gobeille's analysis and mine is perspective.  Mr. Gobeille, from the vantage point of a construction engineering firm, Stantec Consulting, has approached the evaluation from the perspective of constructing a new tollway that would bypass the Seneca Nation and physically remove the existing road through the Seneca Nation.  By contrast, as I noted in the *Turner Report*, I was asked by counsel for the Seneca Nation to provide an estimate of the prospective financial benefits that result from the Thruway's ongoing use of the Seneca Nation property occupied by the Thruway for purposes of valuing a new, valid easement for those lands.  To perform this analysis there is no need to evaluate the cost of removing the current Thruway from Seneca Nation property.

7.      Nonetheless, the evaluation of the incremental cost of the alternative route which both Mr. Gobeille and I have calculated is an important characteristic of the ongoing financial benefit of the Thruway's use of the Seneca Nation property as the ongoing capital cost and maintenance of the route is avoided.  Further, while we have calculated the impact using differing approaches, both Mr. Gobeille and I have determined that there is a significant reduction in the toll revenue that would be recovered by the New York Thruway due to the longer alternate route that provides an ongoing financial benefit to the New York Thruway.  But the question in this dispute is not whether the existing route will be removed and an alternate route constructed.  Instead, the object of analysis is the value associated with the continued used of the Seneca Nation's lands by the New York Thruway.  And Mr. Gobeille and I agree that it is substantial.

## III.    Evaluation of Differences in Analysis

### A.    Structure of the "But For" Scenario

8.      One critical assumption that is fundamentally different between the analysis that I performed and that performed by Mr. Gobeille has to do with the construct of the "*but-for*"

scenario for determining the value of the easement through the Seneca Nation property.  As I noted in my *Turner Report*, the use of a *but-for* framework can be used to "consider the value the plaintiff would have received in the absence of the economically detrimental relationship" under examination in a given dispute.[10]  However, it is important to construct these in a reasonable manner to compare the economic difference between the two scenarios.

9.      In my analysis, I determined an alternative *but-for* route to the direct route through the Seneca Nation that would allow me to then consider what capital, maintenance, traffic and revenue implications would occur prospectively if the Thruway had not had access to the Nation's lands when the Thruway was originally constructed and had instead constructed the Thruway along the alternative route.  Importantly, as the New York Thruway route through the Seneca Nation was already constructed, I compared the Seneca Nation route to the *but-for* alternative route as if that alternative route were also already constructed, so as to isolate the value of the use of the Nation's lands without regard to sunk costs of construction on the current route.  In other words, I did not skew the comparison between the two alternative routes for calculating the value of the easement by burdening only the alternative route with the cost of construction and valuing the existing route without considering such costs.  Skewing the comparison in this way would not create a reasonable valuation of prospective use of the Nation's lands.

10.      Mr. Gobeille has performed an unfair comparison in determining that the cost of constructing his alternative route would be between $2.1 and $3.0 billion.[11]  He illustrates the extremity of his comparison by noting that this construction cost would consume the entirety of

---

[10]    Allen, Mark A., Hall, Robert E., and Victoria A. Lazear. "Reference Guide on Estimation of Economic Damages," in *Reference Manual on Scientific Evidence: Third Edition*, National Academies Press, 2011, p. 436.  The authors note that "In the standard format, the but-for analysis differs from the actual world only by hypothesizing the absence of the harmful act committed by the defendant" (Allen, et al., p. 477).

[11]    *Gobeille Report*, §4.0.

the New York Thruway five-year capital program of $2.4 billion.[12]  And he further concludes that to implement this construction program without disrupting its existing capital program, the New York Thruway would have to increase tolls by $250 to $350 million.[13]

11.     Please note that I am not challenging whether Mr. Gobeille and his firm have correctly identified the cost to build this alternative road, including all of the elements that would make up such a construction.  I am not challenging whether his estimate of $42.5 million to $78.75 million to remove the existing road through Seneca Nation is correct.[14] My concern is that he has not set up a proper framework for evaluating the difference in the two routes for the purposes of valuing a valid easement in place of the existing easement.  I constructed the two scenarios where the existing route through Seneca Nation property and the alternative route around the Seneca Nation property were both already constructed.  This captures the value to the Thruway of using Seneca Nation lands.  The higher quantity of lane miles that would be needed incrementally for the alternative route would result in increased maintenance and other related capital costs.  But it would be unreasonable to compare – again, for the purpose of determining the value of an easement – the difference in initial capital construction costs between an existing route to the construction of a new route along with the removal of the existing route.  Taking this approach would assign a value of approximately $300 million annually to the Thruway of avoiding the alternative route– the midpoint of Mr. Gobeille's increase in the toll revenue required for this new alternative route. But if one assumes that the existing and *but-for* routes are both constructed and then evaluates for the differential in cost and revenue to the New York Thruway, one can more fairly and reasonably

