# EXHIBIT H



# Rebuttal to Expert Report of Steven E. Turner

**August 23, 2024**

Prepared for:



New York State Thruway Authority

Prepared by:

Rick Gobeille, P.E.

Stantec Consulting Services, Inc.

# 1.0  INTRODUCTION AND EXECUTIVE SUMMARY

I have reviewed the May 31, 2024 Expert Report of Steven E. Turner ("Turner Report"[1]) regarding the segment of the New York State Thruway ("the Thruway Authority" or "the Authority") that passes through the Seneca Nation's Cattaraugus Territory (the "Seneca Territory").  It should first be noted that in my June 28, 2024 Expert Report ("Gobeille Report"[2]), I had been tasked with analyzing something broadly different than Mr. Turner, and that was to determine the losses and costs that would be incurred if the Authority were to lose access to the 2.7-mile easement through the Seneca Territory, and had to build an alternative route around it. Mr. Turner, on the other hand, was instructed in his report to determine the valuation, or "ongoing financial benefit," that the Thruway sees on its current routing through the Seneca Territory versus a longer, alternative pathway that bypasses the Seneca Territory. Even with the difference in assignments, Mr. Turner and I chose fairly similar alternative routings that assumed the majority of the Thruway's 70-mile Erie Section in Western New York would remain on its current path.

Mr. Turner states in his report, "I have considered potential alternative routes that the Thruway might have taken if it had not had access to the Seneca Section easement. In my opinion, the most likely alternative route would have travelled east from Thruway Exit 59 along New York State Route 39, and then north toward Eden along US Route 62, before rejoining the current Thruway at Exit 57A (see map below). This alternative "But-For Route" is 37.8 miles in length and is materially less direct than the current Thruway routed through the Seneca Section."[3]  This potential alternative chosen by Mr. Turner, the But-For Route, is shown in Figure 1.

Mr. Turner refers to the existing 22.87-mile section of Thruway between Interchanges 57A and 59 - which passes through the Seneca Territory - as the "Enabled Seneca Section"[4]. The difference in length between the But-For Route and Enabled Seneca Section is about 14.9 miles.

---

[1] *Expert Report of Steven E. Turner, Seneca Nation v. Hochul, et al., Before the United States District Court, Western District of New York, Case No. 18-CV-429-LJV-MJR, May 31, 2024.*

[2] *Rick Gobeille, "New York State Thruway Economic Impacts of Rerouting MP 452.3-455," Stantec Consulting, Prepared for the New York State Thruway Authority, June 28, 2024.*

[3] *Turner Report, ¶46.*

[4] *Ibid., ¶51.*



**Figure 1: But-For Route Around Seneca Territory, as pictured in Turner Report**



*Source: Turner Report, Figure 2, p. 16.*

As he defined it, Mr. Turner's But-For Route was supposed to represent *what might have been built if the Authority did not have access to the easement through the Seneca Territory*. If no easement was ever granted by the Seneca Nation to the State of New York, however, the route developed in the 1950s would have looked materially different than what Mr. Turner had assumed; it would have been more direct from a long-distance trip point of view. Mr. Turner's choice of But-For Route is a significant flaw in his analysis.

In addition to this, Mr. Turner did not apply the correct tolling policy to his analysis of "ongoing benefit" of the Seneca easement. Application of proper toll rates would have resulted in significantly reduced benefit to the Thruway Authority than what he had concluded in his Expert Report.

