# EXHIBIT R

THE SENECA NATION OF INDIANS
PEACEMAKERS' COURT
2 THOMAS INDIAN SCHOOL DRIVE
IRVING, NEW YORK 14081
CATTARAUGUS TERRITORY
TELEPHONE: 716-532-0024*1
FACSIMILE: 716-532-8317

**************************************

BARRY E. SNYDER, SR.
PRESIDENT
SENECA NATION OF INDIANS
12837 ROUTE 438
IRVING, NEW YORK 14081
      PETITIONER

In the Matter of the Easement and Right-of-Way Granted by the Council of the Seneca Nation of Indians by Instrument dated October 5, 1954 to the People of the State of New York, acting by and through the New York State Thruway Authority

v.

THE STATE OF NEW YORK,
THE NEW YORK STATE
THRUWAY AUTHORITY
AND U.S. DEPARTMENT OF
TRANSPORTATION FEDERAL
HIGHWAY ADMINISTRATION
      RESPONDENTS

CIVIL ACTION NO. 0113-09-1

ADVISORY OPINION AND ORDER

**************************************

## I.    SUMMARY

This Court, having found that the requirements set forth in Sections 2-102(b) and 2-106 of the Civil Procedure Rules for the issuance of an advisory opinion are satisfied, having issued a notice to all relevant governmental entities regarding their rights to submit briefs and other materials regarding the issues addressed herein, and to otherwise participate fully in these proceedings, and the Petitioner having appeared by Brady & Swenson, Thomas C. Brady, Esq., of counsel, and the State of New York, the New York State Thruway Authority and the U.S. Department of Transportation Federal Highway Administration having failed to appear either personally or by counsel, and having duly considered the matter, the Court holds as follows:

First, because the United States did not consent to an October 5, 1954 conveyance by the Seneca Nation to the State of New York ("State") of an easement for the placement and use of the New York State Thruway ("Thruway") across the Nation's Cattaraugus Territory, the State's procurement of the easement violated both Nation law and the federal Non-Intercourse Act, 25 U.S.C. § 177. The easement was therefore void at its inception and remains void as a matter of Nation and federal law.

Seneca Nation of Indians v. The State of New York, et al
Civil Action No. 0113-09-1
Advisory Opinion and Order
Page 2 of 18

Second, the Nation possesses absolute sovereign power to exclude non-members from its Territories. Because the October 5, 1954 easement is void as a matter of both Nation and federal law, the State and Thruway motorists have no lawful rights to enter or to be present on that portion of the Nation's Cattaraugus Territory traversed by the Thruway. The Nation's power to exclude thus extends to the State and to motorists entering or remaining on the Nation's Territories via the Thruway, and includes the lesser power to place conditions on such entry or continued presence. Those conditions may include, but are not limited to, the payment by the State of reasonable compensation for the continued presence of the Thruway on the Nation's Cattaraugus Territory, and the payment of a reasonable toll by motorists using the Thruway to cross the Territory. The power of the Nation to effectuate these measures is vested in the executive office of the President acting to enforce lawful resolutions adopted by the Nation's Council.

This Court has jurisdiction over this matter pursuant to Sections 2-102 (as amended) and 2-106 of the Civil Procedure Rules.

## II.    FINDINGS OF FACT[1]

The Context of the Easement Negotiations

1.    Between 1946 and 1954, the Nation and the State engaged in discussions and negotiations that culminated in the October 5, 1954 conveyance by the Nation to the State of an easement for the construction and use of the New York State Thruway ("Thruway") traversing approximately 300 acres of the Nation's Cattaraugus Territory. *See* Exhibit A (*Seneca Nation of Indians v. New York*, 93-CV-688A(H), 6-10 (W.D.N.Y., July 12, 1999)).

2.    The years 1946 to 1954 coincided with the "termination era" of federal Indian policy, which was characterized by policies aimed at ending the trust relationship between the United States and Indian nations, permitting greater state influence over Indians, ending the political existence of Indian nations, removing restrictions on the alienation of Indian lands, and breaking up reservations and relocating Indians to off-reservation lands. COHEN'S HANDBOOK OF FEDERAL INDIAN LAW, § 1.06 (2005 ed.).

3.    The termination era involved "the most concerted drive against Indian property and Indian survival since the removals following the act of 1830 and the liquidation

---

[1] All references herein to "Exhibit[s]" refer to exhibits attached to Brief of Petitioner.

Seneca Nation of Indians v. The State of New York, et al
Civil Action No. 0115-09-1
Advisory Opinion and Order
Page 3 of 18

of tribes and reservations following 1887." *Id.* (quotations omitted). In these years "the value of even the most isolated and resource-deprived Indian lands increased substantially" and "[v]ast acreages of Indian land were allowed to pass out of Indian hands[.]" *Id.*

4.    In 1947, the Seneca Nation was specifically identified by the United States as ready for immediate termination. *See* Exhibit B (Declaration of Laurence M. Hauptman ("Hauptman Declaration") at ¶ 5). At this time the Nation had no full-time employees, its council met only infrequently on very limited issues, and the Nation was almost entirely dependent on the United States for even the most basic needs of its government. *Id.* at ¶ 6.

