# EXHIBIT S

# Seneca Nation of Indians



**President** - Robert Odawi Porter
**Clerk** - Diane Kennedy Murth

**90 OHI:YO' WAY**
**ALLEGANY TERRITORY**
**SENECA NATION**
**SALAMANCA 14779**

**Tel. (716) 945-1790**
**FAX (716) 945-1565**

**Treasurer** - Bradley G. John

**12837 ROUTE 438**
**CATTARAUGUS TERRITORY**
**SENECA NATION**
**IRVING 14081**

**Tel. (716) 532-4900**
**FAX (716) 532-6272**

## PRESIDENT'S OFFICE

July 29, 2011

Honorable Barack Obama
President of the United States
1600 Pennsylvania Avenue, NW
Washington, DC 20500

Dear President Obama:

Greetings from the Seneca Nation of Indians!

The State of New York has unlawfully occupied approximately 300 acres of the Cattaraugus Territory and used this land for its operation of the New York State Thruway. New York State has done so without the approvals required under federal and Seneca Nation law has been ongoing since the mid-1950s. In doing so, the Seneca people have been denied the "free use and enjoyment" of our lands, guaranteed to us by your predecessors in the 1794 Treaty of Canandaigua.

Enclosed with this letter you will find the *Petition from the Seneca Nation of Indians Regarding the Illegal Occupation of Seneca Lands by the State of New York for the Purpose of Constructing and Maintaining the New York Thruway.* The Seneca Nation seeks your immediate assistance, consistent with the commitments set forth in the 1794 Treaty of Canandaigua, to facilitate a final resolution to this longstanding encroachment.

We stand ready to immediately begin discussions with you, on behalf of our Treaty partner the United States, to work towards a permanent and peaceful resolution.

Sincerely,

Robert Odawi Porter
President

Enclosure



# SENECA NATION OF INDIANS

# PETITION TO

# U.S. PRESIDENT BARACK OBAMA

# REGARDING

# THE ILLEGAL OCCUPATION OF
# SENECA LANDS BY THE STATE OF NEW YORK FOR THE
# PURPOSE OF CONSTRUCTING AND MAINTAINING THE
# NEW YORK THRUWAY

## JULY 29, 2011

> *Here, then is the security for the remainder of your lands. No State, nor person, can purchase your lands, unless at some public treaty, held under the authority of the United States. The General Government will never consent to your being defrauded, but it will protect you in all your just rights.*

> President George Washington to Cornplanter,
> Half-Town, and Great-Tree, Chiefs and Councillors
> of the Seneca Nation
> December 29, 1790[1]

> *Indigenous peoples have the right to the recognition, observance and enforcement of treaties, agreements and other constructive arrangements concluded with States or their successors and to have States honour and respect such treaties agreements and other constructive arrangements.*

> Article 37(1) of the *United Nations Declaration on the Rights of Indigenous Peoples*[2]

> *I believe that treaty commitments are paramount law.*

> Senator Barack Obama to the National Congress of
> American Indians, the 65[th] Annual Convention
> October 21, 2008

**Mr. President,**

Great Nations, like great men, should honor their word.[3] For the Seneca Nation, that word was given through the 1794 Treaty of Canandaigua, a treaty between sovereign nations.[4] As Chief Justice John Marshall recognized,

---

[1] *American State Papers, 1 Indian Affairs 142-143.*

[2] *United Nations Declaration on the Rights of Indigenous Peoples*, GA Res. 61/295, UN GAOR, 61st Sess., UN Doc. A/RES/61/295 (2007).

[3] Justice Black's dissenting opinion in *Federal Power Commission v. Tuscarora Indian Nation*, 362 U.S. 99, 142 (1960), cited by Deputy Attorney General David Ogden at the Tribal Nations Listening Session, October 28, 2009.

[4] 7 Stat. 44.

