UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

---

SENECA NATION, a federally recognized Indian tribe,

                    Plaintiff,

  vs.

KATHLEEN C. HOCHUL, in her official capacity as Governor of New York; LETITIA JAMES, in her official capacity as New York State Attorney General; MARIE T. DOMINGUEZ, in her official capacity as Commissioner of the New York State Department of Transportation; THOMAS P. DINAPOLI, in his official capacity as Comptroller of the State of New York; and THE NEW YORK STATE THRUWAY AUTHORITY.

                    Defendants.

Case No. 18-cv-00429-LJV-MJR

---

## REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF DEFENDANTS' JOINT MOTION FOR SUMMARY JUDGMENT

| | |
|---|---|
| **NIXON PEABODY LLP**<br>Erik A. Goergen<br>40 Fountain Plaza, Suite 500<br>Buffalo, New York 14202<br>Telephone: (716) 853-8118<br><br>*Attorneys for Defendant New York State Thruway Authority* | **LETITIA JAMES**<br>**Attorney General of the State of New York**<br>Daniel R. Maguire<br>Stephanie Joy Calhoun<br>Main Place Tower, Suite 300A<br>350 Main Street<br>Buffalo, New York 14202<br>Telephone: (716) 853-8400<br><br>*Attorneys for Defendants Governor of the State of New York, Attorney General of the State of New York, the Commissioner of the New York State Department of Transportation, and the Comptroller of the State of New York* |

**TABLE OF CONTENTS**

Page

ARGUMENT .............................................................................................................................. 1

POINT I      THE NATION'S ATTEMPT TO CIRCUMVENT SHERRILL AND ITS PROGENY FAIL ........................................................................................................ 1

       A.    A "Centuries-Old Violation" Is Not Required For Sherrill Laches To Apply ....... 1

       B.    The Nation's Attempt To Minimize The Significant Disruption Stemming From Its Long-Delayed Claims Should Be Rejected ............................................... 1

            1.    Jurisdictional And Sovereignty Changes Are Not Required For Sherrill To Apply ........................................................................................ 1

            2.    The Nation Ignores The True Nature Of The Property Rights Granted By The 1954 Easement .............................................................. 5

POINT II     FEDERAL APPROVAL OF THE 1954 EASEMENT WAS NOT REQUIRED ..... 7

       A.    1875 Seneca Leasing Act ............................................................................................ 7

       B.    Seneca Leasing Act of 1950 ........................................................................................ 8

POINT III    THE NATION RATIFIED THE 1954 EASEMENT BY ITS POST-1961 CONDUCT .................................................................................................................. 10

CONCLUSION ......................................................................................................................... 10

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Amoco Prod. Co. v. Vill. Of Gambell*,
    480 U.S. 531 (1987) ............................................................................................. 7

*United States v. Cattaraugus County*,
    71 F. Supp. 413 (W.D.N.Y. 1947) ........................................................................ 7

*Cayuga Indian Nation of New York v. Pataki*,
    413 F.3d 266 (2d Cir. 2005) ....................................................................... 1, 2, 3, 4

*Crandon v. United States*,
    494 U.S. 152 (1990) ............................................................................................. 8

*DeCoteau v. Dist. Cty. Court*,
    420 U.S. 425 (1975) ............................................................................................. 8

*Harris v. Elliot*,
    35 U.S. 25 (1836) ................................................................................................. 7

*McGirt v. Oklahoma*,
    591 U.S. 894 (2020) .......................................................................................... 6, 7

*Oneida Indian Nation v. County of Oneida*,
    617 F.3d 114 (2d Cir. 2010) ....................................................................... 1, 2, 3, 4

*Potomac Steamboat Co. v. Upper Potomac Steamboat Co.*,
    109 U.S. 672 (1884) ............................................................................................. 7

*Statement, Inc. v. Pilgrim's Landing, Inc.*,
    49 A.D.2d 28 (4th Dep't 1975) .......................................................................... 10

**Other Authorities**

Black's Law Dictionary, 1st Ed. (1891) .................................................................... 7

*The Law of Easements & Licenses in Land* § 1:20 ................................................... 9

