# EXHIBIT A

**STEVEN E. TURNER**

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

-----------------------------------------
SENECA NATION, a federally recognized
Indian tribe,

                    Plaintiff,

          - vs -     Case No.
                     18-cv-00429-LJV

KATHLEEN C. HOCHUL, in her official
  capacity as Governor of New York;
LETITIA JAMES, in her official capacity
  as New York State Attorney General;
MARIA T. DOMINGUEZ, in her official
  capacity as Commissioner of the New York
  State Department of Transportation;
THOMAS P. DINAPOLI, in his official
  capacity as Comptroller of the
  State of New York; and
THE NEW YORK STATE THRUWAY AUTHORITY,

                    Defendants.
-----------------------------------------

          Examination before trial of **STEVEN E.**

**TURNER**, taken pursuant to the Federal Rules of

Civil Procedure, in the law offices of NIXON

PEABODY LLP, Key Towers at Fountain Plaza, 40

Fountain Plaza, Suite 500, Buffalo, New York, on

September 11, 2024, commencing at 10:01 a.m.,

before ANDREA J. DEMYAN, Notary Public.

APPEARANCES:    AKIN GUMP STRAUSS HAUER & FELD LLP,
                By BRETTE A. PEÑA, ESQ.,
                bpena@akingump.com and
                MERRILL C. GODFREY, ESQ.,
                mgodfrey@akingump.com,
                Robert S. Strauss Tower,
                2001 K Street, N.W.,
                Washington, DC  20006,
                (202) 887-4000,
                Appearing for the Plaintiff.

                LETITIA A. JAMES, ESQ.,
                Attorney General of
                the State of New York,
                By STEPHANIE JOY CALHOUN, ESQ.,
                Assistant Attorney General,
                Main Place Tower,
                350 Main Street, Suite 300A,
                Buffalo, New York  14202-3750,
                (716) 853-8400,
                stephanie.calhoun@ag.ny.gov,
                Appearing for the Defendants,
                Kathleen C. Hochul, in her
                official capacity as
                Governor of New York;
                Letitia James, in her official
                capacity as New York State
                Attorney General; and Maria T.
                Dominguez, in her official
                capacity as Commissioner of
                the New York State Department
                of Transportation.

                NIXON PEABODY LLP,
                By ERIK A. GOERGEN, ESQ.,
                Key Towers at Fountain Plaza,
                40 Fountain Plaza, Suite 500,
                Buffalo, New York  14202-2223,
                (716) 853-8100,
                egoergen@nixonpeabody.com,
                Appearing for the Defendant,
                The New York State
                Thruway Authority.

**THE REPORTER:** How is the billing going to work?

**MR. GOERGEN:** You can -- we'll get -- buy an original and I'm assuming they'll want a copy.

**THE REPORTER:** So you'll supply?

**MR. GOERGEN:** Yes.

**THE REPORTER:** Is there any stipulations, read and sign?

**MR. GODFREY:** Yeah.

**MS. PEÑA:** Yeah.

**MR. GODFREY:** We'll read and sign.

**MS. PEÑA:** We'll read and sign.

**STEVEN E. TURNER**, 8251 Greensboro Drive, McLean, Virginia, 22102, after being duly called and sworn, whose identity was confirmed by government-issued documentation, testified as follows:

**EXAMINATION**

**BY MR. GOERGEN:**

Q. Good morning, Mr. Turner.

A. Good morning.

Q. My name is Erik Goergen and I represent one of the defendants in this case, the New York

And because of the nature of how toll roads work, you're basically trying to evaluate if the future anticipated cash flows would be sufficient to pay for the amount of debt that would be taken on to construct the toll road at the -- in the present.

And what happened in this particular case is the revenue and traffic projections for the toll road were ridiculously exaggerated and so part of it was to demonstrate that.

Secondly, over time, the entities constructing this toll road ultimately started to realize they had a problem and would reduce their projections, but they continue to reduce them at a -- in ways that were still knowable at the time that they were overstated.

So my analysis was -- ultimately what I showed was that in each case with knowable information at that time, the entities that were raising the funding to build this road, knew that it was insolvent at that time and yet proceeded anyway.

Q. So you conducted a valuation of a toll road?

A.     Multiple, yes.  Because I had to do it at each of those timeframes and under different scenarios in each of those timeframes to demonstrate that it was insolvent in each of them. Each solvency analysis requires a valuation.

Q.     And as a part of that toll road valuation, did you ever formulate hypothetical alternative routes?

A.     Yes.  You have to do a but-for consideration because in this case, what you had was a toll road that the State of Texas had procured the right-of-way for and was providing that right-of-way to whoever wanted to build SH 130, whichever partnership wanted to.

In this case, it was a company called Ferrovial, F-E-R-R-O-V-I-A-L, that was building this system.  But you have to consider the but-for scenario which is, you know, what traffic would be generated because of proximity to that road.

But what the State of Texas was hoping for, was that Interstate 35 between Austin and San Antonio, was highly congested and they had their own internal projections as to how traffic was

going to grow.

And the idea was that the differential in speeds relative to the differential in distance, was going to cause traffic to migrate from 35 to the -- to SH 130.

And so I had to do analyses as to whether or not those were reasonable projections based on, you know, we had lots of data available to us as to what the ingress and egress traffic was off of 35.

We knew -- we had lots of data about what the speeds were at different times of day, we knew what the speeds were going to be on the -- on SH 130, we knew the distances of different routes that people could take to get between -- if you were a through traffic where you had different options to move between those two roads.

