UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

UNITED STATES DISTRICT COURT
FILED
SEP **30** 2025
MARY C. LOEWENGUTH, CLERK
WESTERN DISTRICT OF NY

---

SENECA NATION, a federally recognized
Indian tribe,

                    Plaintiff,                              1:18-CV-429-LJV-MJR

                                                           REPORT AND RECOMMENDATION

        -v-

KATHLEEN C. HOCHUL, in her official
capacity as Governor of New York, *et al.*,

                    Defendants.

---

## INTRODUCTION

This case has been referred to the undersigned pursuant to Section 636(b)(1) of Title 28 of the United States Code, by the Honorable Lawrence J. Vilardo, to hear and report on dispositive motions for consideration by the District Court. Before the Court are plaintiff Seneca Nation's motion for summary judgment (Dkt. No. 117) and defendants Kathleen C. Hochul, Letitia James, Marie T. Dominguez, Thomas P. DiNapoli, and the New York State Thruway Authority's motion for summary judgment (Dkt. No. 114), each brought pursuant to Rule 56 of the Federal Rules of Civil Procedure. For the following reasons, it is recommended that plaintiff's motion for summary judgment be granted as to the declaratory relief requested, and that defendants' motion for summary judgment be denied.

## PROCEDURAL HISTORY

The Court assumes familiarity among the parties with the case and its procedural history. Therefore, only the relevant history is outlined here.

In this lawsuit, plaintiff Seneca Nation ("the Nation") challenges the validity of a permanent easement it conveyed to New York State in 1954 to construct and maintain a portion of the New York State Thruway. The 1954 agreement describes a permanent easement "for Thruway purposes" over approximately 300 acres of the Nation's Cattaraugus Territory in exchange for a one-time payment of $75,500. The Nation alleges that the easement was not validly obtained under the federal Non-Intercourse Act and, as a result, the New York State Thruway operates in violation of federal laws and treaties.

The Nation first challenged the validity of the 1954 easement with an action filed with this Court in 1993. That lawsuit was dismissed and such dismissal was affirmed by the Second Circuit in 2004. *See Seneca Nation of Indians v. State of New York ("Seneca I")*, 383 F.3d 45 (2d Cir. 2004) (affirming dismissal under Rule 19(b) of the Federal Rules of Civil Procedure because the State of New York, which declined to waive its sovereign immunity, was an absent and indispensable party).[1]

In 2018, the Nation commenced the instant action seeking to enjoin various New York State officers and the New York State Thruway Authority from continuing violations of federal law stemming from the 1954 easement. (Dkt. No. 1, ¶ 1). The Nation's complaint specifies that "the official-capacity defendants are named pursuant to *Ex parte Young*,

---

[1] In a Report and Recommendation to the District Court on the motion to dismiss, the Honorable Carol E. Heckman recommended dismissal under Rule 19 and reached several other conclusions, including that the 1954 Thruway easement was invalid under the Non-Intercourse Act for lack of approval from the Secretary of the Interior. *See Seneca Nation of Indians v. State of New York*, 1:93-CV-688, Dkt. No. 228 (W.D.N.Y. July 12, 1999). The Honorable Richard J. Arcara adopted Magistrate Judge Heckman's recommendation that the State was an indispensable party under Rule 19, but did not reach the merits or adopt Judge Heckman's other conclusions. *See id.*, Dkt. No. 244 (W.D.N.Y. Nov. 18, 1999).

209 U.S. 123 (1908) and its progeny, which allow declaratory and injunctive relief against state officers in their official capacities to stop ongoing violations of federal law, notwithstanding the state's immunity under the Eleventh Amendment to the United States Constitution." (*Id.*, ¶ 2).

In this lawsuit, the Nation seeks "[a]n injunction requiring that the Defendants (except for the Comptroller) obtain a valid easement for the portion of the Nation's Reservation on which the Thruway is situated, so as to bring continued public use of and public benefit from those Indian lands into compliance with federal law, on terms that will in the future equitably compensate the Nation pro rata for future use of its lands;" or, in the alternative, an order enjoining the Defendants (except for the Comptroller) from collecting tolls for the portion of the Nation's Reservation on which the Thruway is situated without first obtaining a valid easement; and an injunction requiring that "the Comptroller of the State of New York segregate and hold in escrow all future toll monies collected on the Thruway that are fairly attributable to the portion of the Thruway operated in violation of the Nation's federal protected property rights until the other Defendants obtain a valid easement." (Dkt. No. 1, ¶ 51-52; 57). The Nation also seeks a declaration that the Defendants, other than the Comptroller, are violating federal law by not obtaining a valid easement for the portion of the Thruway over the Nation's Reservation lands. (*Id.*, ¶ 62). The Nation "does not seek to eject anyone from the purported easement, but seeks only to prevent further violation of its rights to a valid easement for such usage." (*Id.*, ¶ 49).

Defendants moved to dismiss this action on grounds of collateral estoppel and that the Nation's claims seeking injunctive relief could not be characterized as prospective injunctive relief under *Ex parte Young*. (Dkt. No. 16). By Decision and Order issued on

September 3, 2020, the Honorable Lawrence J. Vilardo found that because the issues raised in the litigation were different than those decided in the 1993 suit, collateral estoppel did not bar this suit. (Dkt. No. 48, pgs. 8-13). Judge Vilardo also determined that the *Ex parte Young* exception to Eleventh Amendment immunity properly applied, and the Nation could proceed with its claims. (*Id.*, pgs. 13-22). On an interlocutory appeal, the Second Circuit affirmed Judge Vilardo's decision. *See Seneca Nation v. Hochul ("Seneca II")*, 58 F.4th 664 (2d Cir. 2023).

The case then proceeded through discovery and the parties engaged in mediation. (Dkt. Nos. 79, 100, 103, 108, 111).

On February 11, 2025, defendants filed a joint motion for summary judgment. (Dkt. No. 114). On the same date, plaintiff also filed a motion for summary judgment. (Dkt. No. 117). Each party filed a response to the opposing party's motion, (Dkt. Nos. 120; 121), and filed reply memoranda (Dkt. Nos. 124; 125). This Court heard oral argument on the motion on July 8, 2025. At the Court's request, the parties submitted supplemental briefing on several issues. (Dkt. No. 129; 130; 132; 133). Upon the conclusion of briefing, the Court considered the matter submitted for report and recommendation.

## FACTS[2]

The Seneca Nation is a federally recognized Indian tribe. (Dkt. No. 117-2, ¶ 1). The Nation exercises jurisdiction over and owns in restricted fee its Allegany, Cattaraugus, and Oil Spring Territories, and individual Seneca members occupy lands on these Territories pursuant to Nation law. (*Id.*, ¶ 2). The Cattaraugus Territory was set

---

[2] The facts described herein are taken from the pleadings, motion papers, statements of undisputed facts, and exhibits filed in this lawsuit. When citing a proposed fact within either party's statement of material facts (Dkt. Nos. 114-1; 117-2), the Court has confirmed that opposing party's responding statement either admits the fact or fails to specifically controvert it with evidence. *See* W.D.N.Y. L.R. Civ. P. 56(a).

aside for the Nation by treaties between the Nation and the United States in 1794, 1797, 1802, and 1842. (*Id.*, ¶ 3).

