UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

SENECA NATION, a federally recognized Indian tribe,

                        Plaintiff,

        vs.

KATHLEEN C. HOCHUL, in her official capacity as Governor of New York; LETITIA JAMES, in her official capacity as New York State Attorney General; MARIE T. DOMINGUEZ, in her official capacity as Commissioner of the New York State Department of Transportation; THOMAS P. DINAPOLI, in his official capacity as Comptroller of the State of New York; and THE NEW YORK STATE THRUWAY AUTHORITY.

                        Defendants.

Case No. 18-cv-00429-LJV-MJR

## DEFENDANTS' OBJECTIONS TO THE MAGISTRATE'S REPORT AND RECOMMENDATION

**NIXON PEABODY LLP**
Erik A. Goergen
40 Fountain Plaza, Suite 500
Buffalo, New York 14202
Telephone: (716) 853-8118

*Attorneys for Defendant New York State Thruway Authority*

**LETITIA JAMES**
**Attorney General of the State of New York**
Daniel R. Maguire
Stephanie Joy Calhoun
Main Place Tower, Suite 300A
350 Main Street
Buffalo, New York 14202
Telephone: (716) 853-8400

*Attorneys for Defendants Governor of the State of New York, Attorney General of the State of New York, the Commissioner of the New York State Department of Transportation, and the Comptroller of the State of New York*

# TABLE OF CONTENTS

**Page**

ARGUMENT ...................................................................................................................... 1

POINT I      THE MAGISTRATE ERRED IN CONCLUDING THAT SHERRILL AND ITS
SECOND CIRCUIT PROGENY DO NOT BAR THE NATION'S CLAIMS...... 1

    A.    Sherrill Laches Applies to the 1954 Easement ......................................... 1

    B.    The Magistrate Misapplied the Three-Part Sherrill Test ....................................... 8

        1.    The 70-Year Passage of Time is Sufficiently Long for Sherrill Laches..... 8

        2.    The Nation's Claims are Disruptive and Upset Justified Expectations ...... 9

POINT II     THE MAGISTRATE ERRED IN CONCLUDING THAT THE STATE
OFFICIAL DEFENDANTS WERE PROPER DEFENDANTS UNDER EX
PARTE YOUNG ...................................................................................... 14

POINT III    THE MAGISTRATE ERRED IN CONCLUDING THAT THE 1954
EASEMENT WAS VOID AT INCEPTION ......................................................... 17

    A.    Federal Consent Was Not Required for the 1954 Easement................................ 18

    B.    The Secretary of the Interior's 1946 Letter Approved the Thruway Project ........ 21

    C.    The Nation Ratified the 1954 Easement Through Its Post-1961 Conduct............ 22

POINT IV    THE DECLARATORY RELIEF RECOMMENDED BY THE MAGISTRATE
IS INCONSISTENT WITH THE SECOND CIRCUIT'S DECISION AND
UNAVAILABLE UNDER EX PARTE YOUNG............................................... 23

CONCLUSION.................................................................................................................. 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Canadian St. Regis Band of Mohawk Indians v. New York*,
No. 5:82-CV-0783, 2013 U.S. Dist. LEXIS 112860 (N.D.N.Y. July 23, 2013) .......................7

*Cayuga Indian Nation of New York v. Pataki*,
413 F.3d 266 (2d Cir. 2005).................................................................................1, 11, 12

*City of Sherrill v. Oneida Indian Nation of New York*,
544 U.S. 197 (2005)......................................................................................... *passim*

*Commissioner of the N.Y. State DOT v. Polite*,
236 A.D.3d 82 (2d Dep't 2024) ..........................................................................6

*Felix v. Patrick*,
145 U.S. 317 (1892)...........................................................................................9

*Fluent v. Salamanca Indian Lease Authority*,
928 F.2d 542 (2d Cir. 1991).................................................................................24

*McGinty v. New York*,
251 F.3d 84 (2d Cir. 2001)...................................................................................16

*Nassau & Suffolk Cnty. Taxi Owners Ass'n, Inc. v. State*,
336 F. Supp. 3d 50 (E.D.N.Y. 2018) ......................................................................15

*Oneida Indian Nation v. County of Oneida*,
617 F.3d 114 (2d Cir. 2010)......................................................................3, 7, 11, 12

*Oneida Indian Nation v. Phillips*,
981 F.3d 157 (2d Cir. 2020)..................................................................................23

*Onondaga Nation v. New York*,
500 Fed. Appx. 87 (2d Cir. 2012)...................................................................8, 10, 13

*Pension Ben. Guar. Corp. v. LTV Corp.*,
496 U.S. 633 (1990)..........................................................................................20

*Puerto Rico Aqueduct & Sewer Auth. v. Metcalf & Eddy, Inc.*,
506 U.S. 139 (1993)..........................................................................................24

*Richardson v. New York State Dep't of Corr. Ser.*,
180 F.3d 426 (2d Cir. 1999)..................................................................................16

ii

*Seneca Nation of Indians v. New York*,
383 F.3d 45 (2d Cir. 2004).......................................................17, 18, 20, 24

*Seneca Nation v. Cuomo*,
484 F. Supp. 3d 65 (W.D.N.Y. 2020) ...........................................................14

*Seneca Nation v. Hochul*,
58 F.4th 664 (2d Cir. 2023) ........................................................... *passim*

*Sossamon v. Texas*,
563 U.S. 277 (2011)......................................................................................17

*United States v. Devonian Gas & Oil Co.*,
424 F.2d 464 (1970)......................................................................................22

*United States v. Southwestern Cable Co.*,
392 U.S. 157 (1968)......................................................................................20

*Sullivan v. Finkelstein*,
496 U.S. 617 (1990) .....................................................................................20

*Whole Woman's Health v. Jackson*,
595 U.S. 30 (2021).......................................................................................15

**Statutes**

23 U.S.C. § 103(a) ..........................................................................................6

Nonintercourse Act ............................................................................. *passim*

Defendant New York State Thruway Authority (the "Thruway Authority") and

Defendants Governor of the State of New York, Attorney General of the State of New York, the

Commissioner of the New York State Department of Transportation, and the Comptroller of the

State of New York (collectively, the "State Official Defendants" and with the Thruway

Authority, the "State Defendants") submit the following objections to Magistrate Judge

Roemer's Report and Recommendation ("R&R") (ECF No. 134).[1]

## ARGUMENT

## POINT I

**THE MAGISTRATE ERRED IN CONCLUDING THAT *SHERRILL* AND ITS SECOND CIRCUIT PROGENY DO NOT BAR THE NATION'S CLAIMS**

### A. *Sherrill* Laches Applies to the 1954 Easement

According to the Magistrate, *Sherrill* laches does not bar Plaintiff Seneca Nation's ("the

Nation") claims because "the holdings of *Sherrill* and its progeny are based on actual loss of

possession of land" and "the 1954 Easement did not result in termination of title or actual loss of

possession of the land by the Nation." R&R 26.

