# Exhibit A

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

ORIGINAL
RECEIVED AND FILED
UNITED STATES DISTRICT COURT CLERK
WESTERN DISTRICT OF NEW YORK

FEB 1 0 1999

BY: _____

SENECA NATION OF INDIANS,

                    Plaintiffs,

        vs.                                          93-CV-688A

STATE OF NEW YORK, et al.,

                    Defendants.

**MEMORANDUM OF LAW ON BEHALF OF DEFENDANTS
STATE OF NEW YORK, NEW YORK STATE THRUWAY AUTHORITY,
AND JOHN R. PLATT, IN SUPPORT OF MOTION
FOR SUMMARY JUDGMENT DISMISSING SENECA NATION
OF INDIANS' SECOND CAUSE OF ACTION**

ELIOT SPITZER
Attorney General of the
  State of New York
Attorney for Defendants
BY:
PETER B. SULLIVAN
Assistant Attorney General
  of Counsel
107 Delaware Avenue
Statler Towers - 4th Floor
Buffalo, NY 14202
(716) 853-8473

# TABLE OF CONTENTS

**Page**

Preliminary Statement................................................................. 1

Statement of Facts.................................................................. 2

Argument

    POINT I

THIS COURT LACKS JURISDICTION ON THIS
CLAIM AGAINST THE STATE OF NEW YORK,
PURSUANT TO THE ELEVENTH AMENDMENT
TO THE U.S. CONSTITUTION........................................... 7

    POINT II

BECAUSE THE EASEMENT AT ISSUE WAS
HELD BY THE STATE OF NEW YORK, IT IS A
NECESSARY PARTY AND ITS DISMISSAL FROM
THE ACTION REQUIRES THAT THE ACTION BE
DISMISSED AGAINST DEFENDANTS THRUWAY
AUTHORITY AND PLATT AS WELL.............................. 9

    POINT III

THE RIGHT-OF-WAY AGREEMENT WAS APPROVED
BY THE SECRETARY OF THE INTERIOR PURSUANT
TO 25 U.S.C. § 311, AND SO IS VALID.............................. 20

    POINT IV

THE ACTS OF 1875 AND 1950 AUTHORIZED THE
SENECA NATION TO GRANT THE RIGHT-OF-WAY
HERE AT ISSUE WITHOUT OBTAINING SEPARATE
FEDERAL APPROVAL..................................................... 22

POINT V

BY THE 1968 AND 1971 RESOLUTIONS OF THE
TRIBAL COUNCIL CERTIFYING PAYMENT TO
MEMBERS OF THE NATION, THE PLAINTIFF
RATIFIED THE 1954 AGREEMENT AT A TIME
WHEN FEDERAL APPROVAL WAS NOT NECESSARY.........    26

Conclusion...............................................................................    31

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

---

SENECA NATION OF INDIANS,

Plaintiffs,

vs.                                                          **93-CV-688A**

STATE OF NEW YORK, et al.,

Defendants.

---

### Preliminary Statement

This memorandum is submitted on behalf of defendants State of New York ("State"),
New York State Thruway Authority ("Authority"), and John R. Platt, Executive Director of the
Thruway Authority, in support of their motion for summary judgment. The motion is directed
only against the second cause of action of the October 14, 1997, second amended complaint of
the Seneca Nation of Indians, which contests rights to the right-of-way, or permanent easement,
by which the New York State Thruway crosses the Cattaraugus Reservation of the Seneca Nation
of Indians ("the Nation" or "SNI"). The claims brought by the Seneca Nation and by plaintiffs
Tonawanda Band of Seneca Indians and United States of America relating to the islands in the
Niagara River are not addressed on this motion.

Also submitted in support of this motion are the moving defendants' statement of
undisputed facts and the February 9, 1999, declaration of Peter B. Sullivan, with exhibits.
References herein to exhibits refer to the exhibits to this declaration.

<u>**Statement of Facts**</u>

At least as early as January 15, 1946, the New York State Department of Public Works ("DPW") was in contact with the plaintiff to discuss surveying the plaintiff's lands for the purpose of constructing the New York State Thruway. In a letter of that date to Cornelius Seneca, President of the Nation, the DPW engineer in Buffalo referred to prior discussions and described, in general terms, where the proposed Thruway would cross the Reservation. Exhibit C, attachments at 1. The letter further requested "permission to enter Reservation Lands to obtain the survey information to enable us to prepare the plans and right-of-way maps. The proposed Thruway is a State matter, and the road will be built and the land will be obtained by the State." *Id.*

On May 7, 1946, J. Frank O'Marah, Director of the Bureau of Rights-of-Way and Claims of DPW, wrote to the Assistant Commissioner of the Office of Indian Affairs of the U.S. Department of the Interior. *Id.* at 2-3. The letter noted that Mr. O'Marah had held a conference with President Seneca about the Thruway project on April 28, 1946, at which time they discussed a procedure by which agreement might be reached both with the Nation itself and with the members of the Nation whose land would be affected, and acknowledged that the State "cannot appropriate or acquire fee title to Indian Lands on this Reservation and must agree with the individual Indians whose allotment of lands is involved in the project and obtained the consent of the Council of the Seneca Nation before any part of their property is used for this project". Further, he "ask[ed] the consent and approval of the Department of the Interior as to this procedure." *Id.* at 3. Included with the letter was a map of the proposed right-of-way. *Id.* at 4-5.

On May 20, 1946, the Clerk of the Seneca Nation wrote to the Buffalo office of the

2

Department of Interior's Office of Indian Affairs, enclosing minutes of a meeting of the Lease

Committee of the Tribal Council meeting held on May 18, 1946 (*id.* at 7), at which the Thruway

project had been discussed. The letter further stated "[t]he proposed Thru-Way is going to affect

this property and a large sum of money will be paid to the legal owner." *Id.* at 6.

On June 10, 1946, Acting Secretary of the Interior Oscar L. Chapman responded to J.

Frank O'Marah's letter of May 7, 1946, and granted permission for the project. The Secretary's

letter states:

> It is agreeable to this department for the New York State
> Department of Public Works to begin construction work on the
> Erie Thruway after consent of the individual Indians and tribal
> council has been obtained and payment of the damages has been
> made.