---

[12]  *Id.*

[13]  *Id.*

[14]  *Gobeille Report*, §3.1.

evaluate the differential in value for the easement.  Hyperbolic estimates that New York toll costs would need to increase by $300 million absent the access to the Seneca Nation's lands does not fairly reflect how such an analysis should be done, given that the Nation is seeking only fair value for ongoing use of its lands and does not seek to displace the Thruway from its lands.

### B. Percentage of Diverted Traffic that is Commercial

12. Within a broad similarity of perspective and method, the *Gobeille* and *Turner Reports* use some different inputs for analysis that warrant further discussion.  The *Gobeille Report* estimates that fully 65% of all Thruway traffic is likely to divert from a re-route around the Cattaraugus Territory.[15]  The *Turner Report* estimates that 60-70% of commercial traffic would divert from the Thruway as a result of a similar re-route, but calculates a lower proportion of diverted passenger vehicles.[16]  Both analyses conclude that US Route 20, which runs parallel to the present Thruway, would be the primary alternative route of choice for a large majority of the drivers who elect to avoid a longer, less direct Thruway  alternative route.[17]

13. I used an assumption, based on the NYSTA Financial Report, that commercial vehicles make up 16.0% of daily traffic along the Erie Section of the Thruway, which encompasses the Enabled Seneca Section.[18] Mr. Gobeille instead assumed that 26% of the traffic on the 57A-58 segment is commercial vehicles.[19]  Mr. Gobeille provides no reference for this traffic level.

---

[15] *Gobeille Report*, §3.2.1.1.

[16] *Turner Report*, ¶85.

[17] *Gobeille Report*, Table 10: Estimated Peak Hour, Peak Direction Additional Traffic due to Diversion off Thruway. (See further discussion on page 20: "The Route 20 additional estimated peak volume of 738… will cause a detrimental impact to traffic congestion in that area.") Cf. *Turner Report,* ¶¶78-79.

[18] NYSTA Financial Report, p. 21.  Section 7.2 of the Thruway's 2023 Traffic and Revenue Report confirms this 16.0% calculation of commercial traffic.

[19] *Gobeille Report*, §2.2.

However, Mr. Gobeille also does considerable work for the New York Thruway and may have access to information that is more detailed than that available to me. If I feed Mr. Gobeille's commercial vehicle proportion input into my analysis rather than using my original 16.0% figure, the impact on revenue is substantial. Specifically, the assumption from Mr. Gobeille that 26% of all traffic traveling across the Cattaraugus Territory on the New York Thruway is commercial,[20] when included in the model I developed, shows on ongoing benefit to the Thruway of $19.70—$21.60 million per year. This increased range is very close to the $21.19 million per year in ongoing benefits suggested by the *Gobeille Report*.[21]

### C. Accounting for Ongoing Capital Expenditures, Depreciation and Financing Costs

14. As I note above, Mr. Gobeille incorrectly performed his analysis by assuming the construction of a new toll road with the resulting requirement that approximately $300 million in incremental tolling revenue per year would be required to support the alternative route to using the Seneca Nation property. This approach did not establish a proper comparison between the current scenario and the *but-for* scenario.

15. However, the approach that I implemented did include ongoing actual capital expenditures on a portion of the Thruway's present Erie Section, expressed in my results as the depreciation and debt servicing (interest) expenses related to those capital expenditures. Whenever toll roads (or non-tolled roads for that matter) are placed into service, they require ongoing capital investments to maintain the infrastructure. The model that I developed accounted for ongoing

---

[20] *Gobeille Report*, §3.2.1.1. The Turner Report had estimated a lower overall percentage of commercial traffic.

[21] Please note, however, that the $21.19 million suggested by the *Gobeille Report* does not account for continuing capital expenditures and the corresponding depreciation that would be required by the increase in the route distance from bypassing the Seneca Nation property, which would increase the cost of the alternative route as explained in the next section.

depreciation and debt services costs in the New York Thruway system, and determined this cost on a per lane-mile basis. Further, the analysis that we performed allowed for the calculation of these costs to be specific to the Erie Section so as to reflect costs in this part of the state.