2

## 2.0   QUALIFICATIONS OF STANTEC AND RICK GOBEILLE, P.E.

I am a registered professional engineer in the State of New York. Including my professional experience and resume detailed in Section 1.1 and Appendix A of the Gobeille Report, I offer additional information on my qualifications herein. As noted in the Gobeille Report, I, along with Stantec staff who I supervised on this project have consulted for the Thruway Authority for several decades.  Stantec and its predecessor firms can trace their experience all the way back to the initial feasibility studies and design of the original Thruway in the 1950s.  Daniel Greenbaum, one of the authors of that Original Feasibility Study (Second Edition)[5], served in the capacity of Consulting Engineer to the Authority since that study.  The Engineer role and contract (with brief interruptions) followed Mr. Greenbaum through changes in organizations until he joined Vollmer Associates (later acquired by Stantec in 2007) in the mid-1970s.  I joined Vollmer Associates in 1986 and in 1989 began working on assignments for the Thruway contract.  Mr. Greenbaum mentored me for over a decade sharing his historical knowledge of the Thruway until his retirement in the early 2000s.  Among the information passed along was a copy of the Original Feasibility Study for the Thruway dated May 1954.  At the time of Mr. Greenbaum's retirement, I became the principal-in-charge of the Thruway contract.  For a period of years, I worked at Jacobs Engineering as a subconsultant to Stantec for the Authority. After a brief period, Jacobs was selected to be the Traffic Engineer for the Thruway until 2018 when I returned to Stantec.  Stantec was subsequently selected later in 2018 to be the Traffic Engineer and I continued in my role as Principal-in-Charge of the Thruway contract.   Over the course of those 30+ years I have completed hundreds of assignments for the Authority and am uniquely qualified to opine on many aspects of the Finance and Operations of the Thruway since its original inception. I offer all the opinions in this report to a reasonable degree of engineering certainty.

## 3.0   FLAWS WITH BUT-FOR ALTERNATE ROUTE

If no easement were granted through the Seneca Territory, Mr. Turner's But-For Route as shown in Figure 1 would not have been the route chosen; planners would have selected a more direct route for the Erie Section of the Thruway. The Highway Act of 1956 states that interstate highways should be "so located as to connect by routes, as direct as practicable, the principal metropolitan areas, cities, and industrial centers..."[6]  Similarly, Federal Highway Administration current practice states that major interstate routes will "generally traverse urban areas on the path of the major traffic stream. Generally, this major traffic stream will be the shortest and most direct line of travel."[7]

In order to develop a more likely alternative to the But-For Route, it is necessary to consider the intent of the original planners when they were initially mapping out the Thruway location. Highway route locations are planned based on multiple factors, including the demand, directness of a route, available connections, jurisdictional parameters, and geographical limitations.

---

[5] *"Estimated Traffic, Revenue and Expenses of the New York State Thruway," Second Edition, Madigan-Hyland Engineers, New York, May 20, 1954. I obtained a hard copy of this report from Daniel Greenbaum, one of the authors of the original report. The report has been included in its entirety in the Appendix.*

[6] *https://highways.dot.gov/public-roads/summer-1996/federal-aid-highway-act-1956-creating-interstate-system*

[7] *https://www.fhwa.dot.gov/programadmin/interstate.cfm*



3

An example of jurisdictional parameters impacting Thruway Authority planning was its selection of location for the original Tappan Zee Bridge. At first view, this is not the most obvious of locations, as they chose one of the widest points of the Hudson River to cross. However, the location of the bridge is as far south towards Manhattan as possible without being constructed within the jurisdiction of the Port Authority of New York and New Jersey, as shown in Figure 2. This was clearly a choice by the original planners that took into account jurisdictional considerations. This jurisdictional limitation was also a factor in the subsequent replacement of the bridge to the north of the original location.



**Figure 2: Port Authority of New York and New Jersey Jurisdiction and Tappan Zee Bridge Location**



5

Figure 3 shows the current Thruway System and other major highways along with 1950s population centers in the state. It is apparent that these highways - mainly built between the mid-1950s and early 1970s – were designed to accommodate increasing travel demand and promote connectivity between major population centers.  Note that the Thruway could have been built near or through Rochester, but it was built almost 10 miles south of downtown. The Thruway's planned pathway was straighter and more direct if it did not pass through Rochester.

As Figure 3 shows, the pathway of the New York State Thruway contained no "cutout shapes" like the one that Mr. Turner selected for his But-For Route. The curvy shape seen on the east-west portion of the system between Utica-Rome and Albany was likely due to geography – planners chose to follow a path close to the Mohawk River/Erie Canal, crossing the river only two times. For the Thruway's Erie Section, planners appear to have chosen the straightest route, barring any limitations, with the rights-of-way granted to them.