5.    Between 1948 and 1950, against the wishes of the Seneca Nation and at the urging of State officials, Congress transferred criminal and civil jurisdiction over Indians in the State of New York, at least in concurrent part, to the State. Hauptman Declaration at ¶ 7. In this same period, the United States Bureau of Indian Affairs closed its New York office and federal officials pressed the Nation to accept a lump-sum payment ending the United States' solemn and historic treaty obligations to the Nation. *Id.* at ¶ 8.

6.    In 1950, President Truman appointed Dillon S. Myer to be Commissioner of Indian Affairs. This appointment was telling of the termination era. Mr. Myer had headed the United States War Relocation Authority during World War II, overseeing the forcible relocation of Japanese Americans from their homes and communities to internment camps. The Secretary of the Interior, in recommending the appointment of Mr. Myer to the President, stated: "He did an outstanding job in the maintenance and relocation of the Japanese evacuated from the Pacific Coast region. . . . I feel that this total experience well fits him for the position of Commissioner of Indian Affairs." Hauptman Declaration at ¶ 9.

7.    The years 1946 to 1954 likewise coincided with the State's postwar development boom, during which the State undertook unprecedented, large-scale highway construction, expansion of state parks, public power development and other public works projects across the State. Seneca lands, like those of other Indian nations in New York, were viewed as potential "sacrifice areas" when situated in the path of the State's development goals. Hauptman Declaration at ¶ 10.

8.    During the months of discussion and negotiations preceding the October 5, 1954 easement, the State prepared to follow through on plans, originally devised in 1946, to

Seneca Nation of Indians v. The State of New York, et al
Civil Action No. 0113-09-1
Advisory Opinion and Order
Page 4 of 18

impound the Allegheny River in cooperation with officials in Pennsylvania. The plans involved one of two scenarios for the Nation's Allegany Territory. One scenario "would have left the Nation in possession of its present land, but would have flooded members' homes whenever operation of the 'Kinzua Dam' required the reservation to be inundated." Hauptman Declaration at ¶ 11. The other scenario called for the "elimination of the Nation's Allegany reservation altogether and the forced removal and relocation of the Seneca Indians living there." *Id.* The Nation had actively opposed these plans since their inception. *Id.* Numerous similar projects had been undertaken in the State in recent years and had resulted in the substantial loss of Indian lands. *See id.* at ¶ 12.

9.    In the years preceding the conveyance of the October 5, 1954 easement, the State of New York had been the subject of intense lobbying pressure by financial interests, transportation companies, and local chambers of commerce, to extend the Thruway from Buffalo, New York, to Erie, Pennsylvania – a route requiring passage across the Nation's Cattaraugus Territory. Hauptman Declaration at ¶ 14. In April of 1954, several months before the Nation had agreed to the easement, the Governor of New York publicly announced that the link between Buffalo and Erie would be built. *Id.*

10.    Formal negotiations for the October 5, 1954 easement occurred over two sessions, on August 28, 1954 and September 17, 1954. The Nation was represented during these negotiations by Edward E. O'Neill, who was an attorney approved and paid for by the State. Mr. O'Neill was hired the day of the first negotiating session on August 28, 1954. He had little, if any, experience in federal law as it related to the rights of Indians or Indian nations. Hauptman Declaration at ¶ 15.

11.    The negotiations took place at a time during which "the value of even the most isolated and resource-deprived Indian lands increased substantially," COHEN, § 1.06, yet the Nation's rudimentary government was unaided by an independent appraisal of the value of its land. The State did not seek to obtain, and did not obtain, a professional independent appraisal of the value of the easement. Instead, the State's bargaining parameters were based on the informal estimations of its negotiators. Hauptman Declaration at ¶ 16. At the outset of the negotiations, the Nation insisted as consideration for the easement that, among other terms, it receive a one-third share of the Thruway revenues

Seneca Nation of Indians v. The State of New York, et al
Civil Action No. 0113-09-1
Advisory Opinion and Order
Page 5 of 18

generated from traffic over that portion of the Thruway passing over the Nation's Territory. *Id.* According to the State's lead negotiator, after "several hours of very frank talk," he was able to get the Nation's opening negotiating position "finally hammered down to a [one-time payment] of $75,000. This is much lower than any of us expected to acquire these lands for[.]" *Id.*

The Absence of Federal Consent to the Easement Agreement[2]

12.    In January 1946, a representative of the State Department of Public Works contacted the Nation to discuss surveying the Nation's lands for the purpose of constructing the Thruway through the Nation's Cattaraugus Territory. *See* Exhibit A (*Seneca Nation of Indians v. New York*, 93-CV-688A(H), 6-7).

13.    On May 7, 1947, Frank O'Marah, Director of the Bureau of Rights-of-Way and Claims for the State Department of Public Works, wrote to the United States Department of the Interior (the "Department") seeking the Department's consent and approval of the State's proposed procedure for acquiring an easement for Thruway purposes across the Nation's Cattaraugus Territory. *See* Exhibit A (*Seneca Nation of Indians v. New York*, 93-CV-688A(H), 7).