1

> *The constitution, by declaring treaties already made, as well as those to be made, to be the supreme law of the land, has adopted and sanctioned the previous treaties with the Indian nations, and consequently admits their rank among those powers who are capable of making treaties.* The words 'treaty' and 'nation' are words of our own language, selected in our diplomatic and legislative proceedings, by ourselves, having each a definite and well understood meaning. *We have applied them to Indians, as we have applied them to the other nations of the earth. They are applied to all in the same sense.*[5]

Recalling the words of Chief Justice Marshall, you have affirmed that treaty commitments are paramount law.[6]   The obligation of states to honor their word towards indigenous peoples has been recently reaffirmed by the adoption of the *United Nations Declaration on the Rights of Indigenous Peoples.   Supra* at Article 37.

The Seneca Nation calls upon President Barack Obama, on behalf of our Treaty partner the United States, to act on the commitment made by President George Washington over two hundred years ago to "protect" the Nation in all of its "just rights," *id.,* and to honor the commitment made in the 1794 Treaty of Canandaigua to protect the Seneca Nation in the free use and enjoyment of its lands.   The Seneca Nation presents this Petition to the President of the United States, in accordance with the complaint mechanism provided for in Article VII of the Treaty of Canandaigua,[7] seeking the United States' involvement and assistance in resolving the nearly sixty year unauthorized occupation of three hundred acres of the Nation's Cattaraugus Territory by the State of New York for purposes of constructing and maintaining the New York Thruway.[8]

---

[5]   *Worcester v. Georgia,* 31 U.S. (6 Pet.) 515, 559-60 (1832) (emphasis added).

[6]   Senator Barack Obama to the National Congress of American Indians, 65th Annual Convention, Oct. 21, 2008.

[7]   Article VII of the 1794 Treaty of Canandaigua contemplates that, upon misconduct that could interrupt "the firm peace and friendship now established  … complaint shall be made … [b]y the Six Nations or any of them, to the President of the United States … and such prudent measures shall then be pursued as necessary to preserve our peace and friendship unbroken …."'

[8]   The New York Thruway System was proposed in the 1940s and constructed in the 1950s.   It is a limited access toll system, much of which is now integrated into the interstate highway system.

2

Such action would also honor the recent commitment made by the United States in adopting and supporting the *United Nations Declaration on the Rights of Indigenous Peoples* which among other things requires the United States to "provide effective mechanisms for prevention of, and redress for ... any action which has the aim of dispossessing [indigenous people] of their lands, territories or resources," and recognizes the right to redress for "lands, territories and resources which [indigenous people] have occupied or used, and which have been confiscated, taken, occupied, used or damaged without their free, prior and informed consent." *Supra*, Article 8 and Article 28.

The history of the Seneca Nation is marked by great achievements in both warfare and diplomacy. The Nation's aboriginal territory encompassing most of western New York was recognized and respected by foreign nations, including other tribal and European powers. As part of the Iroquois Confederacy, the Seneca Nation controlled and protected their territory as the Keeper of the Western Door.

The 1794 Treaty of Canandaigua, which finally brought peace between the United States and the Seneca Nation at the end of the Revolutionary War, promised permanent peace and clear confirmation of Seneca title to its remaining lands. Article I establishes peace and friendship between the Six Nations and the United States:

> Article I. Peace and friendship are hereby firmly established, and shall be perpetual, between the United States and the Six Nations.

Article III confirms Seneca title and guarantees the Nation's free use and enjoyment of its remaining lands:

> Article III. The land of the Seneca nation is bounded as [described herein]... Now, the United States acknowledge all the land within the aforementioned boundaries, to be the property of the Seneca nation; *and the United States will never claim the same, nor disturb that Seneca nation, nor any of the Six Nations, or their Indian friends residing thereon*

3

*and united with them, in the free use and enjoyment thereof...* (emphasis added).