74 N.Y. Jur. 2d Landlord & Tenant § 8 ..................................................................... 9

## ARGUMENT

## POINT I

## THE NATION'S ATTEMPT TO CIRCUMVENT SHERRILL AND ITS PROGENY FAIL

### A.  A "Centuries-Old Violation" Is Not Required For *Sherrill* Laches To Apply

The Supreme Court's analysis of equitable considerations in *Sherrill* and the Second Circuit's application of *Sherrill* laches in *Cayuga Indian Nation of New York v. Pataki*, 413 F.3d 266 (2d Cir. 2005) and *Oneida Indian Nation v. County of Oneida*, 617 F.3d 114 (2d Cir. 2010) demonstrate that disruptiveness of the Nation's claims and requested remedy controls, not the passage of a minimum number of years.  *See* Def. Mem. 16-19; Def. Opp. Mem. 2-4.[1]  Thus, the Nation is incorrect that its six decade-plus delay in filing this lawsuit is insufficiently long for *Sherrill* equitable defenses to apply.  *See* Pl. Opp. Mem. 4-6.

### B.  The Nation's Attempt To Minimize The Significant Disruption Stemming From Its Long-Delayed Claims Should Be Rejected

  1.  *Jurisdictional And Sovereignty Changes Are Not Required For Sherrill To Apply*

According to the Nation, "[u]nlike the transfer of sovereign control sought in *Sherrill*," the remedy here "will not cause any jurisdictional disruption and is not based on any change in possessory interests in land." Pl. Opp. Mem. 6.  Even if true (which it is not), *Sherrill* laches is not limited to cases where an Indian tribe seeks "the transfer of sovereign control." *Id.*  The "broadness of the Supreme Court's statements" in *Sherrill* demonstrate that its "holding is not narrowly limited to claims identical to that brought by the Oneidas, seeking a revival of sovereignty, but rather, that these equitable defenses apply to 'disruptive' Indian land claims

---

[1] Citations will be abbreviated as follows: (1) Memorandum of Law in Support of Defendants' Joint Motion for Summary Judgment ("Def. Mem.") (ECF No. 114-2); (2) Joint Memorandum of Law in Opposition to Plaintiff's Motion for Summary Judgment ("Def. Opp. Mem.") (ECF No. 120); and (3) Plaintiff's Response to Defendants' Joint Motion for Summary Judgment ("Pl. Opp. Mem.") (ECF No. 121).  The abbreviations previously used for the parties carry over to this reply.

1

more generally." *Cayuga*, 413 F.3d at 274.  The Nation's core argument on the disruptiveness of its claims is thus contrary to the Second Circuit's decision in *Cayuga* (and *Oneida*) barring claims for money damages despite such claims having no impact on sovereignty and jurisdiction.

To briefly recap, the Northern District in *Cayuga* concluded that the Cayugas' "preferred remedy" of ejectment was not a proper remedy, but nevertheless allowed money damages claims for the alleged wrongful dispossession of land.  *Id.* at 271, 274-75.  "The District Court thus effectively 'monetized' the ejectment remedy in concluding that 'monetary damages will produce results which are as satisfactory to the Cayugas as those which they could properly derive from ejectment.'"  *Id.* at 275.  After ruling in the Cayugas' favor on its Nonintercourse Act claims, the District Court awarded nearly $37 million for "the current fair market value of the land as well as fair rental value damages" and $211 million in prejudgment interest.  *Id.* at 268.  The Second Circuit reversed the judgment against the State and held that *Sherrill's* equitable principles barred *all* remedies, including money damages, flowing from the Cayugas' claims because they were inherently disruptive.  *Id.* at 275, 277.  "'[D]isruptive,' forward-looking claims, a category exemplified by possessory land claims, are subject to equitable defenses, including laches."  *Id.* at 277.  The Cayugas' possessory and nonpossessory land claims were therefore barred by *Sherrill* laches.  *Id.* at 277.  "The fact that, nineteen years into the case, at the damages stage, the District Court substituted a monetary remedy for plaintiffs' preferred remedy of ejectment cannot salvage the claim, which was subject to dismissal *ab initio*."  *Id.* at 277-78.  Similarly, the Nation's substitution of a "monetary remedy" – a compelled negotiation for a new easement with a $21 million annual payment – for its "preferred remedy of ejectment cannot salvage the claim." *Id.*[2]  Like in *Cayuga*, the Nation's claims are "subject to dismissal *ab initio*."  *Id.*