We took all of that into account in different scenarios to ultimately derive what the level of traffic would have been on SH 130 under different scenarios.

And in traffic and revenue analyses, you're -- you're typically doing a probabilistic analysis and in a case like this where the stakes

were quite high, we had to take that into account as well.

     **Q.**   So you evaluated different scenarios, but did that include the design of a hypothetical but-for route?

     **A.**   The but-for route would have been staying on 35, but what you had to create as hypotheticals is how would traffic move from 35 to SH 130 and you had to consider how long would it take to do that.

     So let's say that you were -- at a certain time of day, your average speed might be, you know, 45 miles per hour from Austin to San Antonio if you were to go during, say, peak traffic.

     At that same time, there would be multiple ways to get from 35 over to SH 130.  So what you're trying to consider is, you know, do you -- do you make that diversion north of Austin which would take you some time to get to SH 130, you have to factor that in.

     And then the distance and then the toll to -- relative to the loss of time, you have to consider all these things.  Or do you go through

Austin, but take another optional path that might get you over to SH 130 faster, but would require that you take more time through Austin.

I mean, it was all these different scenarios that we had to build in to consider what the impact would be on traffic and revenue and then ultimately determine would that revenue then be sufficient to allow for the construction of the road to be solvent.

Q. But all those scenarios involved analysis of existing routes that were available, correct?

A. Yes.

Q. And as part of that analysis, you did not create any hypothetical alternative routes; is that correct?

A. I've said that now twice. Yes, I did, but I didn't have to build a new road.

Q. And that's what I'm asking. So you didn't have to construct a new road?

A. No. If needed to, I could have estimated what that cost would have been from the experience that I had working with NTTA and HCTRA

and Transurban.

But in this particular case, the State of Texas had already identified where SH 130 was going to be at. We knew where it was going to be at at different points in time because that was planned out in the construction arrangements between SH 130 and the State of Texas.

We knew that they were trying to alleviate traffic from a parallel interstate and so the hypotheticals that we had to consider for traffic purposes, were different ways that you could get between them.

Q. Per your --

MS. PEÑA: Can we go off the record for a second?

(Off the record: 11:04 a.m.)

BY MR. GOERGEN:

Q. For -- you discussed your fiberoptic cable right-of-way valuations, do you recall that?

A. Yes.

Q. Any other specific valuations dealing with rights-of-way other than fiberoptic cables?

A. It would still be telecommunications

infrastructure, but we've done this for valuing right-of-way for telecommunications facilities all across the State of Hawaii and a restructuring engagement there.

Valuing the real estate for the use for central offices as to whether or not they were following the highest and best use approaches to the value of the real estate.

I'm trying to think if there's others that I've done that weren't -- I mean, those were not fiber, but they were copper so it's not trying to draw a huge distinction there.

The buildings themselves were -- think of those as equipment offices for the placement of essentially small data centers.

Q.    And did those rights-of-way go through a toll road or highway or a thruway or freeway?

A.    Some of them paralleled a toll road and so they were rights-of-way that would have been alongside of a toll road, but most of them were rights-of-way that were along public highways or municipalities.

Q.    Have you ever conducted a valuation for

a right-of-way that traversed Native American territory?

A.   I have advised on one.

Q.   And which one was that?

A.   It was related to a route, and I cannot remember the name of the tribe right now, but a colleague of mine in our economics group was doing a valuation for what it would be worth to go through the tribe directly east to west versus how much it would cost to go around that tribal's -- that tribe's land.

And it was a situation where this particular route, I believe it was in Arizona, the tribal land was very long north to south and relatively narrow east to west.

Q.   Do you recall what the purpose of that right-of-way would have been for?

A.   In this case, it was for fiber.

Q.   Fiberoptic cable?

A.   Yes, conduit.  It was a right-of-way that would have allowed for a telecommunications company to put in conduit and then put in fiber.

So the question that the telecom company was

having to consider is what it would cost for them to go either north or south of the tribal land or go straight through it.

Q. And you don't recall what tribe that was, correct?

A. I do not. It was -- it was several years back.

Q. And did you do the consulting or did your colleague?

A. I advised on the key inputs that he needed for coming up with the valuation.

Q. And do you remember approximately when that was?

A. It was probably 10 years ago.

Q. And as far as you could recall, that was the only instance where you were involved with the valuation of a right-of-way that traversed Native American territory?

A. I'm doing a fair amount of right-of-way work right now with rail lines, but I haven't sat down and figured out if those are going through tribal lands or not.

Because the rail lines are we'll say a --

and, again, I'm not an attorney here, but they are presumed to have the right to use the land because of whatever statutes enable them to have the corridor in the first place.

And so now the question is more valuing it as a corridor rather than a question of the -- the consideration of whether it's passing through tribal land or not has not been a priority in the consideration for those valuations.

Q. So no valuation of tribal land has yet been conducted?

A. Where -- where it has been -- well, what I'm saying is it is going through tribal land, yes. I just -- that's not how we're valuing it. Whether or not you have to go around or not, has not been a primary factor.

MR. GOERGEN: Okay. I think now's a good time to take a break.

MS. PEÑA: Okay.

MR. GOERGEN: We can go off the record.

(A recess was then taken at 11:10 a.m.)

BY MR. GOERGEN:

Q. Mr. Turner, how many depositions have