The New York State Thruway ("Thruway") was constructed between 1949 and 1960. (*Id.*, ¶ 4). At 570 miles in length, the Thruway is one of the largest tolled highway systems in the United States and is a critical component in the National Interstate Highway System. (*Id.*, ¶ 5). The Thruway connects the principal cities of the State from New York City to Albany, and on to Utica, Syracuse, and Rochester through to Buffalo and the Pennsylvania state line. (*Id.*).

The Erie Section of the Thruway is 70 miles in length and runs from Buffalo through the Nation's Cattaraugus Territory to the Pennsylvania State Line. (*Id.*, ¶ 7). The Erie Section runs through 2.7 miles of the Nation's Cattaraugus Territory, dividing the Territory in two. (*Id.*, ¶ 8). By crossing the Nation's lands, the Thruway has a direct route to the Pennsylvania border, where it connects to the rest of the interstate system. (*Id.*, ¶ 9). On average, 30,000 vehicles cross Seneca Nation lands using the Thruway each day. (*Id.*, ¶ 10).

By at least 1946, New York officials had prepared plans and specifications for the Erie Section of the Thruway, part of which they proposed to extend through the Nation's Cattaraugus Territory. (Dkt. No. 117-2, ¶ 22). The New York State Thruway Authority has a continuous right-of-way that travels the entire route of the Thruway system. Most of the right-of-way was acquired through eminent domain. (*Id.*, ¶ 23).

By January 15, 1946, the New York State Department of Public Works had contacted the Nation to discuss surveying lands in the Cattaraugus Reservation for the purposes of constructing the Thruway. (Dkt. No. 114-1, ¶ 15). On September 18, 1954,

the Nation's council, by an 11-1 vote, adopted a resolution approving construction of the Thruway across the Cattaraugus Reservation. (Dkt. No. 114-1, ¶ 20).

On October 5, 1954, "the People of the State of New York, acting by and through the New York State Thruway Authority," entered into an indenture with "the Seneca Nation of Indians" by which the Nation purported to grant a "Permanent Easement for Thruway purposes" over approximately 300 acres of the Cattaraugus Territory in exchange for a one-time payment of $75,500. (Dkt. No. 117-2, ¶ 26). In a Thruway Authority Inter Office Memorandum dated September 20, 1954, P.G. Baldwin, Director of Bureau of Rights-of-Way and Claims, New York Department of Public Works, reported that after "several hours of very frank talk," the price for the disputed Thruway easement was "hammered down" to a one-time payment of $75,000, which was "much lower than any of us expected to acquire these lands for[.]" (*Id.*, ¶ 27).[3] The Nation was represented by an attorney at closing and during some of the negotiations. (Dkt. No. 114-1, ¶ 22).[4]

The Nation contends that its conveyance of the 1954 Easement violated the Non-Intercourse Act of 1834, which required that any conveyance of land by an Indian tribe be approved by the federal government. On that basis, the Nation claims that the easement was void *ab initio*, thereby setting the stage for the Nation's demand for compensation for a new easement. (*Id.*, ¶ 2).

---

[3] The Court notes the discrepancy between the settlement figure in the Inter Office Memorandum and the final consideration paid according to the indenture.

[4] While the Thruway Authority was negotiating with the Nation, it was also negotiating compensation with the individual allottees, i.e., the individual members of the Nation who held allotment rights, about obtaining an easement for the Thruway across the Cattaraugus Reservation. On June 22, 1957, the Council of the Seneca Nation, acting pursuant to the 1954 Agreement, passed a series of resolutions certifying a number of the allottees as the persons entitled to payment, and such payment was subsequently made. (Dkt. No. 114-1, ¶ 31).

Apart from a May 7, 1946 letter from New York State Department of Public Works to the United States Department of the Interior, discussed below, there is no record that the Thruway Authority or any New York state official ever submitted or provided any documentation or other information related to the disputed Thruway easement to the Secretary of the Interior or any other federal official. (Dkt. No. 117-2, ¶ 28). The disputed Thruway easement was not signed by a representative of the United States, no federal official was present when the agreement was signed, and no federal official was present at the closing. (*Id.*, ¶ 29). There was no professional independent appraisal of the value of the disputed Thruway easement prior to October 5, 1954. (*Id.*, ¶ 30).

There is no record that any map of the definite location of the easement, an application for approval of the easement, signed agreements, or a schedule of damages for the easement were ever filed with the Department of the Interior. (*Id.*, ¶ 31). There is also no showing that the Secretary of the Interior ever approved any agreement, application, map, or schedule of damages for the disputed Thruway easement. (*Id.*, ¶ 32). There is no record of any endorsement by the Secretary of the Interior or any of his or her delegates on any map of definite location of the lands relating to the disputed easement. (*Id.*, ¶ 33).

There is no record showing the disputed Thruway easement was approved by the Secretary of the Interior or his or her delegates on or after October 5, 1954. (*Id.*, ¶ 34). According to a Regional Realty Office for the United States Department of the Interior, if the Department of the Interior had approved an easement between the Seneca Nation and the State of New York, the Bureau of Indian Affairs would have a signed easement document in its files. (*Id.*, ¶ 35).

In 2007, the Nation's Council passed resolutions to (1) officially rescind the Council's 1954 authorization of the 1954 easement agreement, declare New York State's continued use of the illegal easement an ongoing act of trespass, and authorize the Nation's President to request "initiation of negotiations to attempt to resolve this transgression against the Nation and its people;" (2) impose a $1 per vehicle toll on motorists traveling through Nation lands on the Thruway to be collected by the Thruway Authority and remitted to the Nation; and (3) authorize the Nation's President and Treasurer to invoice the Thruway Authority for the toll with interest and penalties for nonpayment. (Dkt. No. 117-2, ¶ 37). On June 11, 2007, the Nation's Treasurer invoiced the Thruway Authority for estimated tolls due for the months of April (partial), May, and June 2007. (*Id.*, ¶ 38). The Nation's President sued the State of New York, the Thruway Authority, and the Federal Highway Administration in the Nation's Peacemakers' Court but none of the defendants appeared. (*Id.*, ¶ 39). After briefing, the Peacemakers' Court issued an Advisory Opinion and Order determining the easement was void at its inception and remains void as a matter of Nation law and federal law. (*Id.*). In 2011, the Nation's President petitioned President Barack Obama "to bring about a reasonable resolution to the nearly sixty-year illegally imposed use of Nation lands by the State of New York" for Thruway purposes. (*Id.*, ¶ 40).

The parties dispute the proper methodology or analysis to be used for valuing the ongoing use of Seneca Nation lands for Thruway purposes. (Dkt. No. 117-2, ¶ 19; Dkt. No. 120-1, ¶ 19).

**DISCUSSION**

*Rule 56 Standard*

Pursuant to Federal Rule of Civil Procedure 56, summary judgment is to be granted where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *See* Fed. R. Civ. P. 56. A genuine issue of material fact exists "where the evidence is such that a reasonable jury could decide in the non-movant's favor." *Beyer v. Cty. of Nassau*, 524 F.3d 160, 163 (2d Cir. 2008). "[V]iewing the evidence produced in the light most favorable to the nonmovant, if a rational trier [of fact] could not find for the nonmovant, then there is no genuine issue of material fact and entry of summary judgment is appropriate." *Bay v. Times Mirror Magazine, Inc.*, 936 F.2d 112, 116 (2d Cir. 1991). When a movant has met this burden, the burden shifts to the non-movant to bring forth evidence establishing the existence of an issue of material fact. *Linares v. McLaughlin*, 423 Fed. Appx. 84, 86 (2d Cir. 2011).