That determination is erroneous. Neither *Sherrill* nor its Second Circuit progeny require

the termination of title or "actual loss of possession of land" for laches to apply to long-delayed

Indian land claims. The Magistrate's narrow interpretation of *Sherrill* laches is contrary to the

Second Circuit's characterization of the doctrine as a broad equitable defense. *See Cayuga*

*Indian Nation of New York v. Pataki*, 413 F.3d 266, 274 (2d Cir. 2005) ("[T]he Supreme Court

did not identify a formal standard for assessing when these equitable defenses apply" but "the

---

[1] The R&R recommends granting the Nation's motion for summary judgment only as to the declaratory judgment claim (not as to the claims for injunctive relief) and recommends denying the State Defendants' motion for summary judgment. Accordingly, the State Defendants' objections are limited to those issues. If the Nation objects to the R&R on the ground that the Nation is entitled to summary judgment on its claims for injunctive relief, the State Defendants reserve the right to respond to those objections.

1

broadness" of the Supreme Court's statements indicate that *Sherrill* was "not narrowly limited to claims identical to that brought by the Oneidas, seeking a revival of sovereignty, but rather, that these equitable defenses apply to 'disruptive' Indian land claims more generally.") (citation omitted). The key inquiry is the disruptiveness of the land claim in question, not its similarity to the Oneida and Cayuga land claims. *See City of Sherrill v. Oneida Indian Nation of New York*, 544 U.S. 197, 217-18 (2005) (noting that laches is "principally a question of the inequity of permitting the claim to be enforced—an inequity founded upon some change in the condition or relations of the property or the parties") (quoting *Galliher v. Cadwell*, 145 U.S. 368, 373 (1892)).

Indeed, in *Sherrill*, the tribe *did* possess the parcels of land at issue. Specifically, the Oneida Indian Nation had reacquired, in fee simple, parcels that had once belonged to its historic reservation, and the dispute concerned whether this act revived its aboriginal title, so that the tribe could assert "sovereign dominion" over the parcels and exempt them from real property taxes. 544 U.S. at 211-13. The Supreme Court held that equitable doctrines of laches, acquiescence, and impossibility barred revival as too disruptive. The same is true here. As extensively discussed in the State Defendants' summary judgment motion, the Nation's claims are highly disruptive as a matter of law and thus barred by *Sherrill* laches. *See* Def. Mem. 19-24; Def. Opp. Mem. 4-7; Def. Reply Mem. 1-5; Def. Supp. Mem. 1-7.[2]

The Nation's retention of fee title to the land covered by the 1954 Easement does not undercut the strong rationale for applying *Sherrill* laches here given the significant property interest granted to the State – a permanent and exclusive right to construct, maintain, and operate

---

[2] Citations to the State Defendants' summary judgment memoranda of law will be abbreviated as follows: Memorandum of Law in Support of Defendants' Joint Motion for Summary Judgment ("Def. Mem.") (ECF No. 114-2); Joint Memorandum of Law in Opposition to Plaintiff's Motion for Summary Judgment ("Def. Opp. Mem.") (ECF No. 120); Reply Memorandum of Law in Further Support of Defendants' Joint Motion for Summary Judgment ("Def. Reply Mem.") (ECF No. 124); Defendants' Supplemental Memorandum of Law ("Def. Supp. Mem.") (ECF No. 129); and Defendants' Response to Plaintiff's Supplemental Brief ("Def. Supp. Resp.") (ECF No. 133).

the New York State Thruway on the 1954 Easement land. The Nation's divesture of this substantial property right – regardless of its characterization – is the functional equivalent of title termination because the Nation cannot use the land for other purposes and has not done so for more than half a century. *See* Def. Mem. 14-15. By granting such broad and extensive property rights for a massive transportation infrastructure project, the Nation essentially relinquished its right to control, exclude others from, dispose of, or use and enjoy the disputed land (other than as a highway). The Nation cannot develop the land through the construction of commercial or residential buildings, nor can it use the land for agricultural or recreational purposes. The possessory rights that the Thruway Authority enjoys under the 1954 Easement are substantially similar to the possessory rights of a leaseholder or fee owner. Real estate interests that are not technically full fee ownership often entail enormously consequential reliance interests and that is the case here. *See, e.g.,* Def. Mem. 30-31 (discussing prejudice to the State stemming from the Nation's delay and the State's reliance interest). Rights of way can be perpetual and may entail substantial vested interests as well. The Second Circuit's precedent on this score compels the conclusion that the claims at issue here, premised on a "continuing right of possession" that would cast a cloud over a vital infrastructure project, are barred by *Sherrill* laches regardless of any purported flaw in the initial conveyance. *See Oneida Indian Nation v. County of Oneida*, 617 F.3d 114, 125 (2d Cir. 2010) ("any claims premised on the assertion of a current, continuing right to possession as a result of a flaw in the original termination of Indian title—are by their nature disruptive . . . ").

The Magistrate's R&R, however, incorrectly treats the 1954 Easement as a typical easement with a "limited right of use" (R&R 26) thereby disregarding the true nature of the vast property rights granted to the State, the State's enormous reliance on this grant, and the State's

control over the disputed land for Thruway operations. *See* Def. Reply Mem. 5-7. There is no principled reason, in equity, to have an entirely different rule for fee title termination than for other real property interests with similarly vested reliance interests of large magnitude – such as an easement with the right to exclude given in perpetuity. *Sherrill* itself makes clear that laches is about assessing reliance interests and changed conditions of the property and the parties (*see* 544 U.S. at 217-18) – and does not in any way suggest that calculus applies only to one type of real property transaction. Given the nature of the Thruway, the reality is that the State's rights pursuant to its status as an easement holder are nearly identical to the rights of a fee owner. Where the rights differ, there is no rationale for not applying *Sherrill* based on these minimal differences. Thus, the equitable considerations set forth in *Sherrill* and its progeny should apply with equal force to the Nation's claims notwithstanding an absence of fee title termination.

Additionally, the Magistrate's conclusion that the Nation did not experience an "actual loss of possession" of the disputed land defies the practical reality that the Nation does not and cannot exercise any of the traditional possessory rights associated with fee title ownership – *i.e.*, the Nation cannot use the disputed land other than by driving on the Thruway, exercise control over that land, exclude others from the land, or dispose of the land. The Magistrate's determination is therefore inconsistent with the Second Circuit's recognition that the State does, in fact, have a "possessory" interest granted by the 1954 Easement. *Seneca Nation v. Hochul*, 58 F.4th 664, 673 (2d Cir. 2023) ("*Seneca II*") ("[T]he Nation holds fee title to the land in question, and New York State's only interest is a possessory one granted by the permanent easement").