*Id.* at 9.

On September 18, 1954, the Council of the Seneca Nation of Indians passed and adopted

a resolution which stated, in part:

> That the New York Thruway Authority be granted permission to
> construct a Thruway over, across and upon the Cattaraugus Indian
> Reservation as approximately shown by the map submitted subject
> to an accurate survey, subject to the following conditions:
>
> I.   That the fee to the land will be reserved to the Nation;
>
> II.  That the individual Seneca Indian landowners be fully
> compensated for their lands and damages thereto;
>
> III. That a payment of Seventy-Five Thousand, Five Hundred
> ($75,500.00) dollars be made to the Nation for the use and
> appropriation of said lands for Thruway purposes, with the
> Thruway Authority settling any claims arising from existing leases
> now in force with the Nation; . . .

*Id.* at 10.

On October 5, 1954, the actual right-of-way agreement (*id.* at 12-19) was entered into between "the Seneca Nation of Indians" as the "first party" and "the People of the State of New York, acting by and through the New York State Thruway Authority" as the "second party". *Id.* at 12. By this agreement, the first party, *i.e.*, "The Seneca Nation of Indians", granted to the second party, *i.e.*, "The People of the State of New York", a "Permanent Easement for Thruway Purposes" over the lands of the Cattaraugus Indian Reservation, for which the Nation was to be paid $75,500.00, exclusive of the rights of individual Seneca Indian landowners, who were to be separately compensated. It was further agreed "that the Council of the Seneca Nation of Indians would expeditiously approve the right of such individual Seneca Indian landowners as the proper person or persons having the right of occupation of the affected property and legally entitled to receive compensation by reason of the acquisition of the permanent easement thereover for Thruway purposes; without cost to the second party." *Id.* at 13, ¶ (d).

The conveyance of the right-of-way was recorded in both the Erie County Clerk's Office and in the Chautauqua County Clerk's Office. *Id.* at 18, 21; exhibit D at 585. The Seneca Nation was represented by an attorney, Edward E. O'Neill, throughout the negotiations and closing, and thereafter. Exhibit C at 10, 18; exhibit E at C-3, C-58; exhibit F at 1.

Meanwhile, the DPW proceeded to negotiate settlements with the allottees, *i.e.*, the individual members of the Nation who held allotment rights which were overrun by the right-of-way. On June 22, 1957, the Council of the Seneca Nation, acting pursuant to the 1954 agreement, passed a resolution certifying a number of the allottees as the persons entitled to payment, and such payment was subsequently made. Exhibit E at C-51.

4

The Council was then unable to resolve claims to four of the titles, however (exhibit F at 1), and in the case of at least two of these, disputes continued as to which members of the Nation were entitled to payment. As indicated by existing correspondence, in one case a member of the Seneca Nation, Harriet Halftown, complained by letter of February 18, 1967 (exhibit C at 22) that she had not been paid for her property rights. By letter of April 14, 1967 (*id.* at 23), which referenced claim map 858, parcel 858, and claim map 871, parcel 871, the Thruway Authority responded by advising Ms. Halftown:

> The record reveals that at a meeting of the Council of the Seneca Nation of Indians on June 2 [sic], 1957 the Council refused to certify the title to either Harriet or Hattie Halftown. The record also shows that other members of the Halftown family would have an interest in the compensation that would be payable herein. This is the reason this matter was not processed for payment.
>
> It is suggested that you take this matter up with the Council of the Seneca Nation of Indians.

*Id.* at 23.

After considerable correspondence on the issue (*see, e.g., id.* at 22 - 28; exhibit E at 136 - 191), on November 20, 1968, the Surrogate for the Cattaraugus Reservation, on behalf of Hattie Halftown, presented to the Council a quit claim deed and verification of land ownership. Exhibit C at 29. As recorded in the Council's minutes for that session, "Mr. Kennedy stated that Hattie Halftown is seeking compensation from the Thruway Authority for easement rights which was [sic] never processed. The Thruway Authority is requesting proof of ownership before payment can be made. There is no dispute in this property." *Id.* As there was, however, apparently some question about the property's description in the deed, the matter was tabled until the December Council meeting for the correction of the deed. *Id.*

5

At the Council's December 14, 1968, meeting, as reflected by the minutes (*id.* at 30-31), the corrected deed was submitted and the motion "that Council accept the Deed dated July 17, 1968, and Land Ownership Verification pertaining to Nancy Halftown Estate" was carried. *Id.* at 31, 32.

A similar dispute existed concerning the lands of Merwin Pierce. *See* exhibit F at 1. It was not until a meeting of the Council on October 16, 1971, that this claim was resolved, at which time the Council passed a motion "to certify that Newton Pierce was owner of property on the Cattaraugus Reservation shown [on] Claim Map 868 of October 3, 1956, and Map 911 dated October 16, 1956." Exhibit C. attachments at 34, 35.

In its November 23, 1998, response to the defendants' request for admissions (exhibit A, ¶¶ 5, 6) and its answers to the defendants' interrogatories (exhibit B, ¶ 5), the plaintiff admitted that the above resolutions pertaining to the Hattie Halftown and Newton Pierce claims were enacted by their Council pursuant to the Council's responsibilities under the September 18, 1954, resolution.

**Summary of Argument**

The defendants submit that summary judgment dismissing the claim here at issue must be granted to the defendants for the following reasons:

1. The claim must be dismissed in its entirety as to defendant State of New York, for the reason that the State is immune from suit pursuant to the Eleventh Amendment of the U.S. Constitution.

2. As the holder of the right-of-way obtained from the plaintiff, the State of New York is an indispensable party to the plaintiff's claim, and so with the dismissal of the claim against the

6

State the claim must be dismissed as to the other defendants pursuant to Rule 19 of the Federal Rules of Civil Procedure.

3. The Secretary of the Interior approved the right-of-way agreement pursuant to 25 U.S.C. § 311, and so the right-of-way taken by the State is valid.

4. Federal legislation enacted with respect to the Seneca Nation in 1875 and 1950 gave to the SNI the authority to grant the easement at issue without further federal approval.