16.    In the manner that I implemented the *but-for* route in my analysis, I increased the distance of the New York Thruway around the Seneca Nation property from 22.87 miles to 37.8 miles – an increase of slightly less than 15 miles or an increase of 65%. When Mr. Gobeille performed his alternative analysis, he increased the route from 13 miles to 30 miles – an increase of 17 miles or an increase of 131%. As such, evaluating his alternative route on an apples-to-apples basis reveals a net benefit for the use of the Seneca Nation property of $24.08 million per year.[22] In short, Mr. Gobeille's assumptions are actually considerably more aggressive than those that I utilized to develop my estimated benefit of $16.98—$18.44 million per year or even my revised estimate with Mr. Gobeille's increase in the commercial traffic mix of $19.70—$21.60 million per year. But either Mr. Gobeille's 30-mile alternative route or my 37.8-mile alternative route coalesce around a $20-25 million net benefit annually to the New York Thruway for the use of the Seneca Nation property.

### D.    Costs Avoided by the Public in the *Gobeille Report*

17.    The *Gobeille Report* discusses a number of costs to the public that would result from a re-routing of the Thruway around the Cattaraugus Territory. Some of these costs, such as projected impacts to local landholders affected by Mr. Gobeille's proposed new Thruway route,[23] imagine the construction of an entirely new Thruway section. I did not consider such costs in the

---

[22]  Gobeille Re-Route Ongoing Benefit Analysis.xlsx.

[23]  *Gobeille Report*, §1.3.1 and §3.2.1.3.

*Turner Report*, which focused instead on the ongoing benefits attributable to the continued use of the Seneca Nation's lands by the New York Thruway.

18.     The *Turner Report* did not enumerate all potential social or "external" economic costs because I did not consider these costs to be direct *avoided costs* for the Thruway itself from the ongoing use of the Seneca Nation's lands. However, certain social costs named in the *Gobeille Report* are in fact costs avoided *by the public* as a result of the Thruway's continued access to the land of the Seneca Nation.

19.     Mr. Gobeille makes reference to a "General impact on the trucking industry, interstate and international commerce."[24] This impact is related to the *Turner Report*'s discussions of the general value of route directness and the multi-state connective function of the Thruway.[25] I agree with Mr. Gobeille that any Thruway re-route would have general impacts on commerce in and beyond the State of New York.

20.     Mr. Gobeille calculates that his new Thruway re-route "would cost $23 additional per truck trip, on average," before offering this discussion of costs likely to be borne by the public:

> When trucking companies face increases in their operational costs, freight rates increase for the businesses that ship goods (whether it be dairy farmers or online retailers), resulting in net revenue losses for these businesses and potentially higher purchase prices for consumers.  Businesses that ship goods between the Buffalo area and points southwest of the Pennsylvania/New York State border would be particularly impacted because the Thruway is their primary transport route – *there is no other direct, high-speed alternative* [emphasis added].[26]

21.     Although the *Turner Report*, like the *Gobeille Report*, made no attempt to actively calculate revenue losses for businesses, or price increases for consumers, I agree with Mr. Gobeille

---

[24]   *Id.*

[25]   *Turner Report*, ¶¶ 49-50.

[26]   *Gobeille Report*, §3.2.1.4.

that these are in fact *avoided costs to the public* – avoided costs attributable to the Thruway's ongoing access to the Cattaraugus Territory.[27]  The avoided costs to the public do not alter my estimate of ongoing benefits to the Thruway itself – but those costs could be significant.

## IV.    CONCLUSION

22.      In summary, both the *Gobeille* and *Turner Reports* allow the reader to assess both (a) the additional costs and (b) the revenue losses that are presently *avoided* by the State of New York as a result of its access to the easement in dispute. By combining these avoided costs and losses, it is possible to estimate the ongoing financial benefit enjoyed by the New York Thruway Authority as a result of that access.

The statements and opinions contained herein are, to the best of my knowledge, accurate as of the date set forth below.


  */s/ Steven E. Turner*
Steven E. Turner
July 26, 2024

---

[27]   Please note that while I acknowledge that such costs would exist from a longer alternative route to the public, I have not endeavored to evaluate whether Mr. Gobeille has accurately calculated his estimate of $23 per truck trip as this public cost was outside of the scope of the analysis I was requested to perform.