**Figure 3: 1950 Major Population Centers and Current Major Highways**



The Thruway Authority had commissioned Madigan-Hyland Engineers to conduct the Original Feasibility Study which was completed in 1954 (see Appendix). Madigan-Hyland conducted extensive origin-destination surveys in 1950 for this study and produced summary graphics showing traffic patterns to and from the major cities of New York State (see Appendix pp. 21-25). Trips that would potentially use the Thruway's Erie Section were split nearly equally between those with destinations across the Pennsylvania border and those with destinations in southwestern New York State. This suggests that planning the Erie Section to the east of its current alignment would have also been an acceptable alternative, especially when considering that it would bring it closer to Jamestown, the largest city in that area (1950 population of 43,000).[8]

Figure 4 shows how the Thruway System route was planned with long-distance travel in mind, and how it was meant to connect with out-of-state routes, many of which were still proposed routes. The current Erie Section (I-90 in New York) connects to I-90 in Pennsylvania, which then connects to I-90 in Ohio, running through Cleveland and further on to Toledo and beyond.  My investigation into the history of I-90 in the Lake Erie area revealed that I-90 was completed first in western New York State (with the Erie Section opening in December 1957),[9] second in eastern Ohio (opening December 1959),[10] and lastly in Pennsylvania (October 1960),[11] nearly three years after the New York Erie Section. This implies that Pennsylvania was aligning the eastern end of its interstate section to match with New York, and not the other way around, and that the Thruway Authority could have chosen to connect to Pennsylvania at a location further east from Lake Erie.

---

[8] *https://usa.ipums.org/usa/resources/voliii/pubdocs/1950/Population/41028710p8ch2.pdf*

[9] *https://www.thruway.ny.gov/oursystem/toll-collector-history.html#:~:text=On%20December%2014%2C%201957%2C%20the,the%20Thruway's%20Mainline%20in%20Buffalo.*

[10] *"27 Miles of North–South Freeway to Open Tuesday". The Telegraph. Painesville, OH. December 14, 1959. p. 1.*

[11] *White, William A. (October 16, 1960). "$40 Million Erie Freeway Opens Friday". The Pittsburgh Press. sec. 2, p. 6. Retrieved August 16, 2024 – via Newspapers.com.*



**Figure 4: 1950s Existing and Proposed Express Highway System**



Source: "Estimated Traffic, Revenue and Expenses of the New York State Thruway," Second Edition, Madigan-Hyland Engineers, New York, May 20, 1954, Exhibit 4 (see Appendix p. 11)

Taking all these factors into consideration, I have mapped out a far more likely route that the Thruway Authority would have chosen than Mr. Turner's route, had it not been able to get an easement through the Seneca Nation's Territory. This route, shown in red in Figure 5, is straighter and more direct than that identified by Mr. Turner. Note that though I represent this alternative route with straight lines, there would likely be some small deviations around specific parcels or small geographic features.  Allowing for this, the alternative route would be some 5 to 7 miles longer than the current Erie Section, and not 14.9 miles longer as Mr. Turner had assumed in his analysis.



**Figure 5: Erie Section Likely 1950s Alternative Route Relative to Existing Erie Section and Turner But-For Route[12]**



Legend

— Erie Section Alternative Route (NY)
--- Extension of Alternative Route (PA)
— Turner But-For Route
— Existing Thruway, Erie Section
— Cattaraugus Indian Territory

Service Layer Credits: Sources: Esri, HERE, Garmin, USGS, Intermap, INCREMENT P, NRCan, Esri Japan, METI, Esri China (Hong Kong), Esri Korea, Esri (Thailand), NGCC, (c) OpenStreetMap contributors, and the GIS User Community

[12] *Turner Report, Figure 2, p. 16.*

11

## 4.0   IMPROPER TOLL APPLICATION

Another flaw in the Turner study is the improper application of tolls in his calculations of operating revenue on his But-For Route.