14.    On June 10, 1946, the Department responded to Mr. O'Marah's May 7, 1946 letter by outlining several steps necessary for a valid conveyance of an easement across Indian land. These steps included providing the Department with a map of the definite location of the easement, an application, and information regarding agreements for compensation to individual landowners. *See* Exhibit A (*Seneca Nation of Indians v. New York*, 93-CV-688A(H), 8).

15.    The State never complied with any of the requirements set forth in the Department's June 10, 1946 letter to Mr. O'Marah. *See* Exhibit A (*Seneca Nation of Indians v. New York*, 93-CV-688A(H), 10-12).

16.    By Resolution adopted September 18, 1954, the Nation's Council permitted the State to construct the Thruway across the Nation's Cattaraugus Territory. *See* Exhibit C

---

[2] Facts 12 through 15 were undisputed in federal litigation initiated by the Nation against the State challenging the validity of the Thruway easement. *See* Exhibit A (*Seneca Nation of Indians v. New York*, 93-CV-688A(H), 6-12).

Seneca Nation of Indians v. The State of New York, et al
Civil Action No. 0113-09-1
Advisory Opinion and Order
Page 6 of 18

(September 18, 1954 Council Resolution); *see also* Exhibit A (*Seneca Nation of Indians v. New York*, 93-CV-688A(H), 8-9).

17. On October 5, 1954, the State and the Nation entered into an easement agreement pursuant to the Council's September 18, 1954 resolution. Under the agreement, the Nation consented to a permanent easement for Thruway purposes across approximately 300 acres of the Nation's Cattaraugus Territory. In exchange, the State paid $75,500 to the Nation, exclusive of the rights of individual landowners, who were to be separately compensated. *See* Exhibit D (October 5, 1954 Easement Agreement).

18. The easement agreement was not signed by a representative of the United States, and contained no reference to the United States or to the requirement for federal approval of the conveyance. *See* Exhibit D (October 5, 1954 Easement Agreement). No federal official was present when the agreement was consummated. *See* Exhibit E (October 5, 1954 Memorandum of Closing Title in Re: The Seneca Nation of Indians, at 1).

19. Thereafter, the State constructed or caused to be constructed approximately three miles of interstate highway over, across and through the Nation's Cattaraugus Territory.

20. Since October 5, 1954, the State and Thruway motorists have repeatedly entered the Nation's Territory for Thruway and related purposes and continue to do so to the date hereof.

21. At the time of the Nation's consent to the easement, federal law provided that any conveyance of an interest in Indian land required the consent of the United States, and that any such conveyance made absent federal consent was void. *See* 25 C.F.R. Part 256 (1949) and 25 U.S.C. § 177.

22. On August 25, 1993, the Nation filed suit against the State in the United States District Court for the Western District of New York claiming, in part, that the conveyance of the 1954 easement was invalid because the United States had not consented to it. On July 12, 1999, Magistrate Judge Carol Heckman determined that the easement was invalid as a matter of federal law based on the lack of federal consent. *See* Exhibit A (*Seneca Nation of Indians v. New York*, 93-CV-688A(H), 6-12). She further concluded, however, that the

Seneca Nation of Indians v. The State of New York, et al
Civil Action No. 0113-09-1
Advisory Opinion and Order
Page 7 of 18

Nation could not maintain a suit in federal court against the State over the invalid easement due to the State's sovereign immunity from such suit. *Id.* at 14-16.

23.    By Resolution adopted April 14, 2007, the Nation's Council rescinded in its entirety its September 18, 1954 Resolution authorizing the Thruway easement. *See* Exhibit F (April 14, 2007 Council Resolution).

24.    By Resolution adopted May 12, 2007, the Nation's Council permitted motorists to enter the Nation's Territory via the Thruway on the condition that the motorists pay a fee to the Nation of $1 per motor vehicle, effective May 18, 2007. *See* Exhibit G (May 12, 2007 Council Resolution).

25.    By Resolution adopted June 9, 2007, the Nation's Council amended its May 12, 2007 Resolution by making the fee imposed thereby effective as of April 14, 2007. *See* Exhibit H (June 9, 2007 Council Resolution).

26.    By letter dated June 11, 2007 to Hon. Eliot Spitzer, Governor of the State, and John L. Buono, Chairman of the New York State Thruway Authority ("Authority"), the Nation advised both entities of the Council's adoption of the April 14, 2007 and May 12, 2007 Resolutions and demanded that the Authority collect and remit payment to the Nation of the fees required by the May 12, 2007 Resolution. *See* Exhibit I (June 11, 2007 Letter to Spitzer and Buono).

27.    By letter dated July 3, 2007 to Maurice A. John, Sr., President of the Nation, Michael R. Fleischer, Executive Director of the Authority, opined that the State had paid in full for the value of the easement and refused to implement the terms of the Council Resolutions adopted May 12, 2007 and June 9, 2007 by collecting and/or remitting the tolls imposed thereby. *See* Exhibit J (July 3, 2007 Letter to President John and Kevin W. Seneca).