Despite the Treaty promises, the end of the Revolutionary War brought neither peace nor prosperity to the Seneca Nation, but rather devastating destruction, loss of territory and suffering to the Seneca People. The 1794 Treaty of Canandaigua was too often violated and the Seneca Nation continued to suffer the loss of its aboriginal lands in later treaties in 1797, 1838 and 1842, largely through the efforts of the State of New York and unscrupulous individuals and land speculators.[9] Today, the Nation's territory consists of the Cattaraugus, Allegany, Oil Spring, Niagara Falls and Buffalo Creek Territories within the State of New York. Having lost so much, the Seneca Nation's remaining territory has taken on elevated importance as the homeland of the Seneca People and the most critical aspect of the sovereignty of the Seneca Nation.

It is for this reason that the Seneca Nation presents this Petition to the President of the United States seeking the United States' involvement and assistance[10] in resolving the nearly sixty year unauthorized occupation of three hundred acres of the Nation's Cattaraugus Territory by the State of New York for purposes of constructing and maintaining the New York Thruway.[11] Because the United States did not consent to an October 5, 1954 conveyance of an easement to the State for the Thruway, made under duress by the Seneca Nation, the easement obtained by the State violated the federal Non-Intercourse Act, 25 U.S.C. § 177, and was void

---

[9] *See generally* Laurence M. Hauptman, CONSPIRACY OF INTERESTS: IROQUOIS DISPOSSESSION AND THE RISE OF NEW YORK STATE (1999).

[10] Article VII of the 1794 Treaty of Canandaigua contemplates that, upon misconduct that could interrupt "the firm peace and friendship now established ... complaint shall be made ... [b]y the Six Nations or any of them, to the President of the United States ... and such prudent measures shall then be pursued as necessary to preserve our peace and friendship unbroken ...."

[11] The New York Thruway System, now known as Interstate 90, was proposed in the 1940s and constructed in the 1950s. It is a limited access toll system, much of which is now integrated into the interstate highway system.

4

from its inception. The State's continuing occupation of Seneca land for purposes of the Thruway for nearly sixty years is a continuing violation of federal law that must be resolved.

The United States' involvement is necessary because - despite the clear violation of the Non-Intercourse Act by the State of New York - the Nation's claim against the State in the absence of the United States' direct involvement and participation has been determined by the Federal Courts to be barred by the States' Eleventh Amendment immunity. *Seneca Nation v. New York*, 383 F.3d 45 (2004). The Nation is therefore left with a clear right but no remedy that the Nation can effectuate itself. *Id.* The United States' involvement is urgently needed to protect the Seneca Nation's land against this continuing violation of federal law by the State of New York, and the continuing unauthorized occupation of its lands by the State.

## THE PRESIDENT'S ASSISTANCE IS ESSENTIAL TO FINALLY BRING ABOUT A RESOLUTION TO NEW YORK'S LONGSTANDING ILLEGAL USE OF SENECA NATION LANDS

The 1794 Treaty of Canandaigua directly acknowledged and confirmed Seneca title to and the "free use and enjoyment" of its lands.[12] The commitment to protect the Nation in its free use and enjoyment of its lands followed directly from the most fundamental legal rule governing Indians and Indian property rights - that federal authority is paramount in relations with Indians.[13] This defining principle was formally incorporated in 1790 into one of the first laws of the United States, the Act of July 22, 1790, 1 Stat. 137, and is carried forward currently in its amended form in 25 U.S.C. § 177 (the "Non-Intercourse Act"). Section 177 provides:

> No purchase, grant, lease, or other conveyance of lands, or of any title or claim thereto, from any Indian nation or tribe of Indians, shall be of any

---

[12] *Supra*, Article II and Article III.

[13] *See Oneida County, New York v. Oneida Indian Nation of New York*, 470 U.S. 226, 231-32 (1985). *See also* COHEN'S HANDBOOK OF FEDERAL INDIAN LAW, §§ 15.06, 15.08 - 15.09 (2005 ed.).

5

validity in law or equity, *unless the same be made by treaty or convention entered into pursuant to the Constitution.* (emphasis added)

It is this law that President George Washington personally committed would serve as "the security" for Seneca lands, and committed to protect the Nation in "all of its just rights."[14] It is a promise that respects the Seneca Nation's sovereignty over its lands and acknowledges the need to obtain the Seneca Nation's free and informed consent for any alienation or grant of any interests in Seneca lands. The Seneca Nation's history shows the critical need for the United States to assert its paramount role and responsibility to step in to prevent the State of New York from appropriating Seneca territory and sovereignty.