---

[2] While the Nation now disclaims ejectment, it sought that remedy in *Seneca I* in addition to monetary damages for the "fair rental value" of the disputed land.  Maguire Decl. Ex. A (ECF No. 114-10) ¶¶ 3, 4(B).

2

The same result is mandated by *Oneida*. There, the Second Circuit agreed with New York State's argument that the Oneidas' nonpossessory claims seeking money damages for Nonintercourse Act violations were "barred by the equitable considerations described in *Sherrill* and *Cayuga*." *Oneida*, 617 F.3d at 135. The Court reaffirmed that "[t]he equitable defense recognized in *Sherrill* and *Cayuga* is not limited to 'possessory' claims" but "[r]ather, the defense is properly applied to bar any ancient land claims that are disruptive of significant and justified societal expectations that have arisen as a result of a lapse of time during which the plaintiffs did not seek relief." *Id.* at 135. Thus, the Nation's argument that *Sherrill* laches is merely a "unique limitation placed on a tribe's broad reassertion of sovereignty over lands it lost centuries before" which only applies in "rare circumstances" (Pl. Opp. Mem. 9, 11) cannot be squared with controlling Second Circuit precedent.

Plaintiffs' attempt to alter their requested remedy to escape the holdings of *Sherrill*, *Cayuga*, and *Oneida* cannot succeed. "[A]droit manipulation of the remedy sought will not rescue a claim where its *essential premise* threatens to disrupt justified societal expectations." *Oneida*, 617 F.3d at 138 (emphasis added). The "essential premise" of the Nation's claims is that the permanent easement it conveyed to New York State over 70 years ago – enabling the State to construct and operate the Thruway from Buffalo, New York to Erie, Pennsylvania – is void *ab initio* and that a new easement must be negotiated with new terms and conditions. Regardless of whether any "jurisdictional disruption" would result or a "change in possessory interests" occurs (Pl. Opp. Mem. 6), the "essential premise" of the Nation's claims "threatens to disrupt justified societal expectations" (*Oneida*, 617 F.3d at 138) concerning (1) the validity of the 1954 Easement; (2) the continuation of the current Erie Section route without the possibility of

3

rerouting; and (3) appropriate toll rates to charge Thruway users (which would significantly increase if the Thruway Authority is subjected to millions of dollars in new operating costs).

Indeed, compelling the State Defendants to negotiate a new easement will impact the Thruway Authority's finances and budget significantly and indefinitely and will do so *regardless* of current Thruway usage which obviously impacts toll revenue. If New York State is deemed responsible for payments to the Nation instead of the Thruway Authority, the Governor and State Legislature would be obligated every year to allocate such funds *regardless* of the State's tax revenue, fiscal condition, and budgetary priorities. In other words, the Thruway Authority and/or State would be required to incorporate such payments into their annual budget(s) every year in perpetuity. Such an outcome is even more disruptive than a one-time payment of a money damages judgment held to be disruptive in *Cayuga* and *Oneida*. This is especially true given the Second Circuit's reversal of the Northern District's $248 million judgment in *Cayuga* which included compensation for "the current fair market value of the land." 413 F.3d at 268, 273. Similarly, the Nation here seeks compensation for the purported *current* value of the disputed land covered by the 1954 Easement – extrapolated indefinitely into future years – as determined by the Nation's novel "ongoing benefit analysis." Pl. SUMF ¶ 19 (ECF No. 117-2). As in *Cayuga*, compensation for the alleged current value of the disputed land should be barred.