In evaluating a motion for summary judgment, a court must resolve all ambiguities and draw all reasonable inferences in favor of the nonmoving party, and it is the burden of the moving party to demonstrate the absence of any material fact genuinely in dispute. *Hathaway v. Coughlin*, 841 F.2d 48, 50 (2d Cir. 1988). Importantly, a court must not "weigh the evidence, or assess the credibility of witnesses, or resolve issues of fact." *Victory v. Pataki*, 814 F.3d 47, 59 (2d Cir. 2016) (citation omitted). However, a party cannot defeat a motion for summary judgment by relying upon conclusory statements or mere allegations unsupported by facts. *Davis v. New York*, 316 F.3d 93, 100 (2d Cir. 2002). The nonmoving party "must come forward with specific evidence demonstrating

the existence of a genuine dispute of material fact." *Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011).

*Application*

Each party moves for summary judgment on plaintiff's three causes of action which seek an injunction compelling the State to renegotiate the 1954 Easement to obtain a valid easement, or alternatively, an injunction against the Comptroller requiring him to "segregate and hold in escrow any future toll monies collected on the Thruway which are fairly attributable to the portion of the Thruway operated in violation of the Nation's federally protected property right until the other defendants obtain a valid easement," and a judgment declaring that the 1954 Easement is invalid.

For the reasons that follow, the Court finds that plaintiff is entitled to summary judgment on its claim for declaratory relief.

1. *Sovereign Immunity and Fed. R. Civ. P. 19*

In response to the Nation's motion for summary judgment, defendants attempt to revive or recast their assertions that the Nation's requests for relief do not fit within the *Ex parte Young* exception to Eleventh Amendment immunity. However, as stated above, the Second Circuit has held in this case that the Nation adequately alleged an ongoing violation of federal law and that it seeks relief properly categorized as prospective under the *Ex parte Young* doctrine. *See Seneca II*, 58 F.4th at 671-72. Defendants argue that the Nation's request, on summary judgment, for an order directing defendants to pay the Nation $21.19 million annually in exchange for a valid easement is a new request for relief which may not be covered by the *Ex parte Young* exception and runs afoul of the State's sovereign immunity.

The Court declines to reassess whether the Nation is properly seeking relief under *Ex parte Young*, a question which has already been considered and decided by the District Court and the Second Circuit. Furthermore, although the Nation seeks a ruling on payment for the easement, the Court's recommendation herein is limited to directing defendants to negotiate with the Nation to obtain a new easement.

Second, defendants contend that the named state official defendants are not proper parties to this litigation. Again, the Court rejects this argument on the basis that this issue has already been considered and decided by the District Court and the Second Circuit. The Second Circuit plainly found that this lawsuit falls under the *Ex parte Young* exception to the Eleventh Amendment, and that neither collateral estoppel nor the Eleventh Amendment bars the Nation from proceeding in this case. *See Seneca II*, 58 F.4th at 674. Implicit in the Second Circuit's decision was the conclusion that the state-official defendants are proper parties under *Ex parte Young*. *See id.*, 58 F.4th at 669 ("Because we did not consider in *Seneca I* whether a lawsuit could proceed in the absence of the State if the defendants were other New York state officials sued in their official capacities, the issue in this case was not actually decided in *Seneca I* […]."). Any question that "was necessarily implicit" in an appellate decision is binding on remand. *See T.W. v. New York State. Bd. of L. Exam'rs*, 110 F.4th 71, 80-81 (2d Cir. 2024).[5]

---

[5] Defendants now ask the Court to find that the named state officials are not proper parties because they lack a requisite connection to the alleged violations of federal law. *See Ex parte Young*, 209 U.S. at 157 (explaining that to make "an officer of the state a party defendant in a suit to enjoin the enforcement of an act alleged to be unconstitutional, it is plain that such officer must have some connection with the enforcement of the act, or else it is merely making him a party as a representative of the state, and thereby attempting to make the state a party."). This strained attempt to reframe the question of whether the state officials are proper parties is rejected because defendants failed to raise the argument before the District Court or the Second Circuit, and the argument is thus deemed waived. *See, e.g., Gross v. Rell*, 585 F.3d 72, 95 (2d Cir. 2009) (holding that arguments not raised before trial court or in opening brief on appeal are deemed waived).

The only argument which the District Court and the Second Circuit left open was the question of whether the named state officials could adequately represent the State's interests. In his Decision and Order, Judge Vilardo held that a Rule 19 failure to join an indispensable, immune party could be cured by suing state officials in their official capacity for prospective injunctive relief. *See* Dkt. No. 48, pg. 11. He noted, however, that "if information gleaned from discovery demonstrates that the state-official defendants cannot adequately represent the State's interests, the defendants would not be precluded from moving for dismissal under Rule 19 at summary judgment – as they did in the 1993 suit." *Id.*, pg. 11 n.4.[6]

Defendants have now conceded that the named defendants can adequately represent the State's interests. *See* Dkt. No. 114-2, pg. 39 n.8. Thus, the Court finds no basis for dismissal on these Rule 19 grounds.

2.  *Validity of 1954 Easement*

The Nation argues that the 1954 Easement granted to the State of New York for "Thruway purposes" was void at inception because consent of the federal government was not obtained for the agreement in violation of the Non-Intercourse Act. Defendants argue that federal consent to the agreement was not required, and that even if it was, the factual record shows that appropriate consent was given by the United States Department of the Interior.

---

[6] This argument was preserved by the Second Circuit, which noted "[w]hether the lawsuit can proceed against these individual state defendants without the State as a party is a separate question from that of collateral estoppel. Defendants here did not move to dismiss the lawsuit on the basis that the State was an absent but indispensable party under Rule 19. As the district court noted, should discovery make it clear that the state-official defendants cannot adequately represent the State's interest such that the action should be dismissed under Rule 19 because the State is a necessary and indispensable party, defendants may so move at summary judgment." *Seneca II*, 58 F.4th at 669 n.19.

"[T]o establish a violation of the Non-Intercourse Act, the Senecas are required to establish that: (1) they are an Indian tribe; (2) the land at issue was tribal land at the time of the conveyance; (3) the United States never approved the conveyance[;] and (4) the trust relationship between the United States and the tribe has not been terminated." *Seneca Nation of Indians v. New York*, 382 F.3d 245, 258 (2d Cir. 2004). Congressional intent to extinguish Indian title must be "plain and ambiguous," and will not be "lightly implied." *County of Oneida v. Oneida Indian Nation*, 470 U.S. 226, 247 (1985).

There is no dispute that the Nation is an Indian tribe, and that the trust relationship between the United States and the Nation has not been terminated. Further, it is undisputed that the land at issue was tribal land at the time of conveyance of the 1954 Easement. The easement for the Thruway lies exclusively within the Nation's Cattaraugus Territory, which the Nation owns by treaty right. The question here is whether the United States approved the conveyance. For the following reasons, the Court finds that no such approval was given and that the 1954 Easement was obtained by New York State in violation of the Non-Intercourse Act.