The instances cited by the Magistrate of purported Nation authority over the disputed land do not demonstrate that "[t]he Nation continues to hold and exercise possessory rights in restricted fee title." R&R 27 (citing "concurrent physical possession and usage at bridges and

underpasses, the retention of a right to ejectment at the end of the specified use, and the continued assertion of authority to regulate use of its lands"). The Nation's claimed exercise of "concurrent physical possession and usage at bridges and underpasses"[3] does not undermine the Thruway Authority's otherwise complete "physical possession and usage" over the disputed land upon which the four-lane Thruway runs and its shoulders. Two of the three bridges on the 2.7-mile portion of the Thruway on Nation land go *over the Thruway* itself and are not part of the four-lane roadway upon which vehicles travel on the Thruway (*i.e.*, one bridge is part of Route 438 and the other is part of Milestrip Road).[4] The third bridge goes over Cattaraugus Creek. The State is not concerned with and does not challenge the Nation's ability to use the land and water underneath the Cattaraugus Creek bridge. None of this, however, demonstrates "concurrent" possession or use over the land that is actually in question here, *i.e.*, the land upon which vehicles traverse on the Thruway and its shoulders.

Relatedly, the Magistrate's conclusion that the Nation continues to assert "authority to regulate use of its lands" is erroneous to the extent it concerns the authority to regulate the Thruway's roadway and shoulders. Contrary to the Magistrate's determination, the Nation does not and cannot assert any "authority to regulate" or otherwise exercise control over the disputed land. Under the terms of the easement, the Nation cannot exclude non-Nation members from the Thruway. Nor can the Nation and its members use or enjoy the disputed land other than to drive on the Thruway like any other member of the traveling public. Additionally, the Nation lacks the authority to alienate or dispose of the disputed land in a manner that would impede the ability of

---

[3] This conclusion derives from the Nation's argument in post-hearing briefing that it "retains the partial use of lands subject to the right of way where the Thruway is crossed by a bridge or underpass, evidencing a continuing exercise of its right of possession even under the invalid easement." Plaintiff Seneca Nation's Supplemental Brief (ECF No. 130) at 13.

[4] *See* Thruway Travel Map between Exits 57A and 58 (https://www.thruway.ny.gov/travelers/map/).

the State to operate the Thruway (otherwise that would constitute an ejectment, which the Nation has disclaimed as a remedy). The Thruway is part of the federal Interstate Highway System and is regulated by the Federal Highway Administration, not the Nation, *see* Def. Mem. 15, and various statutes and regulations require that such highways be available and not modified without federal approval.[5] Taking the issue of regulatory authority out of the theoretical realm and looking at the practical reality, the Nation lacks the authority to (1) regulate Thruway speed and enforce speed restrictions; (2) set vehicle type and weight restrictions; (3) exclude or limit certain types of vehicles or deny Thruway access to particular drivers; (4) impose lane closures due to accidents or construction; (5) close the Thruway due to inclement weather; (6) prohibit federally mandated biennial bridge inspections and required maintenance to ensure the safety of the traveling public; and (7) charge fees to the public for permission to use the Thruway. *See* Def. Reply Mem. 6; Def. Supp. Mem. 5-6.

For these reasons, this Court should adopt the analysis in *Commissioner of the N.Y. State DOT v. Polite*, 236 A.D.3d 82 (2d Dep't 2024), rejected by the Magistrate (R&R 29), which held that *Sherrill* laches applied to easements and rights of way over a public highway. *See* Def. Mem. 18-19, 22. Just like the permanent easement here, in *Polite*, the State acquired a permanent easement in 1959 over Shinnecock Indian Nation land for the construction, operation, and maintenance of a public highway. 236 A.D.3d at 120. The Appellate Division held that the Shinnecock Indian Nation could not assert regulatory authority over land it owned within the State's right-of-way and concluded the claim "present[ed] the type of disruptive land claim that would be barred under [*Sherrill*]." *Id.* The Magistrate, however, attempts to distinguish the *Shinnecock* case, concluding that "the Nation's regulatory authority over the lands is not

---

[5] *See, e.g.*, 23 U.S.C. § 103(a) (interstate system is part of national highway system); (b) (functions highways must serve), (c)(3)(A) ("withdrawal of a road" from system is not permitted absent federal approval).

implicated" since it "has always held sovereign jurisdiction over the Cattaraugus Territory and has maintained its possessory interests in this land." R&R 29. While this is certainly true with respect to the Cattaraugus Territory generally, as discussed above, it is not true as to the disputed land which is occupied by a four-lane interstate highway controlled by the Thruway Authority.

Furthermore, *Canadian St. Regis Band of Mohawk Indians v. New York*, No. 5:82-CV-0783, 2013 U.S. Dist. LEXIS 112860 (N.D.N.Y. July 23, 2013) does not support the rejection of *Sherrill* laches here, as the Magistrate concluded. *See* R&R 27-28. The Northern District's ruling that *Sherrill* did not bar the Mohawks' claim concerning the invalidity of power line easements where there was a "40-year gap" between the easements and the Mohawks' lawsuit (2013 U.S. Dist. LEXIS 112860, at *26-31) is distinguishable. The disruption to settled expectations from the State's loss of control over the Thruway, a vital piece of the State's transportation infrastructure critical to both intrastate and interstate commerce, is a far cry from the disruption in rerouting power lines. *See* Def. Mem. 19-26. The State's reliance interest is also far more significant given the massive undertaking that was the design and construction of the New York State Thruway, the costs of maintenance and improvements through the years, and 70 years of Thruway use by the traveling public. As for the Hogansburg Triangle claim, the Northern District concluded that *Sherrill* laches did not apply given the land did not have a "distinctly non-Indian character." *Canadian St. Regis*, 2013 U.S. Dist. LEXIS 112860, at *69-72. The issue of whether a parcel retained a "non-Indian character" is a proxy for whether an Indian Nation's claim is "disruptive of significant and justified societal expectations." *Oneida*, 617 F.3d at 135. As previously explained, the 1954 Easement land has a "distinctly non-Indian character" since it is a public highway. 2013 U.S. Dist. LEXIS 112860, at *69.

The last point cited by the Magistrate – the Nation's "retention of a right to ejectment at the end of the specified use" (R&R 27) – does not demonstrate that the Nation exercises current possessory rights over the disputed land. The 1954 Easement grants the State permanent easement rights so long as the disputed land is used for "Thruway purposes." Maguire Decl. Ex. K (ECF No. 114-20). The State therefore could use the disputed land for Thruway purposes for an indefinite period with the Nation possessing only a reversionary interest if the Thruway ceased operations. Such an interest, however, does not undermine the State's otherwise strong *current* possessory interest in the 1954 Easement upon which it has relied to operate the Thruway for over 70 years. Accordingly, the Nation's reversionary interest in the disputed land does not render *Sherrill* laches inapplicable.

**B.  The Magistrate Misapplied the Three-Part *Sherrill* Test**

After concluding that *Sherrill* and its Second Circuit progeny did not govern the Nation's claims, the Magistrate analyzed the three *Sherrill* factors. *See* R&R 29-32. According to the Magistrate, an insufficient amount of time passed between the alleged Nonintercourse Act violation and the Nation's assertion of rights (*id*. 29-30); the "disruption" caused by the Nation's claim was "limited" because the Nation does not seek ejectment, a change in possessory interests, or "any additional jurisdictional or regulatory control over the Thruway lands" (*id*. 30-31); and the Nation's claims do not "upset the justifiable expectations" of third parties (*id*. 31-32). As discussed below, these conclusions are erroneous.