5. The Seneca Leasing Act of 1950 was amended in 1961 to allow the SNI to grant rights-of-way without federal approval, and the actions of the plaintiff after 1961, including the resolutions of the Council which certified allottees for payment pursuant to the 1954 agreement, constituted ratifications of that agreement and the creation of a new agreement, at a time when it is undisputed that federal approval was not needed.

### Argument

### POINT I

**THIS COURT LACKS JURISDICTION ON THIS CLAIM AGAINST THE STATE OF NEW YORK, PURSUANT TO THE ELEVENTH AMENDMENT TO THE U.S. CONSTITUTION.**

The Seneca Nation's second amended complaint now before the Court (item 112) includes as defendants the State of New York (*id.* ¶6), the New York State Thruway Authority (*id.* ¶13), and John R. Platt, the Executive Director of the New York State Thruway Authority. *Id.* ¶12. Numerous other defendants are named, but only with respect to the complaint's first and third causes of action, relating to the Niagara River Islands. As for the second cause of action, contesting the right-of-way over the Cattaraugus Reservation, only defendants State, Thruway

7

Authority, and Platt are named; paragraph 36 of the second amended complaint alleges "[t]he defendants State of New York. New York Thruway Authority and John R. Platt, Executive Director of the New York Thruway Authority are trespassers upon the land in violation of the law." This allegation is made against no other defendants.

The claim against the State of New York must be dismissed, as barred by the Eleventh Amendment. The Eleventh Amendment states:

> The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State.

It has been held that, notwithstanding the literal language of the Amendment. a state is not subject to suit in federal court even by its own citizens. Hans v. Louisiana, 134 U.S. 1, 10 S.Ct. 501 (1890). This holding was based not only on an interpretation of the Eleventh Amendment but also on a recognition that states enjoin sovereign immunity apart from that conferred by the Eleventh Amendment. Most relevant to the matter at bar, it is firmly established that the federal courts lack jurisdiction over an action brought by an Indian tribe against a state. Idaho v. Coeur d'Alene Tribe of Idaho, ___U.S.___, 117 S.Ct. 2028, 2034 (1997); Seminole Tribe of Florida v. Florida, ___U.S.___, 116 S.Ct. 114 (1996); Blatchford v. Native Village of Noatak, 501 U.S. 775 (1991).

No further argument is needed on this point.[1] It is clear that this Court lacks jurisdiction over the plaintiff's claim against it, and so the State of New York's motion for judgment dismissing it from the action must be granted.

## POINT II

**BECAUSE THE EASEMENT AT ISSUE WAS HELD BY THE STATE OF NEW YORK, IT IS A NECESSARY AND INDISPENSABLE PARTY AND ITS DISMISSAL FROM THE ACTION REQUIRES THAT THE ACTION BE DISMISSED AGAINST DEFENDANTS THRUWAY AUTHORITY AND PLATT AS WELL.**

Pursuant to Rule 19 of the Federal Rules of Civil Procedure. whether an action may continue in the absence of a party is determined by a two-part procedure. The rule states:

> (a) Persons to be Joined if Feasible. A person who is subject to service of process and whose joinder will not deprive the court of jurisdiction over the subject matter of the action shall be joined as a party in the action if (1) in the person's absence complete relief cannot be accorded among those already parties, or (2) the person claims an interest relating to the subject of the action and is so situated that the disposition of the action in the person's absence may (i) as a practical matter impair or impede the person's ability to protect that interest or (ii) leave any of the persons already parties subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations by reason of the claimed interest. If the person has not been so joined, the court shall order that the person be made a party. If the person should join as a plaintiff but refuses to do so, the person may be made a defendant, or, in a proper case, an involuntary plaintiff. If the joined party objects to venue and joinder of that party would render the venue of the action improper, that party shall be dismissed from the action.

---

[1] Should the Court seek further detail on the Eleventh Amendment's applicability to Indian land claims, the issue has been more fully briefed in the defendants' memoranda previously filed with respect to the islands claim in this action.

(b) Determination by Court Whenever Joinder not Feasible. If a person as described in subdivision (a)(1)-(2) hereof cannot be made a party, the court shall determine whether in equity and good conscience the action should proceed among the parties before it, or should be dismissed, the absent person being thus regarded as indispensable. The factors to be considered by the court include: first, to what extent a judgment rendered in the person's absence might be prejudicial to the person or those already parties; second, the extent to which, by protective provisions in the judgment, by the shaping of relief, or other measures, the prejudice can be lessened or avoided; third whether a judgment rendered in the person's absence will be adequate; fourth, whether the plaintiff will have an adequate remedy if the action is dismissed for nonjoinder.

The procedure to be followed in applying the above language has been summarized:

First, the court must determine whether the absent party is "necessary" to the litigation according to factors enumerated in Rule 19(a); if so, the court must order that the absent party be joined. If a necessary party cannot be joined, the Court must turn to the second step, examining the factors in Rule 19(b) to "determine whether in equity and good conscience, the action should proceed among the parties before it, or should be dismissed, the absent person being regarded as indispensable." Fed.R.Civ.P. 19(b).

Cherokee Nation of Oklahoma v. Babbitt, 117 F.3d 1489, 1496 (D.C. Cir. 1997).

In the instant case. the State of New York is clearly a party "necessary" to the action, under the standards of Rule 19(a). As the plaintiff itself alleges, the State of New York is "the record holder of a purported right-of-way over the land referred to in ¶4(b)" of the second amended complaint, i.e., the Thruway easement (second amended complaint [item 112], ¶6), and the right-of-way documents and the policies established by New York law make clear that it is the State which holds the easement, for the use of the Thruway Authority.

The actual agreement provides that it is "the People of the State of New York, acting by and through the New York State Thruway Authority" which holds the easement. Where, as here

(*see* Point III, *infra*), the Secretary of the Interior has approved the use of Indian lands for highway purposes, the scope of that use is determined by state law. <u>United States v. Oklahoma Gas & Electric Co.</u>, 318 U.S. 206, 209 (1943). The arrangement followed in this case was consistent with New York law, which provides that interests in real property used by the Thruway Authority is to be held by the State.