It is clear from Mr. Turner's report that the difference in length between his two chosen routes – the Enabled Seneca Section and the But-For Route - is the driving factor in his analysis, where he compared estimated annual net income between the two. The difference was deemed the "ongoing benefit", which he estimated to be in the range of $16.98 - $18.44 million.[13] I agree with Mr. Turner that a longer route will have greater overall expenses (operating, depreciation, and interest) than a shorter route, as shown in the concluding figure of his report (see Figure 6).

**Figure 6: Concluding Figure from Turner Report – "Ongoing Benefit" Calculation**

Example Total Ongoing Benefit of the Seneca Section (25% Total Traffic Loss on But-For)

| Annualized Financials, in $M | Seneca Section | But-For Route | |
|---|---|---|---|
| Operating Revenues *(tolling and related fees)* | $19.20 | $12.14 | |
| Operating Expenses *(fixed & variable; maintenance, services, & policing)* | ($4.67) | ($6.56) | |
| Depreciation Expense *(Capital Improvement Projects)* | ($8.35) | ($13.77) | |
| Interest Expense *(on debt financing)* | ($4.67) | ($7.70) | Ongoing Benefit |
| | [A] | [B] | [C] = [A] – [B] |
| Net Benefit / Loss | $1.51 | ($15.89) | $17.40 |

*Source: Turner Report, Figure 9, Page 37.*

As shown in this figure, Mr. Turner also estimated operating revenues for the two routes as part of his analysis. I must point out, however, that he did not apply tolls correctly in his revenue estimation. The Thruway Authority, on its Controlled System including the Erie Section, *currently and throughout its history has charged a distance-based toll.* The recommended passenger car toll in the 1954 feasibility study was 1.25 cents per mile (see Appendix p. xiii) and the current 2024 base rate is 4.69 cents per mile[14]. Mr. Turner's analysis of the But-For Route, however, did not account for this; instead, the toll *per vehicle* currently charged between Interchanges 57A and 59 was applied.[15] The But-For Route length of 37.8 miles is 65 percent longer than the 22.87-mile Enabled Seneca route, and therefore a

---

[13] *Turner Report, ¶95.*

[14] *"New York State Thruway Financial Requirements and Proposed Toll Adjustments," Stantec Consulting, Prepared for the New York State Thruway Authority, November 28, 2022, p.38; accessible via* https://www.thruway.ny.gov/news/adjustment/exhibit-1.pdf

[15] *Turner Report, ¶87.*

*I had similarly applied the current interchange-to-interchange toll rates in my Expert Report analysis (Gobeille Report, p. 11), however, I was analyzing a future potential rerouting of the Thruway and was looking to not penalize current Thruway customers.*



12

toll approximately 65 percent higher should have been applied; this, in turn, would have made the revenue for the But-For Route much higher than Mr. Turner had estimated. If we were to assume 65 percent additional revenue for the But-For Route ($7.89 million on top of the $12.14 million shown in Figure 6), the "ongoing benefit" would be greatly reduced from $17.40 million to $9.51 million. Note that this is for Mr. Turner's chosen But-For Route, and not the more direct alternative to the Erie Section that I have presented.

## 5.0   CONCLUSION

A significant flaw in Mr. Turner's analysis is his choice of alternative route when evaluating the purported ongoing benefits of the "Seneca Section easement"[16] to the Thruway Authority.  If Mr. Turner were to rerun his analysis using a more likely But-For Route that is 5 to 7 miles longer than the current Erie Section, and applied the Authority's per-mile toll policy, any "ongoing benefit" of the current segment would have been substantially lower than what he has estimated.

\*       \*       \*       \*       \*       \*       \*       \*       \*       \*       \*       \*       \*

**Stantec Consulting Services Inc.**



**Rick Gobeille, P.E.**
Senior Principal
Phone: (212) 366-5625
rick.gobeille@stantec.com

---

[16] *Ibid., ¶95.*



13