28.    By letters dated January 31, 2008 to John L. Buono, Chairman of the Authority, and May 28, 2008 to Michael R. Fleischer, Executive Director of the Authority, copies of which were forwarded to Hon. David A. Paterson, the State's Governor, Richard Rifkin, Esq., Special Counsel to the Governor, and Sharon O'Connor, the Authority's General Counsel, Kevin W. Seneca, the Nation's Treasurer, again demanded payment by the State of the fees required by the aforementioned Resolutions. *See* Exhibit K (January 31, 2008 Letter to Buono) and Exhibit L (May 28, 2008 Letter to Fleischer).

Seneca Nation of Indians v. The State of New York, et al
Civil Action No. 0113-09-1
Advisory Opinion and Order
Page 8 of 18

29.    By letter dated March 5, 2008, the State and the Authority, acting by and through Mr. Fleischer, again refused to collect and remit such fees to the Nation. *See* Exhibit M (March 5, 2008 Letter to President John and Kevin W. Seneca).

### III.    CONCLUSIONS OF LAW

1.    The undisputed facts in this case make it clear that the State violated the Non-Intercourse Act, 25 U.S.C. § 177, in procuring the Thruway easement. Even more fundamentally, the conveyance of the easement in contravention of a law (the Non-Intercourse Act) meant to preclude non-Indians from intruding unfairly on the property interests of Indian nations, when that conveyance took place under the starkly unfair circumstances found above, constituted a substantial violation of Nation law.

2.    The Non-Intercourse Act provides, in pertinent part:

> No purchase, grant, lease, or other conveyance of lands, or of any title or claim thereto, from any Indian nation or tribe of Indians, shall be of any validity in law or equity, unless the same be made by treaty or convention entered into pursuant to the Constitution.

25 U.S.C. § 177. Under this provision, the consent of the United States is generally a prerequisite for the lawful conveyance of an interest in Indian land. *See Oneida Indian Nation of New York v. City of Sherrill, New York*, 337 F.3d 139, 147 (2d Cir. 2003) (the United States Supreme Court "has consistently applied the principle, embodied in the Nonintercourse Act, that federal consent is required for purchases of Indian land"), *rev'd on other grounds*, 544 U.S. 197 (2005), (citing *Oneida County, N.Y. v. Oneida Indian Nation of New York*, 470 U.S. 226, 232 (1985) (Non-Intercourse Act evinces Congress's "clear policy that no person or entity should purchase Indian land without the acquiescence of the Federal Government").

3.    Here, the State apprised the Department of its plans to acquire an easement across the Nation's Cattaraugus Territory on May 7, 1946. *See* Exhibit A (*Seneca Nation of Indians v. New York*, 93-CV-688A(H), 7). Two federal statutory provisions, 25 U.S.C. §§ 311 and 323, independently established the authority of the Secretary of the Interior to consent to such a transaction. Both provisions explicitly conditioned that authority on a state's compliance with requirements or conditions established by the Secretary. *See* 25 U.S.C. § 311 (Secretary authorized to approve state highways across Indian lands "upon

Seneca Nation of Indians v. The State of New York, et al
Civil Action No. 0113-09-1
Advisory Opinion and Order
Page 9 of 18

compliance with such requirements as [the Secretary] may deem necessary"); 25 U.S.C. §
323 (Secretary empowered to approve rights-of-way across Indian lands "subject to such
conditions as [the Secretary] may prescribe").

4.    During the relevant time period, Department of the Interior regulations
required as prerequisites for Secretarial consent to an easement across Indian lands that an
application be filed with the Department, along with a map of the definite location of the
proposed easement and information regarding agreements for compensation to individual
landowners. *See* 1938 C.F.R., Subchapter W, Part 256; 25 C.F.R. Part 256 (1949); 25 C.F.R.
Part 161 (1958). Accordingly, on June 10, 1946, the Department responded to the State's
May 7, 1946 overture by explicitly setting forth these very requirements as prerequisites to
its consideration and approval of the proposed conveyance. *See* Exhibit A (*Seneca Nation of
Indians v. New York*, 93-CV-688A(H), 9).

5.    The State did not comply with the Secretary's requirements for federal
approval of the conveyance. In federal litigation initiated by the Nation in 1993 contesting
the validity of the Thruway easement, the State did not dispute that it had failed to meet the
specific prerequisites for federal approval required by federal law and set forth by the
Department in its June 10, 1946 letter. *See* Exhibit A (*Seneca Nation of Indians v. New
York*, 93-CV-688A(H), 11) ("It is undisputed that [the Department's regulatory requirements
for a valid right-of-way across Indian land] were not complied with in this case. . . . It is
undisputed that [the requirements set forth by the Department in its June 10, 1946 letter]
were never met.")).