### *The Seneca Nation Consented to the Thruway Easement under Duress*

The Seneca Nation's "consent" to the 1954 Thruway easement was not free, was not prior and was not informed. The negotiations for the easement occurred under circumstances of profoundly unequal bargaining power, with the State placing enormous pressure on the Seneca Nation to acquiesce, or face removal from its entire Allegany Territory. Advisory Opinion and Order issued by the Seneca Nation Peacemakers' Court, *Barry Snyder, Sr., President, Seneca Nation of Indians v. State of New* York, Civil Action No. 113-09-1 (April 29, 2009). A copy of the Advisory Opinion is attached hereto as Attachment A. The Advisory Opinion establishes that the grant of the Thruway easement was the outcome of a serious inequity in the bargaining power of the parties. *Id.* at ¶¶ 10-13.

---

[14] President George Washington to Complanter, Half-Town and Great-Tree, Chiefs and Councillors of the Seneca Nation, cited in, *American State Papers, 1 Indian Affairs 142-143.*

The easement grant occurred during the height of the federal termination era,[15] and during a period when the Congress was moving forward to transfer jurisdiction from the United States to the State of New York. *See* 25 U.S.C. §§ 232-233. As a result, at the time the State was actively seeking an easement for the Thruway, the State's role in the Nation's affairs was increasing and the federal role was waning.

By the time the easement negotiations between the Nation and the State began, major portions of the Thruway had already been constructed and completion of the Thruway through the Cattaraugus Territory was a foregone conclusion. Advisory Opinion, *supra* at ¶ 11. While the State of New York notified the Department of the Interior of its intent to obtain an easement, and the Department outlined the necessary requirements to obtain federal consent and approval for such, the State never complied with the requirements, and there was no follow-up by the Department and no federal involvement in the negotiations. *Id.* at ¶¶ 3-5.

In the negotiations, the Seneca Nation initially demanded compensation based on a percentage of the revenues generated from the Thruway – an amount calculated by the State as being at least $500,000. The easement was ultimately concluded with a one-time payment to the Nation of $75,000 plus $500 for meeting expenses, an amount arrived at after "several hours of very frank talk," without the benefit of an independent appraisal, and which was "much lower than [the State] expected to acquire these lands for[.]" *Id.* at ¶ 11.

It is clear the Seneca Nation only provided its consent under duress and due to the coercion of New York State. Today, the *United Nations Declaration on the Rights of Indigenous*

---

[15]   Termination, which was the official policy of the Federal Government from the early 1950s through the early 1960s, was intended to terminate the federal trust relationship with Indian tribes, breakup reservations by removing the restrictions on alienation of Indian lands, including the protections of the Non-Intercourse Act, and subjecting Indians to state criminal and civil jurisdiction and control. *See* COHEN'S HANDBOOK OF FEDERAL INDIAN LAW, § 1.06 (2005 ed.).

7

*Peoples* recognizes that States shall consult with indigenous peoples to obtain their free and informed consent "prior to the approval of any project affecting their lands or territories" and must obtain indigenous peoples' free, prior and informed consent before adopting legislative or administrative measures that may affect them. *Supra*, Articles 32 and 19. Further, indigenous peoples have the right to redress for their lands, territories and resources which have been taken, occupied or used without their free, prior and informed consent. *Id.*, Art. 28. Without providing such consent, the Seneca Nation has been burdened by the Thruway and prevented from utilizing the three hundred acres occupied by the Thruway for the benefit of the Nation and its people for nearly sixty years.