Moreover, if the Nation does not agree to a new *permanent* easement, its requested relief would bind the State Defendants' successors for many decades to come and compel them to also negotiate new easement terms each time a temporary easement expires. For example, if the Nation agreed to only a 50-year easement, the Governor in 2075 would need to negotiate yet another new easement with a new payment amount. And, if the State is compelled to pay, future Legislatures would be obligated to approve such funds. The Nation's claims would not only

4

require renegotiation of the 1954 Easement now, but also far into the future thereby further adding to the disruptiveness of its claims. None of this was contemplated with the original execution of the *permanent* easement agreement in 1954 and therefore would upset over 70 years of justifiable expectations by the State, Thruway Authority, and millions of Thruway users.

> 2. *The Nation Ignores The True Nature Of The Property Rights Granted By The 1954 Easement*

Another flaw in the Nation's argument is that it elevates form over substance by disregarding the broad property rights conveyed by the 1954 Easement. *See* Pl. Opp. Mem. 6 (arguing that the State has a "mere use interest, not a possessory interest"). The 1954 Easement is not a typical easement. It is vastly different from virtually all other easements where a limited use of land is granted to the easement holder and where the fee title owner retains virtually all other property rights including the right to possess, control, exclude others, enjoy, and dispose of the property. While the 1954 Easement land is undisputedly *owned* by the Nation (Pl. Opp. Mem. 4), it defies all practical reality to claim that "the Nation has always held *all possessory interests* in the land" and "*already* exercises its inherent authority over the land, and it will continue to do so regardless of the outcome of this case." *Id.* 6, 7 (emphasis in original).

Given the presence of the Thruway, the Nation effectively lacks possession and control over the disputed land. Def. Mem. 14-15. The Nation's members cannot use or otherwise enjoy the land other than to drive on the Thruway like everyone else. The Nation cannot dispose of the property covered by the easement in a manner that would impede the authority of New York State to operate the Thruway. Nor can the Nation exclude others from the portion of the Thruway that traverses its land.

Additionally, the Nation does not dispute that the Thruway is part of the federal Interstate Highway System and is therefore regulated by the Federal Highway Administration. *See* Def.

5

Mem. 15.  There are many aspects of the disputed land that the Nation does not and cannot control.  For instance, the Nation lacks the authority to (1) regulate Thruway speed and enforce speed restrictions; (2) set vehicle type and weight restrictions; (3) exclude or limit certain types of vehicles or deny Thruway access to particular drivers; (4) impose lane closures due to accidents or construction; (5) close the Thruway due to inclement weather; and (6) prohibit federally mandated biennial bridge inspections and required maintenance to ensure the safety of the traveling public.  Thus, for all practical purposes, the Nation does not hold "all possessory interests in the land" and does not "exercise[] jurisdiction over it."  Pl. Opp. Mem. 6.

The Nation's reference to its agreements with the Thruway Authority concerning bridge inspections and Thruway maintenance do not demonstrate otherwise.  The Thruway Authority's "long-standing practice of seeking consent from the Nation" (*id*. at 7) to conduct critical public safety inspections and maintenance – and its decision to work cooperatively with the Nation instead of resorting to litigation or other means to enforce the State's 1954 Easement rights – simply shows that the Thruway Authority has operated in a manner respectful to the Nation.  It is not a concession that Nation approval is required for the Thruway Authority to comply with federal law governing bridge inspections and maintenance and operation of the Thruway.

Finally, *McGirt v. Oklahoma*, 591 U.S. 894 (2020) provides no support for the Nation's arguments.  Pl. Opp. Mem. 7-8.  *McGirt* addressed whether land set aside for the Creek Nation in Oklahoma through treaties with the United States remained "an Indian reservation for purposes of federal criminal law."  591 U.S. at 897-98.  The Supreme Court rejected Oklahoma's claim of jurisdiction to prosecute tribal members for crimes committed within the Creek Nation's reservation, which was never disestablished by Congress and was therefore "Indian country."  *Id.* at 902-913.  The Supreme Court did not address, let alone cite, *Sherrill* and the only mention of

6

laches was a passing reference to various legal doctrines protecting reliance interests (along with res judicata, statutes of repose, and other procedural bars). *Id.* at 936.