First passed in 1790, the Non-Intercourse Act required congressional consent for all land purchases from Indian nations and tribes. *See* Act of July 22, 1790, ch. 33, 1 Stat. 137. "The very first Nonintercourse provided that conveyances of land, absent federal consent, were invalid. That provision has been continually re-enacted in substance, and 'has remained the policy of the United States to this day.'" *Cayuga Indian Nation of New York v. Cuomo*, 565 F. Supp. 1297, 1329 (N.D.N.Y. 1983) (quoting *Oneida Indian Nation v. Cnty. of Oneida*, 414 U.S. 661, 668 (1974)).

In passing the Non-Intercourse Act, Congress' dual purposes were "to prevent unfair, improvident or improper disposition by Indians of lands owned or possessed by them to other parties," and to prevent Indian unrest over encroachment by settlers on Indian lands. *Seneca Nation of Indians v. New York*, 206 F. Supp. 2d 448, 482 (W.D.N.Y. 2002) (quoting *Fed. Power Comm'n v. Tuscarora Indian Nation*, 362 U.S. 99, 119 (1960)). The law provides that:

> No purchase, grant, lease, or other conveyance of lands, or of any title or claim thereto, from any Indian nation or tribe of Indians, shall be of any validity in law or equity, unless the same be made by treaty or convention entered into pursuant to the Constitution.

25 U.S.C. § 177.

Between 1797 and 1874, the Nation entered into a series of leases with settlers in the Village of Salamanca, located on the Cattaraugus Reservation. *Seneca Nation of Indians v. State of New York*, 98-CV-688, Dkt. No. 228 (W.D.N.Y. July 12, 1999). In 1836, New York enacted a statue which authorized Indians in New York to grant rights-of-way upon their lands to railroad companies. *See* N.Y. Ch. Law 1836, c316, § 1. Pursuant to this statute, the Nation entered into various right-of-way agreements with railroads on its reservation land. Around 1875, a New York State court held that New York did not have the authority to empower the Nation to lease their reservation land to non-Indian settlers or enter into right-of-way agreements with railroads. *See U.S. v. Devonian Gas and Oil Co.*, 424 F.2d 464, 465-66 (2d Cir. 1970).

Several statutory enactments by Congress have since authorized the Nation to negotiate for the leasing of its land without the need for formal treaty or convention, thereby "taking Seneca leasing out of 25 U.S.C. § 177 [the Non-Intercourse Act]…."

*Fluent v. Salamanca Indian Lease Auth.*, 847 F. Supp. 1046, 1052 (W.D.N.Y. 1993) (quoting *Devonian Gas*, 424 F.2d at 467 n.3).

For example, on February 19, 1875, Congress ratified the existing leases under the Non-Intercourse Act, and granted the Nation the authority to lease tribal lands in Salamanca and five other villages located within the boundaries of the Cattaraugus and Allegany reservations, without further congressional approval. 18 Stat. 330, § 4 (1875) ("1875 Seneca Leasing Act"). The 1875 Act also authorized the Nation to lease lands within its reservations for railroad purposes and for "laying out" highways and bridges. *See* 18 Stat. 330, §§ 1 and 8.

In 1901, Congress passed the 1901 Highway Act and the Right-of-Way Act of March 3, 1901. 25 U.S.C. § 311 ("1901 Act"). The 1901 Act empowered the Secretary of the Interior to grant permission to open and establish public highways through any Indian reservation, rather than requiring a "treaty or convention" to convey land owned by an Indian nation to a state or local authority for establishment of a public highway. *Id.*

In 1948, Congress passed the Indian Right-of-Way Act of 1948. 25 U.S.C. § 323-328 ("Right-of-Way Act"). The Act empowered the Secretary of the Interior to "grant rights-of-way for all purposes, subject to such conditions as he may prescribe, over and across any lands now and hereafter held in trust by the United States for individual Indians or Indian tribes." 25 U.S.C. § 323.

With the Seneca Leasing Act of 1950, Congress expanded the Nation's ability to lease lands on its reservations without federal approval. *See* 64 Stat. 442. The Act provided, in relevant part:

> In addition to the authority now conferred by law on the Seneca Nation of Indians to lease lands within the Cattaraugus, Allegany, and Oil

> Springs Reservations to railroads and to lease lands within the limits of the villages established under authority of the [1875 Seneca Leasing Act], the Seneca Nation of Indians through its council, is authorized to lease lands within the Cattaraugus, Allegany, and Oil Springs Reservations, outside the limits of such villages, for such purposes and such periods as may be permitted by the laws of the State of New York.

*Id.*, § 5.

On October 5, 1954, the subject Easement was granted. On that date, New York State entered into an agreement with the Nation under which the Nation purported to grant a "Permanent Easement for Thruway purposes" over the Cattaraugus Territory in exchange for payment of $75,500.[7]

In 1961, Congress amended the Seneca Leasing Act of 1950, providing the Nation prospective authority to grant easements and rights-of-way in addition to leasing its lands. Pub. L. No. 87-230, 75 Stat. 499, § 2 (1961) (amending Section 5 of the Seneca Leasing Act of 1950 "by inserting after 'to lease' the last time the verb appears the words 'or grant easements or rights-of-way on.'"). With the amendment, the Act states: "the Seneca Nation of Indians, through its council, is authorized to lease *or grant easements or rights-of-way on* lands within the Cattaraugus, Allegany, and Oil Springs Reservations." *Id.*

The first question here is whether consent of the Secretary of the Interior was needed for conveyance of the 1954 Easement. Defendants argue that the requirements of the Non-Intercourse Act were lifted either by the 1875 Seneca Leasing Act or the 1950 Seneca Leasing Act. The Court disagrees and finds that Congress did not authorize the Seneca Nation to grant rights-of-way or leases until 1961, when the 1950 Seneca Leasing Act was amended.

---

[7] Unlike other lands used for the Thruway system, the Nation's lands were not subject to eminent domain. *See Oneida Indian Nation*, 414 U.S. at 670.

The Court finds persuasive the reasoning expressed by Magistrate Judge Heckman in her prior Report and Recommendation. *See Seneca Nation of Indians v. State of New York*, 1:93-CV-688, Dkt. No. 228 (W.D.N.Y. July 12, 1999). As stated by that Court:

> The State defendants argue that, by "taking Seneca leasing out of 25 U.S.C. § 177…," *United States v. Devonian Gas and Oil Co.*, 424 F.2d 464, 467 n.3 (2d Cir. 1970), Congress also intended to include the authority to grant easements and rights-of-way. However, as noted by the Second Circuit in the *Devonian* case, Congress did not specifically authorize the Seneca Nation to grant rights-of-way, in addition to leases, until 1961 when it amended the 1950 Act. *Devonian, supra*, 424 F.2d at 469 n.7. This finding is supported by the legislative history accompanying the 1961 amendments. *See* S. Rep. No. 87-599, at 2 ("The 1950 act permitted the Seneca Council to lease lands in accordance with the laws of New York, but it did not cover the granting of easements or rights-of-way."); H.R. Rep. No. 87-1003, at 4 ("[T]he 1950 act permits the Seneca Council to lease lands that are within the three reservations and outside certain villages, in accordance with the laws of New York, but it does not cover the grant of easements and rights-of-way.") (Item 195, Ex. 8).
>
> To the extent that the decision in *United States v. Cattaraugus County*, 71 F. Supp. 413 (W.D.N.Y. 1947), provides contrary authority, this court declines to follow it. The *Cattaraugus County* case was brought by the United States on behalf of the Seneca Nation challenging the condemnation and taking, several years earlier, of two acres of Allegany Reservation land for the purpose of constructing Route 17 from East Randolph to Salamanca, New York. The condemnation proceedings had been conducted in accordance with state law but without the permission of the Secretary of the Interior. On April 8, 1947, after conducting a bench trial, the district court dismissed the complaint. The court found nothing in the statutory language of either the 1875 Act or 25 U.S.C. § 311 making express permission of the Secretary of the Interior an essential preliminary to granting a right-of-way for highways through tribal lands. *Id.* at 419. The district court's ruling was not appealed.
>
> The *Cattaraugus County* case was decided before the Congressional enactments in 1948, 1950 and 1961 clarifying the grant of authority to the Seneca Nation with respect to easements and rights-of-way. The decision contains no reference to the Non-Intercourse Act. In addition, its holding has been called into question by *Seneca Nation of Indians*

> *v. State of New York*, 397 F. Supp. 685 (W.D.N.Y. 1975), in which
> Judge Curtin found that the State had no authority to appropriate land
> within the Allegany Reservation for the construction of a highway
> absent federal approval.
>
> Accordingly, I find that the requirements of the Non-Intercourse Act
> were not lifted by either the 1875 Act or the 1950 Act.

*Id.*, pgs. 13-15.[8] Thus, at the time of the 1954 Easement, the Nation did not have authority

to grant easements or rights-of-way over its lands without federal approval.

The second question presented is whether such consent was given by the

Secretary of the Interior. Based on the undisputed facts, the Court concludes that no such

approval was granted. The Secretary of the Interior is authorized to set requirements and

conditions to obtain federal consent for easements across Indian land. *See* 25 U.S.C. §§

311, 323. Pursuant to the statutory authorization, the Secretary issued regulations for

acquiring such property rights. In 1954, those regulations required that an application and

a map of definite location be filed with the Department of the Interior, that damages be

assessed, and that the application, map, and schedule of damages be approved by the

Secretary. *See* 25 C.F.R. Part 256 (1949). These requirements were not met here.

As Magistrate Judge Heckman explained in the 1993 Report and

Recommendation, "[t]hese requirements are not merely ministerial formalities, but are

necessary for the Secretary to carry out his trust responsibilities to the Indian tribes."

*Seneca Nation*, 1:93-CV-688, Dkt. No. 228, pg. 12. "Without knowing the specific land

involved, the amount of the compensation to be paid, or the other terms and conditions

---

[8] Additionally, there is no indication in the language of the 1961 Amendment to the Seneca Leasing Act that Congress intended it to apply retroactively to prior easements. *See generally Landgraf v. USI Film Prods.*, 511 U.S. 244, 272 (1994) ("congressional enactments and administrative rules will not be construed to have retroactive effect unless their language requires this result").

of the transaction, the Secretary could not knowingly and intelligently approve the permanent alienation of reservation land." *Id.*, pgs. 12-13. These requirements should be strictly construed in favor of the tribe in order to protect fully Indian interests. *Id.* (citing *United States v. Southern Pacific Transp. Co.*, 543 F.2d 676, 692 (9th Cir. 1976)).

Here, defendants have produced no record of the 1954 agreement being approved by the Secretary of the Interior. They offer no evidence that a filing meeting the regulatory requirements of the Department of the Interior was ever made. There was no filing of a map of the definite location, no application for approval of the easement, and no schedule of damages. Defendants admit that they have no record of the Secretary of the Interior approving any application, map, or schedule of damage. Indeed, the United States has confirmed the absence of such approval. *See* Dkt. No. 117-2, ¶ 35 ("[i]f the Department of the Interior had approved an easement between the Seneca Nation and the State of New York, the Bureau of Indian Affairs would have a signed easement document in its files.").

Defendants contend that the Secretary of the Interior approved the Thruway project by a June 10, 1946 letter written by Oscar Chapman, Acting Secretary of the Department of the Interior, to J. Frank O'Marah, Director of the New York State Department of Public Works. On May 7, 1946, Director O'Marah sent a letter to U.S. Department of the Interior, Office of Indian Affairs, with respect to extending the Thruway "through the Cattaraugus Indian Reservation." (Dkt. No. 114-1, ¶ 16). The letter stated:

> Mr. Seneca recommended that I communicate with the residents of the land within the Reservation whose property is affected and endeavor to reach an agreement with each person as to the sum to be paid for their interest, and if such agreements can be made, he would call a Council meeting of the Seneca Nation to ratify such action and agree on an amount to be paid the Seneca Nation. This is the

same procedure I followed in dealing with the Seneca Nation when negotiations were undertaken with reference to P.S.C. Case No. 5389 for elimination of grade crossings near Irving, N.Y.

This Department understands it cannot appropriate or acquire fee title to Indian Lands on this Reservation and must agree with the individual Indians whose allotment of land is involved in the project and obtain the consent of the Council of the Seneca Nation before any part of their property is used for this project and the Department proposes to proceed along that line.

Based on this Department's experience in the past in such matters, I would ask the consent and approval of the Department of the Interior as to this procedure.

(Dkt. No. 114-1, ¶ 16; 117-2, ¶ 24).

In a letter dated June 10, 1946, Acting Secretary Chapman responded to Director

O'Marah as follows:

You advise that Mr. Seneca, President of the Seneca Nation of Indians has recommended that an agreement be reached between your Department and the individual Indians, whose property will be affected by the construction of the Erie Thruway. Upon reaching an agreement with individual Indians as to the amount of damages to be paid to them, Mr. Seneca is agreeable to call a council meeting for the purpose of determining the amount of damages due the tribe.

It appears this procedure is similar to that used in the acquisition of a right of way for elimination of a grade crossing . . . near Irving, New York. This Department is agreeable to your proposal that the same method used in acquiring a right of way for the grade crossing be used for the acquisition of a right of way for the Erie Thruway. Maps of definite location together with your application should be filed with the Superintendent. Signed copies of the agreements executed by the individual Indians should also be furnished. The consideration cited in the agreements may be paid to the Indians entitled thereto.

It should be understood that before any construction work is commenced consent of the Indian owners must be obtained. It is agreeable to this Department for the New York State Department of Public Works to begin construction work on the Erie Thruway after consent of the individual Indians and tribal council has been obtained and payment of the damages has been made.

20

(Dkt. No. 114-1, ¶ 19; 117-2, ¶ 25).

Acting Secretary Chapman's letter advises that seeking easements from the individual Senecas occupying the lands and from the Nation itself was an acceptable procedure for obtaining a right-of-way for the Thruway. However, Chapman's letter goes on to instruct Director O'Marah that "[m]aps of definite location together with your application should be filed with the Superintendent. Signed copies of the agreements executed by the individual Indians should also be furnished."