1.  *The 70-Year Passage of Time is Sufficiently Long for Sherrill Laches*

Unlike the *Oneida*, *Cayuga*, and *Onondaga* land claim cases, the Magistrate concluded that the Nation's claims are not "ancient" and that the Nation's delay in asserting its rights is "significantly and meaningfully shorter." R&R 29-30. Notwithstanding the ambiguity regarding what makes a claim "ancient," the Supreme Court's analysis of equitable

8

considerations in *Sherrill* and the Second Circuit's application of *Sherrill* laches demonstrate that the key inquiry is disruptiveness of the claims, not the passage of a minimum number of years. *See* Def. Mem. 16-19; Def. Opp. Mem. 2-4. In other words, contrary to the Magistrate's conclusion, *Sherrill* laches does not just apply to alleged Nonintercourse Act violations occurring centuries ago, but rather, it may apply to "shorter" time delays so long as the defendant demonstrates disruption stemming from those claims. *See* Def. Mem. 19-24; Def. Opp. Mem. 4-7; Def. Reply Mem. 1-5; Def. Supp. Mem. 1-7.

Additionally, the Magistrate's conclusion on the "timing" factor disregards the Supreme Court's reliance in *Sherrill* on *Felix v. Patrick*, 145 U.S. 317 (1892), which barred "the heirs of an Indian from establishing a constructive trust over land their Indian ancestor had conveyed in violation of a statutory restriction" because "[i]n the *nearly three decades* between the conveyance and the lawsuit '[a] large part of the tract ha[d] been platted and recorded as an addition to the city of Omaha, and . . . sold to purchasers.'" *Sherrill*, 544 U.S. at 217 (emphasis added) (quoting *Felix*, 145 U.S. at 326). The three decades of delay in *Felix* is far less than the delay here regardless of how it is measured: 71 years (from the 1954 Easement to today); 64 years (from the 1954 Easement to the 2018 commencement of this action); or 39 years (from the 1954 Easement to the 1993 commencement of the Nation's first action). And again, *Sherrill* emphasized that laches is not a "mere matter of time" but is "principally" a question of "inequity founded upon some change in the condition or relations of the property or the parties." 544 U.S. at 217-18 (quoting *Galliher*, 145 U.S. at 373). Here, those equities must be the principal focus of the inquiry.

2. *The Nation's Claims are Disruptive and Upset Justified Expectations*

The extent of the disruption caused by the Nation's claims is not "limited" (R&R 30-32) as the Magistrate erroneously concluded. *See* Def. Mem. 19-24; Def. Opp. Mem. 4-7; Def. Reply

Mem. 1-5; Def. Supp. Mem. 1-7. As a threshold matter, a declaratory judgment itself can be disruptive. The Second Circuit explained in *Onondaga Nation v. New York*, 500 Fed. Appx. 87 (2d Cir. 2012) that "a declaratory judgment alone—even without a contemporaneous request for an ejectment—would be disruptive." *Id.* at 89. That is because a declaratory judgment with preclusive effect can readily be leveraged to obtain immensely disruptive relief in other cases. The Magistrate, however, erroneously rejected the State's arguments concerning the disruptive nature of the Nation's declaratory judgment claim to the extent it would extinguish New York State's longstanding, seven-decade legal right to operate the Thruway across the Nation's land. If the Court adopts the Magistrate's declaration that the 1954 Easement is invalid, it will dramatically alter the legal status of the disputed land, resulting in the Nation having full sovereignty and complete ownership rights (unburdened by the 1954 Easement). Such an outcome would force the State and Thruway Authority to negotiate a new easement for continued access to the disputed land to operate the Thruway on terms favorable to the Nation, at the risk of the State losing all rights to operate that portion of the Thruway. In that event, the State could be required to reroute the Thruway at enormous expense. To be clear, rerouting has been disclaimed by the Nation, but if court-ordered negotiations are unsuccessful and the State/Thruway Authority and the Nation are unable to reach an agreement, rerouting cannot be foreclosed as a potential outcome. This prospect is precisely what would tilt negotiations so heavily in the Nation's favor and further adds to the disruptive nature of the Nation's claims within the meaning of *Sherrill*. Indeed, it is difficult to conceive of a more disruptive holding than that possession to an important piece of land underlying significant infrastructure is controlled by another sovereign.

The Magistrate's conclusion that the Nation's claims will result in "limited" disruption since ejectment is not sought (R&R 30) misapprehends the Second Circuit's decisions in *Cayuga*

and *Oneida*. The Magistrate appears to have rejected this authority because the Nation's litigation delay was shorter than in *Cayuga* where the claims were "asserted generations after an alleged dispossession[.]" R&R 31 (rejecting reliance on *Cayuga* and concluding that "the Supreme Court and the Second Circuit have only found Indian land claims to be 'inherently disruptive' of state and local governance when they are 'asserted generations after an alleged dispossession,' which is not the case here.") (citation omitted). Notwithstanding that 70 years can also be viewed as a "generations" long delay, timing is not dispositive on the issue of *Sherrill's* application. *See supra* Point I(B)(1). The Court must evaluate the disruptiveness of the Nation's claims considering *Cayuga* and *Oneida*, where the Second Circuit held that *Sherrill* laches barred *all* remedies for both possessory and non-possessory Indian land claims *including claims for money damages* because they were inherently disruptive. *See Cayuga*, 413 F.3d at 275-77 (dismissing the Cayuga Nation's possessory and nonpossessory land claims as barred by *Sherrill* laches, reversing the district court judgment for money damages against New York State, and holding that *Sherrill's* equitable principles barred *all* remedies, including money damages, flowing from the Cayuga Nation's land claims because they were inherently disruptive); *Oneida*, 617 F.3d at 136 (dismissing the Oneida Indian Nation's possessory and nonpossessory land claims seeking money damages and concluding that "the equitable defense originally recognized in *Sherrill* is potentially applicable to *all* ancient land claims that are disruptive of justified societal interests that have developed over a long period of time, of which possessory claims are merely one type, and regardless of the particular remedy sought.").

The same result is warranted here. While not seeking the remedy of ejectment or money damages for *past use* of the disputed land, the Nation does demand payments for *future use* in perpetuity. As such, the Nation's claims are properly viewed as Indian land claims that are

equitably barred under *Sherrill*. As in *Cayuga*, the Nation's "monetary remedy" – which the Magistrate ordered in the form of a compelled new easement negotiation – is "subject to dismissal" since it possesses all the same disruptive attributes of a barred monetary judgment. *Cayuga*, 413 F.3d at 277-78; *see also Oneida*, 617 F.3d at 135 (nonpossessory claims seeking money damages were "barred by the equitable considerations described in *Sherrill* and *Cayuga*").