Section 354 of the New York Public Authority Law ("NYPAL") defines the Authority's powers. Subsection 3 provides that the Authority shall have the power "[t]o acquire, hold and dispose of personal property for its corporate purposes". With respect to real property, however, no such all encompassing right is granted to the Authority. Instead, section 354(4) grants to the Authority the power "[t]o acquire and hold **in the name of the state** by purchase or appropriation real property or rights **or easements** therein" (emphasis added). The statute does not grant to the Authority itself the power to hold easements in its own name.

NYPAL § 356 defines various sections of the Thruway including, at paragraph 6, the Erie section, which includes the area here in dispute. On assuming jurisdiction of such sections, "the authority shall have the right to **possess and use** . . . any real property and rights in real property theretofore **acquired by the state**" (section 357; emphasis added), and if additional real property is needed, "the commissioner[2] when requested by the authority shall acquire such real property in the name of the state". NYPAL § 358(1).

New York Highway Law ("NYHL") § 347(2) also provides for the acquisition "for the people of the state of New York" property "for any and all purposes connected with the

---

[2] Pursuant to NYPAL § 351(5), this term refers to the State's Commissioner of Transportation.

11

construction, reconstruction and maintenance of the thruway system of the state of New York".[3] The statute also contemplates "the vesting of title to such property in the people of the state of New York". NYHL § 347(7).

The defendants' position as to who actually holds the easement is not one that has been invented for the purpose of this action; it is repeated throughout the documentation and correspondence relating to the project, whether created prior to the parties' agreement or after, and it is clear that the plaintiff always understood that it was the State of New York which would hold the right-of-way, for the use of the Thruway Authority. The earliest known relevant documentation is the January 15, 1946, letter from the DPW's district engineer to President Seneca, which states: "The proposed Thruway is a State matter, and the road will be built and the land will be obtained by the State." Exhibit C, attachments at 1. Correspondence dated October 7, 1954, immediately after the October 5, 1954 closing, notes that the SNI "has conveyed to The People of the State of New York acting by and through the New York State Thruway Authority as grantee a permanent easement for Thruway purposes". *Id.* at 20; exhibit E at 574.

The standard "Agreement of Adjustment" form used for settling claims of individual landowners identifies the project, in this case the Erie Section of the Thruway, and in pre-printed language states that "the Superintendent of Public Works of the State of New York hereinafter referred to as 'the State' is appropriating or has appropriated, for the purpose of the above identified project, certain property . . .." Exhibit E at 177, 259, 432. Another version of the form

---

[3] While this statute also provides that such property shall be acquired by eminent domain, presumably the plaintiff does not contest the State's taking of an easement over the plaintiff's lands, instead of acquiring a fee.

omits reference to the Superintendent and simply states that "the State is appropriating or has appropriated" the property. *Id.* at 571. The defendants' map detailing the property acquisitions for the project (exhibit E at 521 *et seq.*) includes a "Table of Right Of Way By State Of New York." *Id.* at 521.

The State's primary role in the holding of the interest was also apparent in earlier litigation. Exhibit G of the defendants' exhibits consists of records of <u>Catalino v. State of New York</u>, an action commenced in the New York Court of Claims in 1955 under claim no. 33343. The original claimant, Sam Catalino, who apparently was not a member of the Seneca Nation, claimed to hold a lease for the removal of gravel and other products from land taken for the right-of-way, and filed his "claim for the appropriation of land by the State of New York for the New York State Thruway". *Id.* at 1, ¶ 2. Although the Thruway Authority is subject to suit in the Court of Claims (*see* NYPAL § 361-b), only the State was named as a defendant, and the State acknowledged that it was the proper defendant.

In an affidavit in support of its motion for an order impleading various individual Seneca allottees, then-Assistant State Attorney General Lawrence H. Wagner noted that "[t]hese lands are a part of the property taken by the State for the State Thruway", and that "[t]he Seneca Nation conveyed to the State a permanent easement for Thruway purposes". Exhibit G at 23, second and third paragraphs. The Court of Claims agreed; in 1960, in its findings of fact the court held "[t]hat the State of New York in the month of April, 1955, appropriated permanent and temporary easements in the property . . . for purposes connected with the Thruway System of the State of New York" and "[t]hat the total amount of claimant's property so appropriated by the State of New York for the aforesaid purposes was approximately thirty-four and three hundred

eighty-six thousandths (34.386) acres." *Id.* at 28, ¶¶ 4, 6. The court also found that previously "the claimant and the State of New York entered into an agreement of adjustment, agreeing to the sum of Eighteen Thousand Dollars ($18,000.00), to be paid by the State of New York to the claimant", and in its conclusions of law the court directed the "Comptroller of the State of New York" to make payment for the agreed award. *Id.* at 29, ¶ 9; at 31, ¶ 8.

Clearly, under New York law -- which controls the relationship between the State and the Authority -- the right-of-way was taken by, and presently is held by, the State itself. It is this interest which, ultimately, the plaintiff now challenges, so it is inconceivable that the action could proceed in the State's absence. Even if the action were to continue and the plaintiff were to obtain relief against the Authority, the Court's order could not invalidate the interest held by the State, so clearly in the State's absence "complete relief cannot be accorded among those already parties". Rule 19(a)(1).

Further, for the same reasons, the State "claims an interest in the subject of the action", such that its absence may "impede [its] ability to protect that interest". Rule 19(a)(2). New York's interest in the continued validity of the easement is at least as great as that of the plaintiff in <u>Niagara Mohawk Power Corp. v. Tonawanda Band of Seneca Indians</u>, 862 F.Supp. 995 (W.D.N.Y. 1994), *affirmed* 94 F.3d 747 (2d Cir. 1996), where a public utility sought a declaration of its rights and obligations to provide service to banished members of tribe and the banished members counter-claimed. With the dismissal of all claims against the tribe, the Court found that the tribe's interest in the agreement between it and the utility, which was at the heart of the case, mandated a finding that the action could not continue without the tribe, pursuant to Rule 19(a).