6.    While she ultimately recommended dismissal of the Nation's federal lawsuit
based on the State's sovereign immunity, the Magistrate Judge in the federal Thruway
litigation determined that the Secretary of the Interior did not approve of the proposed
conveyance and that the conveyance accordingly was procured in violation of the Non-
Intercourse Act. According to the Magistrate Judge:

> These regulatory requirements [*i.e.*, those set forth in Department's June 10, 1946
> letter] must be complied with in order to obtain a valid right-of-way across Indian
> land. . . . It is undisputed that they were not complied with in this case. . . . Without
> knowing the specifics of the right-of-way, it would have been impossible for the
> Secretary to approve it. . . . These requirements are not merely ministerial
> formalities, but are necessary for the Secretary to carry out his trust responsibilities to

the Indian tribes. Without knowing the specific land involved, the amount of compensation to be paid, or the other terms and conditions of the transaction, the Secretary could not knowingly and intelligently approve the permanent alienation of reservation land.

Exhibit A (*Seneca Nation v. New York*, 93-CV-688A(H), 11-12). *See also Nebraska Public Power Dist. v. 100.95 Acres of Land*, 719 F.2d 956, 961 (8th Cir. 1983) ("Conveyances of Indian lands must conform to the requirements of federal law.") (citing *Smith v. McCullough*, 270 U.S. 456 (1926)); *U.S. v. Southern Pacific Transp. Co.*, 543 F.2d 676, 689-91 (9th Cir. 1976) (rejecting railroad's claim of a right-of-way across Indian lands where railroad did not adhere strictly to federal regulatory requirements in obtaining claimed right-of-way).

7. The Magistrate Judge's conclusions were indisputably correct. The Secretary could not lawfully have approved, and indeed did not approve, the proposed conveyance by the Nation to the State of an easement across the Nation's Cattaraugus Territory. The State therefore procured the October 5, 1954 conveyance of the Thruway easement in direct violation of the Non-Intercourse Act. *See Oneida County, N.Y. v. Oneida Indian Nation of New York*, 470 U.S. 226, 232 (1985).

8. Even more fundamentally, the State's violation of the Non-Intercourse Act also constituted a critical violation of Nation law. Where non-Indian sovereigns pass laws meant to preclude those under their jurisdiction from engaging in unfair dealings with Indian sovereigns, such as the Non-Intercourse Act, and where non-Indians then flout those laws with impunity in their interactions with the Nation, they pose a direct affront to the Nation's sovereignty and integrity that the Nation's own laws guard against.

9. The facts of this case highlight the extent to which the State's actions in procuring the easement posed a direct threat to the Nation's paramount legal interests in its own sovereignty and territorial integrity. The Nation's interests in the preservation of its remaining land base, after centuries of wrongful dispossession, cannot be overstated. The Nation's Territories are fundamental to its sovereignty and self-determination, to its cultural and political existence as an Indian nation, and to the heritage and identities of its individual members.

10. The State procured the 1954 easement without the United States' consent at a time in history when the Nation relied significantly on the United States for assistance in

Seneca Nation of Indians v. The State of New York, et al
Civil Action No. 0113-09-I
Advisory Opinion and Order
Page 11 of 18

safeguarding the Nation's land base from erosion. Federal enforcement of the Non-Intercourse Act was integral to that assistance. Absent federal oversight, the State negotiated for a highly intrusive and immensely lucrative interest in the Nation's land under circumstances of profoundly unequal bargaining power. At a time when "the value of even the most isolated and resource-deprived Indian lands increased substantially," COHEN, § 1.06, the Nation's rudimentary government was unaided by an independent appraisal of the value of its land. It was represented in its negotiations with the State by a State-approved and State-paid lawyer with little, if any, experience in protecting the interests of Indians or Indian nations. These negotiations took place while the State was engaged in unprecedented and massive public works and infrastructure expansion, the main architects of which viewed Indian lands as "sacrifice areas" when situated in the path of the State's development goals. Hauptman Declaration at ¶ 10.

11. By the time the State and Nation began to formally negotiate the Thruway easement in August 1954, the State had already completed most of the Thruway and the Nation's Cattaraugus Territory was situated in the path of the uncompleted Buffalo-to-Erie span. And by then, the Governor of New York had already publicly announced that the portion of the Thruway requiring passage across the Nation's Territory would be built. Hauptman Declaration at ¶ 14. He stated that "[t]he Thruway . . . represents one of the greatest engineering accomplishments of our time. It will yield immeasurable benefits to hundreds of communities along its route and many hundreds of others close to it. It will . . . strengthen greatly the economy and competitive position of the State." Id. The Nation was under clear pressure to cooperate with the State and to acquiesce to the easement. Indeed, in the months leading up to and including the easement negotiations, the State was in a position to participate in plans to flood or to take outright ownership of and to remove the Nation from its entire Allegany Territory. Id. at ¶ 11.

12. Given the circumstances surrounding the negotiation of the Thruway easement, and the profound inequality in bargaining power that they connote, it is little wonder that the State's lead negotiator, after "several hours of very frank talk," was able to acquire the easement for "much lower than any of us expected to acquire these lands for[.]" Hauptman Declaration at ¶ 16.