### *The Thruway Easement is Void for Failure to Obtain Federal Consent*

The Thruway easement was never consented to or approved by the United States as required by the Non-Intercourse Act and applicable law and regulations. The easement is therefore void for lack of federal approval and constitutes an unauthorized use of Seneca lands. *See Oneida Indian Nation v. Oneida County*, 470 U.S. at 245. *See also* COHEN'S HANDBOOK OF FEDERAL INDIAN LAW, § 15.09[4] (2005 ed.) (absent compliance with relevant statute, "the user of a right-of-way over Indian lands obtains no interest in those lands and may be held to be a trespasser. No interest can be acquired in tribal lands by long-continued use, adverse possession, or prescription."). For the Seneca Nation, the 1794 Treaty of Canandaigua, the Constitution and the Non-Intercourse Act constitute a shield against the action of the State of New York in its taking under duress of the Thruway easement.

In two enactments, one in 1901 and another in 1948, the Secretary of the Interior was empowered and authorized to grant rights-of-way across Indian lands for highway purposes and

8

for all other purposes.[16]   Such easements and rights-of-way are granted by the Secretary of the Interior, and are subject to the further requirements and conditions established by the Secretary in the form of regulations.  The regulations governing the subject 1954 easement are set out in 25 CFR Part 256 (1949), and carry forth the general requirement of Secretarial consent and approval.[17]   These statutes and regulations comprehensively govern all aspects of easements and rights-of-way on Indian lands and, together with the 1794 Treaty of Canandaigua and the Non-Intercourse Act, provide for the obligation and authority of the United States applicable to the 1954 Thruway easement.  *See United States v. Mitchell*, 463 U.S. 206 (1983); *United States v. White Mountain Apache Tribe*, 537 U.S. 465 (2003).

Two courts have concluded that – despite the clear mandates of the applicable statutes and regulations – the State of New York **did not obtain the consent** of the Secretary of the Interior for the 1954 Thruway easement.  First, in *Seneca Nation of Indians v. State of New York*, No. 93-CV-688A(H) (W.D.N.Y.), the Report and Recommendation of the federal Magistrate concluded that the Secretary of the Interior did not approve the Thruway easement.  The Magistrate determined that the State of New York never complied with the governing regulations, making it impossible for the Secretary of the Interior to approve the easement because he lacked the basic information required by the 1949 regulations to do so.  Magistrate's Report and Recommendation at 10-11 (July 12, 1999).  Notwithstanding the absence of the necessary federal consent to the Thruway easement, and the resulting void transaction, however,

---

[16]   Act of Mar. 3, 1901, 31 Stat. 1084, 25 U.S.C. § 311 (highway purposes); Act of Feb. 5, 1948, 62 Stat. 17 25 U.S.C. § 323 (rights-of-way for all purposes).

[17]   The 1949 regulations provide that "no company or individual is authorized to survey, locate, or do any construction work upon Indian lands for right-of-way purposes until authority therefore has been obtained from the Secretary of the Interior." 25 C.F.R. § 256.1.  Among other things, the regulations require an application to survey, an application for right-of way, maps of definite location and completion of an appraisal by the local agency superintendent for the Bureau of Indian Affairs, subject to the approval of the Secretary. *See* 25 C.F.R. §§ 256.2, 256.5 and 256.6, and 256.76.  The regulations governing rights-of-way across Indian lands have been substantially revised and are currently at 25 C.F.R. Part 169.

the Nation's Thruway claim was dismissed on procedural grounds.[18]    Magistrate's Report and

Recommendation at 15-16; *see also Seneca Nation of Indians v. State of New York*, 383 F.3d 45

(2d Cir. 2004).    Copies of the Magistrate's Report and Recommendation and the Second

Circuit's decision are attached hereto as Attachment B and Attachment C.

Second, in the Advisory Opinion and Order issued by the Seneca Nation Peacemakers'

Court, *Barry Snyder, Sr., President, Seneca Nation of Indians v. State of New York*, *supra*, the

Seneca Court concluded that the Secretary of the Interior did not approve the Thruway easement,

and therefore the easement obtained by the State of New York was "in direct violation of the

Non-Intercourse Act," as well as Seneca law.    Advisory Opinion, *id*. at ¶ ¶ 7-8.