## POINT II

### FEDERAL APPROVAL OF THE 1954 EASEMENT WAS NOT REQUIRED

A.  **1875 Seneca Leasing Act**

The Nation argues that the Indian law of canons of construction require this Court to disregard *United States v. Cattaraugus County*, 71 F. Supp. 413 (W.D.N.Y. 1947) and narrowly interpret the term "laying out" in Section 8 of the 1875 Act as "only provid[ing] for limited application of state law concerning the *planning and designing of highways* to the named villages on the Allegany Territory." Pl. Opp. Mem. 18-19 (emphasis added). This argument lacks merit.

The "laying out" of highways at the time of the 1875 Act did not just mean "arranging and designing" highways as the Nation asserts. As defined in Black's Law Dictionary, 1st Ed. (1891), "[t]he term has come to be used technically in highway laws as embracing all the series of acts necessary to the complete establishment of a highway." This would include the designing, acquisition of required property, and construction of the highway. Supreme Court cases from this period confirm this broad definition. *See Potomac Steamboat Co. v. Upper Potomac Steamboat Co.*, 109 U.S. 672, 689 (1884) ("we have no objection to laying out a new square…"); *Harris v. Elliot*, 35 U.S. 25, 55 (1836) ("This bar of all actions, was to protect and establish the doings of the committee in laying out the streets").

Moreover, the Indian canon of construction does not apply when interpreting "laying out" in the 1875 Act because the term unambiguously includes the acquisition of the necessary property interests for the establishment of a highway. *Amoco Prod. Co. v. Vill. Of Gambell*, 480 U.S. 531, 555 (1987) (Indian canon does not apply when "[t]here is no ambiguity here which requires interpretation"). The structure of the 1875 Act and relevant case law established that the

7

Act provided the Nation with authority to give New York State necessary property rights for establishment of highways. This evidence should not be disregarded because of the Indian canon of construction. While an interpretive tool, it is not "a license to disregard clear expressions of tribal and congressional intent." *DeCoteau v. Dist. Cty. Court*, 420 U.S. 425, 447 (1975).

## B. Seneca Leasing Act of 1950

Rather than directly address the State Defendants' evidence supporting a broad interpretation of "lease," the Nation argues such evidence can be disregarded because the plain meaning of "lease" permits only a narrow interpretation. Pl. Opp. Mem. 20-21. According to the Nation, the 1950 Act empowered the Nation to convey only possessory, not non-possessory, interests on its Reservations. *Id*. While "lease," in isolation, generally refers to possessory interests, the plain meaning of the term as used in the 1950 Act is broader.

The meaning of a statutory term is determined not only by "the particular statutory language," but also by "the design of the statute as a whole" and "its object and policy." *Crandon v. United States*, 494 U.S. 152, 158 (1990). The 1950 Act carries forward the meaning of "lease" from the 1875 Act by explicitly referencing the 1875 Act. The 1950 Act described "the authority conferred by law on the Seneca Nation of Indians…under authority of the [1875 Act]" as the right to "*lease* lands within the…Reservations to railroads." Maguire Decl. Ex. AA (ECF No. 115-16) (emphasis added). The 1950 Act builds upon such by conferring the Nation with the additional authority "to *lease* lands within the [Reservations], outside the limits of such villages, for such purposes and such periods as may be permitted by the laws of the State of New York." *Id.* (emphasis added). By using "lease" to describe both the authority from the 1875 Act and the 1950 Act, the 1950 Act intended the term to have the same meaning across both Acts.

Because the 1950 Act gives "lease" the same meaning it had in the 1875 Act, the next question is the meaning of "lease" in the 1875 Act, which confers the Nation with the authority

8

to "lease lands within said reservations for railroad purposes." Maguire Decl. Ex. W (ECF No. 115-12). By limiting the Nation's authority to grant property interests for only a specific purpose, the 1875 Act granted the Nation authority to "lease" nonpossessory interests (strongly resembling the 1954 Easement). As the Nation recognized, "nonpossessory interests…do not create a right to possession in their holder, *but only a privilege of use of property for limited purposes*." Pl. Opp. Mem. 20. Given the design and structure of the 1875 and 1950 Acts, the plain meaning of "lease" is sufficiently broad to have conferred the Nation with authority to convey the 1954 Easement. At the very least, the term "lease" in the 1950 Act is ambiguous, and the Court should interpret it as encompassing the 1954 Easement based on the State Defendants' evidence and not disregard it solely due to the Indian law canon rules of construction.