This Court finds that Acting Secretary Chapman's letter does not constitute "plain and unambiguous" evidence of federal approval of the 1954 Easement. Contrary to defendants' claim, the correspondence shows that Acting Secretary Chapman gave express instructions to the New York Department of Public Works to file an application for approval, maps of definite location, and copies of the agreements with individual Indians regarding consideration to be paid. These directives conform to the regulatory requirements in 25 C.F.R. Part 256 which were applicable to the acquisition of Indian land rights such as this. Defendants admit that they have no record of these requirements ever being met.[9]

Although Acting Secretary Chapman agreed that construction could proceed "after consent of the individual Indians and tribal council has been obtained and payment of the damages has been made," he did not purport to exempt the Thruway from submission of

---

[9] It is also noted that the State's 1947 letter to the Department of the Interior appears to be a tacit admission or acknowledgment that the State knew that approval from the federal government was needed for the agreement. This appears to be in conflict with defendants' current position that federal approval was not required at the time of the 1954 Easement. There is no evidence before the Court suggesting that the State actually believed, in 1954, that the 1950 Seneca Leasing Act, or any other law, allowed it to enter into an easement directly with the Seneca Nation without federal approval for such an easement.

an application for review by the Department of the Interior. The Court agrees with the reasoning of Judge Heckman in holding that the letter was not sufficient to constitute federal approval of the right-of-way. The letter "merely outlines prospectively the general requirements for obtaining a right-of-way and discussed the procedure for obtaining tribal consent, but does not constitute actual approval of the right-of-way itself." *Seneca Nation*, 1:93-CV-688, Dkt. No. 228, pg. 12. Indeed, without knowing the specifics of the right-of-way, it would have been impossible for the Secretary to approve it. *Id.*

Further, the Court rejects defendants' claim that that the Nation ratified the 1954 Easement at a time when federal approval was no longer necessary.[10] Defendants provide no authority for the proposition that an agreement made in violation of the Non-Intercourse Act can be validated or ratified by an Indian tribe after the fact. *See Oneida Indian Nation*, 414 U.S. at 670 ("Indian title is a matter of federal law" and "its termination [is] exclusively the province of federal law.").

Based on the record, the Court concludes that it was necessary for New York State to obtain the consent of the Secretary of the Interior for the 1954 Easement. The Court further concludes that such approval was not granted. Accordingly, it is recommended that plaintiff Seneca Nation be awarded summary judgment on this claim and that the District Court enter a declaratory judgment finding that the 1954 Easement is void *ab initio*.

---

[10] Defendants' ratification theory is based on the Nation's acceptance and non-return of payment for the easement, the Nation's failure to repudiate the agreement for 32 years, and the Nation's designation of individual Seneca landowners who were entitled to receive compensation from New York for the land acquisition based on the easement.

3. *Affirmative Defenses*

Defendants assert that New York State is entitled to summary judgment on its affirmative defenses of *Sherrill* laches or traditional laches. Defendants principally argue that the doctrine of *Sherrill* laches bars the Nation's claims under equitable principles. The Court does not agree that either defense bars this action.[11]

*Sherrill* laches derives its name from *City of Sherrill v. Oneida Indian Nation*, 544 U.S. 197 (2005). The case involved the Oneida Indian Nation's claims of sovereignty over land once contained within the Nation's reservation in what is now central New York. *Id.*, at 202. In 1997 and 1998, the Oneida Nation purchased, through the open market, approximately 17,000 acres of land in discrete parcels scattered throughout the Counties of Oneida and Madison. *Id.*, at 211. Because the parcels existed within the boundaries of the reservation originally occupied by the Oneidas, the Nation maintained that the properties were exempt from taxation and refused to pay property taxes. *Id.* After the City of Sherrill initiated eviction proceedings, the Oneida Nation sued in federal court seeking equitable relief prohibiting current and future imposition of property taxes. *Id.*

The Supreme Court held that, given the long-standing, distinctly non-Indian character of the area and its inhabitants, the regulatory authority constantly exercised by New York State and its counties and towns for 200 years, and the Oneida's long delay in seeking judicial relief against parties other than the United States, "standards of federal Indian law and federal equity practice preclude the Tribe from unilaterally reviving its

---

[11] The Court rejects defendants' claim that traditional laches warrants denial of the Nation's claims. State law doctrines cannot act as a bar to Indian land claims under the Supremacy Clause or the Non-Intercourse Act. *See County of Oneida v. Oneida Indian Nation*, 470 U.S. 226, 240 n.13 (1985) ("Under the Supremacy Clause, state-law time bars, e.g., adverse possession and laches, do not apply of their own force to Indian land title claims.").

ancient sovereignty, in whole or in part, over the parcels at issue." *Id.*, at 202-03. The Court rooted its decision in the equitable principles of laches, acquiescence, and impossibility. *Id.*, at 221. As the Court explained, "the unilateral reestablishment of present and future Indian sovereign control, even over land purchased at the market price, would have disruptive practical consequences." *Id.*, at 219.

Following *Sherrill*, the Second Circuit applied the same equitable principles in *Cayuga Indian Nation of New York v. Pataki*, 413 F.3d 266 (2d Cir. 2005). There, the Cayuga Nation asserted claims to its historic lands and sought ejectment of the current occupants of those lands. *Id.*, at 274-75. The district court determined that the remedy of ejectment was inappropriate but it granted money damages to the Cayugas for the dispossession of land. *Id.*, at 275. The Second Circuit reversed the district court's award of damages, holding that this type of possessory land claim is "indisputably disruptive" and is subject to the equitable considerations discussed in *Sherrill*. *Id.* "Whether characterized as an action at law or in equity, any remedy flowing from this possessory land claim, which would call into question title to over 60,000 acres of land in upstate New York, can only be understood as a remedy that would similarly 'project redress into the present and future.'" *Id.* The Second Circuit understood *Sherrill's* holding not to be limited to identical claims to that brought by the Oneidas, but rather that these equitable defenses apply to "disruptive" Indian land claims more generally. *Id.*, at 274.

In 2010, the Second Circuit reiterated its prior holding in *Cayuga*, stating that "'possessory land claims' – any claims premised on the assertion of a current, continuing right to possession as a result of a flaw in the original termination of Indian title – are by their nature disruptive." *See Oneida Indian Nation v. County of Oneida*, 617 F.3d 114,

125 (2d. Cir. 2010). It went on to hold that the Oneida Nation's "nonpossessory" claim for money damages based on land transfers made in violation of the Non-Intercourse Act could not proceed under *Sherrill* and *Cayuga* because the "defense is properly applied to bar any ancient land claims that are disruptive of significant and justified societal expectations that have arisen as a result of a lapse of time during which the plaintiffs did not seek relief." *Id.*, at 135. Under this reasoning, the Court explained that "the equitable defense originally recognized in *Sherrill* is potentially applicable to all ancient land claims that are disruptive of justified societal interests that have developed over a long period of time, of which possessory claims are merely one type, and regardless of the particular remedy sought." *Id.*, at 136.

The Second Circuit identified three specific factors to determine when ancestral land claims are foreclosed on equitable grounds: (1) the length of time at issue between the historical injustice and the present day; (2) the disruptive nature of claims long delayed; and (3) the degree to which these claims upset the justifiable expectations of individuals and entities far removed from the events giving rise to the plaintiffs' injury. *Onondaga Nation v. New York*, 500 Fed. Appx. 87, 89 (2d Cir. 2012) (summary order) (quoting *Oneida*, 617 F.3d at 127).