Indeed, while *Cayuga* and *Oneida* barred money damages (as opposed to court-ordered future payments sought here), that difference is immaterial for purposes of evaluating the disruptiveness of the Nation's claims and proffered remedy directing an easement renegotiation that will impose a new perpetual financial obligation upon the Thruway Authority and/or the State. Such compelled future payments are even *more disruptive* than a one-time payment of a money damages judgment for past harm held to be disruptive in *Cayuga* and *Oneida*.

Notably, the Second Circuit in those cases did not examine the State's finances to determine whether payment of a money damages judgment to the Cayugas and Oneidas would be disruptive; instead, it held that such a payment was inherently disruptive and therefore barred as a matter of law. Here, however, despite the over $21 million annual payment sought by the Nation *in perpetuity*, the Magistrate erroneously rejected similar arguments by the State Defendants as "conjectural or hypothetical." R&R 32. It is not conjectural or hypothetical to draw the evident conclusion that perpetual annual payments to the Nation would impact the State and/or Thruway Authority's budget and dramatically change "justifiable expectations."

Furthermore, it is erroneous for the Magistrate to conclude that a toll increase would only have "minor effects." *Id*. Such a conclusion incorrectly presupposes that the massive cost for this new easement will be spread throughout the entire Thruway system, as opposed to a targeted

toll increase that would impact just the portion of the Thruway crossing Nation land.  The expert opinion evidence cited by the Magistrate to support this conclusion did not analyze the issue of whether a toll increase directed solely at the Seneca portion of the Thruway would impact Thruway traffic patterns, but rather, it was a quotation deriving from a statement by the Thruway's consultant that "the Thruway has generally seen relatively small reactions to toll modifications."  Turner Expert Report (ECF No. 117-8) p. 33 of 41 n.53.  The Magistrate also appears to improperly presume that there will be no impact on interstate commerce, specifically that commercial truckers would not need to find other routes if the Erie Section of the Thruway is rerouted if the parties fail to reach an agreement on terms for a new easement, and that there would be no cost increase to truckers subsequently passed on to consumers.  These presumptions are without evidentiary support in the record.

Additionally, the Magistrate erred in rejecting the State Defendants' arguments on the basis that they have "not shown or presented evidence that payment to the Nation for ongoing use of the easement will upset the justifiable expectations of third parties" and failed to rebut the contention that an easement renegotiation "will not disrupt Thruway operations in a manner significantly affecting the public."  R&R 32.  Although this is mistaken on its own terms, the "justifiable expectations" component of the *Sherrill* analysis is not limited to just protecting the expectations of "third parties."  Governmental expectations and interests are protected as well. In *Onondaga*, the Second Circuit explained that the land at issue there "experienced significant material development by private persons and enterprises as well as by *public entities*" and that under *Sherrill*, "*the Government* and current occupants of the land therefore have 'justifiable expectations' to ownership."  500 Fed. Appx. at 89 (emphasis added).  While landownership is

not at issue here, the State and Thruway Authority have similar justifiable expectations concerning the State's permanent easement rights with respect to the disputed land.

## POINT II

**THE MAGISTRATE ERRED IN CONCLUDING THAT THE STATE OFFICIAL DEFENDANTS WERE PROPER DEFENDANTS UNDER *EX PARTE YOUNG***

The State Official Defendants (*i.e.*, all the defendants except the Thruway Authority) argued that the Nation's claims against them must be dismissed because the Nation adduced no evidence that any of them had a connection to the alleged continuing violation of federal law identified by the Nation. As such, they are not proper defendants under *Ex parte Young*. *See* Def. Opp. Mem. 19-21; Def. Supp. Mem. 13-18; Def. Supp. Opp. Mem. 9-10. The Magistrate rejected this argument for two reasons. Both were errors.

First, the Magistrate mistakenly concluded that "this issue has already been considered and decided by the District Court and the Second Circuit." R&R 11. Both the District Court and Second Circuit, however, only addressed the narrow legal issue of whether the Nation pled a viable *Ex parte Young* claim by (1) alleging an ongoing violation of federal law and (2) seeking relief properly characterized as prospective. *See Seneca Nation v. Cuomo*, 484 F. Supp. 3d 65, 73-78 (W.D.N.Y. 2020) (permitting *Ex parte Young* claim to proceed "[a]t this early stage of the litigation"); *Seneca II*, 58 F.4th at 670-74. Neither the District Court nor the Second Circuit considered the separate question—raised for the first time on summary judgment—of whether the specific State Official Defendants were proper defendants in this action. Tellingly, neither the Nation, in its summary judgment briefing, nor the Magistrate have cited any language from the District Court or Second Circuit opinions that addresses this specific question.

In the absence of any express ruling by these courts, the Magistrate instead reasoned that the "conclusion that the state-official defendants are proper parties under *Ex parte Young*" was

14

"necessarily implicit" in the Second Circuit's decision.  R&R 11.  Not so.  Whether the Nation

pled a viable *Ex parte Young* claim by (1) alleging an ongoing violation of federal law and (2)

seeking relief properly characterized as prospective raises issues entirely separate from the

question of whether the named State Official Defendants had a sufficient personal connection to

the purported ongoing violation of federal law such that the *Ex parte Young* exception to

sovereign immunity applies.  A ruling on one issue does not necessarily resolve the other.

A decision from the Eastern District of New York illustrates the distinction.  *See Nassau

& Suffolk Cnty. Taxi Owners Ass'n, Inc. v. State*, 336 F. Supp. 3d 50, 67-68 (E.D.N.Y. 2018).

There, the court concluded that although plaintiffs had "alleged an ongoing violation of federal

law and are seeking prospective relief," there was still "an additional factor which must be

satisfied in order for Plaintiffs' claim against the Individual Defendants to circumvent Eleventh

Amendment immunity: the exception under *Ex parte Young* only applies where the officer sued

has some connection with the enforcement of the allegedly unconstitutional act."  *Id.* (citations

and quotation marks omitted); *see also Whole Woman's Health v. Jackson*, 595 U.S. 30, 35-45

(2021) (state court judge and state court clerk were entitled to sovereign immunity in case

challenging the constitutionality of Texas statute that allowed private citizens to bring civil suits

against those who provided abortions because neither of those defendants enforced the

challenged statute against plaintiffs).  Because a court – as illustrated by *Nassau & Suffolk Cnty.