The State's interest in the easement agreement here at issue is explicitly defined by statute. After decreeing that it is the purpose of the Authority to create and "operate a thruway system", NYPAL § 353 states:

> It is hereby found and declared that such purposes are in all respects for the benefit of the people of the state of New York for the increase of their pleasure, convenience, and welfare, for the improvement of their health, to facilitate transportation for their recreation and commerce and for the common defense; and the authority shall be regarded as performing a governmental function in carrying out its corporate purpose and in exercising the powers granted by this title.

In sum, the State indisputably has an interest in the continued flow of traffic over the contested easement.

It is therefore beyond argument that the State has a substantial interest in the case, an interest with which the plaintiff seeks to interfere. The Court must therefore consider "whether in equity and good conscience the action should proceed among the parties before it, or should be dismissed, the absent party being regarded as indispensable". Rule 19(b).

While the rule then sets out four factors to be considered on this point, not all of the factors listed are entitled to equal weight in deciding whether dismissal is required. The Supreme Court has explained that "[t]he decision whether to dismiss (i.e., the decision whether the person missing is 'indispensable') must be based on factors varying with different cases, some such factors being substantive, some procedural, some compelling by themselves and some subject to balancing against opposing interests." Provident Tradesman Bank v. Patterson, 390 U.S. 102, 118 - 19 (1968). And one factor, immunity, must be given "paramount importance". Fluent v. Salamanca Indian Lease Authority, 928 F.2d 542, 548 (2d Cir. 1991).

15

The absence of a necessary party because of immunity from suit virtually mandates dismissal. As stated by the Court of Appeals in the Fluent case:

> It has been held that when an indispensable party is immune from suit, there is very little room for balancing of other factors set out in rule 19(b), because immunity may be viewed as one of those interests compelling by themselves.

*Id.* at 548 (internal quotes, editing, and citations omitted). Other Courts of Appeals have reached similar conclusions. *See, e.g.,* Enterprise Management Consultants, Inc. v. United States ex rel. Hodel, 883 F.2d 890, 894 (10th Cir. 1989); Whitata & Affiliated Tribes of Oklahoma v. Hodel, 788 F.2d 765, 777 n.3 (D.C. Cir. 1986).

If the four factors were, despite the overriding effect of the State's immunity, to be considered, the balancing would be overwhelming in favor of the defendants. As for the first factor, "to what extent a judgment rendered in the [State's] absence might be prejudicial to the [State] or those who are already parties", a judgment for the plaintiff would certainly prejudice the State's interest, as declared in NYPAL § 353, discussed above.[4] Additionally, "prejudice is almost presumed given that a contracting party is often the prime example of illustrating a prejudiced party." United States ex rel. Hill v. Coulter, 1998 WL 460239*2 (N.D.N.Y. 1998) (action challenging a contract between the Onondaga Nation, which was not a party to the suit, and its attorney).

---

[4] "The inquiry as to prejudice under Rule 19(b) is the same as the inquiry under Rule 19(a)(2)(i) regarding whether continuing the action will impair the absent party's ability to protect its interest." Kickapoo Tribe of Indians in Kansas v. Babbitt, 43 F.3d 1491, 1497 n.9 (D.C. Cir. 1995).

The Court in <u>United States ex rel. Hill</u> further held "that the Onondaga Nation would be substantially prejudiced if it is not a party to this lawsuit." As noted in <u>Fluent</u>, "no procedural principle is more deeply imbedded in the common law than that, in an action to set aside a lease or a contract, all parties who may be affected by the determination of the action are indispensable." <u>Fluent v. Salamanca Indian Lease Authority</u>, 928 F.2d at 547 (internal quotes and citations omitted); *see also* <u>United States ex rel. Hall v. Tribal Development Corp.</u>, 100 F.3d 476, 479 (7th Cir. 1996), which lists cases subscribing to this position.

The second factor listed under Rule 19(b), *i.e.*, whether it is possible to take steps by which "the prejudice can be lessened or avoided", also requires dismissal. With the substitution of the State of New York for the reference to the Onondaga Nation, the holding in <u>United States ex rel. Hill v. Coulter</u> on this issue would apply directly to the instant case:

> In the present case, the Court finds that there is no possible way to lessen or eliminate the prejudice which the Onondaga Nation would be forced to endure if a judgment against its interest was appropriate. The relief requested is simply an all or nothing proposition; either the contract is valid, or it is not. As such, the Court finds that this factor weighs heavily in favor of the Defendant.

*Id.* at *2.

The situation in the present case, should the case proceed, would be identical; either the right-of-way agreement is valid, or it is not. In the prayer for relief in the second amended complaint, the plaintiff seeks, at paragraph 2(D), "a declaration that the interests of the defendant New York State Thruway Authority and State of New York in the easement lands is null and void", at paragraph 4(B) an order "ejecting the defendants from the land", and at paragraph 4(B), damages "for the entire period of occupancy of the [easement] land." There are no means by

17

which the prejudice which would befall the State's interests "can be lessened or avoided" if the action is allowed to proceed in its absence. *See also* Quileute Indian Tribe v. Babbitt, 18 F.3d 1456, 1460 (9th Cir. 1994) ("If the [plaintiffs] were successful . . . , the [absent party] would lose property interests and governing authority over those interests. No partial remedy can be fashioned that would not implicate those interests or would eliminate the prejudice to the [absent party].").

Consideration of the third factor, "whether a judgment rendered in the [State's] absence will be adequate", likewise requires a finding favoring dismissal. A judgment in favor of the Seneca Nation against only the Thruway Authority and its director would be a hollow victory indeed, for it would not invalidate the State's easement or return the use and control of the land to the Nation. It would be less than inadequate; it would be meaningless.

The fourth factor, "whether the plaintiff will have an adequate remedy if the action is dismissed for non-joinder", has little application where non-joinder results from immunity from suit, as a plaintiff's interests in proceeding with a claim may be outweighed by the defendants' interest in maintaining its immunity. *See, e.g.,* United States ex rel. Hall v. Tribal Development Corp., 100 F.3d 476, 480-81 (7th Cir. 1996); Makah Indian Tribe v. Verity, 910 F.2d 555, 558 (9th Cir. 1990); Pit River Home and Agricultural Cooperative Assoc. v. United States, 30 F.3d 1088, 1101-02 (9th Cir. 1994). As held by the Second Circuit Court of Appeals:

> The lack of a forum does not automatically prevent dismissal of the claims asserted. Makah Indian Tribe v. Verity, 910 F.2d 555, 560 (9th Cir. 1990). "Sovereign immunity may leave a party with no forum for [that party's] claim." *Id.* (citing Lomayaktewa v. Hathaway, 520 F.2d 1324, 1326 (9th Cir. 1975), *cert. denied,* 425 U.S. 903, 96 S.Ct. 1492, 47 L.Ed.2d 752 (1976)).