Seneca Nation of Indians v. The State of New York, et al
Civil Action No. 0113-09-1
Advisory Opinion and Order
Page 12 of 18

13.     Against this backdrop of State coercion, the Nation was ill-equipped to properly protect its own interests. Its government was rudimentary in 1954. It had no full-time employees and was almost entirely dependent on the United States for essentials as basic as office supplies. Hauptman Declaration at ¶ 6. Yet the Nation (with a State-approved and State-paid lawyer lacking in relevant experience) was forced to negotiate the easement in an era when sectors of the federal government were withdrawing from the United States' historical commitment to restraining state incursions on Indian sovereignty and land, and which resulted in "the most concerted drive against Indian property and Indian survival since the removals following the act of 1830 and the liquidation of tribes and reservations following 1887." COHEN, § 1.06 (quotations omitted). The State's procurement of the Thruway easement was part and parcel of that "concerted drive against Indian property" and the 300 acres that today lie buried under the Thruway were among the "[v]ast acreages of Indian land . . . allowed to pass out of Indian hands" in that era. *See id.*

14.     This Court cannot condone such a course of dealing. Just as the State's procurement of the Thruway easement constituted a fundamental violation of federal law, it also constituted a critical violation of the Nation's own law.

15.     The Thruway easement was accordingly void at its inception and remains so as a matter of both Nation and federal law. As a matter of Nation law, to hold otherwise would be to recognize the validity of an agreement with the Nation procured by non-Indians in violation of laws directly binding on the conduct of those non-Indians. As non-Indians may rely on the Nation to comply with its own laws in its dealings with them, so the Nation may rely on non-Indians to comply with their own laws in dealing with the Nation.

16.     To hold the easement void at its inception is particularly apt under the circumstances present here. As discussed in more detail above, the Nation, a rudimentary government unaided by an independent appraisal of the value of its land, was negotiating with a powerful state government that held openly hostile and expansionist ambitions vis-à-vis Indian lands and Indian nations; that had approved and paid for the Nation's lawyer, who lacked relevant experience; and that purported to have the power to subject portions of the Nation's Territories to catastrophic flooding, or to forced removal of the Nation and its

Seneca Nation of Indians v. The State of New York, et al
Civil Action No. 0113-09-1
Advisory Opinion and Order
Page 13 of 18

members. And the Nation was doing so while the federal government was not only failing in its trust obligations to oversee the transaction, but was promoting the policy of ending that trust relationship altogether and bequeathing greater control over the Nation to the State. Under these circumstances, the conveyance is one that was void from the outset.

17.    The easement likewise conveyed no lawful interest cognizable by a federal court, as federal law is clear that an easement or other property interest obtained from an Indian nation or its members in violation of statutory restrictions is void at its inception. *See, e.g., Ewert v. Bluejacket*, 259 U.S. 129, 138 (1922) ("[A]n act done in violation of a statutory prohibition is void and confers no right upon the wrongdoer") (quotation marks omitted); *Oneida County*, 470 U.S. at 245 (Non-Intercourse Act "codified the principle that . . . a conveyance without the sovereign's consent was void *ab initio*"); *Federal Power Comm'n v. Tuscarora Indian Nation*, 362 U.S. 99, 119 (1960) (conveyance of Indian lands invalid without federal consent required by Non-Intercourse Act); *Golden Hill Paugussett Tribe v. Weicker*, 39 F.3d 51, 56 (2d Cir. 1994) (Non-Intercourse Act codified principle that "any conveyance without [federal] consent was invalid"); *U.S. v. Boylan*, 265 F. 165, 174 (2d Cir. 1920) (finding "null and void" conveyance of Indian land without federal approval and restoring Indians to possession); *Oneida Indian Nation of New York v. Oneida County*, 434 F.Supp. 527, 530 (D.C.N.Y. 1977) (good faith in acquiring rights to Indian property "will not render good a title not valid for failure to comply with the Nonintercourse Act"). *See also* COHEN, § 15.09[4] (absent compliance with relevant statute, "the user of a right-of-way over Indian lands obtains no interest in those lands and may be held to be a trespasser. No interest can be acquired in tribal lands by long-continued use, adverse possession, or prescription").

18.    Because the State has never obtained any valid right to enter the portion of the Nation's Territory traversed by the Thruway, the Nation may exercise the same full measure of its powers to control that land as it possesses over other portions of its Territory unaffected by the invalid conveyance. The power to control its own Territories is a fundamental attribute of the Nation's sovereignty and, as a matter of Nation law, this Court reaffirms that it is a very broad power. *See, e.g.,* Seneca Nation Civil Procedure Rules ("CPR") § 1-105(ff) (defining Nation's sovereignty as including "absolute power to govern" its Territories).

Seneca Nation of Indians v. The State of New York, et al
Civil Action No. 0113-09-1
Advisory Opinion and Order
Page 14 of 18

19.    Federal courts likewise recognize the broad sovereign power of Indian nations under federal law to control their territories. *See, e.g., United States v. Lara*, 541 U.S. 193, 204 (2004) (referring to the authority of Indian nations "to control events that occur upon the tribe's own land" and citing *U.S. v. Mazurie*, 419 U.S. 544, 557 (1975) (referring to Indian nations' "sovereignty over . . . *their territory*" (emphasis added by *Lara* Court))).