**The Seneca Nation Has Been Unable to Remedy the Unauthorized Use of Tribal Lands by the State of New York Without the Assistance of the United States**

The Nation rescinded its 1954 resolution approving the Thruway easement on May 12,

2007.    The Nation has otherwise also taken steps to inform the State of New York that it is in

violation of federal law in maintaining the Thruway on Nation lands.    While the Nation's

sovereign authority to control its Territory and to exclude outsiders from entering tribal lands is

well established in the law, s*ee Plains Commerce Bank v. Long Family Land and Cattle Co.*, 128

S.Ct. 2709, 2718 (2008); *Merrion v. Jicarilla Apache Tribe*, 455 U.S. 130, 131 (1982); *Duro v.*

---

[18]    The Second Circuit found, at ¶¶ 4-5, that the Seneca Nation's action against the Thruway Authority could not proceed without the State, as the State was a necessary party under Rule 19 of the Federal Rule of Civil Procedure:

> [T]he Magistrate Judge was correct in concluding that the State of New York, rather than the Thruway Authority, owned the Cattaraugus easement, and that, as a result, the State had an "interest relating to the subject of the action and [was] so situated that the disposition of the action in [its] absence may... as a practical matter [have] impair[ed] or impede[d] [its] ability to protect that interest." Fed. R. Civ.P. 19(a)(2)(i).

> Having determined that the State was a necessary party under Rule 19(a), the Magistrate proceeded to examine whether the State was indispensable under Rule 19(b), concluding correctly that it was.

10

*Reina*, 495 U.S. 696, 697 (1990), yet the Seneca Nation is unable to remedy the unauthorized use of its land by New York due to the State's Eleventh Amendment immunity, as determined by the Federal Court.

Notwithstanding that since 1961, the United States has explicitly authorized third parties to obtain valid and enforceable rights-of-way and easements across Seneca lands directly from the Seneca Nation without the approval of the Secretary of the Interior, *see* Act of September 14, 1961, 75 Stat. 499, the Nation has been unable to bring the State to the table to reasonably discuss the status of the Thruway easement. Now, given the State's alleged Eleventh Amendment immunity, other than self-help remedies, the Nation has no options without the involvement of the United States. The Seneca Nation is trapped in a judicial imbroglio, one which prioritizes the sovereignty of the State of New York while Constitutional and legislative requirements are ignored, with the result that the Seneca Nation is prevented from obtaining a just solution to violations to its sovereignty and Treaty rights. Only the intervention of the President will slice through this judicial Gordian Knot.

The Nation therefore seeks the assistance of the United States in finally resolving this longstanding encroachment on Seneca Nation lands and infringement on the Nation's sovereignty over its Territory. Indeed, only the United States – which clearly is not constrained by the State's alleged Eleventh Amendment immunity – can bring about a resolution to the illegal use of Nation lands by the State of New York.

The direct violation of the Non-Intercourse Act by the State of New York and its unauthorized use of Nation lands will continue unabated unless the United States steps forward to assist the Nation in remedying this longstanding wrong. The Seneca Nation therefore petitions the President, on behalf of the United States as our treaty partner, to give the highest

11

12

priority to the United States' trust and other obligations to the Seneca Nation under controlling treaties and federal laws, as well as the *United Nations Declaration on the Rights of Indigenous People*, to bring about a reasonable resolution to the nearly sixty-year illegally imposed use of Nation lands by the State of New York.

Article VII of the 1794 Treaty of Canandaigua contemplates that upon receipt of such a complaint as set forth in this petition, "prudent measures shall then be pursued as necessary to preserve our peace and friendship unbroken".

The Seneca Nation stands ready to immediately begin discussions with the President, as Treaty partners, to finally obtain the long sought vindication of the Seneca Nation's claim and to preserve our peace and friendship unbroken.

Robert Odawi Porter, President
Seneca Nation of Indians

Dated this 29th day of July, 2011
Allegany Territory
Seneca Nation