Even if the 1950 Act only empowered the Nation to convey leases, the Nation still had authority to grant the 1954 Easement because the 1954 Easement is in actuality a lease (*i.e.* a conveyance of a possessory interest). "The test for determining what constitutes a lease, as distinguished from other rights or interests, is not necessarily the descriptive language used, but whether…exclusive control and possession of specified space for a specified term have been granted, subject to reserved rights." 74 N.Y. Jur. 2d Landlord & Tenant § 8; *see also The Law of Easements & Licenses in Land* § 1:20 ("In practice, the line between easements and leases is less easily drawn. Often the courts must look behind misleading or ambiguous terminology to ascertain the true intent of the parties.").

The Court should interpret the 1954 Easement as providing the Thruway Authority with exclusive control and possession of the Thruway. First, the 1954 Easement granted the Thruway Authority an interest in the property "for the purposes of constructing, reconstructing and maintaining a Thruway[.]" Maguire Decl. Ex. K (ECF No. 114-20). Because the Thruway is a

9

massive infrastructure project, the Thruway Authority's interest in the property is effectively possessory. Stated differently, construction and maintenance of the Thruway necessarily requires the Thruway Authority to exercise exclusive control and possession of the property. Without exclusive control and possession, the Thruway Authority would be unable to exercise the legal rights granted in the 1954 Easement. The Thruway Authority could not operate the Thruway if the Nation or third parties were able to access and use the Thruway for non-vehicular purposes. That the parties called the 1954 Easement an easement rather than a lease has no legal significance. *See Statement, Inc. v. Pilgrim's Landing, Inc.*, 49 A.D.2d 28, 33 (4th Dep't 1975) (holding that "management agreement" was in actuality a lease).

## POINT III

### THE NATION RATIFIED THE 1954 EASEMENT BY ITS POST-1961 CONDUCT

There is no dispute that following the 1961 amendment the Nation had the authority to convey the 1954 Easement. Because the Nation had the authority to convey the 1954 Easement post-1961, the Nation could also ratify it, even if it was initially void under the Nonintercourse Act. Rather than applying New York ratification law as it should (*see* Def. Mem. 40, n.10), the Nation incorrectly seeks to import the standard used to determine whether Congress ratified an extinguishment of Indian title. After 1961, however, the issue is not whether Congress had empowered the Nation to grant leases, easements, and rights of way (it clearly had), the issue is whether the Nation, exercising its authority granted by Congress, ratified the 1954 Easement. Resolving that question requires application of New York ratification law. Def. Mem. 40-42.

## CONCLUSION

For the foregoing reasons, the Court should grant the State Defendants' Motion for Summary Judgment and deny the Nation's Motion for Summary Judgment.

| | |
|---|---|
| Dated: May 16, 2025<br>Buffalo, New York | **NIXON PEABODY LLP**<br><br>BY: /s/ *Erik A. Goergen*<br>Erik A. Goergen<br>40 Fountain Plaza, Suite 500<br>Buffalo, New York 14202<br>Telephone: (716) 853-8118<br>egoergen@nixonpeabody.com<br><br>*Attorneys for Defendant New York State Thruway Authority*<br><br>**LETITIA JAMES**<br>**Attorney General of the State of New York**<br><br>BY: /s/ *Daniel R. Maguire*<br>Daniel R. Maguire<br>Stephanie Joy Calhoun<br>Assistant Attorney General, of Counsel<br>Main Place Tower, Suite 300A<br>350 Main Street<br>Buffalo, New York 14202<br>Telephone: (716) 853-8400<br>Daniel.Maguire@ag.ny.gov<br>Stephanie.Calhoun@ag.ny.gov<br><br>*Attorneys for Defendants Governor of the State of New York, Attorney General of the State of New York, the Commissioner of the New York State Department of Transportation, and the Comptroller of the State of New York* |