Here, although the Nation does not seek ejectment, defendants argue that the Nation's requests for a judgment declaring the 1954 Easement void *ab initio* and to compel the State to renegotiate the Easement are "disruptive, forward-looking claims" subject to laches pursuant to *Sherrill*. Relying on *Cayuga*, 413 F.3d at 274, defendants argue that *Sherrill* laches applies even when there has been no loss of actual possession.

The Nation argues that the fact that it has never lost possession and has always held title to the land is essential to this inquiry. Indeed, *Sherrill* expressly bars ancient land claims that are "premised on the assertion of a current, continuing right of possession as a result of a flaw in the *original termination of Indian title*," and that loss of possession has led to a longstanding societal reliance. *Oneida Indian Nation*, 617 F.3d at 135 (emphasis added). Here, there has been no termination of title or transfer of actual possession away from the Nation. Further, as the Nation argues, whether a claim is described as "possessory" or "non-possessory," the holdings of *Sherrill* and its progeny are based on actual loss of possession of land. "Possessory" claims seek ejectment or similar remedies, whereas "non-possessory" seeks damages or other remedies that would not result in recovery of possession despite its loss. *See Cayuga Indian Nation*, 413 F.3d at 274.

The federal cases cited by defendants to support application of *Sherrill* all involve an Indian nation which lost possession of lands for an extended period of time before seeking remedies for such dispossession. *See Onondaga Nation*, 500 Fed. Appx. at 89–90 (dispossession at least 183 years ago, and the land had been "extensively developed and populated" by non-Indians); *Oneida Indian Nation*, 617 F.3d at 119 (dispossession through "a series of transactions from 1795 to 1846"); *Cayuga Indian Nation*, 413 F.3d at 269 (dispossession as of 1795 and 1807); *Shinnecock Indian Nation v. New York*, No. 05-CV-2887, 2006 U.S. Dist. LEXIS 87516, at *4 (E.D.N.Y. Nov. 28, 2006), *aff'd*, 628 Fed. Appx. 54 (2d Cir. 2015) (dispossession as of 1859).

Here, the 1954 Easement did not result in termination of title or actual loss of possession of the land by the Nation. The agreement grants only a limited right of use by

the State for "Thruway purposes" and does not purport to change ownership of the land. "One does not […] possess or occupy an easement […]. An easement derives from use, and its owner gains merely 'a limited use or enjoyment of the servient land." *Di Leo v. Pecksto Holding Corp.*, 304 N.Y. 505, 511 (1952); *see, e.g. Paradise Point Assn., Inc., v. Zupa*, 22 A.D.3d 818, 819 (2d Dept. 2005) ("It is well settled that easement rights derive from use and enjoyment. The easement owner gains no right to possess or occupy the land."). The Nation continues to hold and exercise possessory rights in restricted fee title, including concurrent physical possession and usage at bridges and underpasses, the retention of a right to ejectment at the end of the specified use, and the continued assertion of authority to regulate use of its lands.

The matter of *Canadian St. Regis Band of Mohawk Indians v. New York* is instructive on this point. *See* 82-CV-783, 2013 U.S. Dist. LEXIS 112860 (N.D.N.Y. July 23, 2013). The court there dealt with land, highway, and power line claims brought against New York regarding original St. Regis Mohawk reservation territory. It held that *Sherrill* laches barred the St. Regis Mohawks' attempt to invalidate a right-of-way for State Route 37 because ejection of the State or rerouting of the highway would be highly disruptive. *Id.*, at *22-26. Importantly, the land over which Route 37 runs was conveyed to New York State in 1818 and later developed with a highway. *Id*. Thus, the dispossession of land was ancient and did not involve a right-of-way over existing tribal land. The court also applied *Sherrill* to bar the Mohawk's claim for disputed islands along the United States-Canada border that "were never regularly inhabited," had been possessed by non-Indian parties before coming under the auspices of the New York Power Authority, and eventually became the site for "a major hydroelectric facility." *Id.*, at *31-35.

By contrast, the *St. Regis Mohawk* court refused to apply *Sherrill* to a claim to invalidate a 40-year-old right-of-way for power lines over lands "which were not included" in any of the challenged ancient conveyances. *Id.* at *26-31. The court also did not apply *Sherrill* to a claim for an area of land called the "Hogansburg Triangle" because, despite the purported conveyances, the Mohawks "remained a major portion of the population in the area at issue." *Id.* at *58-78. The court found that despite well over a century of temporal lag and the disruptive nature of the claim, it was distinguishable from that of *Sherrill* and *Oneida. Id.*, at *63-65. "Unlike the Cayugas and the Oneidas, . . . the Mohawks remained in New York," and the case did "not involve a displaced group returning to a region and seeking to reclaim large swaths of land or repayment for the lands in question." *Id.*, at *76-77.[12] *See also Red Cliff Band of Lake Superior Chippewa Indians v. Bayfield Cnty.*, 432 F. Supp. 3d 889, 898 (W.D. Wis. 2020) (declining to apply *Sherrill* to zoning dispute where "the undisputed record here demonstrates that the Red Cliff Tribe and its members owned significant portions of the Reservation for the entire, relevant period of time" and the division of jurisdiction would not change regardless of the outcome of the case.).

The only case cited by defendants in which *Sherrill* was applied to facts that did not involve a historical loss of tribal land is *Commissioner of the N.Y. State DOT v. Polite*, 236 A.D.3d 82 (2d Dept. 2024). The Appellate Division held that *Sherrill* laches barred the Shinnecock Nation from asserting regulatory authority over land it owned within a

---

[12] To this same point, *Sherrill* distinguished the ejectment of non-Indians from reservation land in *United States v. Boylan*, 265 F. 165 (2d Cir. 1920), because it "involved land the Oneidas never left." *See Sherrill*, 544 U.S. at 210 n.3. The Supreme Court noted that in *Boylan*, "[t]he Second Circuit observed that the Oneidas were 'actually in possession' of the 32 acres in question, […] and had occupied the land continuously for over a century." *Id.* (quoting *Boylan*, 167, 171). "Given that occupation and the absence of Federal Government approval for the individual Oneidas' conveyances, the Second Circuit upheld the District Court's 'decree restoring the ejected Indians to possession.'" *Id.* (quoting *Boylan*, at 173-175).

right-of-way on a highway built and operated by the State based on a permanent easement obtained in 1959. *Id.*, at 120. That *Sherrill* analysis focused on "the disruptiveness of taking away the State's power to regulate the subject property." *Id.*, at 120-22. The court determined that "recognition of the Nation's ability to assert sovereign power over the subject property for purposes of constructing, maintaining, and/or operating the structures in the highway right-of-way would likely be highly disruptive of settled expectations." *Id.*

Here, unlike in *Polite*, the Nation's regulatory authority over the lands is not implicated. The Nation has always held sovereign jurisdiction over the Cattaraugus Territory and has maintained its possessory interests in this land. *See* 25 C.F.R. 169.10 ("A right-of-way is a non-possessory interest in land" that does not diminish to any extent: "(a) The Indian tribe's jurisdiction over the land subject to, and any person or activity within, the right-of-way").[13] Further, the Nation expressly states that it does not seek any change to jurisdictional control or regulatory authority over the Thruway lands.