Taxi Owners Ass'n* – could conclude that a party properly pled a viable *Ex parte Young* claim in

all other respects but still hold that sovereign immunity applied because the government official

sought to be enjoined from ongoing violations of law lacked sufficient personal connection to

those ongoing violations, the conclusion that the State Official Defendants are proper parties under *Ex parte Young* was not "necessarily implicit" in *Seneca II*.[6]

Second, the Magistrate erred in concluding that the State Defendants waived this argument by "fail[ing] to raise the argument before the District Court or the Second Circuit[.]" R&R 11 n.5. The Second Circuit has held that a defendant's failure to raise the issue of Eleventh Amendment immunity on a motion to dismiss does not constitute a waiver. *See Richardson v. New York State Dep't of Corr. Ser.*, 180 F.3d 426, 449 (2d Cir. 1999) (state agency "did not waive its Eleventh Amendment immunity by failing to raise the defense" before moving for summary judgment). Indeed, the Supreme Court and the Second Circuit have consistently and uniformly held that sovereign immunity may be asserted at any time in a proceeding. *McGinty v. New York*, 251 F.3d 84, 94 (2d Cir. 2001) ("[T]he Supreme Court and this Court have repeatedly held that a state may assert Eleventh Amendment sovereign immunity at any time during the course of proceedings") (citing *Calderon v. Ashmus*, 523 U.S. 740, 745 n.2 (1998) ("the Eleventh Amendment is jurisdictional in the sense that it is a limitation on the federal court's judicial power, and therefore can be raised at any stage of the proceedings").

That the State Defendants argued the Nation failed to adequately plead an *Ex parte Young* claim in its motion to dismiss but did not raise its argument that the State Official Defendants

---

[6] On summary judgment, the State Defendants argued that the Nation's request for an order directing them to pay the Nation $21.19 million annually in exchange for a valid easement is a new request for relief that runs afoul of the State's sovereign immunity. Def. Opp. Mem. 15-19. The Magistrate declined to "reassess whether the Nation is properly seeking relief under *Ex parte Young*" and explained that the issue "has already been considered and decided by the District Court and the Second Circuit." R&R 11. This finding, however, had no bearing on the relief the Magistrate ultimately recommended because, as he explained, "although the Nation seeks a ruling on payment for the easement, the Court's recommendation herein is limited to directing defendants to negotiate with the Nation to obtain a new easement." *Id.* The State Defendants object to the Magistrate's conclusion that *Seneca II* addressed whether *Ex parte Young* allows the Court to require the State Official Defendants to obtain a new easement for a price set by the Court. As explained previously, this issue was not before the Second Circuit in *Seneca II*. *See* Def. Opp. Mem. 15-16; Def. Supp. Resp. 1-2. The State Defendants note their objection to this conclusion in this footnote for preservation purposes because the conclusion had no impact on the ultimate relief recommended.

lack the requisite connection to the alleged violation of federal law in that motion to dismiss does not support waiver. As explained above, although both arguments raise sovereign immunity issues, the two arguments are distinct. The State Official Defendants did not waive their right to make the latter argument by waiting until summary judgment to make it.

Ultimately, given the importance of sovereign immunity to our constitutional structure, *see Sossamon v. Texas*, 563 U.S. 277, 284 (2011) ("Sovereign immunity principles enforce an important constitutional limitation on the power of the federal courts"), it is imperative that the Court substantively consider whether the State Official Defendants have the requisite connection to the alleged federal law violation to qualify as proper *Ex parte Young* defendants. To date, neither this Court nor the Second Circuit has considered that issue.

As a result of these errors, the Magistrate did not substantively consider the State Official Defendants' argument that they lack the requisite connection to the alleged violation of federal law to be a proper *Ex parte Young* defendant. As explained in prior briefing, that necessary connection does not exist. *See* Def. Opp. Mem. 19-21; Def. Supp. Mem. 16-18; Def. Supp. Resp. 9-10. Accordingly, because the State Official Defendants possess sovereign immunity, this Court should dismiss the Nation's entire complaint against all the State Defendants. And once that occurs, the Thruway Authority cannot remain as the sole defendant because such an outcome would be barred under *Seneca I*. *See* Def. Supp. Mem. 18-19 (the Nation's claims against the Thruway Authority alone are barred by collateral estoppel pursuant to *Seneca I*).

## POINT III

### THE MAGISTRATE ERRED IN CONCLUDING THAT THE 1954 EASEMENT WAS VOID AT INCEPTION

The Nation argued that the State violated the Nonintercourse Act by obtaining the 1954 Easement without federal consent. In response, the State Defendants argued that (1) federal

17

consent was not required, and (2) even if federal consent was required, the United States Department of the Interior consented.  The Magistrate erred in rejecting both arguments.  The Magistrate further erred by rejecting the State Defendants' ratification defense.

### A.  Federal Consent Was Not Required for the 1954 Easement

The State Defendants argued that the federal consent requirements of the Nonintercourse Act were lifted by both the 1875 Seneca Leasing Act and/or the 1950 Seneca Leasing Act.  Def. Mem. 31-38; Def. Opp. Mem. 22-24; Def. Reply Mem. 7-10.  The Magistrate rejected both arguments, concluding "that Congress did not authorize the Seneca nation to grant rights-of-way or leases until 1961, when the 1950 Seneca Leasing Act was amended."  R&R 16.  Rather than independently and directly engaging with the State Defendants' textual and historical arguments supporting an interpretation of the 1875 Seneca Leasing Act and 1950 Seneca Leasing Act that authorized New York to obtain the 1954 Easement without federal consent, the Magistrate relied entirely on the reasoning expressed by Magistrate Judge Heckman in her Report and Recommendation from *Seneca I*.  R&R 17.  Magistrate Judge Roemer made several errors in rejecting the State Defendants' argument that the federal consent requirements of the Nonintercourse Act were effective when the Nation and New York executed the 1954 Easement.

First, the Magistrate is incorrect "that Congress did not authorize the Seneca Nation to grant rights-of-way or *leases* until 1961."  *Id.* at 16 (emphasis added).  By 1950, the Nation had unrestricted authority to "lease" lands within its reservations without federal approval.  The 1950 Seneca Leasing Act clearly granted the Nation such authority:

> In addition to the authority now conferred by law on the Seneca Nation of Indians to lease lands within the Cattaraugus, Alleghany, and Oil Springs Reservations to railroads and to lease lands within the limits of the villages established under authority of the [1875 Seneca Leasing Act], the Seneca Nation of Indians, through its council, is authorized to lease lands within the Cattaraugus, Allegany, and Oil Springs Reservations, outside the limits of such villages, for such purposes and such periods as may be permitted by the laws of the State of New York.

64 Stat. 442, § 5. The issue at the center of this lawsuit is not whether the Nation had authority to "lease" its reservation lands (it clearly did), but whether that leasing authority included the ability to enter the 1954 Easement. By wrongly concluding that the Nation did not have the authority to grant leases in 1954, the Magistrate avoided addressing the State Defendants' textual and historical argument that by 1950 the Nation's leasing authority included the ability to enter the 1954 Easement.