Fluent v. Salamanca Indian Lease Authority, 928 F.2d at 547 (brackets in original); *see also*

Kescoli v. Babbitt, 101 F.3d 1304, 1311 (9th Cir. 1996), noting that courts have "recognized that

a plaintiff's interest in litigating a claim may be outweighed by a tribe's interest in maintaining

its sovereign immunity. If the necessary party is immune from suit, there may be very little need

for balancing Rule 19(b) factors because immunity itself may be viewed as the compelling

factor." Internal citation and quotes omitted.

While many of the decisions which have considered immunity from suit and Rule 19

involve tribal immunity, including many of the decisions discussed above, states' Eleventh

Amendment immunity is treated in the same way. The sovereign immunity of tribes (Oklahoma

Tax Commission v. Citizen Band Potawatomi Indian Tribe, 498 U.S. 505, 509 [1991]; Santa

Clara Pueblo v. Martinez, 436 U.S. 49, 58 [1978]) is no greater than the immunity states enjoy

from suit. Tribal immunity results from the tribes' status inherent sovereignty, but "tribal

sovereignty is subject to Congress' plenary control, and thus 'Congress [is] always . . . at liberty

to dispense with . . . tribal immunity or limit it.'" Fluent v. Salamanca Indian Lease Authority,

928 F.2d at 545, *quoting from* Oklahoma Tax Commission v. Citizen Band Potawatomi Indian

Tribe, 498 U.S. at 510 (internal editing in original Fluent decision). As pointed out in Point I,

*supra*, states' immunity from suits is derived from their sovereign status, but is also protected by

the Constitution and cannot be abrogated by Congress except in very limited instances, which do

not apply here.

Therefore, states have been treated in the same way as the above cases treated tribes for

Rule 19 purposes. For example, in Kickapoo Tribe of Indians in Kansas v. Babbitt, 43 F.3d 1491

(D.C. Cir. 1995), the Court of Appeals held that the State of Kansas was an indispensable party

to action seeking a declaration that a gambling compact between Kansas and the plaintiff tribe was properly approved under the Indian Gaming Regulatory Act. Since the State could not be joined in the action because of its Eleventh Amendment immunity, "and there is very little room for balancing other factors set out in Rule 19(b) where a necessary party under Rule 19(a) is immune from suit (*id.* at 1496; internal quotes and citations omitted), the Court of Appeals remanded the case to the District Court with instructions to dismiss. *See also* <u>Stanton v. Ash</u>, 384 F.Supp. 625, 631 (S.D. Ind. 1974), holding that dismissal was required because of state's immunity from suit.

Similarly, the suit of Indians seeking a declaration as to their rights to former trust land for which the United States had conveyed fee simple patents was dismissed where, because of its immunity, the United States could not be joined in the suit. The Court held that dismissal was required because the merits of the case "would depend entirely on whether the United States acted legally or illegally". <u>Nichols v. Rysavy</u>, 809 F.2d 1317, 1333 (5th Cir. 1987).

Such is the case at bar; determining the merits of this case requires a determination as to whether the State acted legally in obtaining its interest in the Cattaraugus Reservation. By any standard, the State of New York is an indispensable party to this claim, and so the action cannot proceed in its absence.

### POINT III

**THE RIGHT-OF-WAY AGREEMENT WAS APPROVED BY
THE SECRETARY OF THE INTERIOR PURSUANT TO 25
U.S.C. § 311, AND SO IS VALID.**

In the second amended complaint the plaintiff contends that "[t]he permanent easement obtained by the defendants was not approved by the Secretary of the Interior as required under 25

U.S.C. § 323". Although the text of that statute is reproduced at paragraph 34 of the complaint, the complaint makes no mention of the more specific provisions of 25 U.S.C. § 311, which authorizes the Secretary of the Interior "to grant permission, upon compliance with such requirements as he may deem necessary, to the proper State or local authorities for the opening and establishment of public highways, in accordance with the laws of the State or territory, in which the lands are situated, through any Indian reservation". Neither does the second amended complaint mention that such permission was granted by the Secretary in 1946.

The applicable statute[5] states:

> The Secretary of the Interior is authorized to grant permission, upon compliance with such requirements as he may deem necessary, to the proper State or local authorities for the opening and establishment of public highways, in accordance with the laws of the State or Territory in which the lands are situated, through any Indian reservation or through any lands which have been allotted in severalty to any individual Indian under any laws or treaties but which have not been conveyed to the allottee with full power of alienation.

25 U.S.C. § 311.

On May 7, 1946, J. Frank O'Marah, Director of the Bureau of Rights-of-Way and Claims of the New York State Department of Public Works, wrote to the Department of the Interior and outlined the State's plans for the construction of the Thruway over the Cattaraugus Reservation. Exhibit C at 2-3. After describing the project, his letter states: "Based on the Department's experience in the past in such matters, I would ask the consent and approval of the Department of

---

[5] As pointed out under Point IV, *infra*, pursuant to legislation specific to the Seneca Nation, no separate federal approval was required. If any other statute did apply, it was § 311.

the Interior as to this procedure." *Id.* at 3. With the letter was enclosed a detailed map showing the planned route of the Thruway over the Reservation. *Id.* at 4-5.

By letter of June 10, 1946 (*id.* at 9), Oscar L. Chapman, the Acting Secretary of the Interior, responded to O'Marah. As authorized by § 311, the Acting Secretary prescribed certain requirements, and subject to those requirements granted permission for the project. The letter states: "It is agreeable to this Department for the New York State Department of Public Works to begin construction work on the Erie Thruway after consent of the individual Indians and tribal council has been obtained and payment of the damages has been made."