20.    Under Nation law, the Nation's sovereign powers to control its Territories self-evidently include the power to welcome or to exclude others -- including the State and Thruway motorists -- from entering or occupying those Territories. The Nation's Territories belong to the Nation and its people, and to no one else. *See* Canandaigua Treaty of 1794, Art. 3 ("The land of the Seneca Nation is . . . . to be the property of the Seneca Nation" and the Nation shall not be disturbed "in the free use and enjoyment thereof"). Those Territories are fundamental to the Nation's self-determination and to its sovereign obligations to preserve and protect its Constitution and culture. Without the power to welcome or to exclude others, the Nation's sovereign power to control and protect its own Territories would be rendered meaningless.

21.    Again, the federal courts fully recognize this fundamental aspect of Indian sovereignty under federal law as well. *See Plains Commerce Bank v. Long Family Land and Cattle Co.*, 128 S. Ct. 2709, 2718 (2008) (Indian nations possess sovereign power "to exclude outsiders from entering tribal land"); *Merrion v. Jicarilla Apache Tribe*, 455 U.S. 130, 141 (1982) ("[A] hallmark of Indian sovereignty is the power to exclude non-Indians from Indian lands"); *Duro v. Reina*, 495 U.S. 696, 696-97 (1990) ("The tribes also possess their traditional and undisputed power to exclude persons . . . from tribal lands"), *superseded by statute on other grounds. See also* COHEN, § 4.01[2][e] ("A tribe needs no grant of authority from the federal government to exercise the inherent power of exclusion from tribal territory").

22.    Because the Nation possesses the power to entirely exclude the State and non-member motorists from entering or otherwise occupying that portion of its Territory traversed by the Thruway, it follows that the Nation clearly possesses the lesser included power to place conditions on their entry or presence upon that land. *See* Canandaigua Treaty

Seneca Nation of Indians v. The State of New York, et al.
Civil Action No. 0113-09-I
Advisory Opinion and Order
Page 15 of 18

of 1794, Art. 3; CPR § 1-105(ff). This Court reaffirms that the Nation's sovereign power to control and exclude others from its Territories is a flexible power: the Nation may forbid entry altogether, it may allow entry at will, and it may, in between those extremes, establish reasonable terms upon which its Territories may be entered. To hold otherwise would be to adopt an unrealistically stilted and restricted view of the Nation's sovereign power to control its Territories.

23.    The federal courts again recognize this basic aspect of Indian sovereignty under federal law. In *Merrion*, the United States Supreme Court stated:

> Nonmembers who lawfully enter tribal lands remain subject to the tribe's power to exclude them. This power necessarily includes the lesser power to place conditions on entry, on continued presence. . . . When a tribe grants a non-Indian the right to be on Indian land, the tribe agrees not to exercise its ultimate power to oust the non-Indian as long as the non-Indian complies with the initial conditions of entry.

455 U.S. at 144-45. *See also Plains Commerce*, 128 S. Ct. at 2723 ("The tribe's traditional and undisputed power to exclude persons from tribal land . . . gives it the power to set conditions on entry to that land") (internal quotation marks and citation omitted); *New Mexico v. Mescalero Apache Tribe*, 462 U.S. 324, 333 (1983) ("A tribe's power to exclude nonmembers entirely or to condition their presence on the reservation is . . . well established") ( citing *Merrion*, 455 U.S. 130, and *Montana v. United States*, 450 U.S. 544 (1981)); *Merrion*, 455 U.S. at 913 (Stevens, J., dissenting) (Indian nations possess sovereign "power to exclude nonmembers entirely from territory reserved for the tribe. . . . Since a tribe may exclude nonmembers entirely from tribal territory, the tribe necessarily may impose conditions on a right of entry granted to a nonmember").[3]

24.    The Nation's sovereign power to place conditions on the entry onto its Territories by non-members includes the power to condition entry upon payment of a fee. The Nation charges non-members license fees for permission to go fishing within the Nation's Territories. The Nation may therefore condition entry onto its Territory on the payment by Thruway motorists of a reasonable toll and/or on other reasonable compensation by the State. Federal law is again fully consistent with this conclusion. *See Montana v.*

---

[3] The Court of Appeals of New York likewise recognizes the sovereign powers of Indian nations to exclude nonmembers from Indian land and that "the right to exclude necessarily includes the 'lesser power to place conditions on entry, on continued presence, or on reservation conduct.'" *Spola ex rel. Unkechaug Indian Nation v. Jackson*, 10 N.Y.3d 46, 53 (2008) (quoting *Merrion*, at 144).

Seneca Nation of Indians v. The State of New York, et al
Civil Action No. 0113-09-1
Advisory Opinion and Order
Page 16 of 18

*United States*, 450 U.S. 544, 557 (1981) (power of Indian nation to condition entry of non-Indians onto its lands includes power to "condition their entry by charging a fee"); *Merrion*, 455 U.S. at 147 ("[T]he nonmember's presence and conduct on Indian lands are conditioned by the limitations the tribe may choose to impose"); *see also id.* at 183 n.36 (Stevens, J., dissenting) ("Since the tribal government has the power to exclude, it can extract a fee from nonmembers as a condition precedent to granting permission to remain or to operate within the tribal domain." (citation and quotation marks omitted)).