Moreover, applying the factors relevant to a *Sherrill* laches defense, such factors weigh against application of the defense in this instance. First, the Court does not view this claim as ancient. The delay between the alleged Non-Intercourse Act violation and the Nation's assertion of rights, a key component of the doctrine of *Sherrill* laches, is significantly and meaningfully shorter than the lapses of time in comparable cases.

In *Sherrill*, the Oneida Indian Nation sought revival of sovereignty over lands it was dispossessed of by 1805. *Sherrill*, 544 U.S. at 210. The Supreme Court stressed the long

---

[13] In fact, the New York Thruway Authority has a long-standing practice of seeking consent from the Nation for Thruway-related maintenance, and has agreed to "comply with all Nation laws and ordinances in performing" bridge inspection activities within the Cattaraugus Territory. *See* Dkt. No. 121-1, pg. 5.

lapse of time between 1805 and the 1970s during which the tribe had not sought to revive its sovereign control through equitable relief in court. *Id.*, at 216-17; *see Oneida Indian Nation*, 617 F.3d at 117 (explaining that the case brought in 1974 involved claims over "approximately 250,000 acres of ancestral lands, and to relief going back over two hundred years, to the period between 1795 and 1846 when these lands were conveyed in multiple transactions to the State of New York."). Similarly, in *Cayuga*, the tribe waited until 1980 to seek restoration of its rights over land acquired by New York State through treaties ratified in 1795 and 1807. *Cayuga Indian Nation*, 413 F.3d at 269. The Second Circuit also denied the claim for recovery of ancestral land asserted by the Onondaga Nation because "approximately 183 years separate the Onondagas' filing of action from the most recent occurrence giving rise to their claims." *Onondaga Nation*, 500 Fed. Appx. at 88.

It cannot be said that a claim which arose in 1954 and was first asserted by the Senecas less than 40 years later, in 1993, qualifies as an "ancient" land or sovereignty claim. *See Sherrill*, 544 U.S. at 202-03; *Canadian St. Regis Band of Mohawk Indians*, 2013 U.S. Dist. LEXIS 112860, at *31 ("While the 40-year gap between the formation of the agreement and the filing of the 1989 Complaint is not the blink of an eye, neither is it the 'extraordinary passage of time' that is a prerequisite to application of the extraordinary defense of *Sherrill* laches."). Even if the length of time is calculated from 1954 to the present, just over 70 years have elapsed. The wrongs the Nation seeks to correct occurred less than one lifespan ago.

Second, as discussed above, the extent of disruption caused by this claim is limited, particularly in light of the fact that the Nation does not seek ejectment, a change

in possessory interests, or any additional jurisdictional or regulatory control over the Thruway lands. Instead, the Nation seeks an order mandating defendants to obtain a valid easement on equitable terms to correct an ongoing violation of federal law for the unlawfully obtained prior easement.

Defendants rely on the Second Circuit's holding in *Cayuga* to the effect that *Sherrill's* equitable principles barred all remedies, including money damages, for the Cayuga Nation's land claims because they were inherently disruptive. *See Cayuga Indian Nation*, 413 F.3d at 275-77. Although defendants argue that the relief sought here is "inherently disruptive," the Supreme Court and the Second Circuit have only found Indian land claims to be "inherently disruptive" of state and local governance when they are "asserted generations after an alleged dispossession," which is not the case here. *See Stockbridge-Munsee Cmty. v. New York*, 756 F.3d 163, 165 (2d Cir. 2014).

The third prong of the *Sherrill* analysis looks at the degree to which the claims upset the justifiable expectations of individuals and entities far removed from the events giving rise to the plaintiffs' injury. In *Oneida*, the nonpossessory claim over land called into question "the validity of the original transfer of the subject lands and at least potentially, by extension, subsequent ownership of those lands by non-Indian parties," and effectively asked the Court "to overturn years of settled land ownership." *Oneida Indian Nation*, 617 F.3d at 137. The Second Circuit stressed that claims having this characteristic "necessarily threaten to undermine broadly held and justified expectations as to the ownership of a vast swath of lands -- expectations that have arisen not only through the passage of time but also the attendant development of the properties." *Id.* These circumstances are also not present in the case at bar.

Requiring defendants to renegotiate the terms of the easement will not disrupt Thruway operations in a manner significantly affecting the public. Widespread public use of the Thruway is unlikely to be changed in light of any renegotiation. In fact, the Nation submits undisputed expert evidence to support a finding that even if tolls on the Thruway were raised to account for the cost of a new easement, such an increase would have minor effects. *See* Dkt. No. 117-8, pg. 33 (expert report of Steven E. Turner opining that "higher tolls are likely to have only 'minor' effects on Thruway traffic patterns–*i.e.*, Thruway users are relatively price inelastic").

Lastly, defendants offer several conjectural or hypothetical arguments about changes to justifiable expectations. They submit that ongoing payments for use of a new easement would impact the Thruway Authority's finances and budget significantly and notably increase the annual budget of the State. They further speculate that such payments might require approval of the New York State Legislature. Despite these arguments, defendants have not shown or presented evidence that payment to the Nation for ongoing use of the easement will upset the justifiable expectations of third parties. Although the relationship between the State and the Seneca Nation will change under a new agreement, use of the Thruway across the Cattaraugus Territory will be largely unaffected.

For these reasons, the Court concludes that *Sherrill* laches does not bar this claim. Thus, the Court recommends that the Nation be granted summary judgment on defendants' affirmative defense.

## CONCLUSION

For the foregoing reasons, it is recommended that plaintiff's motion for summary judgment (Dkt. No. 117) be GRANTED as to the declaratory judgment, and defendants' motion for summary judgment (Dkt. No. 114) be DENIED.

The Court further recommends that the District Court order that the parties return to mediation in order to negotiate the terms of a new easement.

Pursuant to 28 U.S.C. §636(b)(1), it is hereby **ORDERED** that this Report and Recommendation be filed with the Clerk of Court.

Unless otherwise ordered by Judge Vilardo, any objections to this Report and Recommendation must be filed with the Clerk of Court within fourteen days of service of this Report and Recommendation in accordance with the above statute, Rules 72(b), 6(a), and 6(d) of the Federal Rules of Civil Procedure, and W.D.N.Y. L. R. Civ. P. 72. Any requests for an extension of this deadline must be made to Judge Vilardo. ***Failure to file objections, or to request an extension of time to file objections, within fourteen days of service of this Report and Recommendation WAIVES THE RIGHT TO APPEAL THE DISTRICT COURT'S ORDER.*** *See Small v. Sec'y of Health & Human Servs.*, 892 F.2d 15 (2d Cir. 1989).

The District Court will ordinarily refuse to consider *de novo* arguments, case law and/or evidentiary material which could have been, but were not, presented to the Magistrate Judge in the first instance. *See Paterson–Leitch Co. v. Mass. Mun. Wholesale Elec. Co.,* 840 F.2d 985, 990-91 (1st Cir. 1988).

*Finally, the parties are reminded that, pursuant to W.D.N.Y. L.R. Civ. P. 72(b), written objections "shall specifically identify the portions of the proposed findings and*

*recommendations to which objection is made and the basis for each objection, and shall*

*be supported by legal authority."*  **Failure to comply with these provisions may result**

**in the District Court's refusal to consider the objection.**


       **SO ORDERED.**

DATED:      September 30, 2025
               Buffalo, New York

                        MICHAEL J. ROEMER
                        United States Magistrate Judge