Second, the Magistrate erred by over-relying on Magistrate Judge Heckman's 1999 Report and Recommendation. Although Judge Heckman concluded that neither the 1875 nor 1950 Seneca Leasing Act authorized the Nation to enter the 1954 Easement without federal approval, she made that determination on a different and less developed summary judgment record.[7] The following arguments and evidence, among others, were not presented or comprehensively developed before Judge Heckman:

- Detailed statutory argument that the term "laying out" in the 1875 Seneca Leasing Act provided New York State the ability to acquire the property necessary for the construction of highways on the Nation's reservation (*see* Def. Mem. 31-32; Def. Opp. Mem. 22; Def. Reply Mem. 7-8);

- Copies of right-of-way agreements (substantially similar to the 1954 Easement in all relevant respects) that the Nation entered with railroads between 1900-1910 pursuant to its "leasing" authority under the 1875 Seneca Leasing Act (*see* Def. Mem. 34; Reply Mem. 8-9);

- Argument that the 1954 Easement is, in actuality, a lease because it conveyed a possessory interest to the State of New York (*see* Def. Reply Mem. 9-10);

- Historic contextual argument that the purpose of the 1950 Seneca Leasing Act supports a broad interpretation of the Nation's authority to convey property rights without federal approval (*see* Def. Mem. 36-37).

---

[7] To show that the State Defendants' statutory arguments are better developed now than they were in 1999, a copy of the summary judgment memorandum submitted to Judge Heckman is attached as Exhibit A.

Moreover, Judge Heckman erred in rejecting the State's argument in *Seneca I* that neither the 1875 nor 1950 Seneca Leasing Acts authorized the Nation to enter the 1954 Easement without federal approval. In reaching that conclusion, Judge Heckman relied almost entirely on the 1961 amendment to the Act which added the phrase "or grant easements or rights-of-way on" to the Seneca Leasing Act of 1950 and the accompanying legislative history. *Id.* Admittedly, both the Senate and House Reports to the 1961 amendment state that the Seneca Leasing Act of 1950 did not cover the granting of easements or rights-of-way, but those statements should not be used to ascertain Congressional intent underlying the Seneca Leasing Act of 1950 where the plain language of the latter is to the contrary. *See* ECF No. 115-20; ECF No. 116-1, p. 4.

The Supreme Court has repeatedly warned against using the views of a later Congress to construe a statute enacted years before. *See Pension Ben. Guar. Corp. v. LTV Corp.*, 496 U.S. 633, 650 (1990) (later history is a "hazardous basis for inferring the intent of an earlier' Congress"); *United States v. Southwestern Cable Co.*, 392 U.S. 157, 171 (1968) ("the views of one Congress as to the construction of a statute adopted many years before by another Congress have 'very little, if any, significance.'") (quoting *Rainwater v. United States*, 356 U.S. 590, 593 (1958)); *see also Sullivan v. Finkelstein*, 496 U.S. 617, 632 (1990) (Scalia, J., concurring) ("Arguments based on subsequent legislative history . . . should not be taken seriously, not even in a footnote."). Judge Roemer therefore erred in relying on Judge Heckman's assessment of the 1961 amendment and its accompanying legislative history to conclude that the Seneca Leasing Acts of 1875 and 1950 did not empower the Nation to enter the 1954 Easement without federal approval. In this case, the legislative history of the 1961 enactment is a particularly poor guide to the meaning of the 1875 and 1950 enactments because, on the relevant point, the legislative reports conflict with the plain language and historic practice under those earlier enactments.

Although the State Defendants raised this error in their summary judgment briefing, the R&R did not address this argument and instead wholly adopted Judge Heckman's reasoning. The Magistrate therefore avoided directly addressing the statutory construction and historic arguments the State Defendants made on this summary judgment record as opposed to the record before Judge Heckman over 25 years ago. *See* Def. Mem. 31-39; Def. Opp. Mem. 22-24; Def. Reply Mem. 7-10. This Court should do so now.

**B.** **The Secretary of the Interior's 1946 Letter Approved the Thruway Project**

According to the Magistrate, Acting Secretary of the Interior Oscar Chapman's June 10, 1946 letter to J. Frank O. Marah, Director of the New York State Department of Public Works does not constitute "'plain and unambiguous'" evidence of federal approval of the 1954 Easement under the 1901 Highway Act or Right-of-Way Act. R&R 21. This conclusion discounts the plain language of the letter which unambiguously authorized construction of the Thruway after the State obtained the consent of the individual Indians and Nation's tribal council (requirements which were met): "It is agreeable to [the U.S. Department of Interior] for the New York State Department of Public Works to begin construction work on the Erie Thruway after consent of the individual Indians and tribal council has been obtained and payment of the damages has been made." ECF No. 114-18.

The Magistrate concluded that this language was not sufficient to constitute approval of the Thruway project because New York did not comply with the regulatory requirements for obtaining such approval. R&R 21-22. This conclusion, however, relies on a misunderstanding of what is at issue in this case. The question is not whether the Secretary of the Interior *should have or should not have* approved the Thruway project (it is easy to imagine a contemporaneous lawsuit seeking to enjoin the Secretary of Interior from approving a project due to lack of compliance with relevant regulations); the issue instead is whether the Secretary of Interior *did*

21

approve the Thruway project.  Here, the Secretary did so when he told New York that it could "begin construction work on the Erie Thruway after consent of the individual Indians and tribal council has been obtained and payment of damages has been made."

Moreover, while the letter requested that New York submit "[m]aps of definite location together with [its] application" and "signed copies of the agreements executed by the individual Indians," the Secretary did not *condition* approval of the Thruway project on New York's submission of these documents.  The Secretary knew how to provide such conditional approval as evidenced by his explicit conditioned commencement of the Thruway project on consent of the individual Indians and tribal council in the same letter.[8]

### C.  The Nation Ratified the 1954 Easement Through Its Post-1961 Conduct

According to the Magistrate, an Indian tribe cannot ratify an agreement made in violation of the Nonintercourse Act through its post-agreement conduct.  R&R 22.  The State Defendants do not dispute that, as a general rule, an Indian tribe that did not have the authority to convey a property interest without federal approval cannot ratify such a conveyance through post-conveyance actions of the tribe that occurred while the tribe *still* lacked conveyance authority.  This case, however, is markedly different.  After the 1961 amendment to the 1950 Seneca Leasing Act, there is no dispute that the Nation *had* the authority to enter into easements and rights-of-way without federal approval.  Because the Nation had the unfettered authority to

---

[8]  In a footnote, the Magistrate states that "the State's 1947 letter to the Department of the Interior appears to be a tacit admission or acknowledgement that the State knew that approval from the federal government was needed for the agreement.  This appears to be in conflict with defendants' current position that federal approval was not required at the time of the 1954 easement."  R&R 21 n.9.  The Magistrate misunderstood the timeline.  In 1946, *before Congress passed the 1950 Seneca Leasing Act*, the State contacted the Department of Interior to discuss the process for obtaining an easement across the Nation's Reservation for the Thruway.  That the State did not contact the Department of Interior *after 1950* for further discussions and approval—despite having done so *before 1950*—is strong evidence that the State understood the 1950 Act as eliminating the need for the State to obtain federal approval of the 1954 Easement.  This understanding comports with the Nation itself explaining in 1960 that under the 1950 Act it had "the right…to regulate leases *and rights of ways* to Tribal Lands."  *United States v. Devonian Gas & Oil Co.*, 424 F.2d 464, 469 (1970) (emphasis added).

convey such property interests, the Nation also had the unfettered ability to ratify such conveyances through its conduct. And, the Nation did ratify the 1954 Easement by failing to ever return the payment it received from the State pursuant to the 1954 Easement, failing to repudiate the agreement for 39 years, and designating individual Seneca Indian landowners as entitled to compensation from the State. Def. Mem. 39-42; Def. Reply Mem. 10. Courts have recognized that similar equitable common law defenses may be available to Nonintercourse Act claims when such defenses are factually appropriate. *See Oneida Indian Nation v. Phillips*, 981 F.3d 157, 168 (2d Cir. 2020) (refusing to foreclose the existence of "equitable defenses beyond those described in *Sherrill*").