This consent is all that was needed. The plaintiff acknowledges that the Tribal Council approved the project and that it was paid in accordance with the agreement. Exhibit A, response to interrogatory no. 8. The plaintiff further does not dispute that its members whose interests were affected have been compensated. *Id.*

The Secretary of the Interior having granted permission for the project, the defendants are entitled to summary judgment dismissing the complaint.

## POINT IV

### THE ACTS OF 1875 AND 1950 AUTHORIZED THE SENECA NATION TO GRANT THE RIGHT-OF-WAY HERE AT ISSUE WITHOUT OBTAINING SEPARATE FEDERAL APPROVAL.

With respect to the granting of leases and rights-of-way by the Seneca Nation, the general provisions of the Nonintercourse Act (25 U.S.C. § 177) have been supplanted. The Nonintercourse Act enacted a general ban on any cession of any interest in land by any Indian tribe, unless approved by Congress. For certain interests, however, such as rights-of-way,

Congress has created exceptions to the broad language of the Nonintercourse Act, allowing the Secretary of the Interior to grant permission. *See* 25 U.S.C. Chapter 8. Even more specifically, Congress has removed leasing and the granting of rights-of-way by the Seneca Nation from the coverage of the Nonintercourse Act.

In 1875, Congress authorized the Seneca Nation, through its Council, to lease certain of its lands (18 Stat. 330; exhibit J). Included in this act is the provision:

> Sec. 8. That all laws of the State of New York now in force concerning the laying out, altering, discontinuing, and repairing highways and bridges shall be in force within said villages [on the Allegany Reservation], and may, with the consent of said Seneca Nation in council, extend to, and be in force beyond, said villages in said reservations [Allegany and Cattaraugus] or in either of them; . . .

By the Seneca Leasing Act of 1950 (64 Stat. 442; exhibit K), Congress authorized the Nation to, in addition to its prior rights, "lease lands . . . for such purposes and such periods as may be permitted by the laws of the State of New York." *Id.* § 5. In enacting these statutes, Congress was "taking Seneca leasing out of 25 U.S.C. § 177". <u>United States v. Devonian Gas and Oil Co.</u>, 424 F.2d 464, 467 n.3 (2d Cir. 1970).

Read together, the 1875 legislation and the 1950 legislation authorized the Seneca Nation, even before the 1961 amendment to the legislation (*see* Point V, *infra*), to grant the easement at issue in this case. In <u>United States v. Cattaraugus County</u>, 71 F.Supp. 413 (W.D.N.Y. 1947), this Court dismissed the action brought on behalf of the Seneca Nation to challenge the taking of lands by the County, which was "acting merely as an agent of the State of New York to acquire the land for a 'State Highway'". *Id.* at 420. The Council had approved the taking (*id.* at 418), and while the Court had doubts about the validity of the Secretary of the

Interior's purported approval of the project (*id.* at 419), it was persuaded that § 8 of the 1875 act gave the State to acquire property on the reservation, so long as it acted according to its laws.

In the instant matter, although the Thruway crosses the reservation outside of any villages, the Council was entitled to extend permission for highways for these lands as well as for village lands. The plaintiff makes no claim that the State's laws were not followed; indeed, the records demonstrates that the State proceeded in as close conformity with its usual practices as the unique situation would allow. The present situation is no different than that in <u>United States v. Cattaraugus County</u>.

The 1950 statute did not diminish the authority of the 1875 law, and if anything it added to it. If Congress's grant of authority regarding highways was not enough, it is apparent from these statutes, and the plaintiff's own interpretation of them, that the terms "leases" and "rights-of-way" are used interchangeably. Since under New York an easement may pass by way of lease (*see, e.g.,* <u>Telesca v. Bruenn Co.</u>, 71 Misc.2d 208, 212 [New Rochelle City Co. 1972]; <u>Lemkin v. Gulde</u>, 25 Misc.2d 144 [1960]), the Nation's ability to lease would, in any event, include the ability to grant rights-of-way.

The 1875 legislation, in section 1, ratifies prior leases of reservation land "to railroad corporations" and provides that the "Seneca Nation may, in accordance with their laws and form of government, lease lands within said reservations for railroad-purposes." The Act of 1950, at section 5, in addition to the authority conferred by the 1875 law to lease lands to railroads throughout the reservations, and to lease lands within the limits of the villages to others, allows the Nation "to lease lands within the Cattaraugus, Allegany, and Oil Springs Reservations,

outside the limits of such villages, for such purposes and such periods as may be permitted by the laws of the State of New York."

It requires no stretch of logic to conclude that the lease of land "for railroad-purposes" (1875 statute, § 1) is the equivalent of the granting of a right-of-way; without such an interpretation, there could have been no rail lines, and so no "railroad-purpose" of any kind could have existed. Certainly, the plaintiff viewed this legislation in that manner. In the plaintiff's Resolution passed in March of 1960 (quoted in United States v. Devonian Gas and Oil Co., 424 F.2d at 469), the Seneca Nation recited its position that under the law in place at the time the Nation "has had the right . . . to regulate leases and rights of ways to Tribal Lands".

Also, in its decision on the Nation's petition for rehearing, the Court of Appeals noted the Seneca Nation's position that the 1950 statute left it "free to make leases *either* in accordance with general federal legislation *or* 'for such purposes and such periods as may be permitted by the laws of the State of New York.'" United States v. Devonian Gas and Oil Co., 424 F.2d at 471 (emphasis in original). Further noting that this position "may well have merit", the Court determined to "withdraw any statements in the opinion inconsistent with it." *Id.* The effect of this statement was to withdraw the statement at footnote 7, which suggested that New York could not grant the additional authority to "grant rights of way in addition to leases."

The fact that New York sought and received permission from the Secretary of the Interior pursuant to 25 U.S.C. § 311 is not inconsistent with this argument, since it is understandable that the State would have wanted to resolve any ambiguity on the issue. This would have particularly been so in 1946, prior to the 1950 expanded grant of authority to the plaintiff. Also, that clarifying language was added to section 5 in 1961 (*see* Point V, *infra*) does not establish that, in

1954, the right did not already exist.  In fact, a holding that any rights created by the 1961 amendment (exhibit K) could not have existed previously would lead to a result that could never have been intended.  Because section 5 refers only to rights "outside of such villages", such a ruling would have to be read to mean that rights-of-ways and easements could previously not have been conveyed within the limits of the villages established pursuant to the 1875 statute, an interpretation that makes no sense.