25.    The fact that Thruway motorists have entered the Nation's Territory in the past without paying a toll does not affect the Nation's sovereign right to impose a toll at any time. The Nation's sovereign power over its Territory is absolute and is not susceptible to erosion by acquiescence or any other means. Federal law is again wholly consistent with this conclusion. *See, e.g., Merrion*, 455 U.S. at 145 (entry onto Indian land under authorization by the Indian nation does not "immunize[] the non-Indian from the tribe's exercise of its lesser-included power to . . . place . . . conditions on the non-Indian's conduct or continued presence on the reservation. A nonmember who enters the jurisdiction of the tribe remains subject to the risk that the tribe will later exercise its sovereign power").

26.    The Nation has already demanded of the State that it collect and remit to the Nation a toll of $1 per vehicle from Thruway motorists crossing the Nation's Territory. *See* Exhibit I (June 11, 2007 Letter to Spitzer and Buono), Exhibit K (January 31, 2008 Letter to Buono) and Exhibit L (May 28, 2008 Letter to Fleischer). The State has refused to comply with that reasonable condition on its presence in the Nation's Territory. *See* Exhibit J (July 3, 2007 Letter to President John and Kevin W. Seneca) and Exhibit M (March 5, 2008 Letter to President John and Kevin W. Seneca). Accordingly, the Nation, as a fundamental prerogative of its sovereignty, has the power to revoke permission to use its Territory for Thruway purposes and to regard the State and non-member motorists as trespassers unlawfully interfering with the Nation's sovereignty and its entitlement to the free use and enjoyment of its land. The Nation may lawfully oust the State and Thruway motorists from that portion of the Thruway that runs through the Cattaraugus Territory, or require compliance with its conditions on use of the Thruway by, for example, erecting and operating toll collection barriers on its own Territory. Federal law is again consistent with

Seneca Nation of Indians v. The State of New York, et al
Civil Action No. 0113-09-1
Advisory Opinion and Order
Page 17 of 18

such principles. *See, e.g., Merrion,* 455 U.S. at 144 ("When a tribe grants a non-Indian the right to be on Indian land, the tribe agrees not to exercise its ultimate power to oust the non-Indian *as long as the non-Indian complies with the initial conditions of entry."* (emphasis added)). *See also Brendale v. Confederated Tribes and Bands of Yakima Indian Nation,* 492 U.S. 408, 433 (1989) (Stevens, J., concurring) (referring to Indian nations' "virtually absolute power to exclude" nonmembers from Indian territory); *U.S. v. Becerra-Garcia,* 397 F.3d 1167, 1175 (9th Cir. 2005) ("Intrinsic in tribal sovereignty is the power to exclude trespassers from the reservation"); *Quechan Tribe of Indians v. Rowe,* 531 F.2d 408, 411 (9th Cir. 1976) (Indian nations' inherent power to exclude nonmembers includes the "rights to determine who may enter the reservation; to define the conditions upon which they may enter . . . [and] to expel those who enter the reservation without proper authority"); *Superior Oil Co. v. U.S.,* 353 F.2d 34 (9th Cir. 1965) (upholding authority of federal and tribal officers to establish roadblock to prevent non-Indian entry onto reservation in absence of easement obtained in compliance with federal regulations).

27.     The Nation's sovereign power to exclude others from, or condition entry to, its Territory is vested in the executive office of the President, acting to enforce valid resolutions or other legislative acts of the Nation's Council. *See* SNI Const. § III ("The president shall from time to time . . . recommend [for the Council's] consideration such measures as he shall judge necessary and expedient, not inconsistent with the true spirit and intent of the laws of the Seneca Nation. . . . It shall be his duty to see that the laws applicable to the Nation are faithfully executed.") Accordingly, the President is empowered to enforce the April 14, May 12 and June 9, 2007 resolutions of the Nation's Council. He may negotiate with the State of New York regarding the collection of tolls or other compensation and, if necessary, may take action directly to collect tolls on behalf of the Nation or take other actions consistent with the Nation's laws and its sovereignty, including the ouster of the State and Thruway motorists from that portion of the Thruway that traverses the Cattaraugus Territory.

Seneca Nation of Indians v. The State of New York, et al
Civil Action No. 0113-09-1
Advisory Opinion and Order
Page 18 of 18

IT IS SO HELD AND ORDERED,

_4/28/09_
DATE

HONORABLE JOYCE GATES
SENIOR PEACEMAKER JUDGE
THE SENECA NATION OF INDIANS
CATTARAUGUS TERRITORY

_N-28-09_
DATE

HONORABLE DARLENE SENECA
PEACEMAKER JUDGE
THE SENECA NATION OF INDIANS
CATTARAUGUS TERRITORY

_4/29/09_
DATE

HONORABLE SHELLEY R. HUFF
PEACEMAKER JUDGE
THE SENECA NATION OF INDIANS
CATTARAUGUS TERRITORY

FILED AND ENTERED THIS _29th_ DAY OF APRIL, 2009.

SANDY M. GONZALES, COURT CLERK
PEACEMAKERS' COURT
THE SENECA NATION OF INDIANS
CATTARAUGUS TERRITORY