**POINT IV**

**THE DECLARATORY RELIEF RECOMMENDED BY THE MAGISTRATE IS INCONSISTENT WITH THE SECOND CIRCUIT'S DECISION AND UNAVAILABLE UNDER *EX PARTE YOUNG***

Finally, the declaratory relief recommended by the Magistrate – "a judgment declaring that the 1954 Easement is invalid" or "void *ab initio*," R&R 10, 22 – differs from what the Nation sought in its Complaint and what the Second Circuit reviewed in the earlier appeal. The declaratory relief now recommended by the Magistrate is not available under *Ex parte Young*. Nor is the relief permissible in the absence of one of the parties to the 1954 Easement: the State of New York. For this reason alone, the Court should decline to adopt the R&R.

In its Complaint, the Nation sought "a declaration that Defendants (other than the Comptroller) will continue to violate federal law by not obtaining a valid easement for the portion of the Thruway over the Nation's Reservation lands and that some of the funds being collected by the Thruway and being deposited with the Comptroller on a continuing basis are derived from this violation of federal law." Compl. ¶ 62. While the State Defendants argued that the Nation effectively sought a declaration that the easement was void *ab initio*, this Court

23

and the Second Circuit disagreed. In the Second Circuit's view, the Nation's claims sought *prospective* relief from the *ongoing* harm "that the Nation's free use and enjoyment of its protected land is continuously impaired by the presence of an unlawful easement." *Seneca II*, 58 F.4th at 671. The dissenting judge disagreed. He saw "no daylight" between the declaration sought by the Nation "and a backward-looking judgment that the State's easement is invalid," which "is surely barred by the Eleventh Amendment." *Id.* at 675 (Sullivan, J. dissenting).

In its motion for summary judgment, the Nation dropped the pretense that it was not seeking backward-looking relief. The Nation argued that "the Court should enter a declaratory judgment stating that the 1954 agreement is void *ab initio*" because it violated the Nonintercourse Act. Pl.'s Mem. in Support of Summary Judgment (ECF No. 117-1) at 15. That relief is not available under *Ex parte Young*. The *Ex parte Young* exception "does not permit judgments against state officers declaring that they violated federal law in the past." *Puerto Rico Aqueduct & Sewer Auth. v. Metcalf & Eddy, Inc.*, 506 U.S. 139, 146 (1993).

The Nation's requested declaratory relief is unavailable for the additional reason that one of the two signatories to the 1954 Easement – the State of New York – is not a party in this litigation. When a plaintiff challenges the validity of an easement held by a sovereign entity, the sovereign is a necessary and dispensable party. Indeed, that is the reason the Nation's first challenge to the 1954 Easement was dismissed. *See Seneca Nation of Indians v. New York*, 383 F.3d 45, 48 (2d Cir. 2004) ("*Seneca I*"); *see also Fluent v. Salamanca Indian Lease Authority*, 928 F.2d 542, 548-49 (2d Cir. 1991). The same result must obtain here. The Nation cannot obtain a declaration that the 1954 Easement is invalid because the State of New York is absent and cannot be joined as a defendant.

At most, the Nation may seek a declaration that the State Defendants are violating federal law by not obtaining a valid easement – but even then, the Nation has failed to show that federal law requires the State Defendants to purchase an easement. The R&R cites no law that the State Defendants are allegedly violating on an ongoing basis. Instead, the R&R relies solely on the State's alleged violation of the Nonintercourse Act in 1954. R&R 12-22. That alleged violation does not suffice to support the declaratory relief the Nation sought in its Complaint. As the Second Circuit stated in *Seneca II*, "the invalidity of the easement is critical to plaintiff's case, but this suit is concerned with the *ongoing effect* of the invalidity…" 58 F.4th at 670-71. In other words, it is not enough for the Nation to establish a violation of the Nonintercourse Act in 1954; the Nation must further show that the State Defendants' continued operation of the Thruway, despite the invalidity of the 1954 Easement, violates the Nation's treaty rights. The Nation failed to make that showing because it does not object to the current use of the disputed land: the Nation wants a Thruway on the 1954 Easement land; it just wants to be paid for it.

At bottom, there is a mismatch between the federal law violation the Nation alleged and the relief it now seeks. While the Nation in its Complaint alleged a violation of its treaty rights, the relief it now seeks, and that the Magistrate recommends, would remedy a different violation – the alleged violation of the Nonintercourse Act in 1954. But such backward-looking relief is not available under *Ex parte Young*. Because the Magistrate found no ongoing violation of federal law, no declaratory relief is available against the State Defendants.

**CONCLUSION**

For the foregoing reasons, this Court should decline to adopt the Magistrate's Report and Recommendation, grant the State Defendants' Motion for Summary Judgment, and deny the Nation's Motion for Summary Judgment in its entirety.

25

Dated: November 14, 2025
Buffalo, New York

**NIXON PEABODY LLP**

BY: /s/ *Erik A. Goergen*
Erik A. Goergen
40 Fountain Plaza, Suite 500
Buffalo, New York 14202
Telephone: (716) 853-8118
egoergen@nixonpeabody.com

*Attorneys for Defendant New York State Thruway Authority*

**LETITIA JAMES**
**Attorney General of the State of New York**

BY: /s/ *Daniel R. Maguire*
Daniel R. Maguire
Stephanie Joy Calhoun
Assistant Attorney General, of Counsel
Main Place Tower, Suite 300A
350 Main Street
Buffalo, New York 14202
Telephone: (716) 853-8400
Daniel.Maguire@ag.ny.gov
Stephanie.Calhoun@ag.ny.gov

*Attorneys for Defendants Governor of the State of New York, Attorney General of the State of New York, the Commissioner of the New York State Department of Transportation, and the Comptroller of the State of New York*

## CERTIFICATION

Pursuant to Local Rule 72(c) for the U.S. District Court for the Western District of New

York, I hereby certify that Defendants' Objections to the Magistrate's Report and

Recommendation do not raise new legal/factual arguments.

Dated: November 14, 2025  /s/ *Erik A. Goergen*
      Buffalo, New York  Erik A. Goergen

                                          /s/ *Daniel R. Maguire*
                                          Daniel R. Maguire