The Seneca Nation obviously believed in 1960 that it had that authority, and it should not be allowed to retreat from that position now.

## POINT V

**BY THE 1968 AND 1971 RESOLUTIONS OF THE TRIBAL COUNCIL CERTIFYING PAYMENT TO MEMBERS OF THE NATION, THE PLAINTIFF RATIFIED THE 1954 AGREEMENT AT A TIME WHEN FEDERAL APPROVAL WAS NOT NECESSARY.**

The plaintiff alleges that the 1954 agreement between the parties required federal approval, and that this approval was not given.  As previously pointed out by the defendants, in fact such approval, although not required, was obtained.  However, even if that had not been the case, the plaintiff's subsequent acts ratified the agreement, after the date on which approval by the Department of the Interior was not needed.

Even were it held that the 1875 and 1850 legislation did not give the Seneca Nation of Indians the prior authority to grant the right-of-way here at issue without obtaining separate approval from the federal government, there can be no question that the plaintiff held such authority after the 1961 amendment to the Seneca Leasing Act.  Exhibit K.  This amendment clarified the Act's language by adding to the Nation's authority to enter into leases the term "or

> Ratification of a contract may be found under a variety of
> circumstances: (1) intentionally accepting benefits under the
> contract, (2) remaining silent or acquiescing in the contract for a
> period of time after having the opportunity to avoid it, or (3)
> recognizing the validity of the contract by acting upon it,
> performing under it, or affirmatively acknowledging it. In Re
> Boston Shipyard Corp., 886 F.2d 451, 455 (1st Cir. 1989).

Dorn v. Astra USA, 975 F.Supp. 388, 393 (D.Mass. 1997). *See also* Banque Arabe v. Maryland National Bank, 850 F.Supp. 1199, 1213 (S.D.N.Y. 1994), *affirmed* 57 F.3d 146 (2d Cir. 1995), holding that "[w]here a party engages in acts inconsistent with disaffirmance, such as acceptance of benefits under the contract or the exercise of dominion over the subject matter of the transaction, he will lose the right to rescind" (citation omitted).

Ratification is well recognized in New York law. "The doctrine of ratification presupposes the existence of a contract which by all appearances is valid and binding, but which a party may avoid or disaffirm because of legal incapacity, lack of authority, or the party's unwillingness or absence of intent to enter into it on the terms stated." Leasing Service Corp. v. Vita Italian Restaurant, Inc., 171 A.D.2d 926, 927 (3d Dept. 1991); see also, Palumbo v. Norstar Bank Upstate New York, 212 A.D.2d 377 (1st Dept. 1995); Skytrack Condominium Board of Managers v. Windberk Partners, 167 A.D.2d 381 (2d Dept. 1990) (even if board that made initial determination was improperly constituted, its decision was ratified by subsequent acts).

Examples of the Seneca Nation's recognition of the validity of the 1954 agreement -- and its post-1961 ratification of the agreement -- are many. For one thing, the plaintiff accepted, and has retained, the substantial compensation it received for entering into the 1954 agreement. In the 34 years between 1961, when any legal disability the plaintiff could possibly claim was removed, and 1995, when this action was commenced, the plaintiff neither returned the funds

28

paid to it nor took any action to repudiate the agreement, and this fact alone constitutes a ratification of the agreement. Abbadessa v. Moore Business Forms, Inc., 987 F.2d 18, 24 (1st Cir. 1993); Blakeney v. Lomas Information Systems, Inc., 65 F.3d 482, 485 (5th Cir. 1995) ("Retaining the consideration after learning the release is voidable constitutes a ratification of the release").

Not only did the plaintiff not return the benefits it obtained under the agreement, but it "exercise[d] dominion over the subject matter of the transaction" when, pursuant to the 1954 agreement, it acted to ensure that additional payments were made under that agreement to the plaintiff's members.

The September 18, 1954, resolution of the Tribal Council of the Seneca Nation (exhibit C at 10-11) approved the agreement with the defendants and included the provision "[t]hat the Council of the Nation will approve the right of each individual Seneca Indian landowner as the proper person or persons having the right of occupation and legally entitled to receive compensation by reason of such acquisitions for Thruway purposes". *Id.* at 11. The subsequent indenture between the plaintiff and the State of New York, executed on October 5, 1954 (*id.* at 12-17) contains similar language. After providing that the State "is to compensate the individual Seneca Indian landowners affected, for their interests in said lands and damages thereto", the indenture provides:

> (d) The [Seneca Nation] agrees that the Council of the Seneca
> Nation of Indians will expeditiously approve the right of such
> individual Seneca Indian landowners as the proper person or
> persons having the right of occupation of the affected property and
> legally entitled to receive compensation by reason of the
> acquisition of a permanent easement there over for Thruway
> purposes; without cost to the second party.

177 N.Y. 252, 261 (1904). Only an agreement to commit an illegal act is beyond later ratification. *See* <u>Smith v. City of Newburgh</u>, 77 N.Y. 130, 136.

By accepting and keeping the benefits of its prior agreement, and then passing its resolutions in 1968 and 1971, expressly for the purpose of inducing the State to make payment to its members, the plaintiff both ratified the prior agreement and entered into a new agreement, at a time when it was fully authorized to do so, with the State. By any test, it cannot now go back on its pledge and have the agreement invalidated.

## Conclusion

Summary judgment should be granted to the defendants dismissing all claims of the second amended complaint relating to the crossing of the Cattaraugus Reservation by the New York State Thruway as to all defendants.

DATED:     Buffalo, New York
            February 9, 1999

Respectfully submitted,

ELIOT SPITZER
Attorney General of the
 State of New York
Attorney for Defendants
BY:

PETER B. SULLIVAN
Assistant Attorney General
 of Counsel
107 Delaware Avenue
Statler Towers - 4th Floor
Buffalo, NY 14202
(716) 853-8473